**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| LASERDYNAMICS, INC. | § | |
| | § | |
| V. | § | CIVIL NO. 2:06-CV-348(TJW-CE) |
| | § | |
| ASUS COMPUTER INTERNATIONAL, | § | |
| ET AL. | § | |

**MEMORANDUM OPINION AND ORDER**

**1. Introduction**

In the present case, LaserDynamics, Inc. ("LaserDynamics") accuses the defendants of infringing claim 3 of U.S. Patent Number 5,587,981 ("the '981 patent"). The background of the technology and the invention is fully set forth in Judge Ward's memorandum opinion and order on claim construction dated June 29, 2005, in *Kamatani v. Benq Corp.*, Civil Action Number 2:03-CV-437 (E.D. Tex.) (#105). In general, the '981 patent describes a method by which an optical disk drive discriminates between different types of disks, such as CDs and DVDs, or single density and multiple-density disks. The defendants have asked the court to modify certain claim constructions that issued in the prior litigation. The court has fully considered the defendants' arguments and issues this order to resolve the parties' claim construction disputes.

**2. General Principles Governing Claim Construction**

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)(en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (emphasis added)(quoting *Innova/Pure Water, Inc. v. Safari Water*

*Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.* as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the particular art. *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The en banc court condemned the suggestion made by *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id*. at 1319-24. The approach suggested by *Tex. Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id*. What is described in the claims flows from the statutory requirement

imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

### 3. Discussion

The court has fully considered the intrinsic record and the relevant extrinsic sources cited by the parties. Judge Ward's construction for the pertinent terms of claim 3 are correct and are adopted for use in this case. The following discussion clarifies, to the extent necessary, the construction of certain terms that Judge Ward did not construe.

Claim 3 provides:

An optical disk reading method comprising the steps of:

   processing an optical signal reflected from encoded pits on an optical disk until total number of data layers and pit configuration standard of the optical disk is identified;

   collating the processed optical signal with an optical disk standard data which is stored in a memory; and

   settling modulation of servomechanism means dependent upon the optical disk standard data which corresponds with the processed optical signal;

5

      (c) [as in original] the servomechanism means including:

        a focusing lens servo to modulate positioning of a focusing lens; and

        a tracking servo to modulate movement of a pickup.

'981 patent, claim 3.

  The parties group their various disputes by claim limitation. *See* Joint Claim Construction and Pre-Hearing Statement (#138), at 4-6. The court's opinion will likewise address the parties' disputes in the context of the claim limitations as a whole.

  **A.** **"processing an optical signal reflected from encoded pits on an optical disk until total number of data layers and pit configuration standard of the optical disk is identified"**

  The parties first dispute the meaning of the phrase "processing an optical signal reflected from encoded pits." The plaintiff contends that the term means "converting or manipulating an optical signal from one format into another." The Asustek defendants seek to construe the phrase to mean "converting a reflected light signal containing information encoded by the pits into another form." The Quanta defendants seek to construe the term to mean "converting an optical signal reflected from a pre-arrangement of depressions formed on an optical disk into digital data."

  Judge Ward construed the term "processing an optical signal" to mean "converting or manipulating an optical signal from one format into another." The court adopts this construction for use in the present case and rejects the Asustek defendants' attempt to require that the optical signal "contain information encoded by the pits." The language of the claim requires that a laser, or other form of light, be reflected from encoded pits and that this signal be converted from one format into another. The court agrees with the plaintiff's view that, at the time the number of data layers and pit configuration standard is determined, the reflected optical signal may no longer be a light signal.

As such, a processed optical signal is one that is either a light signal or one that is based on a light signal.

In addition, the Quanta defendants would limit the claim to require the processed optical signal be converted into digital data. As used in the patent, the meaning of "processed" is broader, however, as is the construction previously adopted by Judge Ward. As such, the court rejects Quanta's proposal.

