1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                     MARSHALL DIVISION

 4   LASERDYNAMICS, INC.      )(

 5                            )(    CIVIL DOCKET NO.

 6                            )(    2:06-CV-348-TJW-CE

 7   VS.                      )(    MARSHALL, TEXAS

 8                            )(

 9   QUANTA STORAGE AMERICA,  )(   JUNE 15, 2009

10   INC., ET AL.             )(    9:00 A.M.

11                     PRE-TRIAL CONFERENCE

12         BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM

13                UNITED STATES MAGISTRATE JUDGE

14

15   APPEARANCES:

16

17   FOR THE PLAINTIFF:   (See Attorney Sign-In Sheet)

18
     FOR THE DEFENDANT:   (See Attorney Sign-In Sheet)
19

20   COURT REPORTER:      MS. SHELLY HOLMES, CSR
                          Deputy Official Court Reporter
21                        2593 Myrtle Road
                          Diana, Texas  75640
22                        (903) 663-5082

23

24

25   (Proceedings recorded by mechanical stenography,
```

transcript produced on a CAT system.)

2

1                        I N D E X

2

3   June 15, 2009

4                                              Page

5        Appearances                          1

6        Index                                2

7        Court Reporter's Certificate         63

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              COURT SECURITY OFFICER:  All rise.

2              THE COURT:  Please be seated.  We've got a

3    hearing on the pre-admission of exhibits and addressing

4    objections to deposition designations today in

5    LaserDynamics against Quanta.  It's case 2:06-CV-348.

6              Who's here for the plaintiffs?

7              MR. SANKEY:  Your Honor, Tom Sankey, along

8    with Jeff Pollack and Jeff Rambin on behalf of the

9    plaintiffs.

10             THE COURT:  All right.  For the defendant?

11             MR. WILCOX:  Morning, Your Honor.  Melvin

12   Wilcox on behalf of the defendants, and I have Mr. John

13   Parker, Mr. Christian Platt, and Ms. Kathy Murray.

14             THE COURT:  All right.  Are y'all ready to

15   go?

16             MR. WILCOX:  We're ready, Your Honor.

17             THE COURT:  Okay.  I appreciate the

18   agreements.  I've been furnished with a letter, I think

19   it's from Mr. Pollack.  It sort of outlines the

20   remaining disputes.  So let's -- here's how I'd like to

21   proceed.  I'd like to first address the plaintiff's

22   exhibits and move to the defendant's exhibits and then

23   go back to the plaintiff's deposition designations and

24   then go into the defendant's deposition designations.

25   Depending on how many disputes there are, I may table

4

1   those, the objections to deposition -- depositions and

2   just review the transcripts and give you a ruling, you

3   know, before you roll out for trial with enough time to

4   let you make your cuts and all that.

5              I understand there are three or four motions

6   that y'all wanted to take up, as well, but I'll take --

7   I'll do those today also before we leave, to the extent

8   I can.  There may be some responses outstanding, but

9   we'll at least put a time table in place to get that

10  stuff briefed up and ruled on again before y'all roll

11  out for trial.

12             Mr. Sankey, do you have a list of exhibits

13  that you wish to offer to which there's no objection at

14  this time, or do you want to --

15             MR. SANKEY:  Your Honor, my understanding is

16  that everything that was contained in the letter on

17  Friday is still being objected to.

18             THE COURT:  Okay.  Well, my question is do

19  you -- do you have a list of exhibits that you want to

20  offer that there aren't any objection to, and if you

21  don't, it's okay.  I mean, it's -- I just -- I want to

22  put a procedure in place where we can craft such a list

23  once we're done here today and make sure that I sign an

24  order or Judge Ward signs an order that admits

25  everything to which there's been no objection, admits

1    things over objections that have been made, or refuses

2    to admit based on -- based on an objection being

3    sustained, so --

4               MR. SANKEY:  Understood.  We can get a list

5    to the Court within a day or so.

6               THE COURT:  Okay.  Okay.  That's -- that's

7    fine.  I'm not -- all right.

8               Then let's start, then, with the first one,

9    as I understand it, is -- well, it's Quanta's objections

10   to some of your exhibits.  The first category, documents

11   produced by or relating to ASUS or Asustek.

12              Tell me -- I guess tell me what the --

13   what's the objection, first of all?  Is it just that

14   they were produced by your co-counsel --

15              MS. MURRAY:  Our objection is --

16              THE COURT:  -- or your co -- co-defendant?

17              MS. MURRAY:  Yes.  They relate to a party

18   that's not in this case.  It's source code.  It's

19   license agreements of ASUS's products, not any of the

20   products of any of the defendants in this case.  It's

21   license agreements entered into between ASUS and third

22   parties, nothing to do with any of the Quanta entities.

23   So we don't see why they should stay in this case.

24              THE COURT:  Okay.  Tell me what the

25   relevancy is, Mr. Sankey.  License agreements, I assume

1    you want to show what the custom is in the industry?

2              MR. SANKEY:  Correct.

3              THE COURT:  Okay.

4              MR. SANKEY:  And our damage expert has

5    relied --

6              THE COURT:  Relied, okay.

7              MR. SANKEY:  They are in his report.

8              THE COURT:  Source code, however, for

9    products, are you -- are they still in --

10             MR. SANKEY:  Yes.  And if I could explain, I

11   think that this is actually kind of a second bite at a

12   motion to strike our technical expert.

13             THE COURT:  Okay.

14             MR. SANKEY:  At the time that our original

15   expert reports were due, as the Court's aware, we had

16   much better technical information from the ASUS

17   defendants than we did from the Quanta defendants.  They

18   have the same controller.  One -- there's a Philips

19   controller in one set of theirs.

20             THE COURT:  Right.

21             MR. SANKEY:  And then there's Mediatek in

22   the other.  He used ASUS as an exemplar product, their

23   source code, their specifications.  It's throughout his

24   report.  It's in all of his exhibits.  They have cross

25   examined him on it.  And so, basically, this would be,

1   as I've said, I think a second bite at --

2            THE COURT:  And he's going to testify that

3   the controllers that are in the accused products operate

4   the same way as the exemplar?

5            MR. SANKEY:  Exactly.

6            THE COURT:  Okay.  All right.  Based --

7   based on that representation, I'll overrule the

8   objection to the source code.  I overrule the objections

9   to the license agreements.  I think they go to what the

10  custom is in the industry, okay?  Your point's

11  preserved, though.  Just incorporate it into an --

12           MS. MURRAY:  And for the record, Your Honor,

13  I mean, they had our source code for a year before those

14  reports were due.

15           THE COURT:  Okay.

16           MS. MURRAY:  And all the same information on

17  our technical products.

18           THE COURT:  Okay.  All right.  Thank you.

19           Next category is demonstrative of a product

20  that's not at issue in the case.  Same type of

21  objection?

22           MS. MURRAY:  Yes, Your Honor.  This product

