```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3  LASERDYNAMICS                *    Civil Docket No.
                                 *    2:06-CV-348
 4  VS.                          *    Marshall, Texas
                                 *
 5                               *    June 30, 2009
    QUANTA, ET AL                *    8:30 A.M.
 6
                TRANSCRIPT OF TRIAL PROCEEDINGS
 7          BEFORE THE HONORABLE T. JOHN WARD
               UNITED STATES DISTRICT JUDGE
 8                      AND A JURY

 9  APPEARANCES:

10  FOR THE PLAINTIFFS:    MR. THOMAS SANKEY
                           MR. GREGORY LUCK
11                         Duane Morris
                           3200 Southwest Freeway
12                         Suite 3150
                           Houston, TX   77027
13
                           MR. TIMOTHY TROP
14                         Trop Pruner & Hu
                           1616 South Voss Road
15                         Suite 750
                           Houston, TX   77057
16
                           MR. JEFFREY RAMBIN
17                         Capshaw DeRieux
                           1127 Judson Road
18                         Suite 220
                           Longview, TX   75601
19
    APPEARANCES CONTINUED ON NEXT PAGE:
20

21  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                           MS. JUDY WERLINGER, CRS
22                         MS. SHELLY HOLMES
                           Official Court Reporters
23                         100 East Houston, Suite 125
                           Marshall, TX   75670
24                         903/935-3868

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:          MR. MELVIN WILCOX
                            Yarbrough & Wilcox
                            100 East Ferguson
                            Suite 1015
                            Tyler, TX    75702

                            MR. JOHN PARKER
                            Paul-Hastings
                            600 Peachtree St., NE
                            Suite 2400
                            Atlanta, GA    30308

                            MR. CHRISTIAN PLATT
                            MS. ERICKA SCHULZ
                            Paul-Hastings
                            4747 Executive Drive
                            12th Floor
                            San Diego, CA    92121

                            MS. KATHERINE MURRAY
                            MR. JAY CHIU
                            Paul-Hastings
                            515 South Flower Street
                            25th Floor
                            Los Angeles, CA    90071

                *        *        *        *        *        *

                        P R O C E E D I N G S

            COURT SECURITY OFFICER:  All rise.

            (Jury in.)

            THE COURT:  Please be seated.

            Morning, Ladies and Gentlemen.  Thank you

very much for being here.

            Morning, Counsel.  Appreciate y'all being

here timely.

1           We're going to get started here in just a
2  few minutes.  And as you know, our schedule, we're going
3  to work today, Wednesday, and Thursday.  The courthouse
4  is closed for July 4th, and we'll come back next week
5  and finish this case up then.
6           At this time, I want -- for
7  announcements, for the record in this case of
8  LaserDynamics versus the Quanta Defendants, Cause Number
9  2:06-CV-348.  When you make your announcement, please
10 reintroduce yourself to the jury so that they'll know.
11          Who'll be talking for the Plaintiff.
12          MR. SANKEY:  Your Honor, Tom Sankey, on
13 behalf of LaserDynamics for the Plaintiff, and we're
14 ready to proceed.
15          THE COURT:  Okay.  All right.  For
16 Defendant?
17          MR. PARKER:  John Parker on behalf of the
18 Defendants, Your Honor.  We are ready to proceed.
19          THE COURT:  Okay.  Good.
20          All right.  Ladies and Gentlemen, I need,
21 the first thing, to give you some preliminary
22 instructions in this case.  I know that some of you've
23 served as jurors in state court cases.  And one of the
24 main difference that I -- for jurors in state court, as
25 opposed to what's going to happen in federal court, is

1   at the end of the trial, all of the instructions that

2   the Court has given to you during the course of the

3   trial are handed to you in written form.  That's not

4   true in federal court.

5              All my instructions to you will be

6   orally, and you'll be -- at the end of the case, you'll

7   be asked to answer some questions based upon my

8   instructions on the law and the evidence that you've

9   heard.  So for that reason I ask that you pay close

10  attention to my remarks.

11             You've been previously sworn as the jury

12  to try the case.  And as the jury, you will decide the

13  disputed questions of fact.  As the Judge, I will decide

14  all questions of law and procedure.  From time to time,

15  during the trial and at the end of trial, I will

16  instruct you on the rules of law that you must follow in

17  making your decision.

18             Now, we all know this is a patent case.

19  Have the jurors yet been furnished their jury notebooks

20  or not?

21             MR. SANKEY:  Your Honor, I believe

22  they're on the table right here in front of the court

23  reporter.

24             THE COURT:  Okay.  Why don't we go ahead

25  and hand them their notebooks, because I'm going to talk

1  to them about the patent in just a moment.

2                    (Jury notebooks distributed.)

3                    THE COURT:  All right.  Thank you,

4  Mr. McAteer.  That's fine.

5                    We'll talk about it in just a moment on

6  opening, but I will refer to them.  But as you know,

7  this is a patent case, and you've seen the film, I

8  believe, of -- before you were selected.

9                    But it involves a dispute relating to a

10 United States patent.  Before summarizing the position

11 of the parties, I'm going to review with you again and

12 explain what a patent is and how one is obtained.

13                    The United States Constitution grants

14 Congress the power to enact laws to promote the progress

15 of science and useful arts by securing, for limited

16 times, to authors and inventors the exclusive right to

17 their respective writings and discovery.

18                    Now, with this power, Congress enacted

19 our patent laws.  Patents are granted by the United

20 States Patent & Trademark Office, many times referred to

21 as the PTO.  The process of obtaining a patent is called

22 patent prosecution.

23                    A valid United States patent gives a

24 patent owner the right, for up to 20 years from the date

25 the patent application was filed, to prevent others from

making, using, offering to sell, or selling the patented

invention within the United States or from importing it

into the United States without the patent holder's

permission.

A violation of the patent owner's rights

is called infringement.  The patent owner may try to

enforce a patent against persons believed to be

infringers by a lawsuit filed in a federal court.

To obtain a patent, one must file an

application with the PTO.  The PTO is an agency of the

federal government and employees, trained examiners, who

review the applications for patents.

The application includes what is called a

specification, which must contain a written description

of the claimed invention telling what the invention is,

how it works, how to make it, and how to use it so that

others skilled in the field will know how to make and

use it.  The specification concludes with one or more

numbered sentences.  These are the patent claims.

If you look there in your notebook, the

first thing you've got is the patent.  And if you turn

to the very back of the last part of the patent, you'll

see these last -- these numbered paragraphs at the very

end of the patent.  Those are the claims.  I just wanted

you to know where you could find them.  They're always

1 at the end of the patent, and they're numbered

2 paragraphs.

3             It is the claims -- when the patent is

4 eventually granted by the PTO, it is these claims that

5 define the boundaries of its protection and give notice

6 to the public of what those boundaries are and what is

7 protected by the patent.

8             And after the applicant files the patent

9 application, the PTO, or Patent Examiner, reviews the

10 patent application to determine whether the claims are

11 patentable and whether the specification adequately

12 describes the invention claimed.

13             In examining a patent application, the

14 Patent Examiner reviews records available to the PTO for

15 what is referred to as prior art.  The Examiner also

16 reviewed prior art if it is submitted to the PTO by the

17 applicant.  Prior art is defined by law, and at a later

18 time, I will give you some very specific instructions as

19 to what constitutes prior art.

20             However, in general, prior art includes

21 things that existed before the claimed invention that

22 were publicly known or used in a publicly accessible way

23 in this country or that were patented or described in a

24 publication in any country.

25             The Examiner considers, among other

things, whether each claim defines an invention that is new, useful, and not obvious in view of the prior art.

Now, the patent lists the prior art at the front of the patent that the Examiner considered. When you look there at the front part of your patent, on the first page, the list is called the cited references.

Now, after a prior art search and examination of the application, the Patent Examiner then informs the applicant in writing what the Examiner has found and whether any claim is acceptable and thus will be allowed.  This writing from the Patent Examiner is called an office action.

If the Examiner rejects the claims, the applicant then responds and sometimes changes the claims or submits new claims.  This process which takes place only between the Examiner and the patent applicant may go back and forth for some time until the Examiner is satisfied that the application and the claims meet the requirements for a patent.

The papers that are generated during this time of communicating back and forth between the Patent Examiner and the applicant make up what is called the prosecution history.  All of this material becomes available to the public no later than the date when the patent issues.

1              Now, the fact that the PTO grants a

2    patent does not necessarily mean that any invention

3    claimed in the patent, in fact, deserves the protection

4    of a patent.  For example, the PTO may not have had

5    available to it all the information that will be

6    presented to you in this trial.

7              A person accused of infringement has the

8    right to argue here in federal court that a claimed

9    invention in a patent is invalid because it does not

10   meet the requirements of the patent.

11             To take it a little bit further, look at

12   the patent there at the front page of your patent that

13   you have.  The cover page of the patent provides

14   identifying information, including the date the patent

15   issued and the patent number along the top of it, as

16   well as the inventors' names, the filing date, and as I

17   mentioned before, a list of the cited references that

18   were considered by the PTO.

19             Then you find that the specification

20   begins with an abstract, and the abstract is a brief

21   statement about the subject matter of the invention.

22             Next, you will find drawings.  The

23   drawings illustrate various aspects of the features of

24   the invention.  The written description of the invention

25   appears next and is organized into two columns on each

1  page.

2              And you have each line -- about every

3  five lines, there's a number out at the side so you

4  can -- when you refer to a column and Line 23, you can

5  find it pretty quickly.

6              The specification then ends with these

7  numbered paragraphs that I mentioned to you earlier.

8  These are the patent claims, and it is those patent

9  claims that determine the scope of the invention and

10  what is entitled to protection.

11             Now, to help you follow the evidence in

12  this case, I want to give you a brief summary of the

13  position of the parties.  The Plaintiff in this case is

14  LaserDynamics, Inc.  The Defendants in this case are

15  Quanta Storage, Inc., Quanta Computer USA, Inc., Quanta

16  Storage America, Inc., and Quanta Computer, Inc.

17             Now, the parties and I may refer to the

18  Defendants collectively as Quanta or the Defendants.

19             As you know, the patent, there before

20  you, is a United States patent, and that number is

21  5,587,981.  Now, for convenience, the parties and I will

22  oftentimes refer to the patent by the last three digits

23  of the patent number.  So in other words, this case

24  involves the '981 patent.

25             The Plaintiff files suit in this Court

1 seeking money damages from the Defendants for allegedly

2 infringing Claim 3 of the '981 patent by acts of

3 contributory infringement and inducing the use of a

4 certain optical disk device that constitutes

5 infringement.

6        The Plaintiff further alleges that the

7 Defendants' infringement was willful.  The Defendants

8 deny that they -- that they infringe Claim 3 of the

9 patent, and they deny that there's any willful

10 infringement and deny -- and they contend it is their

11 position that Claim 3 of the patent, the one asserted

12 claim in this case, is invalid.

13        Now, your job in this case will be to

14 decide whether Claim 3 of the '981 patent has been

15 infringed and whether the claim is invalid.  If you

16 decide that Claim 3 has been infringed and not -- is not

17 invalid, then you will need to decide any money damages

18 that should be awarded to the Plaintiff to compensate

19 the Plaintiff for the infringement.

20        You will also need to make a finding as

21 to whether the infringement was willful.  If you decide

22 that any infringement was willful, that decision should

23 not affect any damage award you give.  It is for the

24 Court, and I will take willfulness into account later.

25        It is my job to determine the meanings of

1    any claim language that needs interpretation.  You must

2    accept the meanings I give you and use them when you

3    decide whether any claim of the patents has been

4    infringed and whether any claim is invalid.

5              There in your notebook, you have been

6    provided with a copy of the meaning that I have adopted

7    for certain claim terms.

8              I'll talk to you generally about the

9    trial.  As soon as I finish these preliminary

10   instructions, the lawyers for the parties will make what

11   is called an opening statement.  Now, opening statements

12   are intended to assist you in understanding what the

13   evidence that you will hear following it.  What the

14   lawyers say is not evidence.

15             After the opening statements, the parties

16   will then present their evidence.  And after all the

17   evidence is presented, the lawyers will again address

18   you to make final arguments.  Then I will give you my

19   final instructions on the law, and you will thereafter

20   retire to deliberate on your verdict.

21             Let me talk to you a little bit about

22   your conduct as jurors.  First, you are not to discuss

23   this case with anyone, including your fellow jurors,

24   members of your family, people involved in the trial, or

25   anyone else, nor are you allowed to permit others to

1  discuss the case with you.

2            Should anyone approach you and try to

3  talk to you about the case, please let me know about it

4  immediately.

5            Second, do not read any news story or

6  articles, listen to any radio or television reports

7  about the case or about anyone who has anything to do

8  with it.

9            Third, do not do any research, such as

10  consulting dictionaries or searching on the internet or

11  using other reference materials.  And do not make any

12  investigation of any type about the case on your own.

13            Fourth, if you need to communicate with

14  me, simply give a note here to our court security

15  officer, Mr. Pete McAteer, and he will give it to me.

16            Fifth -- this is very important; all of

17  these are important -- do not make up your mind about

18  this case or what the verdict should be until after you

19  have gone to the jury room to decide the case and you

20  and your fellow jurors have had the opportunity to

21  discuss the evidence.

22            Keep an open mind.  Remember, the

23  Plaintiff goes first, then the Defendant will go, and

24  then there may be some rebuttal testimony.  But you need

25  to have heard all the evidence, the argument of counsel,

1  and my instructions on the law before you make up your

2  mind.  So please keep an open mind.

3              Now, during the trial, it is -- may be

4  necessary for me to confer with the lawyers out of your

5  hearing or to conduct a part of the trial out of your

6  presence.  I will handle these matters as briefly and as

7  conveniently for you as I can.  But you should remember

8  that they are a necessary part of any trial.

9              With respect to evidence, the evidence

10  that you are to consider in deciding what the facts are

11  consist of sworn testimony of any witness, the exhibits

12  which are received into evidence, and any facts to which

13  the lawyers stipulate -- stipulate.

14              What's not evidence?

15              The following things are not evidence,

16  and you must not consider them as evidence in deciding

17  the facts of the case:  Statements and arguments of the

18  attorneys, questions and objections of the attorney,

19  testimony that I instruct you to disregard, and anything

20  that you may see or hear when the Court is not in

21  session, even if what you see or hear is done or said by

22  one of the parties or by one of the witnesses.

23              Now, evidence may be direct or it may be

24  circumstantial.  Direct evidence is proof of a fact,

25  such as testimony by a witness about what the witness

1  personally saw or heard or did.  Circumstantial evidence

2  is proof of one or more facts from which you can find

3  another fact.

4          You should consider both kinds of

5  evidence.  The law makes no distinction between the

6  weight to be given either direct or circumstantial

7  evidence.  It is for you to decide how much weight to

8  give any evidence.

9          In deciding facts in this case, you may

10  have to decide, and undoubtedly you will have to decide,

11  which testimony to believe and which testimony not to

12  believe.  You may believe everything a witness says,

13  part of it, or none of it.

14          In considering the testimony of any

15  witness, in deciding their credibility, you may take

16  into account the opportunity and ability of the witness

17  to see, hear, or know the things testified to, the

18  witness' memory, the witness' manner while testifying,

19  the witness' interest in the outcome of the case and any

20  bias or prejudice they may have, and whether the other

21  evidence contradicted the witness' testimony, the

22  reasonableness of the witness' testimony in light of all

23  the evidence, and any other factors that you believe

24  bear on their credibility or believability of their

25  testimony.

1            Now, the weight of the evidence as to a

2    fact does not necessarily depend on the number of

3    witnesses who testify.  You must consider only evidence

4    in the case.  However, you may draw such reasonable

5    inferences from the testimony and exhibits as you feel

6    are justified in light of your common experience.

7            You may make deductions and reach

8    conclusions that reason and common sense lead you to

9    make from the testimony and evidence.

10            This is a patent case.  There's going to