The parties also dispute the meaning of the term "encoded pits." The Asustek defendants argue that the encoded pits must be located in a pit or track lane on the disk. The Quanta defendants argue that the pits must be "a pre-arrangement of depressions." Contrary to these arguments, there is no requirement in the claim that the encoded pits be physically located in any particular part of the disk. *See* '981 Patent, *Abstract* ("If the total of contents data is not encoded on the optical disk, *any* encoded pits on the optical disk is [sic] processed.") (emphasis added). As such, the court rejects the Asustek defendants' argument that the depressions must be within a track or pit lane on the optical disk. Likewise, the court rejects the Quanta defendants' argument that the depressions must be pre-arranged on the surface of the disk. Nonetheless, use of the word "encoded" suggests that the pits themselves must represent data or information. As such, the court clarifies that "encoded pit" means "a depression in the surface of the disk which represents data or information."

Finally, the parties dispute the meaning of the term "pit configuration standard of the optical disk." Judge Ward construed the phrase "pit configuration standard of the optical disk" to mean "a recognized arrangement of depressions formed in an optical disk." Both groups of defendants seek to further limit that construction. Asustek would require that the pit configuration standard be limited to the set of "industry recognized rules," and the Quanta defendants contend that the

recognized arrangement must be "commonly recognized." The claims do not require either limitation, and the court is not persuaded that the specification or prosecution history mandate the limitations advocated by the defendants. Accordingly, the court adopts Judge Ward's prior construction of this term.

### B. "collating the processed optical signal with an optical disk standard data which is stored in memory"

First, the parties dispute the meaning of the term "collating." Judge Ward construed the term "collating" to mean "comparing." The Quanta defendants disagree with that construction and contend that the comparison required by this limitation involves determining a match. The court rejects this construction, as it is an effort to import a limitation from the preferred embodiment into the claims. Moreover, the extrinsic sources cited by the Quanta defendants do not require the determination of a match. Rather, the sources define "collate" to require a close and careful examination or comparison. *See* Brief for Quanta Defendants, at 14. In any event, the court believes that Judge Ward's definition for this term is correct, and adopts it for use in this case.

The Asustek defendants contend that "processed optical signal" requires that "the same optical signal that identifies both the total number of data layers and the pit configuration standard" be compared to the optical disk standard data stored in memory. The court rejects this limitation. As suggested by Judge Ward's prior construction regarding the order of steps in the method, there is no requirement that the same optical signal determine both the total number of data layers and also pit configuration standard. Based on Judge Ward's prior construction, the phrase, as a whole, means "comparing the processed optical signal with an optical disk standard data stored on a memory."

  C. **"settling modulation of servomechanism means dependent upon the optical disk standard data which corresponds with the processed optical signal"**

Judge Ward construed this phrase to mean "establishing the regulation of the automatic feedback control system for mechanical motion dependent upon the recognized arrangement of depressions for an optical storage medium which corresponds to the processed optical signal." The court is persuaded that Judge Ward's construction is correct and rejects the Asustek defendants' effort to define "settling modulation" as "permanently fixing the modulation." The court further rejects the Quanta defendants' construction, to the extent it incorporates Quanta's requirement that the optical disk standard data match the "converted digital data." The court also rejects any effort by the plaintiff to modify this construction to read "the recognized arrangement of depressions <u>in</u> an optical storage medium."

Finally, the court adopts Judge Ward's construction of "servo" to mean "the motor part of the servomechanism controlled by the feedback circuit that produces the final mechanical output." The court also adopts Judge Ward's constructions of "tracking servo" and "modulate."

**4. Conclusion**

The court adopts the above constructions for use in the trial of this case. The parties are ordered that they may not refer to the contents of this order, beyond the court's claim construction, directly or indirectly, in front of the jury.

SIGNED this 18th day of August, 2008.

                 _____
                 CHARLES EVERINGHAM IV
                 UNITED STATES MAGISTRATE JUDGE