23  isn't accused, and they've haven't shown how it's

24  compared to any of our products.

25           THE COURT:  Okay.  What's the representation

1   as to how it's going to be --

2           MR. SANKEY:  The representation is BenQ uses

3   the other controller.  There's two controllers.  ASUS

4   has one controller, BenQ has the other, and so, again,

5   an exemplar used by the expert in his report.

6           THE COURT:  Okay.

7           MS. MURRAY:  Our products are not BenQ's

8   product.  They haven't analyzed the Quanta product.

9           THE COURT:  Okay.

10          MS. MURRAY:  This is a BenQ product.

11          MR. SANKEY:  It is the exact same as the

12  ASUS.  You've got ASUS that has the Philips controller.

13  You've got BenQ that has the Mediatek controller.  In

14  his initial report, he says these are my -- going to be

15  my two exemplars that I go off of that operate the same

16  as the defendant's products.

17          THE COURT:  Okay.  All right.  Well --

18          MR. PLATT:  Your Honor, if I could just

19  interject one point, and that's with respect to the BenQ

20  drive.  We don't have the source code that was used for

21  that BenQ drive.  They got that in another litigation.

22  Their expert looked at it and analyzed it.  We've never

23  had the opportunity to look at it or analyze it or see

24  whether our products are comparable to that.

25          THE COURT:  Did y'all go to BenQ and try to

1  get it?

2              MR. PLATT:  No, we asked for them for it --

3              THE COURT:  Okay.  Well --

4              MR. PLATT:  -- since they were the ones that

5  were relying on it.

6              THE COURT:  Okay.  Well, I'm going to

7  overrule the objections.

8              All right.  Third party hearsay documents,

9  130 and 131.

10             MS. MURRAY:  Your Honor, these are two data

11 sheets.  They appear to be Sony data sheets.  There's no

12 data on them anywhere.  We don't know where they came

13 from, and we don't believe they're -- they're

14 admissible.

15             THE COURT:  Who's going to authenticate

16 these, and what are they, frankly?

17             MR. SANKEY:  Your Honor, in Dr. Howe's

18 expert report, he refers to these two Sony data sheets

19 as what was known to one skilled in the art in at least

20 1995.  He specifically cited two patent appli -- patents

21 and patent applications wherein these Sony data sheets

22 were contained and listed as prior art.  So he's showing

23 what one in at least 1995 knew with respect to

24 enablement and with respect to what was out there in

25 prior art.  It's throughout his report.  They cross

1   examined him on it in his deposition.

2          MS. MURRAY:  The problem, Your Honor, is

3   that these data sheets don't say the day that they were

4   printed.  We don't know if this is -- these were in

5   existence in 1999 -- '95.

6          MR. SANKEY:  Well, we know that from the

7   patent applications that he specifically referred to in

8   his report that cite these data sheets.

9          THE COURT:  Well, how do they -- how do the

10  applications and the patents, how do they cite them?  Is

11  it by the number up top, it's CXD2545Q, or --

12         MR. SANKEY:  Your Honor, I do not know how

13  they're specifically cited.  I -- I do understand that

14  with respect to the date, which was the only outstanding

15  issue, that he was able to show the date of these data

16  sheets because of the date on the patent applications

17  that were cited in his report, that someone had these

18  data sheets from Sony at least as early as 1995 which

19  were the patent applications that were cited in his

20  report.

21         THE COURT:  Okay.  I'm going to carry these,

22  Mr. Sankey.  I need you to give me the patent

23  applications that cite them, and I want to -- I want to

24  look at whether there's sufficient evidence in the

25  record that would suggest that these are the data sheets

1    that are cited in the application, therefore must have

2    been in existence at least as of the time frame you've

3    identified, okay?

4              MR. SANKEY:  Yes, sir.

5              THE COURT:  All right.  Unrelated QSI patent

6    application, 876.  What's the relevance of 876?

7              MR. SANKEY:  Your Honor, with -- this is a

8    patent application filed by Quanta on very similar

9    technology.  It contains a statement by a party opponent

10   specifically stating that -- that this technology is

11   essential equipment for the personal computers.

12             As the Court may or may not recall, at least

13   during voir dire, the panel was told by the defendants

14   that this should be a low damage case because this is

15   now obsolete technology and that this is not a patent

16   that is essential to the use of computers or -- or

17   optical disk drives.

18             Here's their own statement in their own

19   patent application where they're saying that it is.

20   It's a statement by a party opponent.

21             THE COURT:  And is it -- is it in general

22   the application itself, or is it -- tell me --

23             MS. MURRAY:  Your Honor, this patent

24   application went abandoned.  It was actually never at

25   issue.

1          MR. SANKEY:  My understanding, it is a copy

2    of the application itself filed obviously on behalf of

3    Quanta to the PTO.

4          THE COURT:  Yeah, I don't -- I don't I think

5    the fact that it's abandoned makes it less of a

6    statement of a party opponent.

7          Is there a particular position in here,

8    Mr. Sankey, that you're focusing in on, or is it the

9    entire --

10         MR. SANKEY:  There is a portion, and I

11   believe we can get a copy of that and point it out to

12   the Court, but it is in, I believe, their specifications

13   where they talk about -- and the quote they have here in

14   my notes is they say, Furthermore, an optical disk drive

15   capable of reading CD and DVD becomes one of the

16   essential equipments of a personal computer, a

17   one-sentence quote from their specification.  It's a

18   description of the related art, also.

19         MR. RAMBIN:  I think it's -- do I need to

20   push the button up here, or do I just need to put it on

21   the screen?

22         THE COURT:  Well, it's -- if you've got a --

23   just column and line is fine if you've got the --

24         MR. RAMBIN:  Okay.  Your Honor, it's going

25   to be on the second page of the patent under actually --

1   Paragraph No. 0005.

2            THE COURT:  I got it.  Okay.  Well, I

3   overrule the objection.  I think it's got some

4   relevance.  I don't know if you want to bring out on

5   cross examination the patent is abandoned or that you

6   don't think that the ability to discriminate between

7   DVDs and CDs, essentially, you can do that.  The

8   objection is overruled.

9            Okay.  That takes us, then, to -- other than

10  the two that I've carried, I've resolved those

11  objections, and that takes me to y'all's exhibits.

12           MS. MURRAY:  Actually, Your Honor, there's

13  four more under third-party hearsay documents.

14           THE COURT:  Oh, okay.  Okay.  Well, I'm

15  sorry.  Market analysis of income statement.  How come

16  they're not 803.17 issues?

17           MS. MURRAY:  Your Honor, we don't -- we

18  don't -- we don't know how these can be authenticated is

19  the problem.  These were third party reports about

20  different companies.  They're not reports generated by

21  Quanta.  Quanta can't authenticate the information or

22  know whether the information contained inside is

23  reliable.

24           THE COURT:  Okay.  Where do they -- where

25  did they come from?