11    be some technical testimony, testimony from different

12    experts.  The best tool that you have in deciding this

13    case is your collective wisdom and your common sense.

14            Do not leave your common sense outside

15    this courtroom.  It will serve you well.

16            The testimony of a single witness may be

17    sufficient to prove any fact, even if a greater number

18    of witnesses have testified to the contrary, if, after

19    considering all the other evidence, you believe the

20    single witness.

21            I'll talk to you -- I've mentioned a

22    couple of terms on the day we selected the jury.  These

23    are very important terms.  I'll mention them again to

24    you.

25            Let's talk about the burden of proof;

1   first, about preponderance of the evidence.

2                When a party has the burden of proof on

3   any claim or affirmative defense by a preponderance of

4   the evidence, it means you must be persuaded by the

5   evidence that the claim or affirmative defense is more

6   likely true than not true.  You should base your

7   decision on all the evidence, regardless of which party

8   presented it.

9                You'll recall, perhaps, that when we

10  selected the jury, we talked about the scales of

11  justice.  You've heard no evidence in this case, so at

12  this time, the scales start off exactly even.

13               If at the end of the trial, in order to

14  meet the burden of a preponderance of the evidence where

15  the party has the burden by a preponderance of the

16  evidence, if the scales of credible testimony that which

17  you believe tip ever so slightly, they have met their

18  burden of proof by a preponderance of the evidence.

19               Another burden of proof that you'll be

20  called upon to apply in this case is the clear and

21  convincing evidence.  Now, when a party has the burden

22  of proving any claim or defense by clear and convincing

23  evidence, it means the party must persuade you that it

24  is highly probable that the facts are as that party

25  contends.

1                  Looking at the scales of justice, they

2    must be tipped more heavily in favor of the party with

3    the burden to prove by clear and convincing evidence.

4                  That is not to be confused with beyond a

5    reasonable doubt in a criminal case that you hear a lot

6    about in TV.  The scales would have to be tipped even

7    much greater, because in that case, a person's liberty

8    is at stake.

9                  Again, you should base your decision on

10   all the evidence on which party -- regardless of which

11   party presents it.

12                  Now, we're going to hear testimony from

13   what are known as expert witnesses.  And when knowledge

14   of a technical subject may be helpful to the jury, a

15   person who has special training or experience in that

16   technical field, called an expert witness, is permitted

17   to state his or her opinion on those technical matters.

18                  However, you are not required to accept

19   that opinion.  As with any other witness, it is up to

20   you to decide whether or not to rely on the expert

21   witness' testimony.

22                  Undoubtedly, there will be depositions in

23   this case, Counselor?

24                  MR. SANKEY:  Yes, Your Honor, there will

25   be.

1                   THE COURT:  Are they all video or some of

2 them?

3                   MR. SANKEY:  There are a few short ones

4 that will be just read.

5                   THE COURT:  Okay.

6                   MR. PARKER:  That's correct, Your Honor.

7                   THE COURT:  All right.  During the trial

8 of this case, certain testimony may be presented -- will

9 be presented to you by way of deposition.  This is a

10 testimony of a witness, who for some reason, cannot be

11 present to testify from the witness stand.  It will be

12 presented either in writing or by way of a video.

13                   In both cases, the testimony is under

14 oath in the form of a deposition.  Such testimony is

15 entitled to the same consideration, and insofar as

16 possible, is to be judged as to credibility, weight, and

17 otherwise considered by the jury in the same way as if

18 the witness had been present and given from the witness

19 stand the testimony read or shown to you from the

20 deposition on the video.

21                   It is the duty of the lawyer on each side

22 of the case to object when the other side offers

23 testimony or other evidence which the attorney believes

24 is not properly admissible.

25                   Now, upon allowing testimony or other

1  evidence to be introduced over the objection of an

2  attorney, the Court does not, unless expressly stated,

3  indicate any opinion as to the weight or effect of such

4  evidence.

5           As I've said to you before, the jurors

6  are the sole judges of the credibility of all the

7  witnesses and the weight and effect of all evidence.

8           However, when the Court sustains an

9  objection to a question addressed to the witness, the

10 jury must disregard the question entirely and may draw

11 no inference from the wording of it or speculate as to

12 what the witness would have said, if permitted to answer

13 any question.

14          The law of the United States permits the

15 judge to comment to the jury on the evidence in the

16 case.  Such comments are only expressions of the judge's

17 opinions as to the facts, and the jury may disregard

18 them entirely since the jurors are the sole judges of

19 the facts.

20          Now, that is the end of my preliminary

21 instructions.

22          Will the Rule be invoked in this case?

23          MR. SANKEY:  Your Honor, we would move to

24 invoke the Rule.

25          MR. PARKER:  We agree, Your Honor.

1                      THE COURT:  All right.  I'll excuse

2  expert witnesses from the application of the Rule.

3                      MR. PARKER:  Yes, sir.

4                      THE COURT:  And -- do we have other fact

5  witnesses present?

6                      MR. SANKEY:  We don't have any, other

7  than the parties, Your Honor.

8                      MR. PARKER:  We don't either, Your Honor.

9                      THE COURT:  Okay.  You've got designated

10 representatives present.  They're excused from the Rule.

11                     All right.  Be seated, Counsel.

12                     Let me just explain to the jury what the

13 Rule means.  As to witnesses other than the designated

14 representatives of the parties and experts who are

15 allowed to hear the testimony, since they will need to

16 hear the testimony perhaps or may wish to so that they

17 can express their opinions based on what they've heard,

18 other witnesses have to remain outside the courtroom.

19 And they cannot hear what other witnesses testify to.

20 And they are prohibited, from this point forward, from

21 discussing their testimony with anyone, other than the

22 lawyer.  And the witness as well as the lawyer has a

23 duty to be sure that when they are talking to a

24 particular witness that they are out of the earshot of

25 any other person, so they can't hear what's being said.

1          And so the lawyers are instructed to be

2   sure that in talking with any witness before they come

3   on the stand that they are out of earshot.

4          Nothing further, we'll now hear opening

5   statements from the Plaintiff.  Mr. Sankey?

6          MR. SANKEY:  Thank you, Your Honor.  May

7   it please the Court, counsel.

8          Ladies and Gentlemen of the Jury, good

9   morning.

10          We thank you for being here and being

11  chosen as jurors, and we ask that we be allowed to

12  present our evidence to you over the next several days,

13  and that you use your common sense, as Judge Ward told

14  you, to make a decision and answer the questions that

15  will be presented to you at the end of the case.

16          A quick reintroduction, because it has

17  been several weeks since we met the first time.  My name

18  is Tom Sankey.  The Plaintiff in this case is

19  LaserDynamics, who is represented by the President of

20  the company, Mr. Yasuo Kamatani.

21          I have with me at counsel table, Mr. Greg

22  Luck.  I have Mr. Jeff Rambin.  And then you'll see

23  throughout the courtroom a number of people that will be

24  assisting us during the trial of this case.  We have

25  Wendy that is handling the graphics.  We have Eileen

1  that is handling exhibits for us, and a number of other

2  lawyers that are working behind the scenes on important

3  issues that we discuss with the Judge when you're not in

4  the courtroom.

5           This is a very important case not only

6  for LaserDynamics and Mr. Kamatani but for the patent

7  system.  As you are aware by now, the United States

8  government issued Mr. Kamatani a patent, and when they

9  issue the patent, they have a nice little red ribbon on

10  it, because this is the official one that they issued to

11  him.

12           You will hear testimony that he applied

13  for this patent in 1995, and that date is going to be on

14  the left side of the first page.  And the top right-hand

15  corner shows the date that it was issued, which was at

16  the very end of 1996.  The dates in this case are going

17  to be very important to you, and you're going to hear me

18  talk about them a lot.

19           The technology, as we discussed before,

20  and you'll hear the experts describe it in much better

21  detail than I ever could, but the technology has to do

22  with optical disk drives, which you find in almost every

23  computer, which you find in DVD players, which you find

24  in CD players.

25           As I mentioned to you during the jury

1  selection, you have disks that look identical.  A CD

2  that plays music, a DVD that plays movies, if you hold

3  them up and look at them with the naked eye, you can't

4  tell the difference.

5            The problem is, when you put it into the

6  machine, the machine has to figure out which one it is

7  before it starts playing, because it uses different

8  methods to do so.  And this is what's referred to as a

9  method patent.

10            We refer to that or we talk about that

11  amongst the lawyers and the experts as disk

12  discrimination.  It discriminates between what type of a

13  disk it is about to play, and then it plays it.

14            You will hear testimony that the

15  Defendants' products that they make and sell and ship

16  into the United States, these drives, do just that; they

17  discriminate between what type of a disk it is, and then

18  they play it.

19            There are two things that Judge Ward said

20  this morning that are of such importance that I want to

21  say them again and talk about them just briefly.

22            The first thing that he has said on a few

23  occasions is that what the lawyers in the case say is

24  not evidence.  What I'm saying to you in opening

25  statement is not evidence, what I'll say to you in

1  closing argument is not evidence, what Mr. Parker says

2  to you is not evidence.

3              All the evidence that you're going to get

4  in this case will come from that witness stand up there

5  and/or from the exhibits that the Judge has admitted in

6  this case.  And he has preadmitted most exhibits for

7  both the Plaintiff and for the Defendant.  And those are

8  in evidence, and you'll get a good chance to see those.

9              The important thing about that is, and

10 I'll give you the example, during jury selection,

11 Mr. Parker said, you know, what if we have a contract

12 that says X?

13             And one of the panel that was out there,

14 not one that was chosen to be on the jury, but one of

15 them raised his hand, and he said, well, I'd have to see

16 the contract, and I'd have to read the contract.

17             That's exactly the right answer.  That's

18 exactly right, because that contract will be in

19 evidence, and what that contract says is what you are to

20 rely upon in making your decision, not what Mr. Parker

21 says, not what Mr. Sankey says.

22             Again, the exhibits and the witnesses are

23 extremely important to you, and we will have those

24 agreements before you, and we will walk through those --

25 a few of those exhibits with the witnesses and look at

1   them to see what they say, not what the Defendants tell

2   you they say.

3              The second thing that Judge Ward told you

4   that is of extreme importance, when it comes time to

5   make your decision in this case, was the burden of

6   proof.  And we've got the scales of justice up here, and

7   I've heard it described just a little bit different than

8   Judge Ward did that I'll tell you.  But, basically,

9   again you have the scales, and the Plaintiff will put on

10  their evidence for the first half of the case, and then

11  the Defendants will put on their evidence.  The

12  Plaintiff will come back.

13             At the end of the case, if there's 3

14  ounces on this side and 3 ounces on this side and the

15  Plaintiff has an exhibit that is a feather and he puts

16  it on their side, that is meeting the preponderance of

17  the evidence.  It is more likely than not that this is

18  true than this is true, if you have one feather more on

19  one side of that scale than on the other.

20             It is a -- a rather light burden, but it

21  is the burden that you will be using in deciding at

22  least two issues against the Defendants.

23             One, do they infringe?

24             Again, the burden is going to be one

25  feather more or not.

1                    The amount of damages that you decide in

2    the case, preponderance of the evidence, one feather

3    more or not.

4                    The other burden that we talked about is

5    the clear and convincing burden, a much higher burden

6    than just one feather.  And Judge Ward, before you

7    retire to make your decision at the end of this case,

8    will give you definitions of preponderance, and he'll

9    give you definitions of clear and convincing.

10                    Now, as Judge Ward told you, when the

11   United States, or since the United States government has

12   issued this patent, after going through a process where

13   they have an Examiner that is trained, and he issues it

14   and says this is a valid patent, there is a presumption

15   that it is valid.

16                    Now, the Defendants, as part of their

17   defense, are going to say, well, if we infringe and if

18   you think we owe damages, well, we want to fight this

19   and say the government shouldn't have done this; they

20   made a mistake; they're wrong; the patent is invalid.

21   And you will be asked a question at the end of the case,

22   do you find that the patent is not invalid.

23                    On that, you have the much higher burden

24   of clear and convincing, and it makes sense, because

25   there's a presumption of validity because it's already

1  been issued by the government, and they're trying to

2  change that decision.

3              So when you answer that question again,

4  read the burden, because it has to be a much higher

5  clear and convincing in your mind that the patent is not

6  valid.

7              Let me talk to you about what I expect

8  the evidence to be over the next several days and how I

9  think it will be presented to you.  And Mr. Parker will

10  do the same thing when he gives his opening.  We're not

11  a hundred percent right.

12              We don't know what the witnesses are

13  going to say.  We have an idea of what they're going to

14  say, because during the discovery in this case, we've

15  taken depositions; we've exchanged documents.  We have

16  an idea, but we're not a hundred percent certain.

17  Of course, you're going to hear from Mr. Kamatani, the

18  President of LaserDynamics.  As I told you in jury

19  selection, born and raised in Japan.  Came to the United

20  States and went to the Massachusetts Institute of

21  Technology, MIT, in Boston.

22              Applied or began applying for patents,

23  and he's obtained a number of patents.  You'll hear

24  about them.  And he obtained what we're referring to in

25  this case as the '981 patent.

1              Mr. Kamatani followed the rules.  He will

2    testify about his background.  You'll understand where

3    he's from, a little bit about his family life, how he

4    came to the United States and got his education, and how

5    he began applying for and obtaining patents from the

6    United States government.

7              He's also going to tell you what happened

8    after he got his patents and the fact that he had a

9    number of companies in Japan and in Taiwan and in the

10   United States that came to him and said we would like to

11   use your technology, but we know the government has now

12   given you protection on your technology, so we're

13   willing to pay you money and get a license so that we

14   can use it and sell products using your technology in

15   the United States.

16             Mr. Kamatani is going to testify to you

17   about what has been happening in the industry, the DVD,

18   the optical disk drive industry, from about 1995 through

19   today, 2009.  And, again, we're back to talking about

20   what I'll put up here in a minute on a timeline to show

21   you '95 -- 1995 through 2009.

22             And that timeline will be critical,

23   critical to you in making your decisions in this case,

24   because this is a rapidly growing industry, a rapidly

25   changing industry.  In the last ten years, it's gone

1  from infancy to where it is today.  You'll see and hear

2  evidence of that.

3            Let me talk to you just for a minute

4  about something that happened over the last two years.

5  This lawsuit, by the way, was filed in, I believe,

6  August of 2006.  During that time period, we've been

7  conducting discovery, exchanging documents, taking

8  depositions of witnesses.

9            But one of the things that people that

10  consider themselves in the same industry or potential

11  competitors, they don't want each other sometimes to see

12  each other's documents.  So they have contracts that

13  they didn't want Mr. Kamatani to see.  We had things we

14  didn't want them to see, and they get marked attorney's

15  eyes only.

16            The Court enters an order saying you can

17  do that, and so there are many documents that they have

18  given to our side that Mr. Kamatani hasn't been able to

19  see.  The lawyers can look at them, his expert witnesses

20  can look at them, but he cannot see them because of

21  their confidential nature.

22            The issue there and the reason I bring

23  that up is that when Mr. Kamatani testifies, he has

24  never seen many of those agreements that they entered

25  into.  He hasn't seen their financial numbers.  He

1  doesn't know what their sales have been into the United

2  States over the last two or three years.  And so he's

3  not going to know the answer to those questions, and

4  that's precisely why.

5              His expert witnesses have reviewed those

6  documents.  They know the contracts.  They know the

7  numbers.  And when they get on the stand, they're going

8  to tell you what those documents say.  They'll show you

9  the documents, and they'll tell you what the numbers

10 are.

11             But I wanted you to understand what

12 attorney's eyes only documents are that the parties

13 exchange between each other so that if a witness for

14 either side says I haven't been allowed to see that

15 document, I don't know the answer to that, you'll

16 understand as opposed to say, well, why doesn't he know

17 the answer to that.  That's the reason why.

18             Wendy, could we put up the timeline for a

19 second?

20             And as I told you, I think, in my

21 opinion, this timeline is going to be critical in you

22 making your decision in this case.

23             If we look at this timeline, it goes --

24 the application of when the patent was filed in 1995, I