```
 1              MS. MURRAY:  They were produced by Quanta.

 2              THE COURT:  I mean, but from what firm?

 3              MR. POLLACK:  Your Honor, the firm is known

 4      as TSR, which I believe stands for Techno Systems, and

 5      I'm stretching for the R.

 6              MS. MURRAY:  Research.

 7              MR. POLLACK:  Research.  It's a reputable

 8      organization in the industry.  As counsel testified, it

 9      was within Quanta's files, relied upon by Quanta.  Our

10      expert, Mr. Davis, relies upon these reports in his

11      report.

12              THE COURT:  Okay.  Well, here's what I'll

13      do, the authenticity objection, I'll carry that.  I'll

14      grant you leave.  I'm extending the discovery cutoff for

15      the limited purpose of allowing you to go and take a

16      record's custodian deposition to assess whether or not

17      these documents are authentic, okay, but I'll carry the

18      authenticity objection.  Y'all have got seven days to

19      take that deposition, and if I don't hear back from you,

20      then I'll assume that you've elected not to take the

21      deposition and then I'll take up the authenticity

22      objections at that time.  Y'all can do it by telephone,

23      as well.

24              MS. MURRAY:  Your Honor, the problem is the

25      company is in Japan, so it might be difficult for us to
```

1  be able to take the deposition with the rules in Japan

2  for depositions.

3           THE COURT:  Okay.  Well, that's -- I'll --

4  that's the order of the Court.  I'm allowing you leave

5  to the extent you can do it, and if you can't do it

6  because you're -- because you can't do it in compliance

7  with what the Japanese law is, then y'all let me know

8  that and I'll take up the authenticity objections at

9  that time, okay?

10           MS. MURRAY:  We'll let you know.

11           THE COURT:  Okay.  881 and 882, are these

12  also --

13           MS. MURRAY:  These are third-party summaries

14  of income statements.  881 doesn't have even the correct

15  name of a company for Quanta Storage on it, so we're

16  concerned about the reliability of these documents and

17  the information in them.

18           We did provide to plaintiff actual copies of

19  Quanta Storage and Quanta Computers' income statements,

20  so they -- and those are marked as exhibits, so they can

21  use those, which we don't have a problem with.  We just

22  have a problem with them using a third-party report of

23  Quanta's income statements which may not be as accurate

24  as Quanta's own income statements.

25           THE COURT:  And which portions are not

1   accurate?

2            MS. MURRAY:  Well, the name of the company

3   is not accurate.

4            THE COURT:  Okay.

5            MS. MURRAY:  We haven't had a chance to

6   verify all of the figures in here because it's just a

7   summary for each year.

8            THE COURT:  Well, who -- I mean, do we know

9   who did the summary?

10           MR. SANKEY:  Your Honor, if I could, and

11  I'll let Mr. Pollack speak to this, my understanding of

12  this is this is a company that simply takes Quanta's own

13  financial statements and converts them from Taiwanese

14  dollars to U.S. dollars.  We've got a chart showing that

15  the conversion, based upon what the exchange rate was at

16  the time, is exactly as stated in Quanta's own financial

17  statements.  If you want to show that to --

18           THE COURT:  Has that been provided to the

19  other side?

20           MR. POLLACK:  Your Honor, I just took the

21  comparison over the weekend.  It has been provided, but

22  if you look at the report, and I have 882 in front of me

23  now, you'll see that there's a conversion rate there for

24  each of the years 2007, 2006.  For 2007, it's 32.848802

25  in Taiwanese dollars to U.S. dollars.

1           And if you were to take that number and put

2   up against Quanta's own spread -- income statements and

3   convert that into U.S. dollars and also account for the

4   fact that I believe Quanta's reports are this thousands

5   and -- and the one source is reported in millions, you

6   come out with exactly the same numbers.

7               THE COURT:  Where is one source located?

8               MR. POLLACK:  Where are they physically

9   located?  I don't know the answer to that, Your Honor.

10  These are documents that our experts relied upon.

11              THE COURT:  My -- well, are they located in

12  a place where if I give y'all the same ruling and let

13  you go take their deposition, it's a feasible ruling or

14  is it -- I mean --

15              MR. POLLACK:  Again, I'm sorry, Your Honor,

16  I don't know where they are, but if we're ordered to

17  take their deposition, we will.

18              THE COURT:  Well --

19              MR. SANKEY:  And if I could briefly, Your

20  Honor, what I understand our use of these was is for our

21  damages expert, instead of going to July of 2006 and

22  finding out the exchange rate and doing it, he relied

23  upon this as a -- you know, this is a company that does

24  this with people's financial reports, and so he

25  basically --

 1              THE COURT:  He can rely on it.  I don't have

 2    a problem with him relying on it.  It just doesn't make

 3    it admissible as an exhibit.  That's my point, and I

 4    think that's her point, as well.

 5              MR. POLLACK:  Your Honor, it may be

 6    admissible as a summary under rule 1006, as well.

 7              THE COURT:  Well, it may be admissible as a

 8    summary if it's been properly authenticated, but, I

 9    mean, her point is is that, you know, they've got the

10    name wrong -- the first thing that they've got wrong is

11    the name of the company that they're providing a summary

12    for, so --

13              MR. POLLACK:  I can't -- I can't dispute

14    that, Your Honor.

15              THE COURT:  Okay.  Here's what you need to

16    do, I'm not pre-admitting it, okay, and I'm not

17    pre-admitting the ones from the other company.  I'm

18    carrying those objections.  I'm going to allow seven

19    days.  If you can take a deposition, get them

20    authenticated, let me know within a week of what you --

21    what you can do.  You need to consult with your experts

22    about where they gathered the information.  I mean,

23    these depositions are limited to authentication issues.

24              MR. POLLACK:  Okay.

25              THE COURT:  900 series, all right?

1               MR. POLLACK:  Thank you, Your Honor.

2               THE COURT:  Okay.  Does that resolve all of

3     the issues related to y'all's objections to their

4     exhibits?

5               MS. MURRAY:  Yes, sir.  Yes, Your Honor.

6               THE COURT:  Okay.  All right.  Okay.  Let's

7     go to y'all's exhibits, and I'm referring to Quanta

8     defendant's exhibits.

9               No. 2, I assume y'all want that -- the BenQ

10    license on the issue of your exhaustion defense?

11              MS. MURRAY:  Yes, Your Honor.

12              THE COURT:  All right.  Redact the

13    consideration paid.  I'll admit it for that limited

14    purpose, to the extent it's even going to be a jury

15    issue.

16              MR. SANKEY:  One, I don't think that it

17    would be, but the reason why we maintain our objection

18    to this is that there are no longer any

19    BenQ-manufactured products at issue in the case, and so

20    I think that it would just be more prejudicial --

21              THE COURT:  Is there a willfulness claim?

22              MR. SANKEY:  There is a willfulness claim.

23              THE COURT:  It may have some relevance as to

24    whether or not they believe they're willfully infringing

25    if they were relying on a license defense, so beyond --

1    well, with respect to the BenQ drives that are no longer

2    in the case --

3              MS. MURRAY:  Your Honor, that's the first

4    we've heard that they're no longer in the case, which is

5    why we've had to keep this document on our exhibit list.

6              THE COURT:  Do you still want it there if

7    they're no longer in the case?

8              MS. MURRAY:  If they -- no, we don't need

9    them.

10             THE COURT:  Okay.  All right.

11             MS. MURRAY:  We were using it to show that

12   the products were licensed.

13             THE COURT:  Well, I assume that's why that

14   y'all -- y'all wanted it in.

15             MS. MURRAY:  Yeah, if they're saying these

16   aren't in, then --

17             THE COURT:  Okay.  Well, I tell you what,

18   I'm not going to pre-admit No. 2.  If something happens

19   at trial and it may come back into the case, then leave

20   is granted to approach Judge Ward and -- and get it

21   pre-admitted at that -- or get it admitted at that time,

22   okay?

23             MS. MURRAY:  Okay.  Thank you, Your Honor.

24             THE COURT:  No. 5 -- or, actually, there are

25   news articles and other hearsay documents in the next

1   category.  Exhibit 3 and 525.

2           MS. MURRAY:  Your Honor, Exhibit 3 is an

3   article written by one of our experts.  We've agreed to

4   limit this document to impeachment only.

5           THE COURT:  Okay.  It's not -- what is -- so

6   you're not seeking pre-admission of -- of Exhibit 3?

7           MS. MURRAY:  No.

8           THE COURT:  Okay.  It will be limited to

9   impeachment only, then?

10          MS. MURRAY:  Yes.

11          THE COURT:  All right.  Well, then, I'll

12  overrule the objection to that.  And 525?

13          MS. MURRAY:  The same thing, Your Honor.

14  We're just limiting that to impeachment only.

15          THE COURT:  All right.

16          MR. SANKEY:  Your Honor, if I could, with

17  respect to 525, my understanding is this is an exhibit

18  that was attached to their claim construction briefing

19  where they were seeking a specific definition of the

20  word standard.  The Court obviously didn't accept this,

21  and so I'm not sure of the relevance of it, other than

22  to go against the Court's claim construction.

23          THE COURT:  Well, they're not allowed to do

24  that, but I'm not going to make them tell you what their

25  cross examination is, Mr. Sankey.  They're going to

1   limit its use for impeachment.  With that, I'm not

2   pre-admitting it, and I'm overruling the objections.  If

3   they try to run counter to the claim construction ruling

4   at trial, then you need to object at the time.