25 told you it was issued at the very end of 1996.  And

1  then if you look in 1997 and '98, we have LD, which is

2  LaserDynamics, the Plaintiff in this case, entering into

3  many license agreements with those that came to them and

4  said I want to use your technology; I want to sell

5  products into the United States; I will pay you money

6  for a license.

7              The reason why this timeline is going to

8  be critical to you, again, is because of the drastically

9  changing market.  As you see, most of these agreements

10 are before 2000/2001.

11             After this time period, the market takes

12 off and DVDs become the number one market for movies.

13 If you'll all recall, back in the '90s, if we went to

14 Blockbuster to rent a movie, we watched it on VHS.

15 That's what they had at that point in time.

16             Starting sometime in the early 2002/2003

17 time period, you go to a Blockbuster, you can't find a

18 VHS.  They're all on DVDs.  It became the market.

19 I think that you'll hear one of the Defendants that --

20 the one that manufactures the drive, Quanta Storage,

21 I'll refer to them sometimes as QSI, didn't even start

22 as a company until 1999.  They don't start making these

23 disks until 2001 and 2002, after we're on the up ramp of

24 this becoming the technology.

25             I think that you will hear evidence that

1  sometime in this time range, 2003, Mr. Kamatani actually

2  had or his lawyer had conversations with the company

3  that makes the drives, QSI, Quanta Storage, to ask them

4  if they were interested in a license.

5          They said they weren't.  Mr. Kamatani is

6  going to testify that they never talked about numbers,

7  because he first said are you interested in a license

8  and they said no, we're not.  So they never got to -- to

9  the point of discussing numbers one way or the other.

10  During this infancy stage, '97 to 2000, this stage that

11  I'm going to refer to as the infancy, during that period

12  of time, many companies again entered into license

13  agreements with Mr. Kamatani.  But let's look at what

14  people knew during that time period or what these

15  companies knew.

16          You didn't know whether the technology

17  would catch on.  You didn't know whether or not VHS

18  would remain the technology or not.  There -- there

19  weren't even multiple format disks in existence at the

20  time.  There were other technologies that competed with

21  DVD that never ended up making it.  There was a lot of

22  competition, and no one knew which one would be chosen.

23          Mr. Kamatani, just out of college at MIT,

24  just starting to file for patent applications and obtain

25  applications, was brand-new in business.  He was just

1 getting started in his business career.  Many of the

2 companies that got licenses here never ended up in the

3 business, never made a single drive, never sold

4 anything, yet they paid and got a license just in case

5 they decided to get into that business.

6                Was Mr. Kamatani, during this '97 to 2000

7 time period, willing to accept very modest amounts for

8 these licenses?

9                Absolutely.  There was a lot of risk.

10 There was a lot of unknown about what the industry would

11 do.

12                In the late 1990s, and specifically in

13 1999, Mr. Kamatani's licensing strategy began to change,

14 because now you're starting to see the market pick up.

15 You're starting to see companies make movies on DVD

16 instead of VHS.  Everyone is starting to figure out that

17 this may be the next chosen technology.

18                You will see evidence of Mr. Kamatani's

19 licensing strategy change.  You'll see a letter from one

20 of his lawyers to a company in late 19 -- or in mid-1999

21 asking them if they want a license, and at the end of

22 the letter it says:  You have two months to accept this

23 offer for a license, at which time it's withdrawn, and

24 we're not going to offer it to you anymore.

25                You have another one of those lawyers,

1  and you'll hear this name; he has a lawyer in Japan, a

2  Japanese lawyer by the name of Hagihara.  He's a patent

3  lawyer.

4            Mr. Hagihara sent a letter out to a

5  company in 1999 that says we're going to make an offer

6  to you where you can pay a lump sum, a one-time payment,

7  for a license.  You've got two weeks to accept it.  And

8  at the end of that two weeks, we're no longer going to

9  offer you a license for a lump sum.

10            If you want a license, then it's going to

11  be on what is called a running royalty, which means for

12  every single drive you make, you're going to have to pay

13  us an amount.  It may be $2.50; it may be $5, but we're

14  only going to do it based on a running royalty.

15            And so however many you're selling into

16  the United States, if you sell this for 50 bucks in the

17  United States, I want five bucks, because you're using

18  my technology.

19            Those letters, you will see, show that

20  his licensing strategy began to change right around

21  1999, which is why I say that this timeline is going to

22  be critical at the end of the case when you're making

23  your decision.

24            By the time the Defendants start making

25  optical disk drives and by the time they start selling

1  them or shipping them into the United States, by the

2  time Mr. Kamatani accuses them of using his technology

3  of infringing, the landscape had changed dramatically.

4           We're now all the way over here into the

5  summer of 2006.  The world knew by this point that this

6  was the chosen technology for the future.  VHS was gone.

7  When you went to Blockbuster's, all you could get were

8  DVDs.  All of the technology companies had decided to

9  get into this business, because they all saw the huge

10  market and thus the ability to make billions of dollars.

11  Mr. Kamatani now had a much better bargaining position.

12  He had a patent that was much more valuable than it was

13  when it was first issued, and he also had the ability to

14  enforce his patent to the extent companies decided they

15  didn't want a license, that they were just going to

16  ship -- ship and sell into the United States without

17  permission to do so.

18           So, again, I want you to keep your eye on

19  this timeline throughout the trial.  The Defendants,

20  when they put their witnesses on the stand, I expect

21  them, and when they cross-examine Mr. Kamatani, I expect

22  them to focus on '97 to 2000.

23           It's all about a plea to you to let them

24  off the hook cheap for their infringement.  You can't

25  ignore the reality of what happened in the market and

1   how different the market is in 2006 than it was in

2   1997/1998.  I don't think that you're going to buy into

3   that.

4           Let me turn the tables for a minute and

5   talk about some of the agreements that the Defendants

6   agreed to enter into and monies they agreed to pay other

7   companies, after the market took off and everybody knew

8   it was going to be successful.

9           Wendy, could you pull up the royalty and

10  other agreements that the Quanta Defendants entered

11  into?

12          While she's working on that, let me talk

13  to you about that for just a second.  These are

14  agreements that the Defendants willingly entered into

15  within the last five years.  You can see the dates of

16  them.  And when we have a witness on the stand, we're

17  going to talk about what some of those agreements were

18  and the amounts that they agreed to pay other people.

19          These are amounts that they agreed to pay

20  these companies, but, remember, these are amounts they

21  refused to pay Mr. Kamatani and LaserDynamics.

22  ███ ███ ███ ███ ███ ███ ████ ████ ████ ███

23  ███ ██  ─  ──  ──  ──  ──  ──  ──  ──  ──

24  ████    **REDACTED BY ORDER OF THE COURT**

25  ████ ███ ███ ███ ███ ███ ███ ███ ███ ███



**REDACTED BY ORDER OF THE COURT**

15          Again, they willingly entered into these

16 agreements to pay these companies the money, primarily

17 because of the amount that they could make by selling

18 these into the United States.  And you'll see the

19 evidence of the money that they made.

**REDACTED BY ORDER OF THE COURT**

10 testimony and you hear their pleas in this case, they're

11 going to be asking you to make the damages very low and

12 not to give LaserDynamics very much money, because --

13 and I'll get to this in a second -- as they said during

14 jury selection, the technology, as they put it -- let me

15 find the exact word that was used -- is becoming a less

16 important -- technology is not becoming less important.

17          I mention all these agreements that the

18 Defendants willingly entered into in this case, because

19 you're going to decide the damages at the end of the

20 case.  You will be given specific instructions from

21 Judge Ward on what to consider.  You'll hear expert

22 testimony from an expert that has considered many

23 factors, and he'll give you his opinion on what the

24 figures should be.

25          You're going to hear throughout this case

1  from these expert on what's called the hypothetical

2  negotiation.

3              THE COURT:  You have five minutes.

4              MR. SANKEY:  Yes, sir.

5              The Court will instruct you to consider a

6  hypothetical negotiation as if Mr. Kamatani and

7  LaserDynamics and these Defendants sat down in 2006 and

8  negotiated an agreement.  Remember the timeline.  We're

9  in 2006 now.

10             This expert, Mr. Murtha, who you will

11 hear from, worked for IBM for 34 years.  For 28 of those

12 years, he was in charge of negotiating license

13 agreements; that was his job.  He negotiated with

14 Chinese companies; he negotiated with Taiwanese

15 companies.

16             With respect to infringement in this

17 case, you will also hear from an expert, Dr. Howe.

18 Dr. Howe is from the University of Arizona.  He has a

19 Ph.D. in optics.  Dr. Howe is going to testify to you

20 that in his opinion their products infringe and use

21 Claim 3 of this patent.

22             Their own expert that's going to testify

23 about the technology, we've taken his deposition; we've

24 seen his report.  I believe he's going to tell you that

25 he doesn't know how their products operate.

1            As Judge Ward told you, which witnesses

2  do you believe the credibility of?

3            Finally, let me talk to you about induced

4  infringement and contributory infringement, because to

5  infringe this patent, you have to use the method.  You

6  have to stick a disk in the drive.  It has to figure out

7  which it is and start playing the disk.

8            These Defendants over in China and over

9  in Taiwan, they're not the ones directly infringing.

10  They sell their products to Dell, who then sell the

11  products to you and me.  And when we stick a disk in

12  there and it figures out which one it is and starts

13  playing it, that's direct infringement.

14            The claim against them is that they're

15  contributing to that; they're inducing that by selling

16  the product to Dell and by encouraging that inducement

17  by the end-user, because by using that disk, they're

18  able to then sell more.

19            You will hear numbers that for the last

20  two years, from the time we filed this lawsuit through

21  ■■■■  ■■    **REDACTED BY ORDER OF THE COURT**    ■■■■  ■■■■

22  these products into the United States.  Yet they don't

23  want to compensate Mr. Kamatani for his technology.

24            As jurors, that is your job to make them

25  responsible for their actions and to make them pay what

1  is due in this case.

2             Again, I thank you for your time.  Look

3  forward to putting on our evidence to you.  Wait until

4  you hear all the evidence before you make a decision.

5  And we will get this case to you to make that decision

6  just as quickly as we can.

7             Thank you.

8             THE COURT:  Thank you, Mr. Sankey.

9             Mr. Parker?

10            MR. PARKER:  Yes, sir.  Thank you.

11            May it please the Court.

12            Ladies and Gentlemen of the Jury, I too,

13  on behalf of the Defendants, thank you for the time and

14  attention that you're going to spend here and appreciate

15  your jury service.

16            As was explained to you, I think, by the

17  Court when you first came to be selected for the jury in

18  this case, sometimes business people have disputes that

19  they can't resolve.

20            And when they ultimately can't resolve

21  them, the only way we can get them resolved is by asking

22  citizens like you to come in and sit in this courtroom

23  and help us resolve them, decide the facts of the case

24  as they are presented to you, based on the evidence that

25  you hear.

1                    To be fair to everybody, whether they are

2    big or small, individual or corporation, to look at the

3    evidence fairly, evenly, and in a balanced manner and

4    make a decision.

5                    And we appreciate that, and I'm confident

6    that the Plaintiffs, Mr. Kamatani, also appreciates your

7    time, your attention and your being here and helping us

8    resolve this dispute.

9                    Now, I introduced the people that will be

10   involved on my side of the case when we had jury

11   selection, but it's been a while, and I'd like to

12   introduce them again.

13                    With me are some attorneys that will be

14   involved in presenting this case along with me.

15                    One is Mr. Christian Platt, who is my

16   colleague with the Paul Hastings Law Firm.  He's in San

17   Diego.

18                    Another is Ms. Katherine Murray, also a

19   colleague of mine from the Paul Hastings Law Firm.

20   She's in Los Angeles.

21                    With me, that will be in and out of the

22   courtroom as the proceedings go along is Ms. Ericka

23   Schulz, another attorney from the San Diego office.

24   Also with us, Mr. Trip Wilcox.  He's with his own firm

25   over in Tyler, Texas, and he'll be involved in assisting

1  with and helping with the defense of this case.

2            Also, some people you'll see in the

3  courtroom are two paralegals that will be helping us,

4  Denise Lobodinski and Katie Ringel.

5            And then finally, and most importantly

6  actually, there are two representatives of our

7  respective clients here today, and they will be here

8  throughout this trial.

9            For Quanta Storage, Inc., is Mr. Kevin

10  Cheng, and for Quanta Computer, Inc., is Ms. Tracy Li.

11  They are both from Taiwan, and that's where QSI and

12  Quanta Computer are headquartered.  You'll get a chance

13  to get better acquainted with them later when they

14  appear as witnesses in the case.

15            Now, for some of the testimony of

16  witnesses that are associated with QSI and Quanta

17  Computer, we will be using an interpreter, and I wanted

18  to explain that to you in advance, because I know it's

19  difficult enough to listen to testimony and to sit here

20  and be involved in business when you'd rather be doing

21  something else, and it will even be more tedious when

22  the testimony has to be translated or interpreted by an

23  individual.

24            But in order for our witnesses to fully

25  understand and to be able to fairly and completely

1  answer the questions, there are times when an

2  interpreter will have to be used.

3          Now, Ms. Li is going to attempt to offer

4  most of her testimony in English, but there may be times

5  when she will need help from the interpreter.  And she

6  will signal when she needs help from the interpreter,

7  because even though she speaks English quite well and

8  certainly speaks it a lot better than I speak Mandarin,

9  she still may need help because Mandarin Chinese is her

10 native tongue.

11         Now, the parties in this case.  You've

12 already heard something about them.  Quanta Storage,

13 Inc., sometimes referred to as QSI, they are a Taiwanese

14 corporation.

15         They are publicly traded on the Taiwan

16 stock exchange, and they manufacture what are referred

17 to as optical disk drives, which are suitable for

18 playback and recording of various types of optical

19 disks, which are more commonly referred to as CDs or

20 DVDs.

21         And we're all familiar with them.  You

22 were shown a couple of them by Mr. Sankey during his

23 opening.

24         Quanta Computer, Inc., is also a

25 Taiwanese corporation, but they're an entirely different

1  business.  They assemble various types of equipment,

2  including laptop computers, but they also assemble iPod

3  touches and other things.

4           You'll learn that they are an assembler

5  of electronic equipment for various brand names that are

6  sold throughout the world.  They are what's called an

7  original equipment manufacturer, which means they are

8  the people -- or the company that have people that

9  really build things that are on an assembly line with

10 soldering guns, with other pieces of equipment, and they

11 actually build things and put them together.

12          And you will learn that you will -- you

13 cannot go to Wal-Mart and you can't go to Best Buy and

14 buy something that has the Quanta name on it.

15          Why?  Because the names that will be on

16 these electronic products that are assembled by Quanta

17 Computer are names like Apple, Lenovo, which was

18 formally IBM, Dell, Hewlett-Packard, Toshiba, and

19 others.

20          Now, we expect that the Plaintiffs,

21 throughout this trial, will try to lump QSI and Quanta

22 Computer together, but you're going to learn that they

23 are two completely separate companies.

24          The same individual is the Chairman of

25 the Board of both companies, and Quanta Computer owns 30

1 percent of Quanta -- of QSI.

2          So is there some relationship between the

3 two companies?  There definitely is, and we acknowledge

4 that.

5          But they are separately trained --

6 separately traded, separately managed entities on the

7 Taiwan stock exchange.  Completely separate controls, in

8 terms of management of the two corporations.  Their

9 books are kept separately.  Everything is kept

10 separately with respect to the two companies.

11          And in fact, if you looked it up -- and

12 you're not -- don't -- I'm not suggesting you do this,

13 because you're not supposed to do that -- the Quanta

14 name in Taiwan, it would be sort of like the word

15 general in the United States.

16          There are companies General Tire, General

17 Motors, General Dynamics, but they aren't related.  They

18 don't have anything to do with each other.

19          These companies are related, but they are

20 separate, stand-alone entities that have their own

21 listings on the Taiwanese stock exchange.

22          Now, LaserDynamics is a Japanese

23 corporation, which does not make anything, no product of

24 any kind, no optical disk drives.

25          Never has made even one optical disk

1    drive and never has even written any software to sell

2    into the marketplace that explains how optical disk

3    drives work or that assist optical disk drives in

4    operating.  Don't sell anything, either tangible or

5    intangible.

6              Now, Mr. Kamatani is the sole owner and

7    employee of LaserDynamics, and he has never -- you'll

8    find out he's never built an optical disk drive, not

9    even one, not even one prototype to show what his

10   claimed invention does or doesn't do.

11             And that he's also never written a single

12   line of computer code to enable the operation of an

13   optical disk drive or anything else for that matter.

14   LaserDynamics's sole business is the licensing of

15   various patents owned by it.  And I think the evidence

16   is going to reflect, perhaps unlike what you heard in

17   Plaintiff's opening statement that the world did not

18   beat a door -- did not beat a path to LaserDynamics's

19   door or to Mr. Kamatani's door.  He beat a path to them

20   in trying to hawk his licensing.