5            Third-party websites, 459, 460, and 467.

6            MS. MURRAY:  Two of these, Your Honor, are

7   the subject our request for judicial notice.  We're

8   basically -- we're using these documents to show that

9   Sony and NEC Optiarc was owned -- previously owned by

10   Sony and NEC just for that proposition, because Sony and

11   NEC both have a license to the patent, and our position

12   is, therefore, products made by Optiarc also have a

13   license.

14           Plaintiff is contesting that, so we've had

15   to put in evidence of just -- just the composition of

16   Optiarc.

17           THE COURT:  What's the objection to

18   third-party websites?

19           MR. SANKEY:  Your Honor, first of all, and

20   I'll let to Mr. Pollack talk to the law on it, but it's

21   clearly hearsay because they're using them to assert the

22   truth of the matter that's contained in there, and

23   that's a specific ownership interest at a specific date.

24           A couple of things about it, first of all, I

25   think these exhibits, the four exhibits of these

1   websites, are inadmissible hearsay, but then take it

2   further to their motion for the Court to take judicial

3   notice of it, they want to take hearsay and not only

4   have it admissible at the trial but have the Court tell

5   the jury that I'm accepting this, taking judicial notice

6   of it, this is a fact.  They're taking something that's

7   inadmissible and giving it even higher credibility than

8   all the other evidence in the case.

9           But this is a -- this goes towards their

10   license defense that they've had in the case since day

11   one.  They know that pursuant to that license defense,

12   that one of the four or five elements they're going to

13   have to show is this specific ownership.  They've listed

14   Sony and Philips on their initial disclosures as

15   witnesses that are going to -- they may potentially

16   testify at trial.

17           They know it's a piece of evidence that they

18   need at trial, and now they want the Court just to

19   accept it even though it's hearsay, and there's no way

20   to cross examine the witnesses on the ownership

21   interest, the dates, who was controlling these joint

22   ventures.  And so there's issues related to these that

23   clearly would be extremely prejudicial to the plaintiffs

24   for them to come in.

25           MR. PARKER:  May I address this briefly,

1   Your Honor?

2          THE COURT:  Yes.

3          MR. PARKER:  First of all, we believe that

4   the greater weight of authority -- and this gets into --

5   and I was going to address with the Court our motion for

6   judicial notice.  We're not asking for any special

7   imprimatur to be placed on these documents.  We don't

8   even think we should have to be arguing this.

9          Everybody in this courtroom candidly knows

10  what the ownership of Optiarc was, that it was 55

11  percent Sony and 45 percent NEC.  Both Sony's website

12  and NEC's website demonstrate that.  There was no

13  motivation in either of these major companies --

14         THE COURT:  To misrepresent what the

15  ownership is?

16         MR. PARKER:  To misrepresent what the

17  ownership was.

18         THE COURT:  You're suggesting they're

19  business records and they ought to come in, right?

20         MR. PARKER:  Yes, sir.  And beyond that,

21  beyond that, one of the cases they rely on is a Texas

22  case in which the web information was not permitted

23  because the Court said you needed some additional

24  verification.  For instance, they suggested it had to do

25  with ownership of a yacht.  They suggested, for

1   instance, if you had the Coast Guard license, well, we

2   have precisely that here.  We have NEC's SEC filing in

3   which they just as consistently as is set forth on the

4   two websites of the two companies point out that their

5   ownership in this Optiarc joint venture is set out as 55

6   for Sony, 45 for NEC.

7            There's no conceivable reason why NEC would

8   file an official document with the United States

9   government, the SEC, misrepresenting the ownership of

10  this joint venture.  And we really shouldn't have to

11  waste our time doing this, but because they wouldn't

12  stipulate and they wouldn't relent on this, more than a

13  week ago, we sent them a letter offering, okay, if

14  you'll agree with us to just ask the Court's permission

15  to take a deposition, we'll go take a deposition of

16  somebody from Sony or NEC for the sole purpose of

17  authenticating this, although we believe it will be a

18  waste of everyone's time to do that, we will do that if

19  you stand on this in light of what we think is an

20  overwhelming basis for admissibility and judicial

21  notice, and they didn't even respond to us.

22           MR. SANKEY:  Two comments, Your Honor,

23  number one, Sony's own website has a disclaimer on it

24  that says, Do not accept any of this information as

25  valid after the date that it's posted.  And, second,

1   what witness does these -- do these exhibits come in

2   through that we can cross examine on?

3           They simply want to get the exhibit, put it

4   in front of the jury, and argue it in opening and

5   closing without a witness being able to testify to it.

6   I don't know how we rebut it without that witness.

7               MR. PARKER:  Sir?

8               THE COURT:  Well, hold on.

9               MR. PARKER:  I didn't mean to interrupt.

10              THE COURT:  It's all right.

11              MR. PARKER:  We asked them to give us a

12   basis for their opposing this ownership that is so well

13   known and highly publicized publicly, and they haven't

14   done that.

15              THE COURT:  Well --

16              MR. PARKER:  And we really are being kind of

17   jerked around here.

18              THE COURT:  Well, the purpose for these

19   hearings is to sort of cut through the red tape, as I

20   would call it, and let in documents that everybody knows

21   can be proved up either through authenticity issues or

22   business records issues.

23              On their face, Mr. Sankey, you know, I

24   agree, I mean, these are business records of the

25   company, and I'll -- I'm admitting them as exhibits, and

1  I'm not sure you have to have a sponsoring witness for

2  every exhibit.  You know, I know of at least one deed

3  construction case that I was involved in where the

4  entirety of the proof consisted of three certified

5  copies of the deeds and then requested the judge to

6  construe them to see who owned what.

7           So I'm admitting them.  I'll give you --

8  I'll give you the opportunity, if you want to, to go and

9  take whatever corporate rep you can find from NEC or

10 Optiarc to verify or to disprove the contents that are

11 contained in the website, but I'm admitting them.

12          I'll -- again, you've got seven days.  If

13 you want to go take an authenticity objection, if you

14 think they're misrepresenting to the world and to the

15 SEC the state of ownership of this venture, I'll let you

16 do that, okay?

17          MR. SANKEY:  Well, is the Court at least

18 denying the motion to take judicial notice --

19          THE COURT:  I'm not ruling on it.

20          MR. SANKEY:  And inform the jury that this

21 is, in fact, a fact?

22          THE COURT:  I'm not ruling on that right

23 now.  I'm admitting these exhibits, okay?

24          MR. SANKEY:  Yes, sir.

25          THE COURT:  Other hearsay documents, 216,

1    217, 477 (sic), and 421.

2              MS. MURRAY:  Your Honor, 216 and 217, which

3    are actually also on the plaintiff's exhibit list, the

4    reason we have these documents, we don't believe --

5    these are basically lists of patents that Quanta

6    Computer has purchased from IBM in connection with a

7    license between Quanta Computer and IBM.  We don't think

8    they're relevant to anything.

9              We've agreed to limit them to rebuttal, and

10   the reason why we would just want these, it's for

11   completion sake.  If plaintiff is going to offer into

12   testimony or evidence that Quanta paid a certain amount

13   to IBM for patents, we want to show how many patents

14   Quanta purchased from IBM.

15             THE COURT:  The entirety of the license of

16   the transaction?

17             MS. MURRAY:  Exactly.

18             THE COURT:  Right?

19             MS. MURRAY:  So that's the only way that

20   these are coming in.

21             THE COURT:  Okay.  In light of that

22   representation, I'm not going to pre-admit them.  I

23   think they do bear on the entirety of the transaction,

24   and I'll grant you leave to approach Judge Ward during

25   the course of the trial if something comes in with

 1   respect to the amount of the purchase price to IBM,

 2   okay?

 3            MS. MURRAY:  Okay.  Thank you, Your Honor.

 4            And 421, in light of their new

 5   representation that the BenQ drives are out of the case,

 6   we don't need to -- we can remove 421.

 7            THE COURT:  All right.  421 is withdrawn,

 8   and is 777, is that in the same -- that's also the IBM?

 9            MS. MURRAY:  Yes.

10            THE COURT:  It's a technical disclosure.

11   Well, excuse me, no, it's not.

12            MS. MURRAY:  That one we've agreed to limit

13   to impeachment.

14            THE COURT:  All right.  I'm not

15   pre-admitting it, then.

16            MR. SANKEY:  Your Honor -- Your Honor, just

17   for the record, with respect to 777, I understand it's

18   not being pre-admitted, but our -- one of our objections

19   to that is that that was not identified on Quanta's --

20            THE COURT:  3-3 disclosures.

21            MR. SANKEY:  Yes, sir.

22            THE COURT:  Okay.  I'm getting ready to

23   address that issue.  What -- and here I am going to ask

24   you what -- what you're requesting to use 777 for

25   because it seems to me to be a little unfair to allow

1   you to, quote, use them as impeachment and get before

2   the jury the same thing you wouldn't be allowed to get

3   before them if you hadn't identified it in your

4   contentions.

5              MS. MURRAY:  They were identified in our 282

6   disclosures, Your Honor.

7              THE COURT:  Well, what are -- what is 777?

8   What are you trying to use it to prove?

9              MS. MURRAY:  I believe this one was for