21             And some companies decided it was easier

22   to buy it than fight about it.  And so he did sell a

23   number of licenses.  You'll learn that their sole

24   business is licensing the '981 patent and a number of

25   other patents.

1            Now, LaserDynamics accuses QSI and Quanta

2    Computer of infringing Claim 3 of LaserDynamics'

3    patents.  And we believe ultimately they will not be

4    able to carry that burden of proof even -- even by a

5    feather.

6            And I'm going to explain to you in a

7    minute why we -- why we think that is the case based on

8    how the evidence is going to come in.

9            But, first of all, I wanted to comment on

10   the timeline that you were shown and how we think you

11   should pay attention to the timeline, too, but we think

12   it demonstrates some different things.

13           What you're going to learn from the

14   evidence in this case is that the price for this product

15   peaked in the '01, '02 timeframe.

16           And you will have evidence before you

17   that shows that early on in the sale of these disks,

18   particularly the DVDs when the DVD technology took on,

19   Quanta Storage, Inc., QSI was selling these things for

20   ████████ ██ ██ ████████ ██ ██ ██ ████ ████

21   ████ ██ ███ ████ ████ ████ ███ ████ ████ █

22   ████    **REDACTED BY ORDER OF THE COURT**

23              ███ ███ ███ ███ ███ ████ █

24   ███ ████ ███ ███ ████ ███ ████ ████

25           And why is that?

1                Well, first, it's competition, which is a

2   good thing.

3                Another is, the technology has developed

4   and assembly has gotten more efficient.

5                But the last one is, just like happened

6   with the VHS, this is passing, too.  And some of you may

7   already see that.

8                You can now go online with your desktop

9   or laptop computer and download a movie and look at it

10  on your TV, put it on a flash drive and look at it on

11  your TV, if you have the technology.

12               And in a year or more, everybody's going

13  to have it, or a majority of the market is going to have

14  it, and we're going to be in the same situation we were

15  with VHS morphing into DVD.  DVD is going to morph into

16  solid state electronics, because it's smaller, it's more

17  convenient, and it's higher quality.  And it's just the

18  way technology develops in the marketplace.

19               So we're not at the peak.  We're past the

20  peak, and we're on the downhill slide on this

21  technology.  And as much as they're going to try to

22  argue that we're at some point in time when the damages

23  should be astronomical, if you should find infringement,

24  which we don't think you will, that's just not the case.

25  And your common sense will tell you that.

1    Now, there was a meeting in '02 or '03

2    between representatives of QSI and LaserDynamics, and

3    there was some discussion about a license, and there was

4    some follow-up meetings among lawyers, and there was a

5    range of prices discussed, you'll learn.  And that range

6    was from, even in that timeframe, between 100 and

7    $200,000.

8    But QSI decided that -- two things in

9    consultation between their legal department and their

10   technology department, was that they didn't use the

11   technology, and they didn't want to pay for it, even if

12   it was relatively cheap.  They decided not to be pushed

13   into buying something they didn't need.

14   Now, you saw in the opening statement a

15   bunch of agreements put up that Quanta had entered into.

16   Well, what does that mean?

17   That means, when somebody comes with real

18   technology, with something that has value, we pay for

19   it.  It's not that this company is dodging its

20   obligations to pay.

21   They showed you, when somebody comes with

22   real technology, like Philips -- now, they show you the

23   **REDACTED BY ORDER OF THE COURT**

24

25   And other agreements that they showed

1  you, you will learn from the evidence in this case don't

2  even involve patent licenses.  They involve agreements

3  to manufacture both for Philips and later for a company

4  called Sony NEC Optiarc.  Entirely different, entirely

5  different agreements.

6              Not licensing of technology, but

7  agreements to build things and to be paid for building

8  things and to pay for the opportunity to have the

9  technology to use to build things, technology that's

10  actually valuable and that, as they point out, my client

11  was more than willing to pay for when the value was

12  demonstrated to them.

13              Now, as to infringement, we expect that

14  LaserDynamics will try to meet its burden of proof on

15  that issue by use of an expert, a Mr. -- or rather --

16  I'm sorry -- a Dr. Howe.

17              And we think that as you look at the

18  evidence, that effort will fall short, and it will fall

19  short by more than a feather's worth.

20              And why do I say that?  They've already

21  told you -- Mr. Sankey said, and we agree -- there's

22  some things we do agree on.  This is a process claim.

23  And in order to demonstrate what a process claim does

24  and to show whether or not the technology that someone

25  else is using actually employs that process claim or

1   implicates that process claim, you will learn that that

2   requires a detailed analysis of the source code, of the

3   source code associated with the implementation of that

4   process.  And that is the only way you can determine

5   whether or not there is infringement.

6               And Dr. Howe will admit -- and these

7   are -- I'm borrowing his words -- that the only way to

8   present an in-depth or very precise description of how

9   an ODD operates is through -- is through logical

10  analysis of the firmware source code associated with

11  that drive.

12              That's what he says.  That's what you

13  have to do.  The only way you can figure out how these

14  things operate and whether or not they use

15  LaserDynamics's technology is to conduct a detailed

16  analysis of the source code of that drive.

17              Now, you will learn that there are 20

18  so-called accused drives in this case.  And you will

19  learn that Dr. Howe did do a detailed source code

20  analysis of two drives.

21              Well, what you'll also learn is, neither

22  of those drives is one of the 20 accused drives in this

23  case.  They are both drives manufactured by a company

24  called ASUS that used to be in the case but isn't around

25  anymore.  And it has no relationship whatever with

1  Quanta, not at all.

2              By his own admission, Dr. Howe did only a

3  cursory, cursory or limited -- those are two words he

4  used and that he will have to use again, because we'll

5  point them out to him -- analysis of the source code of

6  three of QSI's drives but not the detailed analysis that

7  he himself says you have to do in order to truly analyze

8  this process claim and to come to a scientific

9  conclusion about whether or not the accused instrument

10 actually infringes the patent.

11             The burden won't be carried.  It won't

12 even come close.

13             As you hear the evidence in this case,

14 think about it.  Pay attention to it.  Wait for Dr. Howe

15 to explain to you a detailed analysis that he's done on

16 even one QSI-manufactured drive.

17             He won't do it, because he can't do it,

18 because he hasn't done it.  And that's what they have to

19 do to carry their burden.

20             Now, we think, as the evidence unfolds,

21 you'll not need to consider damages.  We think, when you

22 go back to the jury room, you will decide the case on

23 infringement, and that's as far as you'll need to go.

24             But I'm going to discuss other issues in

25 the case, including damages, with you briefly in this

1   opening statement.

2              As I said earlier, QCI, Quanta Computer,

3   assembles electronic devices, including laptop

4   computers, all bearing the name of some major brand that

5   markets and sells the actual products.

6              You'll learn that nearly every component

7   in a laptop that eventually goes to the market with the

8   name of this brand-holder, every single major component

9   is bought by the brand-holder and sold to Quanta

10  Computer.

11             It's chosen by the brand-holder and sold

12  to Quanta Computer, and Quanta Computer just assembles

13  these various component parts into the particular brand

14  name, sells the assembled product back to the brand

15  seller that the cost of the components, including the

16  CPU, the keyboard, the optical disk drive, is a straight

17  pass through back to the brand-holder.

18             No markup on it.  No profit on it at all.

19  Made by Quanta Computer.  And the only way they make

20  their money is a fee they charge to the brand-holder for

21  assembling the finished product, the computer.

22             So it's not Quanta Computer who decides

23  which optical disk drive or CPU or keyboard or anything

24  else in these computers to buy and put in it; it's Dell,

25  Hewlett-Packard, Apple.

1                In fact, they don't only decide it; in

2   most cases, they buy it and then sell it to Quanta

3   Computer to assemble into the finished product.

4                Now, why do they do it this way?  Because

5   those brand-holders are the ones that have the market

6   power.  They can go into the marketplace and shop for

7   the part we're talking about here, an optical disk

8   drive, and they can look at QSI or TEAC or any one of a

9   number of different potential suppliers, and they can

10  negotiate the lowest price.

11               And they may buy a thousand from QSI and

12  give 300 of them to QCI -- or sell 300 to QCI, sell 300

13  to Compal, which is another OEM manufacturer, sell 300

14  to another OEM manufacturer.  They make that decision,

15  and you'll learn that about how this business works.

16               And why is this important?  This exercise

17  of market power by the brand-holders here, by the Dells

18  and the Hewlett-Packards and the Apples of the world.

19  Well, what you'll learn is, while they want to talk to

20  you about millions of dollars, even billions of dollars

21  of sales, you will learn that the margin in this

22  industry for OEM manufacturers is razor thin, because

23  they are not the entity that has the market power.  They

24  are not the Dell, the Apple, the Hewlett-Packard.

25               And what the evidence will show is that

1  the margin, the profit margin in this industry is in a 2

2  to 4 percent range.

3              And why is that important?  Because that

4  will demonstrate how unrealistic Mr. Murtha, their

5  expert's testimony is with respect to what a royalty

6  should be.

7              He wants a 2 percent royalty on every

8  ████ ███ ████ ████ ████ ███ ████ ████ ██ ████ ███ ████

9  ██ ███        **REDACTED BY ORDER OF THE COURT**

10 █████

11             And you will learn that there are various

12 factors to take into account in deciding what a

13 reasonable royalty is.

14             And one of those factors is the profit

15 and the business reality related to the transaction and

16 that under no circumstances could a royalty that

17 completely eliminates the profit in the transaction ever

18 be reasonable or even approach reasonable.

19             And we will bring an expert to you,

20 Mr. Reed, who will testify that even if you were talking

21 about a running royalty rate as an appropriate approach

22 in this case -- and I'm going to explain to you in a

23 minute why we don't think the evidence will demonstrate

24 that it is -- even if that were appropriate and even if

25 you were forced to do that, even though these people

1  have never done it, that the -- the appropriate royalty

2  would be miniscule compared to what they're claiming,

3  that it would be a fraction of the 2 percent that

4  they're claiming.

5           Now, the patent at issue here was issued

6  in 1996.  That's some 13 years ago.  During that time

7  period, you will learn, as the evidence comes out in

8  this case, that there were 16 arm's-length negotiated

9  license agreements that have been entered into covering

10 this patent.  They'll be in evidence.  Not one single

11 one of them has a running rate royalty in it.

12           Now, remember, Mr. Sankey told you in

13 opening, they established a policy in 1999 that we're

14 going to start having running rate royalties.

15           Well, I don't know what their policy was,

16 but their practice was they never, ever entered into one

17 single running rate royalty agreement.  They won't have

18 one to show you.

19           That's why they have to show you a letter

20 that says, Hey, we'd like to start doing this, or their

21 expert will say, I talked to Mr. Kamatani, and he said,

22 Gee, I really would like to do that.

23           Well, the proof is in the pudding, and

24 the proof that you will see is, they've never, ever done

25 it.  Why?  Because no one that they approached was

1  willing to do it with them.

2           Now, all of these lump-sum license

3  agreements have a range of between $50,000 on the low

4  end and $233,000 on the top end.

5           THE COURT:  You have five minutes.

6           MR. PARKER:  Yes, sir.

7           And these were for multiple patents, not

8  just the '981 patent in most cases, and they granted

9  worldwide, unlimited, life-of-the-patent licenses

10  complete for a one-time, one-off payment.

11           The licenses were granted again, and you

12  will have them in evidence, and they were granted to

13  some of the biggest and most well-known companies in the

14  world, like Sony.

15           You see there, the Sony Corp.  And how

16  much was it?  $84,000.

17           NEC, lump-sum amount, $84,000.  And then

18  there's some tax added on to it.

19           Philips, $120,000, one of the biggest

20  ones.  And there were others as well.

21           And you'll learn that the method that

22  they used, the real method that they used -- not what

23  their plan was, the real method that they used -- and

24  this will come out in the evidence in the case -- was

25  that when they went out to license the product, their

1  target was to get 200,000 from big companies, 100,000

2  from midsized companies, and 50,000 from small

3  companies.

4           And in the face of all this, not a single

5  deal with an ongoing royalty and not a single deal over

6  $233,000, even at the point where these disks were

7  selling at the top, the top price they ever sold at,

8  about 80 bucks apiece, the most they got as a license

9  was $233,000.

10           MR. SANKEY:  Your Honor?

11           MR. PARKER:  But they're going to ask --

12           THE COURT:  Wait.  What?

13           MR. SANKEY:  I have an objection.  Can we

14  approach the bench?

15           THE COURT:  Okay.

16           (Bench conference.)

17           MR. SANKEY:  Your Honor, we have a

18  representation to the Court that the most Mr. Kamatani

19  has ever gotten is 233, completely ignoring all of

20  the --

21           THE COURT:  Well, this is opening

22  statement.  You can point that out and how wrong he was

23  and how he misrepresented it.

24           MR. PARKER:  The only ones that were,

25  Your Honor, were the ones that have been excluded

1  because litigation was involved.  And we've already been

2  over this with Judge Everingham.

3              THE COURT:  Well, no, wait a minute,

4  Counsel.  Judge Everingham and I are consistent about

5  one thing.

6              MR. PARKER:  Yes, sir.

7              THE COURT:  And that is, if you know

8  about something, you do not represent to the jury that

9  there are none.

10             Now, you can say there's none outside of

11 litigation.

12             MR. PARKER:  Yeah.  Well, when I started

13 this, I said negotiated agreements, and I meant to hold

14 to that.

15             THE COURT:  Well, I think you went a

16 little further than that, so you might want to clear

17 that up.

18             MR. PARKER:  I will.  I will.

19             THE COURT:  Okay.  Thank you.

20             (Bench conference concluded.)

21             MR. PARKER:  I think I said this when I

22 started this discussion.  I said there's 16 negotiated

23 arm's-length agreements that have been entered into

24 during the life of this patent that you'll see in

25 evidence in this case, and that's what I'm talking about

1  in this opening statement, those 16 arm's-length

2  negotiated agreements and not anything else in terms of

3  any licensing.

4              Now, having heard this, the 16 negotiated

5  arm's-length agreements, with a maximum being $233,000,

6  we expect, ultimately, that the Plaintiffs are going to

7  ask you to consider damages of millions.

8              One thing that we also agree with

9  Plaintiffs on and that the Court said to you at the

10 beginning here, don't park your common sense at the

11 courthouse door.

12             They've never sold it for millions.

13 They've never even sold it for 1 million.  They've never

14 even sold it for half a million.

15             So even if you get past infringement,

16 which we don't think you will, employ your common sense

17 and determine that the range we're discussing here is a

18 range within 50 to $233,000.  And that's all we're here

19 talking about.

20             Thank you.

21             THE COURT:  All right.  Thank you,

22 Mr. Parker.

23             Ladies and Gentlemen, before we start the

24 evidence, we'll take a morning break.  Be ready to come

25 back in the courtroom at 10:15.  I'll see you back at

1    10:15.  Follow Mr. McAteer.

2                    (Jury out.)

3                    THE COURT:  All right.  Be seated,

4    please.

5                    We have both -- been tendered to the

6    courtroom deputy, Ms. Dupree, both exhibit lists of --

7    y'all have exchanged those, I take it?

8                    MR. PARKER:  Yes, sir.

9                    MR. SANKEY:  We have.

10                   THE COURT:  All right.  You believe they

11   accurately represent the rulings of admissions and

12   refusals?

13                   MR. SANKEY:  We believe they do, yes,

14   sir.

15                   THE COURT:  Okay.  Those exhibits on each

16   of the respective party's lists are deemed admitted and

17   may be referred to without further foundation.  Any

18   questions you wish to ask to place some context, that's

19   strictly up to you.

20                   Second thing, I don't believe that you've

21   tendered to the Clerk the exhibits for the Defendant.

22                   You need to get those, so she can mark

23   them during the course of the trial.

24                   MR. WILCOX:  That's correct, Your Honor.

25   They're right here.  We're going to do that at the

1  first --

2                    THE COURT:  Well, that's what I said.

3  Just get them up here.  That's all I'm asking you to do.

4  That's all I need from you.  I'll see you back here at

5  10:15.

6                    MR. SANKEY:  Your Honor, if I could, one

7  point, something we filed this morning, but Judge

8  Everingham, obviously, ruled on the limines.  The Court

9  reaffirmed that on the reconsideration.

10                    He then ruled on the exhibits, but we

11  would like, for the record, for the Court to affirm his

12  ruling with respect to allowing in all of the prior

13  license agreements, which we object to.

14                    We understand they're in, and they're

15  coming in, but we would like, I guess, during the

16  course --

17                    THE COURT:  That was a definitive ruling.

18  The Court's, you know -- I overrule your objection, the

19  Plaintiff's objection to all those prior licenses.

20                    Now then, I don't know what else you need

21  to preserve the record, but I'm overruling that

22  objection as stated to Judge Everingham.

23                    Do you need something else?

24                    MR. SANKEY:  That's all I needed, Your

25  Honor.