10  state of the art.  Your Honor, we can withdraw it.

11             THE COURT:  Okay.  I'm going to -- I'm not

12  allowing you to use it even for impeachment purposes.

13  You know, 282 disclosure is required by statute, but,

14  you know, the rules here require you to identify things

15  far in excess of what the statutory 30 days is, okay?

16  All right.  That's the basis for my disallowing it even

17  for impeachment purposes.

18             953, does it go solely to inequitable

19  conduct?

20             MS. MURRAY:  Yes, Your Honor.

21             THE COURT:  Okay.  Well, the objection is

22  that you didn't allege 953.  Is that a -- that's a

23  prior -- it's a different Kamatani patent?

24             MS. MURRAY:  It's a different Kamatani

25  patent.

1            THE COURT:  Okay.

2            MS. MURRAY:  We did allege specificity.  We

3    didn't put in every single patent in our answer.

4            THE COURT:  Well, Mr. Sankey, I find it hard

5    to believe how prejudiced you are if I just allow it for

6    inequitable conduct purposes and it's your client's own

7    patent.  So I'm overruling that objection.

8            Now, y'all want me to sort out the incorrect

9    translation?  I'm serious.

10           MR. SANKEY:  Well, Your Honor, it's just

11   they gave us a translation that said recorded, and our

12   translator came back and said it's unrecorded.  The

13   word --

14           THE COURT: Okay.

15           MR. SANKEY:  -- they used, recorded, it

16   should be unrecorded.  So it changes it substantially,

17   and we're happy to give them the correct translation.

18   We've asked them to go back and get it re-translated,

19   and they just haven't had time to do that.

20           THE COURT:  Okay.  Well, tell me this, tell

21   me in the translation, the English version, Mr. Sankey,

22   exactly where the word is that you're talking about.

23           MR. SANKEY:  I'm told it is the second page,

24   last paragraph, last sentence that starts "As a result,

25   the type of optical disk that can be determined by

1   detecting the reflectance of the recorded Area B."  Our

2   translator says that should be "the unrecorded Area B."

3              THE COURT:  And are you on the second page?

4              MR. POLLACK:  That's our translation.

5              MR. SANKEY:  Let me find it in their

6   translation for the Court.

7              MR. POLLACK:  It's on the third page, the

8   second paragraph beneath "an embodiment of the

9   invention," Judge, and it is the last sentence in that

10  paragraph starting "As a result."

11             THE COURT:  And it should be "the

12  unrecording Area B"?

13             MR. SANKEY:  Correct.

14             THE COURT:  Well, the sentence preceding

15  talks about "the recording Area B and a nonrecording

16  Area A."

17             MR. POLLACK:  Your Honor, our translation

18  is --

19             THE COURT:  Is that one wrong, too?

20             MR. POLLACK:  Our translation is consistent

21  with that, Your Honor.  The only thing inconsistent with

22  it is the -- our translator has translated the last

23  sentence to be "unrecorded area."

24             THE COURT:  Is it a -- is what you're

25  telling me it's a typo in the patent?

1              MR. POLLACK:  It may be a typo in the

2    patent, or it may -- that could be -- that could be one

3    of the explanations.  I don't know if that's the case.

4              THE COURT:  Well, if the nonrecording area

5    is A and the recording area is B, it would need to be a

6    typographical error in the patent.

7              MR. POLLACK:  It would seem.  Really, what

8    we're saying, Your Honor, is simply that their

9    translation is literally incorrect.  Regardless of what

10   reason it was --

11             THE COURT:  The reason it's literally

12   incorrect is because there's a typographical error in

13   the patent.

14             MR. POLLACK:  There could be a typographical

15   error.

16             THE COURT:  I'm not fussing at you.  That

17   may be --

18             MR. POLLACK:  There could be a typographical

19   error.  I'm not saying that that's out of the realm of

20   the possibility, but even if there is --

21             THE COURT:  Do you think there's a

22   typographical error?

23             MR. POLLACK:  Even if there is a

24   typographical error, the translation should reflect

25   that.

1                THE COURT:  Okay.

2                MR. POLLACK:  That's the only position we're

3    taking on that.

4                MR. SANKEY:  And as I said, I think we

5    brought this up to them last week, and they had

6    commented that their translator had not had an

7    opportunity to go back and check.  We're happy to work

8    with them, let them -- their translator do that and see

9    if we can resolve it without the Court having to figure

10   out what translation is correct or whether it's a typo

11   or not.

12               THE COURT:  Have y'all had a chance to visit

13   with your translator yet?

14               MS. MURRAY:  They just -- we haven't had,

15   Your Honor.  They just mentioned this the latter part of

16   last week, but we're happy to go back and --

17               THE COURT:  All right.

18               MS. MURRAY:  We do want the right

19   translation of the record.

20               THE COURT:  Okay.  Well...

21               MS. MURRAY:  But we don't -- we don't have

22   plaintiff's translation, so --

23               THE COURT:  Okay.  You might -- can y'all

24   provide a copy of your translation?

25               MR. POLLACK:  Yes, Your Honor.

1          THE COURT:  Okay.  Why don't you give them a

2     copy of your translation, and why don't y'all meet about

3     it?  Also meet about whether or not y'all can agree

4     whether it's a typographical error in the patent that

5     the jury ought to be informed or the Judge ought to tell

6     the jury about, okay?

7          MR. SANKEY:  Yes, sir.

8          THE COURT:  Given that they're working with

9     documents that have been translated.  All right.  Is

10    there a filing, Mr. Sankey, in the record that reflects

11    the basis for your objections to Quanta's deposition

12    designations, I mean, the ones that are -- that are --

13    have narrowed down here?

14         MR. POLLACK:  Yes, Your Honor.  We filed our

15    objections to their deposition designations on I believe

16    May 1st.

17         THE COURT:  Okay.  That's -- whatever these

18    are, they're -- they're a distilled version, rather, of

19    what you already filed?

20         MR. POLLACK:  That's correct, Your Honor.

21         THE COURT:  Okay.  All right.

22         MR. POLLACK:  So we haven't -- neither party

23    has gone ahead and amended those.  We thought it was

24    easier to put them in a letter.

25         THE COURT:  I don't need them amended.  I

1   just want to make sure that the record is complete as to

2   what your objections are.

3              Same for the Quanta defendants?

4              MS. MURRAY:  Yes, Your Honor.

5              THE COURT:  Okay.  Well, then I'll -- what

6   I'm going to do is I'll carry it rather than have y'all

7   sit here and watch me read depositions all morning.  I

8   know y'all have other things to do.  I'll just read

9   those, and I'll get them to you in sufficient time for

10  you to make whatever edits you need to your video or

11  videoclips.

12             MR. POLLACK:  Your Honor, if I may.

13             THE COURT:  Yes, sir?

14             MR. POLLACK:  In our letter, in the first

15  deposition designation for Mr. Kamatani, the references

16  is 3/24/05.  The correct designation is the 3/25/05

17  transcript.  I understand that Mr. Rambin brought over

18  the correct -- the correct version of that deposition in

19  any event.

20             THE COURT:  Okay.

21             MR. POLLACK:  Okay.

22             THE COURT:  But it is the March 25th, '05?

23             MR. POLLACK:  It is.

24             THE COURT:  Okay.

25             MR. POLLACK:  It is.

1          THE COURT:  Okay.

2          MR. POLLACK:  And that's reflected in our

3    objections.

4          THE COURT:  Okay.  Is there any corrections

5    to the objections from the defendants?

6          MS. MURRAY:  Your Honor, on the last one for

7    the defendants, the cite here is just the objection to

8    the question, 108, 21 through 25, but our position would

9    be if the question drops out, the answer should also

10   drop out, and the cite for the answer --

11         THE COURT:  Would be 109 something?

12         MS. MURRAY:  Yes.  109, 1 through 5.

13         THE COURT:  All right.  I'll take a look at

14   that.

15         Now, then, there's an unopposed motion to

16   appoint interpreters at trial.  That's no opposition?

17         MR. SANKEY:  No opposition.  My

18   understanding is they could not find one that could be

19   available for all the dates, and so we ended up with

20   three that could.

21         THE COURT:  Okay.  These are the

22   interpreters that will be here with the witnesses.  Now,

23   I don't -- y'all may have additional ones that are

24   present at counsel table for purposes of advising, you

25   know, your clients and everything, but the ones -- these

1  are the ones you're talking about that are going to be

2  up here?

3          MR. SANKEY:  Correct.

4          THE COURT:  Okay.  Well, that will be

5  granted.

6          I've got a motion for leave to supplement

7  Mr. Davis -- Davis' opinion.  Is this related to the

8  damages documents I just ordered produced?

9          MR. SANKEY:  It is, Your Honor.

10          THE COURT:  Is that the limita -- is that

11  the extent of his supplementation?

12          MR. SANKEY:  That is my understanding.

13          MR. PLATT:  Your Honor, we would disagree

14  with that.  In the -- in the new charts that they

15  provided, they went through -- and to give you a little

16  background on our sales summaries that were provided.

17  Throughout the course of the litigation back starting in

18  June of 2008, we provided sales summaries that broke

19  down our sales by individual drives, and this is for

20  Quanta Storage, with units and revenues on a quarterly

21  basis.  We supplemented that again in January of 2009

22  and supplemented it again updating the figures in April

23  of 2009.

24          Now, in Mr. Davis' original report, he did

25  not include any breakdown of individual drives.  He just

1    summed everything up together.  Now, in this report,