```
 1                    THE COURT:  Okay.

 2                    MR. SANKEY:  Thank you.

 3                    COURT SECURITY OFFICER:  All rise.

 4                    (Recess.)

 5                    COURT SECURITY OFFICER:  All rise.

 6                    (Jury in.)

 7                    THE COURT:  Please be seated.

 8                    All right.  Mr. Sankey, who will be your

 9  first witness?

10                    MR. SANKEY:  Your Honor, LaserDynamics

11  would call Mr. Kamatani.

12                    THE COURT:  All right.  Come around and

13  be sworn.

14                         (Witness sworn.)

15          YASUO KAMATANI, PLAINTIFF'S WITNESS, SWORN

16                         DIRECT EXAMINATION

17  BY MR. SANKEY:

18      Q.   Would you introduce yourself to the jury,

19  please, sir.

20      A.   My name is Yasuo Kamatani.

21      Q.   Mr. Kamatani, how old are you?

22      A.   I'm 39 years old.

23      Q.   And tell the jury where you live.

24      A.   I live in Tokyo.

25      Q.   Is that where you grew up?
```

1    A.    No.   Actually, I grew up next to Tokyo.   It is

2   Kanagawa, K-A-N-A-G-A-W-A.

3    Q.    And tell the jury just a little bit of

4   something about yourself.   Tell me about your family.

5    A.    Well, I have parents, of course, who are in

6   good health, and I have a brother five years older than

7   me.

8    Q.    Did you attend high school in Japan?

9    A.    Yes, I did.

10    Q.    After high school, did you make a decision to

11   come to the United States to go to college?

12    A.    That's right.   After I finished high school in

13   Japan, I start working at the restaurant and save some

14   money to come to United States for college education.

15    Q.    And what did you do at this restaurant; what

16   was your job?

17    A.    Well, I was basically washing dishes and

18   served the dinner, lunch to the customers.   That was my

19   job.

20    Q.    Tell us -- tell the jury why you made a

21   decision to go to college in the United States.

22    A.    Well, like I said, I have a brother five years

23   older than me, and he went to very best college in -- in

24   Japan.   It's called University of Tokyo.

25        So we are brothers, so kind of -- I didn't

1  want to be his shadow, so to speak, so I didn't want to

2  do the same thing like my brother did.  So I decided to

3  come to the United States and study here.

4      Q.   Now, working as a waiter and dishwasher, did

5  you have the money to go to college in the United

6  States?

7      A.   No, I did not.

8      Q.   How did you get the money?

9      A.   Of course, I worked for the restaurant and

10  saved some money.  Of course, it wasn't enough to study

11  in this country.  So I did ask the parents.  I did ask

12  to my grandmother for the support.

13      Q.   So your grandmother, did she pay for your

14  college?

15      A.   My grandmother decided to pay for my tuition.

16      Q.   Now, what year did you come to the United

17  States?

18      A.   19 -- 1990 when I was 20 years old.

19      Q.   At the time that you came to the United

20  States, did you speak English?

21      A.   No, I did not.

22      Q.   And where did you first enter college in the

23  United States?

24      A.   First, I entered college called Edinboro

25  College in Pennsylvania.

1       Q.    And how long did you attend Edinboro?

2       A.    Three years.

3       Q.    What were some of the things that you studied

4    at Edinboro?

5       A.    Well, I took some -- which is called

6    pre-engineering school, pre-engineering course to study

7    the very basic mathematics, physics, you know, that you

8    study the best engineering program.

9       Q.    At some point in time, did you learn about

10   another school that you wanted to go to?

11      A.    Yes.  I decided to transfer to MIT,

12   Massachusetts Institute of Technology.

13      Q.    Did you apply and were you accepted at MIT?

14      A.    That's right.

15      Q.    Why did you want to go to MIT?

16      A.    Well, that was my impression, that the MIT is

17   the very best engineering school in the whole world.

18      Q.    How long -- let me go back to Edinboro

19   College.  How long did you attend there?

20      A.    Three years.

21      Q.    And once you got to MIT, how long did you

22   attend there?

23      A.    I was there for two years.

24      Q.    Did you obtain a degree from MIT?

25      A.    No, I did not.

1        Q.    Why did you leave MIT after two years?

2        A.    Well, like I said, my grandmother was

3   supporting for my tuition and, of course, I spend all of

4   my savings after I made some money working for the

5   restaurant.  My mother got disease, which is an

6   Alzheimer's disease, so I decided that I could not ask

7   further support to my grandmother, who had sick.

8        Q.    And at that point in time, did you return to

9   Japan?

10       A.    That's right.

11       Q.    From that point out, returning to Japan for --

12  describe the business that you have been in.

13       A.    Well, after I went back to Japan, of course, I

14  started looking for a job and start working for the game

15  company.  And my job was kind of inspecting the software

16  of the game and checking that their software works fine.

17  That was my job.

18       Q.    And as I understand it, at some point in time,

19  you incorporated a company and you called it

20  LaserDynamics?

21       A.    That's right.

22       Q.    Now, how many -- you have more than just the

23  '981 patent, correct?

24       A.    Well, I have 15 patents so far.

25       Q.    And, generally, what are -- what is the

1   technology that the U.S. government has issued you

2   patents for?

3        A.   Well, most of my patent technology is

4   according to optical disk technology and some display

5   technology and also some communication system I have the

6   patent on.

7        Q.   Now, about how many license -- or how many

8   companies have licensed your technology in your patents?

9        A.   Well, I do think it's 27 companies so far, 27

10  agreements so far.

11       Q.   And so when Mr. Parker talks about there being

12  16 agreements, you actually had more than that, correct?

13       A.   That's right.

14       Q.   Tell us a little bit about how you learned

15  about U.S. patents.

16       A.   Well, that's when I was in -- when I was

17  studying at MIT, of course, there is a lot of professors

18  who owns the patent after they succeed on the research,

19  but applied for a patent to protect their own

20  intellectual property, to protect their idea.

21            And also there is a lot of graduate students

22  who is doing research, and they are always thinking, do

23  I apply the patent once they come up with a new idea or

24  new technology.

25       Q.   Did any of those professors or graduate

1  students give you any advice on how to obtain a patent?

2       A.   Of course, I ask very general question about

3  what the patent is or how it's going to work.

4       Q.   How did you eventually learn the mechanics of

5  how to go about applying for and obtaining a patent?

6       A.   How I obtain a patent is that I went to the

7  library.  I looked for the books which describe how to

8  apply the patent.

9       Q.   With respect to the very first -- when was the

10  first time you filed a patent application?

11       A.   Well, I think my very first application I

12  filed is 19 -- 1994, I believe.

13       Q.   And did you have the assistance of an attorney

14  at the time you did that?

15       A.   Of course.  Yes, I did.

16       Q.   With respect to the '981 patent, which -- in

17  that line of that 15 that you have, which -- where does

18  this fall in line?  Is this your second, third, fourth?

19       A.   Well, I believe it's my third or fourth

20  application, and my fourth patent I obtained.

21       Q.   When you filed, with respect to the '981

22  patent, did you have the assistance of an attorney for

23  that one?

24       A.   No, I did not have.

25       Q.   Can you tell the jury why it is that you

1 wanted a patent on the technology that's disclosed in

2 the '981?

3     A.   Well, basically, that's my reason.  I didn't

4 have enough money to hire a patent attorney to apply the

5 patent.

6     Q.   Because this is going to be relevant to your

7 technology, tell the jury what a couple of your hobbies

8 are.

9     A.   Well, my hobby is fishing and listening to the

10 music.

11     Q.   Okay.  Now, when you grew up, you listened to

12 music.  On what format was that music?

13     A.   Well, when I was -- when I was a kid, I used

14 to have so-called record, which is like donut sort of

15 shape, and I used to have tape, and I had the CD.  Now,

16 I have iPod, too.

17     Q.   And now starting when you had -- when you were

18 growing up as a kid and you said you had records, did

19 you have a large collection of records?

20     A.   Yes, I did.

21     Q.   All right.  What ultimately had happened to

22 that collection of records?

23     A.   Well, it turned to be obsolete.  I cannot play

24 it anymore, because that's old technology, and it's

25 better to find the replacement of the needle thing to

1   play the record.  It's broken and I cannot find it.  I

2   cannot find a replacement anymore.

3       Q.   So once your record collection was obsolete,

4   did you then begin collecting music on CDs?

5       A.   That's right.

6       Q.   In addition to having music on your CDs, did

7   you have any other data on those CDs?

8       A.   Well, of course, that besides music, I store

9   pictures of -- family pictures in a CD-ROM or a lot of

10  data is in a CD-ROM, too.

11      Q.   In the mid-'90s, did you learn or hear that

12  there was going to be a potential new standard of

13  optical disk drive?

14      A.   That's right.  I learned the news that the new

15  standard, which is called DVD, will be out very soon.

16      Q.   And did this create any type of problem in

17  your mind that you wanted to solve?

18      A.   Of course, as I said, I used to have record

19  player, and I could play a lot of my record collection,

20  but now I cannot play it anymore because I don't have

21  any replacement of some parts.  And it turned to be old

22  technology, and I cannot play the -- my record

23  collection anymore.

24           I thought that it's going to -- same thing

25  going to happen to my CD collection.  If the new

1  technology comes to the market, I cannot play the old

2  format.  I thought it was going to happen the same way

3  for the CD collection.

4       Q.   Did you want to invent a technology that would

5  allow you to play a DVD and a CD on the same player?

6       A.   That's right.  I thought that the -- I wanted

7  to protect my own CD collection.  I wanted to play it as

8  long as I live, or just the -- I have enough time to

9  replace all of my data into the DVD or in other new

10 format.

11            I wanted to keep -- you know, I wanted to keep

12 the ability to access to my data or music or family

13 pictures I have in the old format.

14      Q.   And would this invention that you are working

15 on allow not only you to save your CD collection but

16 everyone that has CDs?

17      A.   Of course.  I thought that it was going to be

18 good for all of the consumers.  I thought that every --

19 each consumer may have same trouble.

20      Q.   Did you have any criteria or understanding of

21 what this invention would need to be or do in order for

22 it to be successful?

23      A.   Well, it has to be -- it will be successful,

24 because in order to accomplish the objective is that you

25 just provide the consumer for certain amount of time to

1   replace the data from old format to new format.

2          I thought that those systems will be readily

3   accepted to the consumers.

4       Q.   Did you intend it to be a rather simple

5   technology?

6       A.   Of course, it has to be very simple and very

7   cheap and doesn't cost a lot to the consumers.

8       Q.   In addition, then, to music being one of your

9   hobbies, you said that one of your other was fishing,

10  correct?

11      A.   That's right.

12      Q.   All right.  Now, you have a story to tell the

13  jury, but before we get there, did I ask you about a

14  month ago to put some drawings together for me to

15  illustrate this story?

16      A.   That's right.  I tried to describe as much as

17  I can.  I draw the picture a month ago I believe, yes.

18           MR. SANKEY:  Wendy, if you could put up

19  the picture that you (sic) drew.

20      Q.   (By Mr. Sankey) Is this the picture that you

21  drew for me?

22      A.   Yes, I did.  That's my drawing.

23      Q.   All right.  Tell the jury, just starting off

24  here about your story.  And is this now sometime in

25  1995?

1     A.   In the spring of 1995.  Well, it's in kind of

2  very cold and little shower day.  I went to the fishing

3  and, of course, I didn't have any fishing boat myself,

4  so I rent the fishing boat.  And at that time, I could

5  borrow the fish-finder and actually was my very first

6  time I did use a fish-finder and --

7     Q.   Okay.  Let me interrupt you for a second and

8  see if we can go to the next slide that -- or drawing

9  that you did for me.

10        What -- tell the jury what you're depicting

11  here with respect to the fish-finder.

12     A.   Basically, the fish-finder was using some kind

13  of echo system energized the sound wave to the bottom

14  and detect the bounced-back sound and measure the

15  distance between a boat and the bottom of the lake and

16  also find what the depths of where the fish is.

17        And that's the very basic -- that's, I think,

18  basically how the fish-finder works.

19            MR. SANKEY:  If we can go finally to the

20  third screen.

21     Q.   (By Mr. Sankey) With respect to this

22  fish-finder, you say that it sends sound waves down

23  through the water?

24     A.   That's right.

25     Q.   And they bounce back up and tell you what the

1  bottom looks like?

2      A.   It shows that some logs on the bottom.  Also,

3  the particular fish-finder couldn't pick up the

4  difference of what the bottom is, mud or sand or log, or

5  even shows the dead trees underneath of the water.

6          So I could realize that your -- this is a way

7  to distinguish the type of disk, same very basic --

8  same -- same principle can be applied to how distinguish

9  how to -- the type of the disk.

10     Q.   And so while you're on this fishing trip with

11 the fish-finder, did a lightbulb go off and give you

12 your initial idea?

13     A.   Initial idea, yes.

14     Q.   Now, when you do your technology -- and we're

15 going to hear a lot of technology about it through the

16 trial -- but do you use sound waves to go down and shoot

17 down onto the disk?

18     A.   No.  It's -- for the optical disk technology,

19 we use the laser to energize onto the disk and read the

20 data from the disk.  We use the laser, not the sound

21 wave.

22     Q.   And is that -- the fact that you use a laser

23 to shine onto the disk, is that where the name of your

24 company, LaserDynamics, came from?

25     A.   Well, actually, it's not.  The name

1    LaserDynamics is named after -- well, it was named by

2    the professor who used to -- my brother used to work

3    with, and he passed away, but he gave me the name of the

4    company.  That's LaserDynamics is kind of word of that

5    professor's -- that professor kind of invented.  It's a

6    new word.

7         Q.   Okay.  Let me show you what is Exhibit 1,

8    which is the red-ribbon copy of the '981 patent.

9              Is this the patent that the United States

10   government awarded to you?

11        A.   That's right.

12              MR. SANKEY:  Now, if we could put up

13   Exhibit No. 3.

14        Q.   (By Mr. Sankey) This patent, as I read it,

15   says that it's being issued to the inventor, Yasuo

16   Kamatani.  That's yourself, correct?

17        A.   That's right.

18        Q.   Can you tell us -- Exhibit No. 3 says that

19   it's an assignment to LaserDynamics.

20              Can you tell us what that transaction was that

21   you filed with the Patent Office?

22        A.   Well, I assigned the patent to the

23   corporation, which I established, LaserDynamics,

24   Incorporation.  I assigned -- basically, I transferred

25   the right of the patent to my company.

1    Q.   And that's -- is that why the LaserDynamics is

2    the Plaintiff in this lawsuit?

3    A.   That's right.

4    Q.   All right.  Now, tell the jury why it is to

5    begin with that you incorporated the company,

6    LaserDynamics?

7    A.   Well, since I started the licensing business,

8    I made the agreement with some company when I was still

9    the independent inventor, and the company required me to

10   establish the corporation.  It's better to negotiate

11   with.  It's kind of good to work with the big company.

12        So, actually, some of my licensees recommended

13   me to establish a corporation.

14   Q.   Your lawsuit in this case is with respect to

15   just Claim 3 of the patent, correct?

16   A.   That's right.

17   Q.   Can you tell the jury what it is -- what the

18   invention is in Claim 3 of the patent?

19   A.   Claim 3 is how to distinguish or how to

20   discriminate the type of the disk, and you can play more

21   than one type of the disk, CD or DVD, or another new

22   format, and provides you the ability to play even the

23   old format you used to have and protect your -- protect

24   your collection.

25   Q.   Is that an important method for an optical

1  disk drive?

2       A.   I do believe so.  I haven't ever seen any DVD

3  drive that is not using my invention.

4       Q.   Now, what I have here and what I've shown is

5  I've got a DVD and I've got a CD.  They're the same

6  size, right?

7       A.   That's right, same size.

8       Q.   Now, if I handed this up to you and let you

9  look at them with your naked eye, can you tell the

10 difference and tell me which one is the CD and which one

11 is the DVD?

12      A.   Of course not.

13      Q.   Is that what your technology and your method

14 does when -- with respect to once one of these disks

15 goes inside of a drive?

16      A.   That's right.

17      Q.   The data that is on either the DVD or the CD,

18 is it encoded the same way or differently?

19      A.   Differently, of course.  DVD stores the movie,

20 and CD stores just the music.  And the capacity is

21 totally different, so, basically, the DVDs can store

22 much more data than CD.

23      Q.   The disk drive that we -- that the Defendants

24 make, what are some of the products you find those

25 drives in?

1      A.    Well, in the computer, laptop computer, and
2  desktop computer.
3      Q.    How about a DVD player?
4      A.    DVD player, of course.
5      Q.    CD player?
6      A.    Well, CD player, of course.
7      Q.    And then how about Blu-ray -- well, first of
8  all, what is Blu-ray technology?
9      A.    Well, my knowledge that Blu-ray is another new
10  format which can store even more data than DVD.  Also,
11  it's recordable.  I do believe that your -- the Blu-ray
12  disk player, you just started to sell in the United
13  States market a couple years ago.
14      Q.    Okay.  If we had -- if we're looking at our
15  timeline, do you remember approximately when Blu-ray
16  technology came into existence?
17      A.    Well, I believe it's around 2005/2006.
18      Q.    Let me go back to the process that you went
19  through in obtaining this patent from the United States
20  government.
21           First of all, after you came back from this
22  fishing trip, what did you do?
23      A.    Well, even -- even -- I didn't -- even before
24  I come back to my house, on the boat, I start drawing
25  the pictures.  I made some sketches and tried to figure

1   out what came to in my -- in my brain and tried to

2   write -- write it down.

3       Q.   Did you have to go to the library to do

4   anymore studying?

5       A.   Of course I did.  I went to the library and

6   read some books to make sure that my idea is right.

7       Q.   How long -- I assume, then, you wrote an

8   application that you submitted to the Office.

9       A.   Well, actually, after I invented -- it took --

10  it took about around six months to apply the patent

11  application.

12      Q.   Did you write that application yourself?

13      A.   Yes, I did.

14      Q.   About how much did it cost you to file the

15  patent application?

16      A.   Well, I -- I don't remember exactly, but the

17  filing fee I have to pay for the Patent Office was about

18  500 to 600, 700 -- $700, something like that.

19      Q.   When you filed your patent application and

20  dealt with the United States government, did you

21  disclose to them everything that you knew about your

22  invention?

23      A.   Of course, I did.

24      Q.   Why did you do that?

25      A.   Well, of course, the -- that's the obligation,

1    to disclose everything I knew, all of the reference I

2    knew.  Also, the patent has to be good to license to

3    somebody else.

4         Q.    And you sent this in, and was it assigned to a

5    trained Patent Examiner that worked for the United

6    States government?

7         A.    That's right.

8         Q.    And did he -- we talked about office actions.

9               Did he send you an office action asking you

10   questions?

11        A.    That's right.

12        Q.    And did you file a response back to him?

13        A.    That's right.

14        Q.    In December of 2006, did he allow your patent

15   and issue you the '981 patent?

16        A.    Well, December '96 is the date of my patent

17   issued.  And I know once from the Examiner was, I think

18   I received the allowance of just a month before the

19   issue date of my patent.

20        Q.    So sometime in November of 1996, the Office --

21   the Patent Office sent you a letter saying we're going

22   to allow your patent, and then about a month later, you

23   received this red-ribbon patent?

24        A.    That's right.

25        Q.    Now, how did -- when you first got this at the

1   end of 1996, now we're in the beginning of 1997, how did

2   you get companies to recognize your patent?

3       A.   Well, right after I received allowance from

4   the Patent Office, I started to sending the letters to a

5   lot of companies to introduce my idea.

6       Q.   And were you sending these letters yourself or

7   with attorneys or both?

8       A.   Both.  At the beginning, I send the letters to

9   the companies by myself, and a couple years later --

10  well, one year or two years later, I started working