2    they're going through and sorting out specific drives

3    which they didn't do the first time around.

4             THE COURT:  Well, has the overall number

5    increased?

6             MR. PLATT:  I don't believe the overall

7    number has increased other than -- and, actually, the

8    estimates -- the data that he used for Quanta Storage

9    went through 2008.  Those were the same numbers that

10   they had back in January 2009 with I think some slight

11   modifications that were -- that I think would be --

12   could have been addressed at trial.  But the breaking

13   down of the individual drives, that's something entirely

14   new.  That was not done before.

15            THE COURT:  But y'all had provided numbers

16   to them that break down by drive, right, revenues on per

17   drive basis?

18            MR. PLATT:  That's right.  And they had not

19   used that -- he had not used that information in his

20   original report.

21            THE COURT:  Well, have they dropped out some

22   of the drives that they're accusing?

23            MR. PLATT:  I believe they have, Your Honor.

24            THE COURT:  So you want me to limit him to a

25   larger number that would be unsupported then by the

1   proof?  I mean, is that the reason that you're making

2   the objection?

3               MR. PLATT:  Well, I think our objection is

4   that -- that our expert hasn't had a chance to go

5   through and respond to it.  I think Mr. Davis' original

6   report wasn't going to be substantiated anyways at trial

7   because of the -- I mean, although they were going to

8   come in with a larger number, I don't think it had any

9   basis because it hadn't gone through and tried to parse

10  out licensed drives from unlicensed drive.

11              THE COURT:  That's a different issue,

12  though.  I mean, if they're -- I mean, if all they've

13  done is taken the aggregate number that he originally

14  gave you and then broke it down into the per drive basis

15  that y'all also -- and dropped some of those drives out,

16  I'm having a hard time figuring out how you're

17  prejudiced by -- by allowing him to do that.

18              MR. PLATT:  I think, Your Honor -- I mean,

19  the prejudice is we haven't -- we didn't know that

20  that's what they were going to put on at trial, and now

21  we're finding that out, that they're going to have their

22  expert go through on a drive-by-drive basis, which

23  that's not what they -- that's not what he was

24  originally going to do.

25              THE COURT:  Well, how much -- how much time

1   does your expert need to meet that?

2              MR. PLATT:  I haven't talked to the expert

3   about the timing of responding on it, but I would

4   estimate probably a week.

5              THE COURT:  All right.  Well, he's got a

6   week --

7              MR. PLATT:  Okay.

8              THE COURT:  -- to meet, okay?

9              MR. PLATT:  Thanks, Your Honor.

10             THE COURT:  And serve him supplemental

11  reports limited to responding to what you've been

12  furnished here today, okay?

13             MR. PLATT:  Thank you, Your Honor.

14             THE COURT:  All right.  So 485 is granted to

15  that extent with the caveat that I'm going to allow the

16  Quanta defendant's expert to serve a supplemental report

17  that likewise correlates on a drive-by-drive basis the

18  damages figures of the plaintiff's expert.

19             487, what's -- what's Mr. Howe trying to

20  do -- Dr. Howe, excuse me?

21             MR. PARKER:  I'm ready to address that, Your

22  Honor.

23             THE COURT:  Okay.

24             MR. PARKER:  And it addresses -- I think

25  that addresses a larger issue, and we have some

1   demonstratives that we'd like to show to the Court and

2   to the other side including a timeline.

3           The main problem we have with Mr. Howe's new

4   proposed supplemental expert report is for the very

5   first time in this case he has actually identified

6   source code related to Quanta -- Quanta Storage accused

7   devices, the very first time, and he admitted in the

8   deposition that was taken of him last week that he had

9   that information when his deposition was first taken and

10  his report was first issued, and he didn't use it.

11          He concentrated on the ASUS drives, and he

12  prepared similar charts for the ASUS drives but not for

13  the Quanta drives, and he has now done that for the

14  first time in a supplemental report that we received

15  last week, and they now are seeking for the very first

16  time in this case to have a fourth amended set of

17  infringement contentions.

18          Remember, Your Honor at the last hearing

19  granted them the right to submit their third amended

20  infringement contentions.  They had had an earlier

21  proposed fourth amended infringement contentions which

22  were never apparently submitted.  Now they are

23  submitting what they denominate as their fourth or

24  proposed fourth amended infringement contentions, and,

25  again, for the very first time actually list source code

1    for Quanta Storage accused drives.

2                Now, why is that inappropriate at this point

3    in time in this case?

4                THE COURT:  Are the --

5                MR. PARKER:  Your Honor, can I show --

6                THE COURT:  -- proposed fourth amended, are

7    they here somewhere?

8                MR. PARKER:  Yes, sir, and I'm ready to --

9    can I --

10               THE COURT:  Yes, sir.

11               MR. PARKER:  May I approach and show you

12   something?

13               THE COURT:  Yes, of course.

14               MR. PARKER:  The first is a timeline.  I

15   think I can go through this quite quickly, Your Honor.

16               Now, if -- the first two pages are the

17   timeline.  The first page is the true timeline.  The

18   second page emphasizes the amount of time that's

19   expired.  The third page is -- and there are actually

20   two pages there -- and this is what is in Mr. Howe's

21   supplemental report, and what they also want to place in

22   their fourth amended infringement contentions.  This for

23   the first time identifies source code of Quanta Storage

24   accused drives.

25               Now, if you flip to the next pair of pages,

 1   it's the same diagram, that is to say it's plaintiff's

 2   diagram, but in green, we have highlighted the drives

 3   and the source code that were made available to them in

 4   September and October of 2007, and there is no dispute

 5   about this.  Plaintiff's vendor picked up source code

 6   and generated the documents labeled QSI, slash, LD,

 7   1 through 1535.  All of those documents in green, all of

 8   that in green they have had since the fall of '07.

 9           If you go to the next page --

10           THE COURT:  Excuse me, what are QSI/LD 1

11   through 1535?

12           MR. PARKER:  Those are -- that is the copy

13   of source code that their technical expert gen -- as I

14   understand, and make sure I'm not misspeaking, their

15   technical expert generated from what we made available

16   to them in Los Angeles.  They came and got it, and they

17   got it in a searchable PDF format, which was their

18   choice to do.  Remember, Your Honor asked them about

19   that at the last hearing?

20           THE COURT:  I understand.

21           MR. PARKER:  And I think there might have

22   been some confusion about that at the last hearing

23   because as I recall, Your Honor cited the e-mail that we

24   had sent to them saying, "We have it on a computer.  You

25   can come do whatever you want to do with it."  This is

1   what they came and did with it at that time.  And then

2   they talked about asking for it in a deposition, and I

3   think the implications was that they asked for it in a

4   deposition shortly after the offer was made.  But that's

5   not what happened.

6            The offer was made in the fall of '07 by

7   Terry Garnett, one of the partners that has been

8   involved in handling this case.  The deposition of our

9   technical -- in-house technical person was taken almost

10  13 months later, and at that time, he made some

11  reference in needing to get to the source code.

12           The deposition was being defended by an

13  associate who is tech -- who is also a technical expert

14  but also happens to speak fluent Mandarin, and that's

15  why he was defending the deposition.  Mr. Garnett was

16  not there, and it was this associate some 13 months

17  later that they said, "Don't you have it around here?"

18  And he didn't know anything about that, but he invited

19  them on the record to say, "If you'll straighten this

20  out, if you point it out to me, we'll see what we can do

21  to get it to you."

22           There was never any follow-up on that, that

23  is to say getting to the native source code again until

24  in this Court on the hearing the last time we were here

25  in which the Court said, "Go ahead and make it available

1   to them."  And we did.  We made it available to them yet

2   again, but it was no different from what was available

3   to them in the fall of '07 and what was offered to them

4   in the fall of '07.

5            Now, if you look at the next pair of

6   experts, Your Honor, or documents, this is again their

7   chart, and what are added are these yellow stars?  Now,

8   what do the yellow stars mean?  The yellow stars mean

9   that in August of '08, the plaintiff deposed a QSI

10  technical witness on the documents and/or drives, each

11  one of them that has a yellow star by them, and there's

12  no doubt about that.  That is absolutely clear in the

13  record.

14           And now we move to the next set, and that's

15  Tab 4, and there you see not only yellow stars but red

16  stars.  Now, what does that mean?  The green, of course,

17  means it was made available in September and October of

18  '07.  The yellow means they deposed our man about it in

19  August of '08.  And the red means that in February of

20  '09, we provided narratives with respect to each one of

21  these drives and each one of these source code

22  references.

23           Remember, Your Honor, there was a dispute

24  about whether we ought to have to provide those

25  narratives, and the Court ordered us to do it, and we

1  did it, and the red stars indicate with respect to which

2  of the portions of the matrix provided by them those

3  narratives were given.