11  with the Japanese patent lawyer or patent attorney.

12      Q.   Now, at the time that your patent application

13  or your patent was issued, were there companies making

14  DVD players?

15      A.   Well, when I started sending the letters,

16  right after I received allowance from the Patent Office,

17  nobody was making a DVD player.

18      Q.   And who were some of the companies that you

19  sent letters to at that point in time?

20      A.   Well, Toshiba, Sony, Panasonic, Sharp.  Most

21  of them are Japanese companies.

22      Q.   About how long after your patent issued did

23  companies start making DVD players?

24      A.   Well, my patent is issued 1996, December.

25  Well, my understanding is that the first introduction of

1  a DVD player is sometime spring of '97 in Japan.

2      Q.    And you brought up a good point there.

3  Were DVD players in Japan and/or Asia before they made

4  it to the United States?

5      A.    That's my knowledge.  Because DVD standards

6  basically determined by the Japanese company, Toshiba,

7  Panasonic, and Sony and Philips.  Philips, of course,

8  here is a Netherland company.

9      Q.    And in '97, when there were companies that

10 began making DVD players, how many were there?

11     A.    Well, I think at the beginning, all I remember

12 when I go into the store, I could find only two DVD

13 player.  One is made by Panasonic; one is made by

14 Toshiba.

15     Q.    When we looked at the timeline, we saw that

16 you entered into a number of agreements in 1997/1998,

17 correct?

18     A.    That's right.

19     Q.    What was your original licensing policy with

20 respect to that timeframe?

21     A.    Well, basically, first I asked them whether

22 they are interested in my idea or not.  And next, the

23 company who paid attention of who pay interest to my

24 idea, I offer the price or just listen to their price.

25     Q.    Did you accept a number of licenses in the

1  '97/'98 timeframe that were for modest amounts?

2      A.   That's right.

3      Q.   What were some of the reasons why you did

4  that?

5      A.   Well, because I didn't have any money, and I

6  didn't have enough funding.  If I find somebody infringe

7  my patent, I didn't have any bargaining power.  So I

8  thought I should save enough money, as much as I could,

9  to protect my own property.

10     Q.   About 1999, did your licensing policy begin to

11 change?

12     A.   That's right.

13     Q.   And tell us why that is.

14     A.   Well, around 1999, I kind of noticed that the

15 DVD market is quickly changing, because at the

16 beginning, in 1997, I could see just a few DVD players.

17 Everybody is using the VCR/VHS format.  I didn't see

18 many of DVD titles back then.

19          Getting to 1999 or 2000, when I walk into the

20 store, I was seeing a lot of DVD players and tons and

21 tons of DVDs movies on the shelf.  So I realized DVD

22 business is kind of kicking off and kind of promising --

23 going to be the promising product in -- in the near

24 future.

25     Q.   Okay.  And I talked in my opening about a

1  couple of letters that your lawyer sent out.  Let's take

2  a look at those.

3          MR. SANKEY:  If we could, pull up first

4  Plaintiff's Exhibit 492.

5      Q.   (By Mr. Sankey) Which is a letter called Trop,

6  Pruner.  Is Mr. Trop one of your patent attorneys?

7      A.   That's correct.

8      Q.   And did you authorize him to send letters?

9          This one appears to be a company called

10 Camelot Technology.

11     A.   Yes, I did authorize him.

12          MR. SANKEY:  If we could go to the end of

13 this letter and take a look at the timeframe.

14          Probably one more page, please.

15     Q.   (By Mr. Sankey) On the last page of the

16 letter -- it looks like we only have one page of that on

17 this screen.  But let me read this to you and ask if

18 this is something that -- and we'll have this for the

19 jury, since it's been admitted into evidence.

20          But it says that:  In this regard, if a

21 license is executed within two months from the date of

22 this letter, we will offer you a license under

23 reasonable terms.

24          Was that something you authorized Mr. Trop to

25 tell Camelot Technology?

1        A.   That's right.

2        Q.   And by the way, did Camelot Technology ever

3   enter into a license agreement?

4        A.   No, they did not.

5        Q.   Let's take a look at one of -- Plaintiff's

6   Exhibit 503.

7             Now, this is a letter from Mr. Hagihara.  Tell

8   the jury who Mr. Hagihara is.

9        A.   He is the patent attorney or patent lawyer I

10  talked about.

11       Q.   Okay.  And he's sending a letter to LG

12  Electronics.  That's located in Korea, correct?

13       A.   That's right.

14       Q.   And, again, we're looking at -- this letter

15  went out at the end of December of '98.

16             MR. SANKEY:  Can we look at the end of

17  this letter, please?

18             I'm sorry.  Let's go back to the first

19  page.

20             THE COURT:  Mr. Sankey, before you ask

21  anymore questions, let me tell the jury something.

22             On these exhibits, there's boxes of

23  exhibits.  You will be shown lots of different exhibits.

24  They give you each time the Plaintiff's exhibit number.

25  It looks like on this setup that number up at the very

1    top is Exhibit 503.

2                If you see an exhibit that you think you

3    might be interested in that you want to keep in mind,

4    you just need to write that number down, because at the

5    close of the trial, rather than send in boxes of

6    exhibits, I'll send in the exhibits that you actually

7    request rather than -- so I'll just tell you, if you see

8    an exhibit that you want to make a note of, just make a

9    note of the number and what it is.

10               Okay.  Let's proceed.

11       Q.   (By Mr. Sankey) Did Mr. Hagihara send letters

12   out telling people that if they did not accept a license

13   agreement that you had other patents that were issuing

14   and that they were then going to have to pay a running

15   royalty?

16       A.   That's right.

17       Q.   And what is a running royalty?

18       A.   Running royalty is the very basic licensing

19   system.  I charge them the -- based upon how many

20   product they are making, how many product they are

21   selling, I think there's a general way to license the

22   intellectual property to somebody else.

23       Q.   In the '97/'98/'99 timeframe, you did lump

24   some license agreements, correct?

25       A.   No, I did not.

1      Q.   You did lump some ones and not running

2  royalties, correct?

3      A.   Of course, I couldn't do it, because the

4  future of the DVD was nobody -- nobody knows about

5  what's going to happen for the DVD business.  And most

6  of the licensee I made agreement with, they took the

7  license before they start making any DVD.

8          And, of course, those company are not making

9  any DVD products, so I cannot charge them on protection

10  basis or sales basis, because protection and sales were

11  zero back then.

12      Q.   They had yet to start making and/or selling

13  product?

14      A.   That's right.

15               MR. SANKEY:  Wendy, if we could put the

16  timeline back on.

17      Q.   (By Mr. Sankey) Let me talk to you about the

18  market, ODD market.

19          Because your technology and your 15 patents

20  are in this industry, did you keep abreast of what was

21  happening in the market?

22      A.   Of course, I have been -- walk into the store,

23  what kind of product they are selling, and of course I

24  have been watching the DVD market very closely by using

25  internet or any other source.

1      Q.   Okay.  And let's start, if we would, at about

2  the time that you filed your patent application and

3  obtained your patent in '95 and '96.

4           What was the technology that was being used

5  primarily for movies?

6      A.   Well, the VHS format.  VCR was dominant.  VCR

7  was the king.

8      Q.   Do they have a store in Japan or in Tokyo

9  where you were living, similar to what we have here,

10  Blockbuster?

11      A.   Yes, we do.

12      Q.   And did you go to Blockbuster in the '95/'96

13  timeframe to obtain moves?

14      A.   Well, the only format for playing a movie was

15  VHS.

16      Q.   Were there any DVDs available at that

17  timeframe on movies?

18      A.   Of course not.

19      Q.   Did computers during this timeframe have DVD

20  players?

21      A.   No.  There was CD-ROM.

22      Q.   When these first DVD players came out, you

23  say, and the company started making them in this

24  timeframe, were they expensive?

25      A.   It was very expensive.  My best recollection

1  is at the beginning, a DVD player cost almost like

2  $1,000.

3      Q.   And ultimately, when it becomes much more

4  popular, what's the average price of a DVD player?

5      A.   Well, it's getting cheaper and cheaper, and

6  sometime around 2000/2001/2003, price of a DVD player

7  started to be less than $100.

8      Q.   Now, when you went to this Blockbuster

9  similar-type company in Japan, toward the '98/'99/2000

10 timeframe, did they start having movies in DVD?

11     A.   Well, around the 1997, I believe that was the

12 year the DVD player was produced.  Right after I heard

13 the news, I went to the Blockbuster sort of shop in

14 Japan.  Only thing I could find was a 3 -- one music DVD

15 and two other DVD movies.  So there was only 3 DVD

16 movies in the store.

17     Q.   So let me jump ahead a little bit on the

18 timeline and go closer to 2002/3 and even 2006.

19          By 2006, when you went into the store, what

20 would you find with respect to the format that movies

21 were located on?

22     A.   Well, it's only DVD format.  I couldn't find

23 any VHS format anymore.

24     Q.   By 2006, did computers have DVD players?

25     A.   Yes, I do believe so.  Most of the computer

1 does have the DVD-ROM or any DVD so-called burner, DVD

2 recordable drive.  And it's very hard to find any

3 computer with a CD-ROM.

4     Q.   With respect to video games, what format were

5 they on in this later time period?

6     A.   Well, for the video game, you know, most of

7 the people used some kind of cartridge system for the

8 Nintendo.  And it turned to be CD-ROM sometime late

9 1990.

10          And I believe Sony start making DVD basis game

11 player called PlayStation could be 2000.  And also it

12 was very slow start.  And around 2002/2003, most of the

13 format for the game turned to be the DVD basis.

14     Q.   Now, if we look back in this timeframe,

15 '98/99, about how many companies world-wide were making

16 DVD players?

17     A.   Well, my very best guess is maybe 20, 30

18 company.

19     Q.   Okay.  If we jump to 2006, when you filed this

20 lawsuit against the Quanta Defendants, about how many

21 companies do you think are making DVD players?

22     A.   Well, I believe it's hundreds of companies.

23     Q.   Did this change in the market also affect or

24 have a change in your licensing policy?

25     A.   That's right.

1    Q.   Is it your understanding that from the first

2 DVD in 1997 forward, has sales of DVDs around the world,

3 and especially in the United States, increased?

4    A.   That's right.  It's increasing very slowly,

5 but some -- some point around the 1999 or 2000, the DVD

6 business is rapidly changing and grow up like -- grow up

7 very -- suddenly grow up very high.

8    Q.   These 26 or 27 companies that you have

9 licensed, you gave them the right to manufacture and

10 sell products, correct?

11    A.   That's right.

12    Q.   Did you ever give any of those companies the

13 right to issue sublicenses to other companies?

14    A.   Well, sublicense is something I only give them

15 the -- not just a license and license to somebody else.

16 Of course, absolutely not.  I've never give any right to

17 any -- any company.

18    Q.   All right.  And I want to talk to you just

19 briefly about what I had mentioned to the jury in

20 opening.

21    But is it your understanding in this case that

22 there have been a number of documents that the

23 Defendants have produced that they chose to make

24 attorney's eyes only, since you're inventing in the same

25 industry?

1    A.    That's right.

2    Q.    And so, for example, there are agreements that

3  they've entered into with these other companies.

4         Have you been allowed to see those agreements?

5    A.    No, I cannot see.

6    Q.    And the financial documents that show the

7  amount of sales that they make in the United States and

8  the amount of money that they make, have you been

9  allowed to see those agreements?

10   A.    I cannot see it, and I have never seen it.

11   Q.    Okay.  And so what did that require you to do

12 in part in this lawsuit, since you couldn't see those

13 documents?

14   A.    Well, my expert can -- my experts are able to

15 see those documents, so I rely on their opinion.

16   Q.    Is it your testimony to this jury that you

17 believe your patent is more valuable today than it was

18 when it was issued in 1996?

19   A.    That's correct.

20   Q.    Now, as we heard earlier from Judge Ward, this

21 patent is good for how long?

22   A.    20 years.

23   Q.    And so until 2015, no one can make and sell or

24 ship products into the United States without getting

25 your permission or getting a license agreement, correct?

1          A.    That's my understanding, yes.

2          Q.    Have you seen any sign that the DVD market is

3    declining and that there are less sales?

4          A.    Well, what I've been seeing around 2006, of

5    course, I didn't do any market research by myself, but

6    with the common sense, when I go to the store or when I

7    see the internet, DVD business is just growing until

8    2006.

9          Q.    Now, in -- there's two main Defendants, QSI

10   that manufactures the drive, and QCI that puts it into

11   their laptops and sells it.

12              Did you have one of your attorneys in

13   2002/2003 send a letter to QSI, the manufacturer?

14         A.    Well, I don't remember the year, but one

15   occasion my Japanese attorney did contact with Quanta

16   Storage Incorporation.  And one occasion, my U.S.

17   attorney, Mr. Trop, did send the letter to Quanta

18   Storage or Quanta Computer, Incorporation.

19         Q.    Okay.  Now, the letter that was sent to Quanta

20   Computer would have been in 2006, correct?

21         A.    That's right.

22         Q.    Did -- what was the method of sitting down and

23   negotiating a license agreement with someone like Quanta

24   Storage?

25         A.    Well, first contact with them was sending the

1  letters and make sure whether they are interested in

2  taking my license or not.  Then we -- basically, my

3  attorney is going to negotiation for -- for the

4  licensing price on a case-by-case basis.

5      Q.   Okay.  With respect to Quanta Storage, were

6  they interested in taking the license?

7      A.   Well, what I do remember is they said they are

8  not interested in my idea; they're not interested in

9  taking the license from me.  Also, they said they are

10  not infringing my patent.

11      Q.   With respect to any specific numbers, were

12  numbers discussed at all with Quanta Storage, Inc., in

13  2002?

14      A.   Well, like I said, they said they did not --

15  they are not interested to taking a license, so I didn't

16  offer anything.

17      Q.   As we sit here today, does any of the

18  Defendants have a license agreement with LaserDynamics?

19      A.   No, absolutely not.

20      Q.   The products that they make and that they're

21  selling and shipping into the United States, do they

22  determine -- when you put a disk into their drive, do

23  they determine what type of a disk it is before it

24  begins playing it?

25      A.   That's my understanding, yes.

1    Q.    And is that a basic, general description of

2 your technology?

3    A.    That's right.

4    Q.    What is it that you're asking the Ladies and

5 Gentlemen of the jury to do in this case?

6    A.    Well, I'm asking the jury that -- to decide to

7 a reasonable amount of my damage caused by the Defendant

8 infringing my patent.

9              MR. SANKEY:  I have no further question,

10 Your Honor.

11              THE COURT:  Okay.  Mr. Parker?

12              MR. PARKER:  Yes, sir.

13                    CROSS-EXAMINATION

14 BY MR. PARKER:

15    Q.    Good morning, Mr. Kamatani.

16    A.    Good morning, Mr. Parker.

17    Q.    How are you doing?

18    A.    I'm okay.  How are you?

19    Q.    Good.

20              Now, I think you've -- I'm going back a little

21 bit to your background just briefly.

22              You first went to college in 1990 in

23 Pennsylvania?

24    A.    Edinboro College in Pennsylvania.

25    Q.    For a couple of years?

1      A.    For two years, yes.

2      Q.    And you did not get a degree there?

3      A.    No.

4      Q.    Okay.  And you were -- you took some

5  engineering courses?

6      A.    It's called pre-engineering course.

7      Q.    Okay.  Were you ever formally accepted into

8  their engineering program?

9      A.    Well, basically, all Edinboro College could

10 give the student was pre-engineering school only, and

11 transfer to some other college or university for

12 advanced engineering to take advanced engineering

13 course.

14     Q.    And then you went to MIT?

15     A.    Yes, I did.

16     Q.    And how long were you at MIT?

17     A.    Two years.

18     Q.    Wasn't it actually just eight months, eight

19 months total?

20     A.    No.

21     Q.    So if -- if MIT's records show that you were

22 just there eight months, they're wrong?

23     A.    Well, I been there for two years.

24     Q.    Well, were you there over -- you know, from

25 one year into the next, but the total amount of time was

1    just eight or nine months?

2        A.   Well, I took the class only -- only two

3    semesters.  And after that, I start working at the

4    laboratory for the professor.

5        Q.   You took three courses at MIT; is that

6    correct?

7        A.   Well, I don't remember exactly.

8        Q.   And you did not get a degree from MIT either,

9    did you?

10       A.   I did not, of course.

11       Q.   And you -- so you do not have an engineering

12   degree from any institution; is that -- is that correct?

13       A.   That's right.

14       Q.   But you describe yourself as an engineer, do

15   you not?

16       A.   Well, I do believe I'm an engineer.

17       Q.   Okay.  And you describe yourself and hold

18   yourself out as an engineer?

19       A.   I don't quite see the difference.

20       Q.   You describe yourself and you call yourself an

21   engineer?

22       A.   Yes.

23       Q.   To the public?

24       A.   To the public, I do call myself I'm an

25   engineer.  I don't introduce myself to the public I'm an

1  engineer.

2      Q.    But you are not, for instance, a registered

3  professional engineer anywhere either here or Japan,

4  correct?

5      A.    Well, I don't have a degree; that's correct.

6      Q.    Nor do you have what's called a license;

7  you're not a registered professional engineer?

8      A.    What kind of a registration that's not about

9  degree?

10      Q.    Do you not understand that the engineering

11  profession has certain registrations that in order to

12  hold yourself out and sign certain documents and things

13  of that nature, you need to get those certifications?

14      A.    Well, I don't have any certification --

15      Q.    Okay.

16      A.    -- as engineer.

17      Q.    Okay.  Well, that's good.

18          Now, for the very first patent you applied

19  for, you did hire a patent attorney to help you.

20      A.    That's right.

21      Q.    But after that, you -- at least through the

22  '981 patent, you took care of it yourself; you did it

23  all yourself without an attorney's help; is that

24  correct?

25      A.    That's correct.

1      Q.   Okay.  Now, with regard to the patent in this

2  case, you wrote the application without anybody's help.

3      A.   That's right.

4      Q.   And you handled the -- what's been described

5  as the prosecution of the patent yourself personally?

6      A.   Prosecution, like responding to the office

7  action, yes, I did by myself.

8      Q.   Yes, sir.

9           And when you first came up with the idea for

10  this patent, that wasn't based on anything you'd learned

11  at MIT, was it?

12      A.   No.  I didn't learn anything about the optical

13  disk technology at MIT.

14      Q.   Okay.  And we saw some notes that you put up

15  on the screen, a picture of you fishing and then a

16  picture of the disk and a picture of the fish-finder.

17  Those are drawings you -- I think you've already told

18  us, you did very recently; is that correct?

19      A.   That's right, only one month ago.

20      Q.   Yeah.  But back at the time when you were

21  thinking about this and on the fishing trip and after

22  that, you stated that you prepared notes at that time,

23  correct?

24      A.   That's right.  Right after I came up with the

25  idea, even on the boat, I start drawing something in the

1  boat.

2     Q.   Right.  But you don't have those anymore.

3     A.   No.

4     Q.   You threw them away?

5     A.   Well, simply I didn't think that the -- those

6  notes or memos were important, so I think I lost them.

7     Q.   So as important as this patent is, it wasn't

8  important enough for you to put those notes in a safe

9  place and keep them?

10    A.   Sure.  I do wish that I could keep those memos

11 now.

12    Q.   And in that time period, you also kept a

13 personal diary that discussed what you were doing and

14 when you were doing it, in terms of applying for patents

15 and doing other things; isn't that right?

16    A.   Well, of course, I had been keeping a diary,

17 but sometime I took those patent -- patent incident to

18 my diary -- sometime I did; sometime I didn't.

19    Q.   But those diaries are gone, too, aren't they?

20    A.   Well, no, I do have a diary, but my diary in

21 the old computer is gone.

22    Q.   The diary that would apply to this time period

23 we're talking about, you don't have anymore; is that

24 correct?

25    A.   That's right.

1      Q.    So that's not something we can look at either

2  today.

3      A.    That's right.

4      Q.    Okay.  So you don't have any documents that

5  are what I would describe as contemporaneous documents

6  related to your idea or this patent; is that correct?

7      A.    I don't have any memos.  I don't have any