4            Now, finally, or moving along, if you look

5  at the next pair of pages, there are a couple of columns

6  that had been in white before and had no designation on

7  them.  The reason for that is these were newly-accused

8  drives.  They were newly-accused in February of this

9  year.  So, of course, we couldn't have given them

10  anything back in '07 or '08 with respect to them.  But

11  on March --

12            THE COURT:  Well, didn't I -- wasn't there

13  an order signed, though, that allowed them to get

14  discovery of accused drives and products that were like

15  accused drives or operated similarly to those?  I mean,

16  I didn't limit discovery at any time in this case to

17  accused drives, did I?

18            MR. PARKER:  Not to my knowledge, Your

19  Honor, but you did at some point require them to do this

20  within 30 days of their receipt of the source code that

21  would permit them to do this.

22            THE COURT:  Right.

23            MR. PARKER:  And we are now months and in

24  some cases years down the road from that.

25            THE COURT:  Right.

1           MR. PARKER:  And that's what our problem is.

2           THE COURT:  Well, I've seen that theme

3   throughout a lot of your filings, but I know that I

4   signed an order also that has a no excuses provision in

5   it, and that your failures in discovery are your

6   failures, and theirs are theirs, and the failure of one

7   party doesn't excuse compliance by the other party.  So

8   if that argument that y'all have been making seems to be

9   falling on deaf ears a little bit is because I know that

10   I've signed an order that dispatches it, okay?

11           MR. PARKER:  Yeah, and I'm not -- I don't

12   think I'm trying to make that argument here, Your Honor.

13           THE COURT:  No, I understand.  I'm just

14   trying to -- I'm trying to explain to you what my

15   position is about discovery transgressions.

16           MR. PARKER:  Yes, sir.

17           THE COURT:  And so -- I mean, I'm -- so when

18   you say that these were newly accused and we couldn't

19   have provided discovery on them, I disagree with that,

20   and that's why I interrupted you, okay?

21           MR. PARKER:  Yes, sir.  In any event, the

22   newly-accused drives, we did provide to them the source

23   code on March 17th of '09, and if you flip to the very

24   next one, on March 23rd of '09, we provided them

25   narratives that related to the newly-accused drives.  So

1   as late as March 23rd of '09, they had -- or as early as

2   March 23rd of '09, they had all of this, all of this,

3   and it was not until last week that now Mr. Howe

4   realizing -- and I know they realize now because of our

5   motion to strike their infringement contentions.  Their

6   infringement contentions do not in any way comply with

7   the local rules because they haven't done, even through

8   the third amended infringement contentions that this

9   Court permitted them to file, they haven't done what

10  they are now attempting to do and what they were ordered

11  to do a long time ago and what they've had the

12  capability to do in most cases for months, if not more

13  than a year, and have refused to do until after the

14  jury's struck and on the eve of trial.

15          And our position is we are substantially

16  prejudiced by them waiting to this late date after the

17  jury is struck to finally provide on a drive-by-drive

18  basis source code references that they could have

19  provided with respect to all of these drives months ago

20  and with respect even to the newly accused ones as early

21  as at least April of this year.

22          Now, we took Dr. Howe's continued

23  deposition, if you will, and he admitted during that

24  recent deposition that the source code and deposition of

25  QSI's witness in August of 2008 were available to him,

1    and he could have included that information in his

2    report, but he did not.  He made the choice not to do

3    so.  In fact, he agreed that all but three of the drives

4    now accused, those are the newly-accused drives in the

5    litigation, were disclosed back in August of 2008.

6              And he -- Dr. Howe informed us at his

7    recent -- at his recent deposition that he never even

8    received the source code provided by QSI on March the

9    17th, and on April 7th, 2009, Dr. Howe submits a

10   supplemental expert report finally citing to source code

11   that he has had available to him from almost the

12   beginning of this litigation.  We are -- and available

13   to them, Your Honor, in the format that they requested

14   and that their technical expert went and obtained.

15             Now, I understand that there have been

16   accused discovery transgressions on both sides of this

17   case from the beginning.  I haven't been managing this

18   case from the beginning, and I might have managed it

19   differently had I been doing so, but I have now had the

20   chance and I was at a little bit of a disadvantage when

21   we were here for the last hearing, I now have had a

22   chance to educate myself fully on what we've done.

23             And, frankly, Your Honor, while we might

24   have done some things more quickly and we might have

25   done some things more differently, it is absolutely

1    unfair and it is absolutely litigation by ambush for

2    them to come up at this late date, even after his

3    subsequent deposition, and prevent -- and present,

4    rather, a supplemental report by their expert and seek

5    to have this Court approve a fourth set of infringement

6    contentions two weeks before trial, two weeks after the

7    jury is selected.

8              It's absolutely inappropriate, and it is no

9    way we aren't substantially prejudiced by having to

10   proceed on that basis.  There is no way with the time

11   left we can have an expert prepared to respond to this

12   or to deal with this, Your Honor.  This is the ultimate

13   in terms of an ambush as far as we're concerned in this

14   case, and it should not -- absolutely should not be

15   permitted.

16             If you look at when the vast majority of the

17   source code, everything except for the three unaccused

18   drives, was provided 21 months ago, and the new

19   supplemental -- the fourth supplemental infringement

20   contentions, and that is sought to be filed or is filed

21   on June the 12th of '09.

22             And, Your Honor, I know that they have not

23   yet responded to our motion to strike their third

24   amended infringement contentions.  That is a motion

25   that's based on the fact that they don't meet the local

 1    rules, and they clearly don't.  It's not until their

 2    fourth amended, the ones that they are now asking the

 3    Court to permit to come in, that they have even made an

 4    effort to meet the local rules.

 5              And they're going to -- there's one more

 6    thing I want to point out, Your Honor, and this is maybe

 7    the most egregious move of all.  In taking our technical

 8    expert's deposition -- and I can -- I can get you the

 9    numbers, or I can get somebody to pull the numbers for

10    me.  In taking our technical expert's deposition, in an

11    effort to try to come in here and I think today or at

12    some point argue that this is somehow new, they showed

13    him exhibits and they showed him and they -- and they

14    apply -- they put new numbers on those exhibits.  I

15    don't want to misstate here.  I want to get it precisely

16    right.

17              Katherine, do you have that --

18              MS. MURRAY:  Yes.

19              MR. PARKER:  -- because I want to give the

20    corresponding -- as an example, on the May 28th and

21    29th, where are they?  Okay.

22              on May 28th and 29th, they took, per the

23    Court's permission from our last hearing, our technical

24    expert for I believe it was an additional 10 hours over

25    two days.  They marked an Exhibit 78 as this proposed

1   new exhibit, but it was Exhibit 3 from the same man's

2   deposition a year ago, more than a year ago.  They had

3   an Exhibit 7, and Exhibit 86 is the same as Exhibit --

4   they had a new Exhibit 86.  It is the same as Exhibit

5   29.  A new Exhibit 74 is the same as Exhibit 47.  A new

6   Exhibit 70 is the same as -- Exhibit 70 is the same as

7   Exhibit 42, and Exhibit 80 is the same as Exhibit 50.

8            In other words, in an effort, I think, to

9   try to argue that there's something new here, they

10  remarked as supposedly new exhibits to our in-house

11  technical guy's deposition the very same exhibits that

12  they had used with him before, and there's something

13  inappropriate about doing that and then trying to come

14  to this Court and argue that it's only because they got

15  this better availability to the source code since the

16  hearing in May that they are now able to provide these

17  infringement contentions.

18           First of all, that was offered as early as

19  '07.  It was their choice not to look -- it was their

20  choice to get it in a format they got it in then.  They

21  didn't ever ask for it again except this one mention in

22  a deposition approximately 13 months later that wasn't

23  followed up on at all.  When they brought it back up

24  again in May, we made it available again but to amend

25  the infringement contentions now and to change the

1   expert report now to include the source code is just

2   absolutely an ambush and should not be permitted, Your

3   Honor.

4            THE COURT:  Mr. Sankey, I know you hadn't

5   had a chance to file a written response, and you don't

6   have to orally respond at this time unless you want to,

7   so --

8            MR. SANKEY:  Your Honor, and that's what I

9   was going to tell the Court, is I obviously am not

10  intimately involved in this.

11           THE COURT:  And I'm not -- I understand he

12  wants -- he's making his argument, but I'm -- I'm going

13  to allow everybody adequate opportunity to respond.

14           So if you want to defer any argument,

15  I'll -- I'll reconvene another session if you want to

16  orally argue.

17           MR. SANKEY:  What I would like to do, Your

18  Honor, we will be filing that response later today I

19  believe is our deadline.

20           THE COURT:  Okay.

21           MR. SANKEY:  But I'd like to just make a few

22  general comments from my personal knowledge and then let