8  diaries.  I don't take any so-called technology note to

9  prove that my invention.  I don't have any.

10      Q.    Okay.  Now, you claim your invention relates

11  to an optical disk drive distinguishing between CDs and

12  DVDs in sort of a basic statement, correct?

13      A.    Well, CD and DVD and any other different

14  format.

15      Q.    Okay.  But you never actually built one of

16  these drives, even a prototype, to test your patent, did

17  you?

18      A.    That's correct.

19      Q.    Okay.  And you never even tested one of these

20  drives using laboratory equipment or anything else to

21  determine what the effect of your patent or your claimed

22  technology was, did you?

23      A.    Well, I think I did once dismantle a CD player

24  and checked inside, but, of course, I didn't use any

25  laboratory equipment to inspect those players.

1    Q.   You didn't attach oscilloscopes or other

2  measuring devices to --

3    A.   I haven't done any such kind of thing.

4    Q.   All right.  And you have not yourself written

5  any software or prepared any source code or anything to

6  implement your technology; is that correct?

7    A.   For the optical -- optical disk technology,

8  no.

9    Q.   For the '981 patent?

10   A.   No.

11   Q.   You've not done that.  Okay.

12        Now, your patent includes a discussion of TOC

13  or table of contents data on optical disks; is that

14  right?

15   A.   That's right.

16   Q.   Okay.  And the different types of optical

17  disks include CDs, minidisks, and DVDs; is that right?

18   A.   Well, of course, the -- the purpose of my

19  invention is to play a different type of disk, which is

20  included CD, minidisk, and DVD -- DVD on different kind

21  of format and also the Blu-ray disk.

22   Q.   But at the time that you came up with the idea

23  for your patent, you didn't even know how the data was

24  organized on a CD, did you?

25   A.   Data is organized on a CD.  Of course, what

 1   kind of -- what kind of data was on the CD, I didn't

 2   know that.

 3        Q.   You didn't know how it was organized or how it

 4   was placed on the -- on the -- on the disk.

 5        A.   On the CD, no.

 6        Q.   Okay.  And at the time you prepared your

 7   patent, you didn't know how the data was organized on a

 8   minidisk, did you?

 9        A.   No.

10        Q.   And you didn't know whether minidisks even had

11   a table of contents, did you?

12        A.   Well, I didn't know much about minidisks.

13        Q.   Okay.  And you didn't even know whether the CD

14   and the minidisk used the same laser diode to read them,

15   did you?

16        A.   Well, I didn't know that.

17        Q.   Okay.  And -- and turning to DVDs, isn't it

18   true that you didn't know what the structure of a DVD

19   even was at the time of your claimed invention?

20        A.   Well, at the time of my invention, DVD was

21   not -- was not produced yet, so, of course, I didn't

22   know the specification of the DVD.  At the time --

23        Q.   And there were no standards -- I'm sorry.  I

24   didn't mean to interrupt you.

25        A.   That's fine.

1       Q.   And please, if I do that, let me know, okay?

2       A.   Sure.

3       Q.   In fact, there were no standards available in

4  the market for DVDs at the time of your claimed

5  invention.

6       A.   At the time of my invention, there was no DVD

7  standard.

8       Q.   And if there were no DVD standards at all,

9  there were clearly no standards that distinguished

10  between single-layer or multilayer DVDs; is that

11  correct?

12      A.   Well, my understanding at the time of my

13  invention, DVD standard -- so-called DVD standard was

14  not fixed.

15      Q.   All right.  And so do you know whether the --

16  the multilayer DVD had even come into existence at that

17  time or was under consideration at that time?

18      A.   Well, I thought it could happen, but like I

19  said, DVD standard was not fixed at the time of my

20  invention, so I didn't know.

21      Q.   And no one was commercially even manufacturing

22  and selling DVDs at the time you came up with your

23  invention, correct?

24      A.   That's correct.

25      Q.   And you didn't know at the time you came up

1  with your invention whether a DVD had a table of

2  contents on it, did you?

3      A.   Of course, like I said, that there was -- no

4  DVD standard was fixed, so I didn't know then.

5      Q.   Okay.  And were you aware of the thickness of

6  the data layers of CDs versus DVDs at the time you came

7  up with your invention?

8      A.   Well, at the time of my invention, I think I

9  knew that your -- where the data layer is for the CD,

10  but of course, like I said, again, that I didn't know

11  what kind of -- actually what kind of DVD specification

12  will be released, so I didn't know -- the disk placement

13  of the data layer for the CD, I did not know.

14      Q.   And even today you don't claim expertise in

15  the distance and sizing of data layers, both in CDs or

16  DVDs, do you?

17      A.   Well, I don't memorize the number, but, of

18  course, what I do know is that the position of the data

19  layer for the CD and DVD is different.

20      Q.   And the data layer in the CD is 1.2

21  millimeters, correct?

22      A.   Well, I have not -- I don't have any

23  knowledge, so I don't know.

24      Q.   Okay.  And so you -- do you know whether the

25  dual -- in a dual-layered DVD, the first layer is .575

1    millimeters and the second layer is .625 millimeters?

2          Do you know that?

3      A.   No, I didn't know.

4      Q.   Okay.  And your patent does not specifically

5    discuss distinguishing the position of the data layers,

6    does it?

7      A.   Well -- well, I wish that -- could I have a

8    copy of my patent?

9      Q.   Yes.

10          MR. PARKER:  May I approach, Your Honor?

11          THE COURT:  Certainly.

12          THE WITNESS:  Thank you.

13          MR. PARKER:  Sure.

14      Q.   (By Mr. Parker) What I asked you was, your

15    patent does not specifically talk about distinguishing

16    the position of data layers, does it?

17      A.   Position of the data layer.

18      Q.   Yes, sir.

19      A.   Well, my patent is disclosing the number of

20    data layers, so that's correct.

21      Q.   The way I state it is correct; it does not?

22      A.   No.

23      Q.   Okay.  Now, identifying the total number of

24    data layers is a significant and novel part of your

25    patent; is that correct?

1        A.    That's right.

2        Q.    Do you know the number of data layers that

3   could be determined using S-curve technology?

4        A.    Do you mean at the time of the invention or

5   now?

6        Q.    At the time of the invention first.

7        A.    At the time of the invention, I didn't know

8   about S-curve -- so-called S-curve technique.

9        Q.    Okay.  And so you said -- you asked me at the

10  time of the invention or now.  Do you know now?

11       A.    Well, I don't know the detail, but I do know

12  what -- I don't know the detail, but I do know the -- I

13  think I have heard about S-curve.

14       Q.    Okay.  But you're not personally knowledgeable

15  about it?

16       A.    No.  No.

17       Q.    Okay.  Do you know how the S-curve method is

18  done?

19       A.    Like I said, I don't know what the S-curve

20  technique is now, so I just don't know.

21       Q.    And do you know if it can be used to determine

22  the number of data layers on a disk?

23       A.    Like I said, again, I don't know what the

24  S-curve technique is, so I just don't know.

25       Q.    And you don't know if it can be used to

1   determine pit density on a disk?

2       A.   No.

3       Q.   And you never even heard of the S-curve until

4   after you submitted your patent application; is that a

5   fair statement?

6       A.   Well, the first time I heard about the word

7   S-curve technique is just a -- just a few years ago.

8       Q.   Okay.  After your patent.

9       A.   That's right.

10      Q.   And your patent, obviously, then, doesn't

11  mention S-curve; is that right?

12      A.   No.  That's correct.

13      Q.   Okay.  So, obviously, you did not, at least

14  with respect to the '981 patent, come up with the idea

15  of using the S-curve analysis as a distinguishing factor

16  in ODDs, correct?

17      A.   Well, like I said, again, I don't know what is

18  the -- what kind of a technology that -- what the

19  S-curve technique is, so I cannot compare something I

20  don't know.  And with my patent, I cannot do that.

21      Q.   Now, let's discuss some more recent events.

22  You understand that the Patent Office did what's called

23  a reexamination of your patent?

24      A.   Yes, I do know that, yes.

25      Q.   Okay.  And you're aware that one of the

1  references they considered in the reexamination was

2  something offered by Mr. Maeda, M-A-E-D-A?

3      A.   Well, I do know that the reexamination process

4  is going on as we speak, but I don't know the detail of

5  the reexamination process, because it's done by my

6  attorneys.

7      Q.   And -- but your company, LaserDynamics,

8  submitted to the Patent Office a statement by a patent

9  owner in ex parte reexamination.

10         Do you -- are you familiar with that?

11     A.   No.  But, of course, like I said,

12 reexamination process is ongoing.

13     Q.   And you don't -- you don't understand -- you

14 never looked at that statement by a patent owner or read

15 it?

16     A.   Well, I don't know that any specific document

17 I have sent to Patent Office for reexamination process.

18     Q.   Do you know if in that statement, you explain

19 why your patent is not the same as the Maeda patent?

20     A.   You are still talking about the reexamination

21 process, right?

22     Q.   Yes, sir.

23     A.   I haven't seen any documents.

24              MR. PARKER:  This case is about

25 technology, but sometimes we're not as good with our

1  technology as we need to be.

2                    Oh, and it's my fault, see?  There you

3  go.

4       Q.   (By Mr. Parker) Can you see that, sir?

5       A.   Yes, I do.

6       Q.   Do you recognize that as statement by owner in

7  ex parte reexamination?

8       A.   (No response.)

9       Q.   Have you seen that before?

10      A.   Well, maybe I did, or maybe I did not.  I

11 don't -- I don't remember this document.

12                    MR. PARKER:  Can we take it to the end?

13      Q.   (By Mr. Parker) Do you recognize who signed

14 it?

15      A.   Well, I don't know -- it says Nancy Meshkoff,

16 but I don't know who is she.

17      Q.   Do you know if that's something acting on your

18 behalf?

19      A.   Well, no.

20      Q.   Okay.  You agree that Maeda talked about

21 detecting the number of recording layers in an optical

22 disk by counting the number of S-curves?

23      A.   Are you talking about Maeda?  You said Maeda

24 has the patent and --

25      Q.   And that it -- I'm sorry.  Go ahead.

1      A.    -- and something -- the statement my attorney

2  filed to reexamination process mentioned about the Maeda

3  patent, but, of course, I haven't ever seen those

4  patents, and I haven't ever seen any reexamination

5  documents.

6          So my answer is, I just -- I haven't ever seen

7  those documents.

8      Q.    Okay.  Do you know whether Mr. Maeda taught

9  the number of recording -- detecting the number of

10 recording layers in an optical disk by counting the

11 number of S-curves?  Do you know?

12     A.    Well, like I said, I haven't ever seen what

13 you're saying, the Maeda patents, so I just don't know.

14              MR. PARKER:  Can we see that section?

15     Q.    (By Mr. Parker) Okay.  Do you see the section

16 there that's been highlighted?

17     A.    Uh-huh, yes, I do.

18     Q.    And you see that it says the apparatus detects

19 the number of recording layers in an optical disk by

20 counting the number of S-curves.

21          Do you see that?

22     A.    Yes, I do.

23     Q.    And do you understand this is a document that

24 was submitted to the Patent Office -- whether or not you

25 recognize it, was submitted to the Patent Office on your

1 behalf?

2     A.   That's right.

3     Q.   Okay.

4     A.   My attorney filed those documents, yes.

5     Q.   Okay.  And do you agree that Maeda taught the

6 use of a comparator?

7     A.   Like I said, I don't know what the -- Maeda's

8 patent is, so I cannot compare the -- Maeda's patent and

9 my patent.

10             MR. PARKER:  Can we find that section,

11 please?

12     Q.   (By Mr. Parker) Do you see the reference

13 there -- and I think I'm pronouncing that correctly -- a

14 comparator that compares the focus error signal?

15     A.   Yes, I do see it, yes, sir.

16     Q.   Okay.  And, again, this is a document that was

17 submitted to the Patent Office on your behalf.

18     A.   I believe so, yes.

19     Q.   And do you agree that Mr. Maeda taught that

20 the, quote, focus and tracking gains are then set in

21 accordance with the S-character amplitude level

22 difference of the recording membranes, which is an

23 indication of the amount of light reflected from the

24 face of the membrane and thus the position of the

25 membrane?

1      A.    Well, if it is prepared by my attorney on my

2  behalf, of course, I agree with it.

3      Q.    I mean, you don't deny that it was submitted

4  on your behalf.

5      A.    What do you mean I don't deny?  This is --

6      Q.    This was submitted on your behalf.

7      A.    Well, if this is submitted by my attorney, of

8  course, I agree with it.

9      Q.    Okay.  And in order to distinguish your '981

10 patent from the Maeda patent, you told the Patent Office

11 that the S-curve was not the same as your patent,

12 correct; S-curve discrimination is not the same as your

13 patent?

14     A.    Well, I haven't seen this document, so if you

15 could point me out where -- whether this document says

16 that's so, I can give you the answer.

17             MR. PARKER:  I think it was the

18 section -- well, that's all right.

19     Q.    (By Mr. Parker) In any event, without having

20 to waste time looking for the technology, because our

21 time is limited -- looking for the statement, because

22 our time is limited, your -- you do acknowledge that

23 your patent does not even mention the S-curve, correct?

24     A.    That's right.

25     Q.    So that it doesn't describe discrimination of

1  a CD versus a DVD by comparing S-curves, correct?

2      A.   Well, like I said, again and again, I don't

3  understand what the S-curve technology is, so how can I

4  compare the technology of something I don't know with my

5  patent?

6      Q.   Okay.  Now, we'll leave S-curves alone.

7  Let's talk about your license agreement, okay?

8      A.   Sure.

9      Q.   And let's talk about Trial Exhibit 12, and

10 we'll show it.

11          You entered into a license agreement with

12 Philips Corporation dated July the 7th, 1998; is that

13 correct?

14     A.   That's correct.

15     Q.   Do you recognize this as the license agreement

16 you entered into with Philips Corporation?

17     A.   Yes, I do.

18     Q.   And you signed that license agreement?

19     A.   Yes, I did.

20     Q.   And what was the amount that was paid by

21 Philips Corporation to obtain that license agreement?

22     A.   Well, if you could pause -- yes.

23     Q.   I will.  It's $120,000 U.S., correct?

24     A.   That's correct.

25     Q.   And you agreed to that.

1      A.   Well, of course, I did.  That's why I do have

2  agreement.

3      Q.   And you accepted that money.

4      A.   That's right.

5      Q.   And in return for that, Philips Corporation

6  got a worldwide, nonexclusive right to use your patents.

7      A.   That's correct.

8      Q.   So they didn't have to pay any more money.

9      A.   So Philips doesn't have to pay more money, as

10  long as they keep those agreements, yes.

11      Q.   They don't have to pay for each one they sell

12  or anything like that.

13      A.   Well, as long as it's covered by my agreement,

14  that's right.

15      Q.   Okay.  And they paid for the patents that are

16  listed on this document, LD859 through 860.

17                MR. PARKER:  There we go.

18      Q.   (By Mr. Parker) Those are the patents that

19  they were licensing, correct?

20      A.   Well, I believe so, yes.

21      Q.   So more than just the '981 patent.

22      A.   That's right.

23      Q.   So they got multiple patents for $120,000.

24      A.   That's right.

25      Q.   Was that agreement with Philips, was that

1 negotiated by you or by your counsel?

2      A.   Well, I believe it has been negotiated by --

3 by my Japanese patent attorney, Mr. Hagihara.

4      Q.   Okay.  But once he completed those

5 negotiations, you agreed to sign the document and accept

6 that as compensation, correct?

7      A.   Of course, I do accept the terms of this

8 agreement, and I signed, yes.

9      Q.   Okay.

10           MR. PARKER:  Now let's go to Trial

11 Exhibit 106, please.

12      Q.   (By Mr. Parker) Do you recognize this as the

13 patent you entered into with NEC Corporation?

14      A.   Well, may I ask?  Is this the top page of the

15 agreement?

16      Q.   This is the first paragraph that shows that

17 Party A is NEC.  If you would rather see paper copies,

18 we can get them for you.  I was just trying to move

19 things along, but we'll --

20      A.   Oh, I'll -- I'll -- is this --

21      Q.   You see this?

22      A.   -- a translation of agreement with NEC?

23      Q.   Well --

24      A.   I think -- I think it's not the -- I do

25 believe that this is not the original.

1      Q.   The original was in Japanese?

2      A.   I do believe so, yes.

3      Q.   All right.  Which would probably be somewhat

4  difficult -- not for you to read, but for all the rest

5  of us to read.

6      A.   Sure.  I understand, sir.

7      Q.   Okay.  So you did enter into a license

8  agreement with NEC, correct?

9      A.   Yes.  This is the original agreement with the

10  company called NEC.

11      Q.   And that's the one that's in Japanese, right?

12      A.   That's right.

13      Q.   And that means nothing to me, although my

14  daughter speaks it fluently.

15      A.   That's great, sir.

16      Q.   Well, when you have -- when you've had four

17  Japanese exchange students living with you, that's what

18  happens.  I guess I should have learned more than I did.

19               MR. PARKER:  Okay.  Now let's go back to

20  the English language version, please.

21      Q.   (By Mr. Parker) And the fee that was paid

22  by -- the license fee that was paid by NEC, do you

23  recall what that was?

24      A.   Well, again, this is a translation, so would

25  you go back to original document, which is -- I signed

1  for --

2              MR. PARKER:  Can you go back?

3       A.    -- I signed for the Japanese document.  And

4  the top of this section, please pull it up.  Eighty-four

5  hundred thousand (sic), that's correct.

6       Q.    (By Mr. Parker) And that's U.S. dollars,

7  correct?

8       A.    That's U.S. dollars, yes, that's correct.

9       Q.    All right.  And you agreed to that number,

10  correct?

11      A.    That's right.

12              MR. PARKER:  And can we see which patents

13  that covered.

14      Q.    (By Mr. Parker) Does that -- does -- I can't

15  tell, but I think probably you can.  Does that list the

16  patents that are covered by this agreement?

17      A.    Well, I'm not an expert to analyze the

18  agreement, but I do believe that -- well, I guess --

19  would you mind to show what -- the one page before of

20  this page?

21      Q.    I mean, I'm at your mercy.

22      A.    Well, I do believe that this patent covers

23  more than one patent, yes.

24      Q.    Okay.  And the document does list multiple

25  patents that are covered by it.

1    A.   Well, if -- if this original document does

2  have a list, of course.  But I haven't seen this --

3  whole pages of this document, so...

4    Q.   Did you sign this document originally?

5    A.   Yes.  This is --

6            MR. PARKER:  Can we find that?

7    A.   I mean -- well, of course, we don't sign the

8  Japanese agreement.  We used the corporate seal and

9  stamp on it.  And of course, it's the same thing as

10 signing on the document.

11   Q.   (By Mr. Parker) Okay.  I understand that.

12 And your company's corporate seal was placed on this

13 document with your permission, correct?

14   A.   That's right.  I mean, I did -- I did seal on

15 it by myself.

16   Q.   And you intended to transfer multiple patents

17 to NEC Corporation -- the license to multiple patents to

18 NEC Corporation for $84,000?

19   A.   Well, first of all, would you mind to go back

20 to the first page?  I'm not sure this is the license

21 agreement or not.

22   Q.   Okay.

23   A.   Well, you used the term of licensing

24 agreement.  I'm not sure this is a license agreement or

25 not.

1    Q.   What would you call it?

2    A.   Well, I call it the -- a patent non-assertion

3    agreement.

4    Q.   All right.  Now -- and we might as well get to

5    that right now, because some of these documents are

6    called -- you're right.  Let's be precise.

7         Some of these documents are referred to as

8    license agreements and others are called non-assertion

9    agreements; is that -- is that correct?

10   A.   To my knowledge, yes.

11   Q.   Of the 16 that we're going to look at that you

12   negotiated.

13        Now, the license agreement says it grants a

14   license.

15        The non-assertion agreement says that if you

16   use -- if you employ -- you, NEC, employ or use these

17   patents, in return for paying the $84,000, I will not

18   assert any infringement against you, okay?

19   A.   Well, that's my understanding, yes.

20   Q.   Okay.  So, in effect, whether we call it a

21   license agreement or a non-infringement agreement, the

22   company that you accept the money from has the right to

23   use the patents that are listed in there on a worldwide,

24   nonexclusive basis, and they're not going to be accused

25   of infringing if they do so, no matter what we call the

1  document.

2     A.   Well, it's very complicated, and I just don't

3  understand it.

4        It says -- the only thing I understand, this

5  is not the license agreement, so I'm not sure -- I did

6  license one or more than one patent to the NEC.  I just

7  don't know.

8     Q.   Okay.  I don't want to fence with you about

9  semantics.

10        If we call it a non-assertion agreement or if

11  a document is titled a non-assertion agreement, the

12  effect of that is, in return for money, the person or