23  one of the technical expert attorneys respond once the

24  Court has all the briefing in.

25           THE COURT:  Before I forget, too, can y'all

1    tender to my chambers a copy -- complete copy of both of

2    your in-house persons' depositions, both the initial one

3    and then with those exhibits on it and the continuation

4    that I ordered with the new exhibits?

5              MR. PARKER:  Yes, sir.

6              THE COURT:  Okay.  I need that.  And I also

7    need -- that's it.  I'll call on you if I need anything

8    else.

9              MR. PARKER:  Yes, sir.

10             THE COURT:  Just before I forget that, I

11   want to see the entire depositions.

12             MR. PARKER:  We will do that.

13             MR. SANKEY:  Briefly, Your Honor, my general

14   comments would be this with respect to these charts and

15   the stars, with respect to the source code provided in

16   October of 2007, there was a deposition taken of their

17   deponent that I think now will be given to the Court in

18   August 2008 where their own witness says, looking at the

19   course code that we have provided to you, I can't tell

20   you how our products work.

21             It was at that same deposition that we had

22   requested and said, "We will take advantage of your

23   offer to provide us with this computer that has a reader

24   on it so we can read the source code."  A different

25   attorney from their side present added -- said, "I'm

1   not -- I don't understand what the agreement was.  I

2   don't understand what you want."  Didn't give it to us.

3           The red stars on the narrative that they

4   finally provided to the interrogatory answers based upon

5   an order from the Court, same thing.  Three or four

6   hundred pages of a narrative given to their witness and

7   saying, "Okay.  Now with the source code you've given us

8   with the narrative that you've given us, tell us how

9   your products work."

10          "Sorry, we can't do it."

11          Still not able to do it.  At the last

12  hearing, I think the Court heard the arguments about the

13  computer reader and the misunderstanding between the

14  parties and why it had never been provided.  The Court

15  ordered that be produced 48 hours before the deposition.

16          Mr. Howe and Mr. Trop went to L.A. on

17  Memorial Day.  They looked at it on Tuesday and

18  Wednesday, were able for the first time to read that

19  source code based upon that reader to the detail that

20  they needed with respect to the specific drives.  Mr.

21  Howe was deposed then on the following Thursday and

22  Friday on those issues.

23          THE COURT:  Well, not Mr. Howe, though, was

24  it?  Is that --

25          MR. SANKEY:  I'm sorry, their expert.

1          THE COURT:  Okay.

2          MR. SANKEY:  After Mr. Howe had had an

3     opportunity to -- to review that for the first time.

4          The only other general comment that I'll

5     make that -- is that with respect that there's something

6     nefarious or -- going on with, you know, renaming

7     exhibits something different, I don't think there's an

8     argument that we're changing the number on the exhibit

9     and now saying that this is first time we've ever had

10    that exhibit.  I just -- I don't think that's the case.

11          But with those general comments, I will rely

12    upon what we file this afternoon and any arguments from

13    the experts that have been intimately involved in this

14    issue.

15          THE COURT:  Well, I need -- and if you need

16    another day to make your filing, that's okay, but I want

17    to know what all interaction occurred, what conferencing

18    occurred as far as getting the source code on the

19    stand-alone computer that y'all requested at the

20    deposition.  I need to know what all efforts were made

21    by, you know, your view by both sides from August or

22    September of 2008 when y'all were in this deposition out

23    here until I ordered it to be produced the last time we

24    were here, because the meeting and conferring in this

25    case has been dismally poor since before I had the

1   scheduling conference, and I commented on it then, and,

2   you know, I want to know with sworn testimony or

3   affidavits what all happened.

4           And I'll -- and, obviously, the Quanta

5   defendants can introduce me to their view on that, as

6   well, but, you know, I commented on it at the scheduling

7   conference that the rules require you to meet and

8   confer, that y'all didn't know how to meet and confer,

9   y'all had a dispute over how to do that, and that's how

10  the case got kicked off, and that's how it's been ever

11  since, and it's going to trial on the 30th in some form

12  or fashion, so we'll -- I'll let you respond to that --

13          MR. SANKEY:  Okay.  One more comment --

14          THE COURT:  -- as best you can.

15          MR. SANKEY:  -- while I'm thinking of it,

16  Your Honor, that I wanted to respond to with respect to

17  their expert and having -- him having an ability to

18  review the fourth supplemental and respond to it.

19          It's my understanding, and, again, from what

20  I'm told from my colleagues, that their expert is not

21  going through the source code and the reader in the --

22  in their narrative explanation and testifying as to how

23  their products operate.  He's not doing that, so I don't

24  know that -- how he's prejudiced.

25          THE COURT:  Of course, their argument is

1   going to be they wouldn't have to do that because y'all

2   haven't identified the source code modules until -- I

3   mean, that's --

4              MR. PARKER:  You took the words right out of

5   my mouth, Your Honor.

6              THE COURT:  That's --

7              MR. PARKER:  That's what I was going to say.

8              THE COURT:  Like I said, y'all got a jury in

9   the box, it's going to trial on the 30th, and I will do

10   my level best to put it in a position that it needs to

11   be in given the position y'all have put it in.  So I'll

12   just leave it at that, and I'll sign whatever orders I

13   need to sign to get it there.

14              MR. SANKEY:  Yes, Your Honor.

15              THE COURT:  Okay?

16              MR. SANKEY:  Thank you, Judge.

17              THE COURT:  What else?  Anything else from

18   the plaintiff that we can do today?

19              MR. SANKEY:  Your Honor, the only other

20   thing that we've put in our letter, I think the parties

21   were going to ask the Court for the procedure with

22   respect to the inequitable conduct portion.  Would that

23   occur directly after or two weeks later or --

24              THE COURT:  You did say that in your letter,

25   and I don't have an answer for you, but I'll -- how much

1   time you think that case is going to take to put on?

2            MR. PARKER:  One day.  I'm not -- Mr. Platt

3   is going to do that, so I have to --

4            THE COURT:  That's okay.  Your estimate at

5   this time is it would take -- you can have it done in a

6   day, then, Mr. Platt?

7            MR. PLATT:  That's correct, Your Honor.

8            THE COURT:  Okay.  I don't know whether

9   he'll want to start it right as soon as the jury gets

10  the case or if he'd want to bring y'all back a couple

11  weeks later and schedule a time.

12           He may want to have you do some trial briefs

13  between -- from the time the case gets submitted to the

14  jury and the time you start.  He's done that in the past

15  on his inequitable conduct cases, but you did tell me

16  that in the letter.  I don't have an answer for you,

17  though, and I'll get you one as quickly as you can, all

18  right?

19           MR. SANKEY:  Nothing else from the

20  plaintiff.

21           THE COURT:  I'll try to get you one this

22  week, okay?

23           MR. PARKER:  One thing we did discuss last

24  time, Your Honor, and you said you were going to take it

25  under consideration was the issue of potential

1   additional time related to the fact that interpreters

2   are going to be used.

3            THE COURT:  I think you're going to get an

4   additional three hours, and I have raised that with the

5   trial judge, but I don't have a -- I don't want to

6   warrant that to you yet --

7            MR. PARKER:  Yes, sir.  Yes, sir.

8            THE COURT:  -- okay?  But I have raised it

9   with him.  He knows that it's an issue.  And I'll get

10   you -- I'll get you something on that today formally,

11   okay?

12            MR. PARKER:  Yes, sir.

13            THE COURT:  He is -- let me -- he is out of

14   state today.  I'll get you something as quickly as I

15   can, but before -- I think before the close of the week

16   for sure, okay?

17            MR. PARKER:  Understood.  Understood.

18            THE COURT:  All right.  Is that it?

19            MR. PARKER:  Yes, sir.

20            MR. SANKEY:  Yes, sir.

21            THE COURT:  All right.  Again, I appreciate

22   the -- the agreements that y'all have made on your

23   exhibits.  If y'all want to start working on your lists,

24   I've carried a few things, and I'll get you rulings.  If

25   you just want to indicate on your lists that you're

```
 1    submitting to me that you've carried -- or that the

 2    Court has carried, you know, the objections to those

 3    exhibits, if you want to put it in an order form that

 4    just said, you know, The following were -- exhibits were

 5    admitted without objection, the following objections

 6    were made and overruled by the Court to these exhibits

 7    and they're admitted, and these were sustained, and

 8    these exhibits are excluded, then I'll sign that so

 9    you'll know before you -- you can use your exhibits,

10    then, that are in evidence in opening statement, okay?

11              MR. PARKER:  Yes, sir.

12              THE COURT:  All right.  Thank y'all.

13              COURT SECURITY OFFICER:  All rise.

14              (Recess.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATION

 2

 3            I HEREBY CERTIFY that the foregoing is a

 4    true and correct transcript from the stenographic notes

 5    of the proceedings in the above-entitled matter to the

 6    best of my ability.

 7

 8

 9
      SHELLY HOLMES                        Date
10    Deputy Official Reporter
      State of Texas No.: 7804
11    Expiration Date:    12/31/10

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```