13  company agreeing with you gets the right to use the

14  listed patents on a nonexclusive, worldwide basis, and

15  you will not assert any claim of infringement against

16  them, okay?

17     A.   Well, it's -- it's a lot of legal term, and my

18  answer is, I don't know.  I don't even know the

19  difference between a license agreement and a

20  non-assertion agreement.

21     Q.   Do you even understand, sir -- I mean,

22  you're -- you've already told us that you approved your

23  corporate seal being put on this non-assertion

24  agreement.

25     A.   That's right.

1      Q.   Are you saying that you're in the habit of

2   running --

3      A.   Of course --

4      Q.   I'm sorry.  Let me finish this time.

5      A.   Sure.

6      Q.   Are you saying you're in the habit of running

7   this company and having your corporate seal put on a

8   document that you don't understand?

9      A.   That's right.  Sir, I mean that the -- I don't

10  understand each term of the legal document.  That's why

11  I -- I asked -- appealed to the attorneys.

12     Q.   On a basic level, do you understand that it

13  gives the party that you accept the money from the right

14  to use your patents?

15     A.   Well, my understanding of non-assertion is

16  that your -- I don't assert my right to the company who

17  has the agreement with.

18     Q.   So, in effect, they have the right to use your

19  patent in return for paying you money.

20     A.   Well, I agree -- I agree with that, yes.

21     Q.   That -- I mean, that's in its simplest terms;

22  is that correct?

23     A.   Uh-huh, that's correct, yes.

24     Q.   Whether we call it a license agreement or a

25  non-assertion agreement.

1    A.   Like I said, I don't understand even the

2  difference between a license agreement and a

3  non-assertion agreement, so I don't know.

4    Q.   Okay.  But you did understand when you signed

5  this document or when, to be precise, the corporate seal

6  of LaserDynamics was placed on this document, it gave

7  NEC the right to use the patents that were listed in the

8  document, correct?

9    A.   Well, I don't understand the scope of this

10  agreement, but I do follow this agreement, because I

11  sign it.

12            MR. PARKER:  Trial Exhibit 91.

13    Q.   (By Mr. Parker) Is this the agreement you --

14            MR. PARKER:  I'm sorry.  Is it up there?

15    Q.   (By Mr. Parker) -- the agreement that you

16  entered into with Sony?

17    A.   Again, this is a translation, and I do believe

18  that I made agreement with Sony in Japanese.

19    Q.   Okay.  And we can show you the Japanese

20  version, if you want to see it.

21            Do you recognize this as a copy of the

22  original agreement that you entered into with Sony?

23    A.   Yes, I do.

24    Q.   Okay.  And is it okay if we go back to the

25  translated version?

1    A.    Sure.

2    Q.    Okay.  And do you recall how much Sony paid?

3    A.    Well, I believe -- well, I believe this

4  translation is correct, and the amount is $126,000.

5    Q.    And do you know what patents this covered?

6    A.    Well, again, this is -- I believe this is not

7  the license agreement, so --

8    Q.    I agree.  This is another one of those

9  non-assertion agreements.

10    A.    That's right.

11         MR. PARKER:  Can we see what patents are

12  covered by it, please.

13    Q.    (By Mr. Parker) And that covers the '981

14  patent; is that right?

15    A.    That's right.

16    Q.    Do you need to see that in the Japanese

17  version?

18    A.    For this question, I don't think so.

19    Q.    Okay.  And Sony Corporation paid you $126,000;

20  is that correct?

21    A.    That's right.

22    Q.    In October of 1998?

23    A.    Could I see the page that has a date on it?

24    Q.    Sure.

25         MR. PARKER:  Could we get that?

1     A.    The date should be on the last page, I

2  believe.

3     Q.    (By Mr. Parker) It should be on the first page

4  and the last page, but we'll...

5     A.    October 1st, 1998, that's correct.

6     Q.    Okay.  All right.  And your company seal was

7  affixed to this document with your agreement, correct?

8     A.    That's right.

9     Q.    Was this another one of those that was

10  negotiated by your attorney?

11     A.    Well, with this Sony, I believe this -- this

12  is negotiated by my Japanese patent attorney,

13  Mr. Hagihara, yes.

14     Q.    Okay.  But once he had completed those

15  negotiations, you agreed to the terms, did you not?

16     A.    Of course I did.

17     Q.    Okay.

18             MR. PARKER:  Now let's look at Trial

19  Exhibit 77.

20     Q.    (By Mr. Parker) At some point in time, did you

21  enter into a license agreement with Toshiba?

22     A.    Yes, I did.

23     Q.    Okay.  And is your company seal affixed to

24  this document?

25             MR. PARKER:  Go to the end.

1        A.   Yes, I do see it.

2        Q.   (By Mr. Parker) And that was --

3        A.   Excuse me.  This is not my company's seal.

4    I -- I believe I made agreement with Toshiba when I was

5    still -- I didn't have a company.  So this is my

6    personal seal.

7        Q.   All right.  And was this one of the things

8    that was assigned to LaserDynamics later?

9        A.   That's right.

10       Q.   Okay.  But in any event, your personal seal is

11   on this document, and you agreed to it.

12       A.   I sign the document, I sign agreement, and my

13   company also sign the -- the supplement of the

14   agreement, so, of course, this agreement is effective

15   both on me and LaserDynamics, yes.

16       Q.   Okay.

17            MR. PARKER:  And could we see the

18   consideration, the amount of money paid in this one.

19   Okay.  We're getting there.

20       Q.   (By Mr. Parker) And there was a formula here,

21   but, ultimately, there was a one-time payment.

22            Do you understand that?

23       A.   Yes, I do believe so.  That was a one-time

24   payment.

25       Q.   And we'll see if we can get to it.

1          So it was for -- I think that means 7,875,000

2    yen, correct?

3        A.   That's right.

4        Q.   And do you understand, at that point in time,

5    that you would get the dollar number by dividing that

6    number by a hundred?

7        A.   Well, that's fair enough, yes.

8        Q.   So it would be approximately $80,000 U.S.?

9        A.   I agree with you, yes.

10       Q.   More or less?

11            MR. PARKER:  And can we see what that

12   covered, please.

13       Q.   (By Mr. Parker) And, again, that is for the

14   '981 patent, correct?

15       A.   Could I see the first page?

16       Q.   Sure.

17       A.   Well, again, this is the non-assertion

18   agreement, so I didn't license the patent, but like you

19   said, this agreement covers more than one patent.

20       Q.   Okay.

21       A.   That's right.

22       Q.   And it covers more than one patent for

23   whatever that converted amount of money is, 75 or

24   $80,000 at that time period, correct?

25       A.   That's correct.

 1      Q.   All right.  And was this another one that

 2  your Japanese patent counsel negotiated for you?

 3      A.   With Toshiba, yes, that's correct.

 4      Q.   Okay.  But, ultimately, you agreed to what he

 5  had negotiated, including the figure?

 6      A.   Of course I did.

 7      Q.   And including the fact that it covered more

 8  than just the '580 -- the '981 patent, rather.

 9      A.   It looks to me, yes.

10      Q.   Okay.

11           MR. PARKER:  Now let's look at Trial

12  Exhibit 80.

13      Q.   (By Mr. Parker) Do you recall that you entered

14  into a license agreement with Hitachi Corporation?

15      A.   Well, I believe it's a translation, but, yes,

16  I do have an agreement with Hitachi.

17      Q.   All right.  And that was April of 1998?  Did

18  you find the date?

19      A.   Well, I do believe that translation is

20  correct, so that's correct.

21      Q.   Okay.  And the license agreement with Hitachi

22  was for what amount?  Again, that's in yen?

23      A.   Yes.  This is Japanese yen.  It looks to me

24  it's 31,250,000 Japanese yen.

25      Q.   And do you understand, at that time, that

1    would have correlated to about $266,000?

2         A.   Well, I don't know the rate, but it sounds to

3    me that's fine.

4         Q.   I mean -- I mean, in approximate terms.

5         A.   Sure.

6         Q.   You're familiar with the conversion, right?

7         A.   Sure.

8         Q.   Okay.  And that fee was a result of

9    give-and-take negotiations between you and the other

10   party to the contract, Hitachi, correct?

11        A.   Negotiation is done by my Japanese patent

12   attorney and Hitachi representative.

13        Q.   Okay.  And that one included more than the

14   '981 patent, also, right?

15        A.   I do believe so.

16        Q.   So for their 226-odd-thousand dollars, they

17   got multiple patents.

18        A.   This agreement included more than one patent,

19   that's correct.

20        Q.   And that was a one-time payment.

21        A.   One-time payment, that's right.

22        Q.   All right.

23             MR. PARKER:  Okay.  Let's look at Trial

24   Exhibit 88.

25        Q.   (By Mr. Parker) And do you recall that at some

1    point in the latter part of 1988, you entered into an

2    agreement with Yamaha Corporation?

3         A.   That's correct.

4         Q.   And does this agreement include your either

5    personal or corporate seal?

6         A.   This agreement contains both.

7         Q.   But --

8         A.   Both of my corporate seal and my personal

9    seal.

10        Q.   So you did agree to the document?

11        A.   That's right.

12        Q.   And this license agreement is for $65,000?

13        A.   Well, it's plus taxes, but --

14        Q.   You're right.  65,000 base, and then there was

15   $3,250 in taxes that was also paid by Yamaha

16   Corporation.

17        A.   That's correct.

18        Q.   Okay.  And this is a one-time payment.

19        A.   That's right.

20        Q.   Do you know how many patents it covers?

21        A.   Well, I can't count the number, but it include

22   more than one patent.

23        Q.   It's definitely more than just the '981

24   patent, right?

25        A.   I believe so, yes.

134

1      Q.   Okay.  And that's for $68,250 one time.

2      A.   That's right.

3      Q.   Okay.

4           MR. PARKER:  Now let's look at Trial

5  Exhibit 89.

6      Q.   (By Mr. Parker) Another agreement you entered

7  into in late 1998, and this one is with Sanyo

8  Corporation, correct?

9      A.   That's correct.

10     Q.   And your seal is affixed to it, is it not?

11     A.   Yes.  It contains the -- both my corporate

12  seal and my personal seal, yes.

13     Q.   So you agreed to the document?

14     A.   That's right.

15     Q.   And the amount that was paid?

16     A.   Well, I do believe the translation is correct,

17  63,000 U.S. dollar.

18     Q.   And how many patents were covered?

19     A.   Well, I do believe it's more than -- more than

20  one patent.

21     Q.   So, again, your Sanyo Corporation is getting

22  multiple patents for $63,000, not just the '981 patent.

23     A.   That's correct.

24     Q.   Okay.  And, again, that's a one-time payment,

25  no continuing royalty?

135

1       A.    That's correct.

2       Q.    Okay.

3             MR. PARKER:   Now let's look at Trial

4  Exhibit 90.

5       Q.    (By Mr. Parker) Now, do you recall that at

6  some point in the latter part of 1998, you entered into

7  an agreement with Sharp Corporation?

8       A.    That's correct.

9       Q.    And your seal is on this document?

10      A.    Yes, I did.

11      Q.    Okay.  So you -- you agreed to whatever the

12  terms were?

13      A.    That's right.

14      Q.    And Sharp Corporation paid $84,000?

15      A.    That's right.

16      Q.    And this agreement covered more than just the

17  '981 patent, did it not?

18      A.    I believe so, yes.

19      Q.    So, again, Sharp got more than the '981 patent

20  for $84,000, and they only had to pay that one time.

21      A.    That's right.

22      Q.    Okay.

23             MR. PARKER:   Now let's look at

24  Exhibit 92.

25      Q.    (By Mr. Parker) Do you recall that near the

1  end of 1998, you entered into an agreement with Onkyo

2  Corporation?

3      A.   That's correct.

4      Q.   And your company's seal is affixed to this

5  document?

6      A.   Yes, I did.

7      Q.   Meaning you agreed to it?

8      A.   Yes, I did.

9      Q.   And the license fee was 50,000 -- $57,750?

10     A.   Well, I believe so, yes, that's correct.

11     Q.   And what patents did it cover?

12     A.   I include the '981 patent and all patents

13  which I used to have when I signed this document.

14     Q.   So for the $57,750, Onkyo Corporation got

15  multiple patents, correct?

16     A.   More than one patent, that's correct.

17     Q.   And that was a one-time payment?

18     A.   That's right.

19     Q.   Okay.

20          MR. PARKER:  And let's look at Trial

21  Exhibit 67.

22     Q.   (By Mr. Parker) Do you recall, at some point,

23  you entered into an agreement with Pioneer Corporation?

24     A.   That's right.

25          MR. PARKER:  And let's see what Pioneer

1   Corporation paid.

2        Q.   (By Mr. Parker) Pioneer Corporation paid

3   100,000 in fee and $5,000 in taxes; is that correct?

4        A.   That's correct.

5        Q.   And what patents did it cover?

6        A.   I include the '981 patent.  I do believe it's

7   more than one patent.

8        Q.   More than one patent for the $100,000, plus

9   $5,000 in taxes?

10        A.   That's correct.

11        Q.   And that's a one-time payment by Pioneer

12   Corporation?

13        A.   That's correct.

14        Q.   Okay.

15                  MR. PARKER:  Let's look at Trial

16   Exhibit 95.

17        Q.   (By Mr. Parker) That takes us into the middle

18   of 1999.

19             Do you recall that you entered into an

20   agreement with LG Electronics?

21        A.   That's correct.

22        Q.   Okay.  And that agreement includes your seal?

23        A.   Well, I believe -- I believe this is agreement

24   based on English, so I did sign it, yes, I did.

25        Q.   So this one is executed more traditionally.

1       A.   Yeah, that's right.

2       Q.   Or more traditionally for us, not more

3  traditionally for you.

4       A.   That's correct.

5       Q.   Okay.  I didn't mean to sound like I was

6  saying anything inappropriate.

7            So this was executed by you on behalf of

8  LaserDynamics Corporation, correct?

9       A.   That's correct.

10      Q.   And the fee that was paid by LG Electronics

11 was $95,000?

12      A.   That's correct.

13      Q.   And that was -- that included more than the

14 '981 patent?

15      A.   I believe so, yes.

16      Q.   And that payment was a one-time payment, not

17 any kind of ongoing royalty, correct?

18      A.   That's correct.

19           MR. PARKER:  Let's look at Trial

20 Exhibit 94.

21      Q.   (By Mr. Parker) Do you recall also in the

22 middle of 1999 entering into an agreement with the

23 Clarion Corporation?

24      A.   That's correct.

25      Q.   And the fee for that was $60,000?

1     A.   That's correct.

2     Q.   And what did it cover?

3     A.   Well, I do believe it's more than one patent,

4  including the '981 patent.

5     Q.   So for 60 -- $60,000, the Clarion Corporation

6  got the right to multiple patents?

7     A.   That's correct.

8     Q.   And they only had to pay it one time?

9     A.   Only one time, that's correct.

10    Q.   All right.

11         MR. PARKER:  And so let's look at Trial

12  Exhibit 98.

13    Q.   (by Mr. Parker) And do you recall that at some

14  point, you entered into an agreement with Mitsubishi

15  Corporation?

16    A.   That's correct.

17         MR. PARKER:  And let's look at the end of

18  this document and see how it was executed.

19    Q.   (By Mr. Parker) And that is one of the ones

20  that does include the corporate seal?

21    A.   Yes, it does.

22    Q.   Meaning you agreed to it?

23    A.   That's right.

24    Q.   Okay.  And there was a negotiated fee, and the

25  amount of the fee was -- I think that is 18 million yen;

1  is that correct?

2       A.   18 million and 900,000 Japanese yen.

3       Q.   Almost 19 million, yeah.

4       A.   That's correct.

5       Q.   And so if you divide that by a hundred more or

6  less, about $190,000?

7       A.   That's correct.

8       Q.   Okay.  And this was an agreement that covered

9  more than just the '981 patent, correct?

10      A.   I believe so, yes.

11      Q.   And it was a one-time payment?

12      A.   That's correct.

13           MR. PARKER:  Now let's look at Trial

14  Exhibit 96.

15      Q.   (By Mr. Parker) Do you recall that you entered

16  an agreement with the TEAC Corporation?

17      A.   That's correct.

18      Q.   Okay.

19           MR. PARKER:  And can we look at the end

20  of this one and see how it --

21      Q.   (By Mr. Parker) And that contains your

22  corporate seal?

23      A.   Yes, it does.

24      Q.   Meaning, once again, that you agreed to it?

25      A.   That's right.

1    Q.   And the fee that was paid by TEAC is $70,000?

2    A.   That's correct.

3    Q.   Okay.  And what does that agreement cover?

4    A.   Well, include your '981 patent, and I believe

5 it's -- more than one patent is covered by this

6 agreement.

7    Q.   So for the $70,000, TEAC got multiple patents,

8 and that was a one-time payment?

9    A.   That's correct.

10    Q.   Okay.

11         MR. PARKER:  Now let's look at Trial

12 Exhibit 99.

13    Q.   (By Mr. Parker) And do you recall that in the

14 year 2000, you entered into an agreement with the

15 Kenwood Corporation?

16    A.   That's correct.

17         MR. PARKER:  And let's look at the end of

18 that one.  I think that may be another one.  It's

19 signed.

20    Q.   (by Mr. Parker) And, again, that reflects your

21 signature on behalf of LaserDynamics Corporation?

22    A.   That's correct.

23    Q.   Okay.  And the amount of fee that was paid by

24 the Kenwood Corporation is $100,000; is that correct?

25    A.   Yes, that is correct, yes.

1        Q.    Okay.  And what did that cover?

2        A.    Well, I do believe it's -- it covers more than

3   one patent, including the '981 patent.

4        Q.    So the -- again, the Kenwood Corporation got

5   the right to multiple patents for a one-time payment of

6   $100,000?

7        A.    That's correct.

8                MR. PARKER:  Let's look at Trial

9   Exhibit 102.  Excuse me.

10       Q.    (by Mr. Parker) Do you recall that you

11  entered -- at some point, you entered into an agreement,

12  also in 2000, with the Ricoh Corporation?

13       A.    That's correct.

14               MR. PARKER:  Could we look at the end of

15  that?

16       Q.    (by Mr. Parker) And that document contains

17  your corporate seal?

18       A.    Yes, it does.

19       Q.    Indicating that you agreed to it, correct?

20       A.    That's correct.

21       Q.    Okay.  And that license agreement is, I think,

22  also in yen, and it's 15,075,000 yen, correct?

23       A.    I believe it is correct.

24       Q.    And this one actually calculated from a neat

25  thing on the internet.

1        Would you agree with me that that's

2   approximately $135,675 as of that date?

3        A.   Well, I don't know exactly the rate.  I think

4   it's fair enough, yes.

5        Q.   I'm teasing you a little bit, Mr. Kamatani.

6   Do you agree that the amount is about $135,000?

7        A.   Well, I guess so, I mean, if the rate is

8   correct.

9        Q.   Okay.  And did that cover more than just the

10  '981 patent?

11       A.   I do -- I do believe so, yes.

12       Q.   And for this 135,000-dollar payment, more or

13  less, Ricoh Corporation got the right to multiple

14  patents; is that correct?

15       A.   That's correct.

16       Q.   And they only had to make that payment one

17  time?

18       A.   That's correct.

19       Q.   Now, isn't it a fact that the strategy that

20  was employed by LaserDynamics in negotiating all of the

21  license agreements that we've looked at here today was

22  that, for small companies, the goal was around 50,000,

23  for medium-sized companies, it was around 100,000, and

24  for big companies, it was around 200,000?  That was the

25  general approach.

1       A.    Well, I didn't have any general approach.

2  Actually, I negotiated with a case-by-case basis.

3              At the time -- I mean, the term of -- when I

4  was making agreements between 1998 to 1999, of course,

5  I -- most of the time, my patent attorney approached to

6  the company, and based upon how big the company is and

7  how much interest they're paying for the DVD business,

8  based upon those issues, and basically, we decided the

9  amount of the license or any other agreement.

10      Q.    You didn't understand --

11              THE COURT:  We'll stop our question now.

12  It's noon.  I know that y'all want to go on, but the

13  jury and I would sort of like to have lunch.

14              All right, Ladies and Gentlemen.  I'm

15  going to excuse you at this time until 1:15.  Be ready

16  to come back in the courtroom at 1:15.

17              It's real important now -- you'll hear

18  this over and over, though -- that you not discuss this

19  matter during these breaks, and do not discuss it

20  because you've got to wait and keep an open mind until

21  we've heard all the evidence.  So don't discuss this

22  case during the breaks.

23              Have a nice lunch, and I'll see you at

24  1:15.

25              (Jury out.)

```
 1                    THE COURT:  All right.  Court's in recess
 2   until 1:15.
 3                    (Recess.)
 4                    *      *      *      *      *
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                           CERTIFICATION

2

3              I HEREBY CERTIFY that the foregoing is a

4    true and correct transcript from the stenographic notes

5    of the proceedings in the above-entitled matter to the

6    best of my ability.

7

8

9

10   /s/_____              _____
     SUSAN SIMMONS, CSR                      Date
11   Official Court Reporter
     State of Texas No.:  267
12   Expiration Date:  12/31/10

13

14

15   /s/_____              _____
     JUDY WERLINGER, CSR                     Date
16   Official Court Reporter
     State of Texas No.:
17   Expiration Date:  12/31/10

18

19

20   /s/_____                 _____
     SHELLY HOLMES, CSR                      Date
21   Deputy Official Court Reporter
     State of Texas No.:  7804
22   Expiration Date  12/31/10

23

24

25