```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3   LASERDYNAMICS            *    Civil Docket No.
                             *    2:06-CV-348
 4   VS.                      *    Marshall, Texas
                             *
 5                            *    July 1, 2009
     QUANTA, ET AL            *    1:10 P.M.
 6
                  TRANSCRIPT OF TRIAL PROCEEDINGS
 7           BEFORE THE HONORABLE T. JOHN WARD
                UNITED STATES DISTRICT JUDGE
 8                     AND A JURY

 9   APPEARANCES:

10   FOR THE PLAINTIFFS:    MR. THOMAS SANKEY
                            MR. GREGORY LUCK
11                          Duane Morris
                            3200 Southwest Freeway
12                          Suite 3150
                            Houston, TX   77027
13
                            MR. TIMOTHY TROP
14                          Trop Pruner & Hu
                            1616 South Voss Road
15                          Suite 750
                            Houston, TX   77057
16
                            MR. JEFFREY RAMBIN
17                          Capshaw DeRieux
                            1127 Judson Road
18                          Suite 220
                            Longview, TX   75601
19
     APPEARANCES CONTINUED ON NEXT PAGE:
20

21   COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                            MS. JUDY WERLINGER, CRS
22                          MS. SHELLY HOLMES
                            Official Court Reporters
23                          100 East Houston, Suite 125
                            Marshall, TX   75670
24                          903/935-3868

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:        MR. MELVIN WILCOX
                          Yarbrough & Wilcox
                          100 East Ferguson
                          Suite 1015
                          Tyler, TX    75702

                          MR. JOHN PARKER
                          Paul-Hastings
                          600 Peachtree St., NE
                          Suite 2400
                          Atlanta, GA   30308

                          MR. CHRISTIAN PLATT
                          MS. ERICKA SCHULZ
                          Paul-Hastings
                          4747 Executive Drive
                          12th Floor
                          San Diego, CA   92121

                          MS. KATHERINE MURRAY
                          MR. JAY CHIU
                          Paul-Hastings
                          515 South Flower Street
                          25th Floor
                          Los Angeles, CA   90071

              *      *      *      *      *      *

                    P R O C E E D I N G S

          COURT SECURITY OFFICER:  All rise.

          (Jury in.)

          THE COURT:  Please be seated.

          Continue, Mr. Luck.

     EMMETT MURTHA, PLAINTIFF'S WITNESS, SWORN

          DIRECT EXAMINATION (CONTINUED)

BY MR. LUCK:

1          Q.    The last thing I asked you was, did you form

2    an analysis to form your ultimate opinion in this case?

3          A.    Yes, I did.

4          Q.    What was the nature of that analysis?

5          A.    The analysis is called a Georgia-Pacific

6    analysis, and it's named after a legal case that was

7    heard in federal court in New York in 1971, where the

8    federal judge established 15 steps, if you will, to be

9    followed, leading to a result in the context of a

10   hypothetical negotiation.

11         Q.    Is this type of analysis also called a GP

12   analysis?

13         A.    Yes, for short, Georgia-Pacific or GP.

14         Q.    Is a GP analysis the type of analysis that you

15   performed in your own negotiating of licenses for IBM

16   and otherwise?

17         A.    It contains many elements of it, and in some

18   cases, however, there is information that would not be

19   normally available outside of a litigation context,

20   because there's no discovery -- confidential financial

21   information and license agreements and so forth.

22         Q.    Well, what is -- how does a hypothetical

23   negotiation differ from a negotiation that you employed

24   in -- in your work for IBM?

25         A.    Well, it starts with the assumption that the

1  patent or patents in-suit are valid, infringed, and

2  enforceable, which is generally not an assumption shared

3  by parties in a normal negotiation.

4         And then it has available to the parties

5  information produced by discovery, and they have the

6  novel ability to look into the future.

7      Q.   What was the period of time that you reviewed

8  evidence in this case?

9      A.   Starting at the time of the patent, which

10 issued in 1996, to the present.

11     Q.   What was the date you used for the

12 hypothetical negotiation?

13     A.   August 31, 2006.

14     Q.   And so under a GP analysis, we go back in time

15 from today back to that date; is that correct?

16     A.   Yes.  We act in the hypothetical negotiation

17 as if it was occurring on or about August 31, 2006.

18     Q.   Okay.  I have here on this board the GP

19 Factors; is that correct?

20         Are you able to see these?

21     A.   I know they're there, but I can't see them.

22     Q.   Okay.  I believe they're also going to be on

23 the overhead.  I'd like to step through each of those

24 factors and -- and glean an understanding of how you

25 came to your ultimate opinion in this case.

1          MR. LUCK:  If we can have those on the

2    overhead, please, the GP Factors.

3          Q.   (By Mr. Luck) Let's begin with Factor No. 1.

4          A.    Factor No. 1 causes us to look at agreements

5    entered into by the patentee in which the patent-in-suit

6    was licensed and determine whether those agreements

7    proved that there's an established royalty.

8          Q.   Did you do an analysis under Factor 1?

9          A.    Yes.  I read the agreements that had been

10   entered into by LaserDynamics and reached a conclusion.

11         Q.    What was the evidence, other than the

12   LaserDynamics agreements, that you reviewed under

13   Factor 1?

14         A.    Well, in addition to the agreements, I

15   interviewed Mr. Kamatani and read correspondence

16   relevant to various license negotiations.

17             MR. LUCK:  If I could have Slide M19,

18   please.

19         Q.   (By Mr. Luck) Does Slide M19 on the overhead

20   illustrate by date the agreements entered into by the

21   Plaintiff in this case?

22         A.    Yes, it does.

23         Q.    How many agreements did they enter into?  Do

24   you remember adding those up?

25         A.    I believe it was 16.

1      Q.   And the dates of those are what, '98 through

2  2001?

3      A.   Most of them were in 1998 and then five more

4  in '99, one in 2000, one in 2001.

5      Q.   Did you review the scope of those agreements?

6      A.   I read every one of them.

7      Q.   Did those agreements go only to the '981

8  patent or to other rights as well?

9      A.   In some cases, there was more than one patent

10  controlled by LaserDynamics, which was licensed.  So in

11  some cases, it was only '981; in some cases, it was

12  more.

13      Q.   You were here for opening statements in this

14  case?

15      A.   Yes.

16      Q.   You also heard the examination of

17  Mr. Kamatani?

18      A.   Yes.

19      Q.   And he was stepped through each of these

20  agreements and the scope of these; is that right?

21      A.   Would you repeat that?  I missed it.

22      Q.   He was asked the scope of these patents; is

23  that correct?

24      A.   Yes.

25      Q.   Do you remember him being asked if the

1 agreements include the '981 patent and other patents as

2 well?

3      A.   Yes, I remember that.

4      Q.   What is the significance, if any, of the fact

5 that these other agreements included the '981 and other

6 rights as well?

7      A.   Well, if you consider what they actually

8 included, the '981 patent has great significance,

9 importance, and the others, which I had analyzed by one

10 of my partners, are unimportant.  They bear no weight in

11 the deal.  They're just thrown in.

12               MR. LUCK:  If I could have Slide 20,

13 please.

14      Q.   (By Mr. Luck) What is the dollar range of all

15 these prior agreements entered into by Plaintiff here?

16               And in this particular slide, this is actually

17 a slide from the expert for Defendant, who has graphed

18 these out in a dollar amount.

19               Have you ever reviewed that before?

20      A.   Yes.  I've seen it before, and I would

21 characterize my answer as the highest payment was nearly

22 $250,000, and that was to Hitachi.  It's over on the

23 left.

24               And the smallest payment, which was

25 approximately 52,000, was to a company called Onkyo.

1   And that is in the center.

2       Q.    From your earlier answer, I deduced that the

3   dollar amounts sought by Plaintiff in this case is a lot

4   more than any of these prior agreements; is that

5   correct?

6       A.    Yes, it is.

7       Q.    Would it -- would it have -- in the

8   hypothetical negotiation, would Defendants know of these

9   earlier agreements?

10      A.    Absolutely.

11      Q.    You mentioned that the import of Factor 1 was

12  to determine if there's an established royalty.

13            Did you make that determination in this case?

14      A.    Yes.

15      Q.    What was the outcome of that review?

16      A.    I determined that these agreements did not

17  reflect an established royalty on the part of

18  LaserDynamics.

19      Q.    Have you seen the report of Defendants' expert

20  on that point?

21      A.    Yes.

22      Q.    And how does he -- how did he come out on that

23  point?

24      A.    Mr. Reed agreed with that.

25      Q.    If a royalty is not established under

1  Factor 1, what does that mean?

2      A.    Well, for one thing, you proceed to Factor 2

3  and the rest of the factors and try to come up with the

4  royalty by the time you're finished.

5          But what it certainly means is that the patent

6  owner has not established a rate that he's obliged to

7  offer others.

8      Q.    In your review of these agreements, did you

9  see any for a running rate?

10     A.    No.

11     Q.    Is your opinion in this case for a running

12  rate?

13     A.    Is my opinion for a running rate?

14     Q.    Yes.

15     A.    My opinion is that a running rate would be

16  appropriate.

17     Q.    How can LaserDynamics, not having executed an

18  agreement in the past for a running rate, get a running

19  rate in this case?

20     A.    Well, we're at a different point in time, for

21  one thing.  Any patent owner is entitled, if they

22  haven't established something that obliges them to do

23  the same thing over and over again, is free to change

24  how they approach things.

25          And both of those factors apply here.

1  Certainly, in 2006, LaserDynamics had a much better

2  understanding of the value of its patent, and certainly

3  has -- I have determined from conversations and review

4  of documents that it was always their intent to have a

5  running royalty form of license arrangement.

6      Q.    I'm interested to know how -- if LaserDynamics

7  entered into 16 prior agreements, none of which were

8  over $250,000 in the time period '98 through '01, how in

9  the world can it ask for tens of millions of dollars in

10  this case?

11     A.    Well, if you'll recall the previous chart, all

12  of the agreements were on the left side in '98 and '99.

13  And remember that the technology in question is digital

14  videorecording, which was in its infancy at best at that

15  time.

16          And by interview with Mr. Kamatani, as well as

17  other documents I've reviewed, the parties, certainly

18  the licensees, were claiming that the future was very

19  uncertain.  VHS was soundly entrenched.  It was unclear

20  that DVD would be able to supersede it.

21          And as you can see along the bottom, the first

22  DVD recorders in 2000 cost $4,000, which is pretty much

23  out of sight for most people.  So it was very uncertain.

24          By 2006, DVDs had totally replaced VHS, were

25  highly successful.  Everybody you knew had multiple

1   DVDs.  And Blu-ray, a whole new and enhanced form of

2   DVDs, sort of a high-definition DVD, was -- was out.

3       Q.   Did you observe any of the agreements being

4   executed under threat of -- or potential threat of

5   litigation?

6       A.   Yes.  That's another factor.

7                    MR. PLATT:  Your Honor, may we approach?

8                    THE COURT:  Yes.

9                    (Bench conference.)

10                   MR. PLATT:  The Court's already

11  considered whether certain license agreements were

12  subject to litigation threats, and they made that

13  argument and tried to keep these out on that basis.

14                   MR. LUCK:  I'm not trying to keep them

15  out.

16                   THE COURT:  He's not trying to keep them

17  out.  He can -- that's still evidentiary of this

18  expert's opinion.

19                   MR. PLATT:  I agree that the exhibit

20  should come.  In terms of damage of threat in

21  litigation, they haven't demonstrated that, and the

22  Court looked at that before.

23                   THE COURT:  Well, I'll overrule your

24  objection to that question.  Go ahead.

25                   (Bench conference concluded.)

1      Q.   (By Mr. Luck) I'm sorry.  I believe --

2      A.   I can answer your --

3      Q.   Okay.  Sure.  Go ahead, please.

4      A.   I -- the final factor that demonstrates it to

5  me that a royalty rate was not established is that these

6  agreements, all of them, were entered into either

7  because the licensees were threatened with litigation or

8  against the backdrop, an awareness by them, that

9  LaserDynamics was litigating.

10     Q.   What is the significance of entering into an

11 agreement under a threat of litigation?

12     A.   You're really not focused on the value of the

13 patent, but possibly on the cost of the lawsuit.  It's

14 not an arm's length transaction.

15     Q.   What was your ultimate evaluation under Factor

16 1?

17     A.   The point of the Georgia-Pacific Factors, one

18 by one, is to determine whether or not they would

19 increase or decrease the royalty rate you would come up

20 with at the end.

21          And in the case of Factor 1, it was my opinion

22 it would decrease the rate.

23     Q.   Okay.  I'm just going to indicate on the board

24 an arrow up or down depending on how you concluded this.

25 An arrow down; is that correct?

1    A.    Yes.

2    Q.    Let's turn to Factor 2.  Explain the

3  significance of that, please.

4    A.    Well, this is the reciprocal of Factor 1 in

5  that we look at licenses entered into and for similar

6  subject matter, if we can find any, by the Defendants in

7  this case, Quanta.

8    Q.    And so under Factor 2 now, the shoe is on the

9  other foot; is that right?

10    A.    Yes.

11            MR. LUCK:  If I may have Slide M18,

12  please.

13    Q.    (By Mr. Luck) Does M18 represent the value of

14  some of the agreements you reviewed under Factor 2?

15    A.    Yes.  It's a graphical summary of the prices

16  or royalties that were agreed to be paid by the licensee

17  to the licensors whose names are on the bottom.

18    Q.    If I could ask you to explain precisely what

19  you did review under Factor 2.

20    A.    I looked at the -- the agreements.  I read the

21  agreements.

22    Q.    Are all these agreements for ODD technology?

23    A.    Yes.

24    Q.    Are these agreements close in time to the date

25  of the hypothetical negotiation in '06?

**REDACTED BY ORDER OF THE COURT**

5     Q.    Under Factor 2, what is the value of these

6 prior agreements?

7     A.    Well, first, they occur at roughly the same

8 time or close to the same time as the hypothetical

9 negotiation, so that they're contemporaneous.  They deal

10 with the same subject matter.

11          They demonstrate that Quanta in this case is

12 willing to take licenses under the patents of others and

13 willing to pay running royalties in this case.  So the

14 numbers up on top of the bars are unit prices, but it's

15 the same thing as a percentage.  It's just a fixed price

16 per item.

17     Q.    Did you see the rate per drive calculated by

18 Mr. Reed?

19     A.    By Mr. Reed?

20     Q.    Yes.

21     A.    Yes, I did.

22     Q.    Is that illustrated on this slide?

23     A.    It's -- yes.  It's on the extreme right.

24     Q.    In the green over there?

25     A.    Yes.

1    Q.   And so the amount per drive -- per drive asked

2  for by the Plaintiff in this case is smaller than the

3  rates for the earlier agreements; is that correct?

4    A.   Yes.   That's what Mr. Reed calculated.

5    Q.   Now, I didn't see on this slide any agreements

6  for computers.

7  ▬▬▬ ▬▬▬ ▬▬▬▬▬ ▬▬▬▬

8

9  ▬▬▬ **REDACTED BY ORDER OF THE COURT** ▬▬

10 ▬▬ ▬▬ ▬▬▬ ▬▬▬ ▬▬ ▬▬ ▬▬▬ ▬▬▬ ▬▬▬▬

11 ▬▬▬▬ ▬▬ ▬▬▬ ▬▬▬ ▬▬ ▬▬ ▬▬▬ ▬

12 ▬▬▬▬ ▬▬▬ ▬▬ ▬▬▬▬ ▬▬ ▬▬▬ ▬▬▬▬▬

13 ▬▬▬▬▬ ▬▬ ▬▬ ▬▬▬ ▬▬ ▬▬▬ ▬▬▬ ▬▬ ▬▬

14 ▬▬ ▬▬▬ ▬▬▬

15 ▬▬▬▬ ▬▬▬ ▬▬▬ ▬ ▬▬▬ ▬▬▬ ▬▬▬

16 ▬▬▬ ▬▬ ▬▬ ▬ ▬▬▬ ▬▬ ▬▬▬ ▬▬▬▬

17 ▬▬▬▬ ▬▬ ▬▬▬ ▬▬ ▬▬▬ ▬▬▬ ▬▬▬ ▬▬▬

18 ▬▬▬ ▬▬ ▬▬ ▬ ▬▬ ▬▬ ▬▬▬ ▬▬ ▬ ▬▬▬

19 ▬▬▬ ▬▬ ▬▬ ▬▬ ▬▬▬

20    Q.   What is the upshot of your evaluation under

21 Factor 2?

22    A.   That it would tend to increase the royalty

23 rate arrived at in the hypothetical negotiation.

24    Q.   Thus, the arrow up?

25    A.   Arrow up.   I'm sorry.

1    Q.   Let's talk about Factor 3.

2    A.   Factor 3 asks, what would be the nature and

3    scope or the shape of a license between the parties?

4         Would it be exclusive or nonexclusive?  Would

5    it have restrictions?

6         And because LaserDynamics has already granted

7    quite a number of patents, it cannot be exclusive.  And

8    LaserDynamics has expressed no interest in imposing any

9    restrictions on its licensees.  Therefore, it wouldn't

10   have -- it would be nonexclusive.  It would be

11   unrestricted.  And, accordingly, that would tend to

12   depress the royalty rate.

13   Q.   So arrow down?

14   A.   Arrow down.

15   Q.   What about Factor 4?

16   A.   Factor 4 asks what's -- what is the policy of

17   LaserDynamics with regard to licensing its patents?

18        Does it resist licensing?  Does Quanta

19   withhold licensing and maintain a monopoly, or is it

20   willing to license without any special conditions?

21        And in this case, it is definitely

22   LaserDynamics' stated policy and demonstrated policy to

23   offer a license, and in this case, on a running royalty

24   basis.  Because of that willingness, it would decrease

25   the ultimate royalty rate.

1          So the arrow is down.

2     Q.    You say the arrow is down.  You have a policy

3  of wanting a running rate, but you agree with all of us

4  that they never had an agreement that had a running

5  rate; is that correct?

6     A.    Not yet.

7     Q.    Let's talk about Factor 5, please.

8     A.    Factor 5 asks, in essence, if the parties are

9  competitors, or whether one is an inventor and the other

10 is what they call a promoter or a user of the

11 technology.  And, certainly, it's the latter.

12          In this case, LaserDynamics and Quanta do not

13 compete.  They're not in the same line of business.

14 LaserDynamics is an inventor, which is willing to

15 license its patents, and Quanta would appear to have a

16 need for such a license and to use the technology.

17    Q.    What's the upshot of Factor 5?

18    A.    It would -- excuse me -- depress or decrease.

19 Arrow down.

20    Q.    Let's talk about Factor 6.

21    A.    Factor 6 asks, if using or selling the

22 patented specialty has an effect on promoting sales of

23 other products of the licensee.  It also asks if there's

24 any value to the licensor, but the licensor does not

25 sell anything.

1          And then it asks what's the extent of such

2  related sales, and it means related sales of products

3  not covered by the patent.

4      Q.   Well, what was the evidence you reviewed under

5  Factor 6?

6      A.   Many discovered documents, depositions, and,

7  most importantly, discussions with LaserDynamics'

8  experts in this case.

9      Q.   I think the jury has already met Dr. Howe and

10  will meet Mr. Davis directly.

11          Could you identify the other two experts,

12  please?

13      A.   Yes.  One is Dr. Alan Bell.  Dr. Bell not only

14  spent 18 years at IBM where he -- as a scientist in the

15  research labs where he had responsibility for DVD

16  technology, but also most recently was the Chief

17  Technical Officer and Executive Vice President of

18  Paramount Pictures where he was responsible for assuring

19  that Paramount incorporated present and future video

20  technology in its product offerings.

21          The other gentleman is -- is Mr. Costello, who

22  most significantly was Vice President of Marketing for

23  Gateway Computer where he had responsibility for selling

24  Gateway products and good insights into the importance

25  of various features, including DVD in personal

1  computers.

2      Q.   What did you gather from the discussions of

3  these four experts?

4      A.   It was very instructive.  The -- I learned

5  that virtually every personal computer -- or excuse

6  me -- virtually that all optical disk drives use the

7  patented method of disk discrimination.

8          And then, secondly, virtually all personal

9  computers contain or incorporate one -- at least one

10  optical disk drive.  And if they didn't, in Costello's

11  words, nobody would buy them.

12      Q.   Did you have a discussion with Dr. Howe?

13      A.   Yes.  I had a lengthy telephone conversation

14  also with Dr. Howe, who not only echoed but underlined

15  what was said about the nature and importance of the

16  disk discrimination feature, meaning that if it

17  didn't -- if it didn't exist, customers would be --

18  would be very upset.

19          He -- in my mind, he kind of reminded me of

20  what it would be like if we didn't have a remote for the

21  TV.  And he -- he also indicated it was his firm opinion

22  that the optical disk drive with disk discrimination was

23  critical for the efficient and satisfying use of the

24  personal computer.

25      Q.   Do you have an opinion as to whether the

1    invention of the patented issue that has integrated

2    optical disk drives helps promote the sale of computers

3    in which they're integrated?

4         A.   Oh, yes.  I thought I had stated that.

5    It's not only my opinion, but Costello, the marketing

6    person for Gateway, was quite emphatic that without the

7    optical disk drive with disk discrimination, customers

8    would be reluctant to buy a given computer model that

9    lacked that.

10        Q.   What was the upshot of your review under

11   Factor 6?

12        A.   That it would most definitely not only

13   increase the royalty rate, but it would also increase

14   the royalty base to cover not only the optical disk

15   drive but also any personal computer in which one was

16   integrated.

17        Q.   When you say base, what is the base?

18        A.   Well, in order to come up with a royalty

19   payment, one multiplies the royalty rate, which is a

20   percentage, against the sales revenue of the product

21   which is covered by the patent to get the royalty.

22   So it's -- it's percent times selling price equals

23   royalty.

24        Q.   Let's talk about Factor 7.

25        A.   Factor 7 is quite straightforward.  It asks,

1  how much longer does the patent have to run, and what

2  would be the term of the license as a result of the

3  hypothetical negotiation?

4       The patent runs for 20 years from when it was

5  filed, and, therefore, it expires on September 5, 2015.

6  It is my opinion that the duration of the -- or the term

7  of the license would be for the life -- the remaining

8  life of the patent.

9     Q.   What is the bottom line on your review under

10  Factor 7?

11    A.   Well, because we're seeking a running royalty

12  that is based not on anything other than the usage, it

13  wouldn't matter.  It's neutral.  It's -- it's -- it's

14  neutral.  Neither up nor down.

15    Q.   Factor 8?

16    A.   Factor 8 inquires to the profitability of the

17  accused product, the product made under the patent;

18  also, how commercially successful is it and how popular

19  is it.

20       As you can see, there are substantial revenues

21  realized by Quanta in the sale of these products.  And

22  as you have heard and as I would certainly state and as

23  our experts have stated, the product is -- is quite

24  popular.

25       You can't get an optical drive that doesn't

1   contain disk discrimination, and it's very unlikely that

2   anybody would buy a personal computer without, one, an

3   optical drive, or, two, one with disk discrimination.

4   Therefore, it's popular; it's a commercial success; and

5   according to our financial expert, Mr. Davis, the sales

6   volumes are quite substantial, and they -- the products

7   sales are also profitable.

8       Q.   Well, what was evidence you reviewed under

9   Factor 8?

10      A.   Among other things, I saw the report of

11  Mr. Davis.  Further, the experts I mentioned earlier

12  referred to the product and its popularity.

13      Q.   Are you familiar with Blu-ray technology?

14      A.   Yes.  As I mentioned a little bit earlier and

15  we saw on the time scale, Blu-ray was introduced

16  commercially first by Sony in 2006, and it's an HD

17  version, if you will, high-definition version of DVD.

18      Q.   How did the introduction of Blu-ray impact

19  your review under Factor 8?

20      A.   Well, Blu-ray is another format.  There are

21  already a number of formats, but it's just another

22  format.  It's a multilayer format.

23          If you saw Dr. Howe's slides this morning,

24  Blu-ray records on multiple layers, so it's even more

25  complicated.  And it -- it appears -- it's -- it's going

1  to have quite a lot of success.  In fact, if I recall,

2  the annual report of Quanta points to the arrival of

3  Blu-ray as a -- an indicator that their sales and,

4  presumably, their profits are going to ramp up.

5       Q.   Well, how did you end up under Factor 8?

6       A.   It's my opinion Factor 8 would definitely

7  increase the arrow up, I guess is the best way.  And it

8  would certainly reinforce the royalty base to include

9  the personal computers in which the drives are

10  incorporated.

11       Q.   Let's move on to Factor 9, please.

12       A.   Factor 9 asks, how does the patented device

13  improve things over what existed before for the same

14  purpose?

15            Well, there was nothing before, because the

16  patent was issued when DVD was only a future potential,

17  and CDs were about the only thing around.  So there was

18  no predecessor to it, and so it was -- it was a dramatic

19  improvement over that when multiple formats became

20  available.

21            Again, it's -- it's -- the predecessor to

22  the -- to the invented technology is like days when

23  there was no remote for the TV.

24       Q.   Did you speak to any experts under Factor 9?

25       A.   Well, the first person I spoke with was the

1  inventor, and he gave a pretty graphic illustration

2  yesterday about how he came to make the invention and

3  how he perceived the need.

4       And I talked first with Alan Bell about what

5  was accomplished by -- technically, by the invention in

6  terms of filling a need with multiple formats, and he

7  has spent half his life working on dealing with these

8  standards, as they were called this morning.

9       And, likewise, Dr. Howe said not only was

10 there nothing previously, but there really isn't any

11 alternative.

12      Q.   So your understanding is, there are no prior

13 devices or modes?

14      A.   Yes, sir.

15      Q.   How about the option of manual discrimination?

16 Did you ever review that at all?

17      A.   Well, I think the analogy to the TV remote is

18 apt in this case, although there is no manual option

19 available either.  It's just theoretical that you could

20 flip some kind of a switch or push a button or something

21 to make a choice.

22      But it would require you to know what kind of

23 a format you were dealing with to begin with so you

24 would be able to dial it up.  And in the opinion of

25 Costello, customers wouldn't stand for that.

1    Q.    Are you aware of any options today to the disk

2  discrimination of the '981 patent?

3    A.    No.  I'm not aware of any, and I've inquired,

4  and I've been told by Howe and Bell that there are none.

5    Q.    How did you bottom out under Factor 9?

6    A.    Arrow up.

7    Q.    What is your opinion under Factor 10?  And

8  describe that, if you would.

9    A.    Yes.  Factor 10 inquires into what is the

10  invention all about, and how -- how is it used by, in

11  this case, Quanta?  And what are the benefits to using

12  it?

13          And to reiterate, all optical drives,

14  including those produced by Quanta, use the disk

15  discrimination process.  And most computers have at

16  least one such optical drive in them.

17    Q.    What was the evidence you reviewed under --

18  under Factor 10?

19    A.    Well, I read the patent.  I spoke with the

20  inventor, and I talked with the experts, Bell, Costello,

21  and Howe, as to their analysis, and also from a

22  marketing standpoint, their impression of the invention.

23    Q.    What is your opinion under Factor 10, ultimate

24  opinion?

25    A.    It positively would affect -- would increase

1    the ultimate royalty, so it's an arrow up.

2        Q.    Factor 11?

3        A.    Factor 11 looks specifically into the extent

4    to which the patent has been used by the infringer and

5    whatever evidence there is indicative of the value of

6    that use.

7        Q.    In your review under Factor 11, did you refer

8    to market survey, also known as a TSR report?

9        A.    Yes.  Yes, I looked at that two years.

10       Q.    In your practice, is this type of report

11   something that you would rely upon at IBM?

12       A.    Well, not only at IBM but also in my present

13   practice.  Whenever we have to get our arms around

14   industry volumes, whether it's DVDs or semiconductors or

15   whatever it is, personal computer sales, there's

16   generally an industry report or two that help you with

17   statistics -- with volumes.

18       Q.    Do you know if others at IBM and others also

19   rely upon these kind of industry reports?

20       A.    Oh, yes, definitely.  That's why they're so

21   popular.

22       Q.    What influence did the evidence you reviewed

23   under Factor 11 have on your opinion?

24       A.    Well, ultimately, I -- I formed the opinion

25   that disk discrimination process, while it is not an

official standard from some standards body, is what we in the industry have always called a de facto standard. It doesn't take a vote by anything other than 100-percent use to know that this disk discrimination process in optical disk drives is a standard, in fact.

And that's very important.  There is no alternative.

Furthermore, the Defendants have used the drives in -- with the process in the computers they sell, and that just increases the royalty base on which you would impose a royalty in a license agreement.

Q.   And so how would your review of the evidence under Factor 11 impact the rate?

A.   It would definitely raise the rate and broaden the royalty base.

Q.   And that's an arrow up?

A.   Arrow up.

Q.   Factor 12?

A.   Factor 12 asks us to look at what portion of the selling price would be customary in this business or the industry to -- it says allow to charge for the use of the invention.

I set aside profit, because rarely is profit used as a -- as a base for royalties in the information technology business.  So in a nutshell, it says, what

1 portion of the selling price is customary?

2         And now we know, or at least we know my

3 opinion, that the '981 patent is essential.  And then

4 I'll stop here, so if you have something else to ask,

5 you'll have a chance to ask it.

6     Q.    All right.  Thanks for that.

7         What was the evidence you reviewed under

8 Factor 12?

9     A.    Well, the first thing you do is look for

10 anything comparable in the industry.  There are two

11 royalty or patent licensing programs of DVD technologies

12 in the industry.  I've identified them in my report.

13 They started in the early part of this century or maybe

14 even in the late part of the 1990s, and they deal with

15 DVD technology.  And if I recall, one is 3.5 percent of

16 selling price, and the other is 4 percent.

17         But I also looked at a study of royalty rates

18 done by the Licensing Executive Society in 1997.  And

19 this was a remarkable benchmark, because nothing like it

20 had ever been done before, and it is widely used even to

21 this day.

22         And the reason it was useful is it not only

23 talked about royalty rates, which I'll get to in a

24 minute but also talked about the form of license

25 agreements as to royalty bearing or paid up and so

    1   forth.

    2        Q.   Well, what is the significance of programs to

    3   the issues under Factor 12 or any of the other factors?

    4             In other words, how do they apply?

    5        A.   You said programs?

    6        Q.   Yes.  Of the license programs, the two

    7   programs you just discussed.

    8        A.   Oh, well, they are -- the two licensing

    9   programs are important, because they indicate the going

   10   rate, if you will, at least for those patents, which may

   11   or may not be as important as the one at question.  They

   12   are programs that are active, and people are taking

   13   licenses under them.

   14        Q.   Well, what was the date of the LAS survey?

   15        A.   1997, about midyear.

   16        Q.   Well, how is a survey that old in time

   17   significant to the issues in this case when you have the

   18   date of the hypothetical negotiation in '06?

   19        A.   Well, the licensing executive survey is a --

   20   is a benchmark.  It's like a textbook.  It -- it

   21   synthesized the responses of 428 licensing executives,

   22   of which I was one, people who were now responsible for

   23   licensing at major companies, at universities, at

   24   government laboratories, in other words, the real world.

   25   It had never been done before.  So like any other study

which tabulated information that is used by professional

people to make decisions, whether they're doctors,

lawyers, or licensing people, it is important.  It's

still widely used.

Q.   Was the LAS survey directed to ODD technology?

A.   No.  It was across whatever technologies were

being licensed by the people who responded.

So in my case, yes, ODD technologies would

have been part of IBM's royalty outlook, but in other

cases, it might have been healthcare, agriculture,

chemicals, materials, whatever.

I believe the -- perhaps about a quarter of

the respondents were from the information technology

industry.

Q.   Well -- well, how could agreements and rates

directed to healthcare be significant in our case?

A.   The -- the -- I'll explain.  One of the key

questions said:  How do you set a rate for a given

patent?

And the respondents were given some categories

of a major breakthrough, a major improvement, or a minor

improvement.

And so they said, for a minor improvement, we

would charge 2 to 5 percent.  For a major improvement,

we would charge 4 to 8 percent.  And for a major

1  breakthrough, 6 to 15 percent, if I recall correctly.

2  I don't -- haven't seen many of those.  So it -- it gave

3  all of us, for the first time, a feel for what our

4  colleagues were charging or how they were valuing

5  patents.

6          Also, it wasn't confined to rates.  It also

7  talked about the licensing structures, and it said, by

8  far, the favored licensing structure was running

9  royalties, because it was -- it was a fair way to reward

10  or pay the license -- the patent owner because it

11  measured -- it was based on use, but it also followed

12  price fluctuations.  So if the prices were going down,

13  it was fair to the licensee.

14      Q.   How did you conclude Factor 12?

15      A.   That it would tend to support an increase, or

16  an arrow up, in terms of the ultimate royalty rate.

17      Q.   Did you do a review under Factor 13?

18      A.   Yes.

19      Q.   What -- what is the import of Factor 13 to the

20  GP analysis?

21      A.   It asks us to look at the apparatus in which

22  the patented technology is embodied, and in a sense, if

23  possible, divided between the portion of the apparatus

24  that's affected or favored by the licensed -- or the

25  patented technology and other elements tangible and

1   intangible, as they're listed up here.

2        Q.   What was the effect of your review of the

3   evidence under Factor 13?

4        A.   Well, I did look to see if Quanta could --

5   could or had identified any aspect of optical disk

6   drives, which was not affected by or not attributed to

7   the '981 patent.

8             I also inquired of and read the reports of our

9   experts, and they were quite emphatic that the disk

10  discrimination capability was a pervasive part of the

11  optical disk drive; that is, it wasn't one isolated

12  little knob on the outside.  It was -- it was throughout

13  the system.  It was -- it was -- completely influenced

14  the functionality of an optical disk drive.

15       Q.   Is it your opinion the -- the evidence you

16  reviewed under Factor 13 would tend to increase or

17  decrease the ultimate rate?

18       A.   Arrow up.

19       Q.   Let's review Factor 14.  If you could,

20  describe that, please.

21       A.   Yes.  Factor 14, as you've heard me say

22  several times, so you know I consider it important, is

23  the opinion testimony of qualified experts.  I'm not

24  an -- an engineer or a technical person, but I've been

25  around them all my life.

1          And every time I entered into a negotiation, I

2   asked IBM scientists, researchers, or my client experts

3   about the nature of the technology, its importance, how

4   it works, how it fits, and so forth.  And that helps me

5   to understand, in a way, what to charge for it.

6   So Dr. Howe, who's our technical expert, as you can see,

7   indicated that there is no alternative; there's no other

8   way to do this.

9          And, furthermore, when the optical disk drive

10  is working with the PC, they interoperate; they function

11  together.  They all -- it all works together.  It's --

12  it's not an isolated thing.

13         Dr. Bell, who's the man from Paramount, also

14  Warner Brothers, and IBM, says that the disk

15  discrimination feature is essential to the operation of

16  an optical drive.  And as we can understand with

17  multiple standards, you have to have it.

18         And Mr. Costello, who has a delightful Irish

19  accent, says that personal computers, nobody will buy

20  one without an optical disk drive, and certainly, no one

21  would buy one without an optical disk drive with disk

22  discrimination.

23         Finally, our financial expert, Mr. Davis, has

24  told me that Quanta's accused products are selling well

25  and that they're profitable.

1      Q.    What is your ultimate opinion of Factor 14?

2      A.    Overwhelmingly, arrow up.

3      Q.    If you could describe Factor 15, please.

4      A.    Well, Factor 15 summarizes the outcome of the

5  Georgia-Pacific analysis.  It's a -- it's a long factor

6  that basically asks, what would be the result, after

7  going through these factors, if the two parties were

8  being reasonable and willing and prudent and

9  business-like to arrive at a license under which one

10  party would obtain a license to make and sell a patented

11  product, and the other party would receive a reasonable

12  profit or a reasonable royalty?

13      Q.    What is your opinion under Factor 15?

14      A.    My opinion is, based on the assumption that

15  the patent -- the '981 patent is valid, infringed, and

16  enforceable, and, therefore, I arrived at the opinion

17  that a reasonable royalty for an optical disk drive on a

18  standalone basis would be 6 percent of the selling price

19  and that 2 percent of the selling price would be a fair

20  royalty for the situation where an optical disk drive

21  was integrated with or inserted into a personal

22  computer.

23      Q.    So we're clear, you are suggesting that a

24  2-percent rate would apply to a computer, even though

25  the accused process is operated in the smaller component

1    of the ODD; is that correct?

2        A.   Yes.   That's not unusual.

3        Q.   Can you describe any -- anything from your

4    experience that would explain this?

5        A.   Yes.   I have something that probably most

6    people could appreciate, because you may not realize it,

7    but IBM invented laser eye surgery.   And it had a key,

8    important patent covering laser eye surgery equipment.

9    The IBM technology was embodied within a larger laser

10   eye surgery machine that had other technologies in it as

11   well.   IBM licensed every maker of laser eye surgery

12   equipment at the rate of 2 percent of selling price for

13   the use of its patent.

14            And when they were all licensed, the new

15   company started up and came and bought the patent from

16   us.   And when I asked the fellow why he wanted to buy it

17   instead of taking a license, he said so there will be no

18   more competition after me.

19       Q.   I asked before if you were here during opening

20   statements.

21       A.   Yes.

22       Q.   I believe Defendants' counsel, Mr. Parker,

23   indicated and stated in his opening statement, and I'm

24   going to quote:   So it's not Quanta Computer who decides

25   which optical disk drive or CPU or keyboard or anything

1  else is in these computers to -- in it; it's Dell,

2  Hewlett-Packard, Apple.

3          Have you seen any evidence that support --

4  supports the assertion that it is not Quanta's choice to

5  put in a driver that -- the keyboard or otherwise?

6      A.   No.  I've -- I've not heard that until

7  Mr. Parker said it.

8      Q.   Assuming that to be the case, would that

9  impact your opinion in this case?

10     A.   No.

11             MR. LUCK:  Pass the witness.

12             MR. PLATT:  May it please the Court.

13             THE COURT:  Counsel.

14                   CROSS-EXAMINATION

15  BY MR. PLATT:

16     Q.   Mr. Murtha, we haven't met before.

17     A.   What's your name?

18     Q.   My name is Christian Platt.

19     A.   Platt?

20     Q.   Platt.

21     A.   Nice to meet you.

22     Q.   Nice to meet you as well.

23             Now, sir, Plaintiff's counsel hired you solely

24  for the task of determining a reasonable royalty; is

25  that correct?

1          A.    No.

2          Q.    Well, your task was to do an analysis to come

3    up with a reasonable royalty percentage; isn't that

4    right?

5          A.    That was among my tasks.

6          Q.    Well, Mr. Murtha, you claim here that there

7    should be a 6 percent running royalty rate on the sale

8    of an optical disk drive; is that correct?

9          A.    Yes.

10         Q.    And it's also your position that you claim

11   that there should be a 2 percent running royalty rate on

12   the sale of a computer with an optical disk drive in it;

13   is that right?

14         A.    Yes.

15         Q.    Now, you would agree that a running royalty --

16   excuse me.  Strike that.

17              You would agree with me that a royalty rate

18   does not need to be expressed as a percentage royalty,

19   does it?

20         A.    No.  It could be a unit rate, like a number of

21   the agreements that Quanta has signed.

22         Q.    Right.  But it doesn't have to be a percentage

23   royalty, does it?

24         A.    No.

25         Q.    Now, despite these running royalty percentages

1  that you calculated in your report, you never bothered

2  to perform a calculation of the total damages amount,

3  did you?

4  　　A.　You mean multiplied times the royalty base?

5  　　Q.　That's right.

6  　　A.　That information was not available to me at

7  the time I completed my report nor was I asked to do

8  that.  I was asked to simply come up with a reasonable

9  royalty rate and the reasons supporting my opinion.

10 　　Q.　Okay.  So you didn't do that?

11 　　A.　Do what?

12 　　Q.　You didn't -- you did not calculate the total

13 damages amount, did you?

14 　　A.　No.  I said no.

15 　　Q.　Okay.  Would you agree with me, sir, that your

16 damage opinion should not be speculative?

17 　　A.　My royalty rates are not speculative.

18 　　Q.　Okay.  Your opinions shouldn't be speculative

19 either, should it?

20 　　A.　I don't think it is.

21 　　Q.　You'd agree with me that your damage opinion

22 should be based on reliable information, wouldn't you?

23 　　A.　Yes.

24 　　Q.　Okay.  Now, part of determining whether some

25 piece of information is reliable is to consider whether

1   it is independently verifiable.

2           Wouldn't you agree with that, sir?

3       A.   That's one way to put it, sure.

4       Q.   Now, you're aware, sir, that the law requires

5   you to consider the past licenses of the -- of the

6   patent holder when considering what a reasonable royalty

7   should be; is that right?

8       A.   Well, the Georgia-Pacific factors include

9   that, yes.   I'm not sure --

10      Q.   And in fact --

11      A.   -- sure that there's a law that says that.

12      Q.   In fact, that's the Georgia-Pacific Factor No.

13  1; is that right?

14      A.   Correct.

15      Q.   Now -- now, you reviewed all the Plaintiff's

16  16 license agreements that we've been talking about in

17  this case; is that right?

18      A.   Yes.   That's what I said.   I read all of them.

19      Q.   Okay.

20           MR. PLATT:   If we can put up on the

21  screen the 16 agreements.

22      Q.   (By Mr. Platt) Now, can you agree with me that

23  when we talk about these 16 agreements, that we talk --

24  when we talk about LaserDynamics' agreements, that we're

25  talking about these 16 agreements?

1       A.    That's pretty small print.  I think that's the

2  16, yes.  They certainly look familiar.

3       Q.    And can you agree with me, when we're talking

4  about LaserDynamics' agreements, we're talking about

5  these 16 agreements?  Is that right?

6       A.    Yes.

7       Q.    Okay.  Now -- and I think, if we look at the

8  bottom at Hitachi, we've had some discussion about what

9  that number is.

10          Would you agree with me that part of the

11 agreement why that fluctuates between 260 and 250 is a

12 result of the conversion from yen that we've had to do

13 in this case?

14      A.    Never thought about it.

15      Q.    Okay.  Well, I think you testified earlier

16 that it was under 250,000; is that right?

17      A.    Well, I was just pointing to where it stood on

18 the graph.  I wasn't being precise.

19      Q.    Sure.

20          Now, there are lots of agreements in this case

21 that include the '981 patent, aren't there?

22      A.    16.

23      Q.    Now, you were here yesterday in the courtroom

24 when Mr. Kamatani went through and talked about all 16

25 of these agreements; is that right?

1       A.    Yes.

2       Q.    And Mr. Kamatani signed or put his stamp on

3  all of these agreements; is that right?

4       A.    So it came out.

5       Q.    And those agreements were all written, weren't

6  they?

7       A.    What do you mean written?  They were printed,

8  typed, handwritten, yes.

9       Q.    And those agreements were with third-party

10 corporations, weren't they?

11      A.    They were with those companies.

12      Q.    And the payment terms under those agreements,

13 they were all accepted by Mr. Kamatani, weren't they?

14      A.    Yes, sir.

15      Q.    And each of these agreements was for a

16 lump-sum payment; is that right?

17      A.    Yes.

18      Q.    And all of these agreements ranged from as low

19 as $57,000 all the way up to about $260,000; is that

20 right?

21      A.    Yes.

22      Q.    And these agreements aren't just for the '981

23 patent; these agreements were for all of Mr. Kamatani's

24 patents, aren't they?

25      A.    Well, some were, and some weren't.  Not all of

1  them included -- other than '981 -- all of them did

2  include '981.  Some included other patents.

3       Q.   Now, sir, you were here yesterday when

4  Mr. Kamatani told the jury that he was represented by

5  lawyers when he entered into most of these 16 lump-sum

6  agreements; is that right?

7       A.   I did hear him say that.

8       Q.   Sir, you don't have any basis to believe that

9  Mr. Kamatani was being given incompetent legal advice by

10 counsel when they represented him in these licensing

11 negotiations, do you?

12      A.   Not that I -- I have no basis for such an

13 opinion, no, sir.

14      Q.   Okay.  And, in fact, I think we also heard

15 yesterday that Mr. Kamatani switched -- or strike that.

16           I think we also heard that he started out

17 working with a Japanese patent lawyer named

18 Mr. Hagihara, and then at some point, he started working

19 with lawyers here in the United States; is that right?

20      A.   Yes.

21      Q.   Okay.  And, in fact, one of the lawyers that

22 he worked with in these licensing negotiations was

23 Mr. Tim Trop, who questioned Dr. Howe today; is that

24 right?

25      A.   That's my understanding.

1     Q.   Now, out of these 16 license agreements,

2 you're not aware of a single license agreement where the

3 Plaintiff received anything other than a lump-sum

4 payment of about 260 or less -- 260,000 or less; is that

5 right?

6     A.   Correct.

7     Q.   Now, let's -- let's look at some of these

8 agreements and talk about them.

9         Now, Toshiba doesn't have any interest in the

10 outcome of this lawsuit, do they?

11    A.   How would I know?

12    Q.   Do you know if Yamaha had any interest in

13 entering into this license agreement because of this

14 lawsuit?

15    A.   This lawsuit?

16    Q.   Yeah.

17    A.   These agreements are from 1998 and 1999.

18    Q.   Now, you would agree with me that all these

19 parties are independent, aren't they?

20    A.   Of what?

21    Q.   They're independent.

22    A.   Of -- of LaserDynamics?

23    Q.   Yeah.

24    A.   Near as I know.

25    Q.   Now, wouldn't you agree with me that these 16

1  written agreements that Mr. Kamatani signed and approved

2  are evidence of what other parties, these 16 parties,

3  were willing to pay for the '981 patent?

4      A.   Well, the assumption going in is, they would

5  pay as little as they possibly could.  That would have

6  been my operation, if I was getting a license from them,

7  pay as little as possible.  That's in their interest,

8  so...

9      Q.   And you would agree with me, this shows what

10  they were willing to pay.

11      A.   Yeah.  Whether they were willing to pay more

12  is speculative.

13      Q.   That's right.

14           In fact, in other cases that you've been

15  involved in, different lawyers have hired you to be an

16  expert in damages in their cases, haven't they?

17      A.   Plaintiffs and Defendants, yes.

18      Q.   And, sir, it's true, then, in some of those

19  other cases, you have opined that the measure of damages

20  should be a lump sum and not a running royalty; is that

21  right?

22      A.   If it fit the circumstances, yes.  But I would

23  go on to say, since maybe it would be helpful, that all

24  lump sums, unless they're plucked out of the air, come

25  from -- or at least all the lump sums I calculate come

1    from applying a royalty rate against a royalty base.

2    That's where -- that's where that product comes from.

3         Q.   Well, sir -- sir, you would agree with me,

4    though, that in the cases where you've found lump-sum

5    payments in the past, it's been where a party has a

6    policy of accepting lump-sum payments; isn't that right?

7         A.   No.  It may be a policy where the licensee has

8    a strong policy against paying royalties, and they've

9    won the point.  Sometimes the parties don't care.

10        Q.   And some companies have policies doing

11   licenses on a lump-sum basis; is that right?

12        A.   I suppose.

13        Q.   But in this case, you don't offer an opinion

14   at all, do you, on the lump-sum amount that would fall

15   within the scope of these agreements, do you?

16        A.   No.

17        Q.   And it's your opinion that these 16 lump-sum

18   amounts do not establish a royalty; is that right?

19        A.   Yes.  That's what I've stated in my report and

20   in my testimony.

21        Q.   Now, you claim that a running royalty form of

22   payment is preferred by LaserDynamics in this matter.

23        A.   That's -- I'm sorry.  In this matter?

24        Q.   Yes.

25        A.   Yes.  That is what they have stated to me.

1      Q.   And that's the analysis that you looked at,

2  right?

3      A.   That is what I take to be their licensing

4  practice or policy.

5      Q.   And it was Mr. Kamatani that told you that his

6  intent was to get a running royalty; is that right?

7      A.   He said it was his intent then and it's his

8  intent now, even though he was willing to take lump-sum

9  payments in that era, he is no longer interested in

10 doing it that way.  He prefers a lump -- or excuse me --

11 a royalty-bearing arrangement.

12     Q.   Well, and that's because he claims that he had

13 no leverage to get a running royalty rate during this

14 time; is that right?

15     A.   Well, I have heard him say that, but, of

16 course, there are other reasons as well.

17     Q.   Well, did you just accept what Mr. Kamatani

18 told you?

19     A.   About leverage?

20     Q.   Yeah.

21     A.   He was there.  He made the assessment.  I

22 suppose he expressed his true feelings, right or wrong.

23     Q.   But you had no way of knowing whether he was

24 right, do you?

25     A.   No, I don't.

1      Q.   Now, one of your opinions is that

2   Mr. Kamatani's agreement -- agreements with these third

3   parties do not establish a royalty rate, because they

4   recite a lump-sum payment; is that right?

5      A.   No, that's not the reason, and that's not what

6   I said.

7      Q.   Well, sir, we took your deposition in this

8   case, didn't we?

9      A.   Somebody did.   Not somebody here.

10     Q.   Right.   Okay.

11          Wasn't it true that you agreed that your

12   opinion was that those agreements do not establish a

13   royalty rate, because they're lump-sum payments?

14     A.   I don't recall stating that that was the

15   reason I felt it did not establish a royalty rate that

16   may have -- lump sums, by definition, don't establish a

17   rate, and there are other factors why there was no rate

18   or royalty established in this era.

19     Q.   Now, sir, I appreciate that you want to

20   explain your answer.   I just want to let you know you

21   should be aware that we --

22               THE COURT:  Well, what is -- I'll take

23   care of the instructions to the witness, Counsel?

24               MR. PLATT:  Okay.

25               THE COURT:  Now, what is it that you have

1  an objection about?

2          MR. PLATT:  Yeah.  I'd like to show some

3  deposition testimony.

4          THE COURT:  Well, you haven't confronted

5  him yet, for sure, so let's -- let's do it the way the

6  rules require it, and I'll be happy to follow the rules,

7  if you will.

8          MR. PLATT:  Okay.

9      Q.  (By Mr. Platt) Now, sir, in your deposition,

10  you testified that it was your opinion that those

11  agreements do not establish a royalty rate because

12  they're lump-sum payments; is that right?

13      A.  I don't recall saying exactly that.

14      Q.  Okay.  We took your deposition back in April;

15  is that right?

16      A.  I think that's when it was.

17      Q.  Okay.  And during that deposition, there was a

18  court reporter present?

19      A.  Yes.

20      Q.  Okay.  And the Plaintiff's lawyer was there as

21  well?

22      A.  Yes.

23      Q.  Okay.  And you were placed under oath?

24      A.  Yes.

25      Q.  And the court reporter took down our questions

1    and answers; is that right?

2        A.   Yes.

3        Q.   And a couple of weeks later, you received a

4    copy of that transcript.

5        A.   Yes, sir.

6        Q.   So I'd like to show you Page 215, Lines 9

7    through 10 of your deposition transcript -- sorry --

8    Lines 6 through 10.

9            You'll see there, the question is:  And I

10   wanted to clarify some of your testimony regarding the

11   earlier LaserDynamics license agreements.

12           Is it your opinion that those agreements do

13   not establish a royalty rate because they're lump-sum

14   payments?

15           And the answer was:  Yes.

16           Did I read that correctly?

17       A.   You did, and it doesn't differ with my earlier

18   responses to you.

19               THE COURT:  Well, the jury will decide

20   that.

21               THE WITNESS:  Oh, I'm sorry, sir.

22               THE COURT:  Okay.  That's all right.

23       Q.   (By Mr. Platt) Sir, you would agree with me

24   that Mr. Kamatani certainly has an interest in the

25   outcome of this litigation.

1      A.   Yes.

2      Q.   Now, it's your view, sir, that the prior

3  licenses are not relevant to the hypothetical

4  negotiation; is that right?

5      A.   No.

6      Q.   Sir, would you agree with me that at your

7  deposition, you testified that:  From the review of

8  prior licenses -- sorry.  Strike that.

9           Would you agree with me that during your

10  deposition, you agreed that if you cannot, from the

11  review of prior licenses, derive an established rate,

12  that it is your view that those prior licenses were not

13  relevant to the hypothetical negotiation?

14      A.   Not relevant to the outcome.

15      Q.   Now, you contend that the parties would have

16  had a hypothetical negotiation for a license in 2006; is

17  that right?

18      A.   Yes.

19      Q.   And that's because Plaintiff's lawyers told

20  you to use that date; is that right?

21      A.   Yes.

22      Q.   Now, you didn't do an analysis to determine

23  when the date of first infringement began, did you?

24      A.   No.  That's a legal question.

25      Q.   And since it's a legal question, you're aware

1   that the hypothetical negotiation date is the date

2   shortly before the alleged infringement -- infringement

3   began; is that right?

4        A.   That's what I've been told.

5        Q.   Okay.  Now, you're aware, are you not, that a

6   stipulated fact in this case is that QSI began selling

7   drives into the United States in 2001 and 2002?

8        A.   I believe I've heard that.

9        Q.   Now, because these license agreements were

10  more than three years before 2006, you claim that they

11  weren't helpful; is that right?

12       A.   Well, that's one reason.

13       Q.   Now, you provided no law to support your claim

14  that there's a three-year window for considering license

15  agreements; is that right?

16       A.   I'm not a lawyer.

17       Q.   Now, we talked earlier about your 1997 survey

18  of licensed royalties.  You'd agree with me that's nine

19  years earlier than 2006, isn't it?

20       A.   Yes, you're right.

21       Q.   And in your report, you also rely on licensing

22  terms from Philips, Sony, and Pioneer from 1999, seven

23  years earlier; is that right?

24       A.   Those were continuing programs, and I said

25  that, so that those programs were still ongoing.

1     Q.   Well, for the Philips, Sony, and Pioneer

2 terms, that's what's sometimes referred to as the 3C

3 Group?

4     A.   And 6C.

5     Q.   And those patents that are covered by that 3C

6 Group -- do you know how many patents are covered by

7 that?

8     A.   Many.

9     Q.   How many?

10     A.   I don't know.  It changes.

11     Q.   It could be hundreds?

12     A.   You want a long answer?

13     Q.   It could be hundreds?

14     A.   Oh, it's many.  It could be.  You know, some

15 expire.  Maybe they put new ones in.  There are many.

16     Q.   And those are patents that are considered to

17 be essential to the DVD industry; is that right?

18     A.   Essentiality is a matter of declaration by the

19 patent owners.  So the patent owner so states that

20 they're essential.  It doesn't prove that they're

21 essential; they just state it.

22     Q.   And, in fact, for those 3C license agreements,

23 they've been getting rates on those -- they've always

24 been getting a running royalty rate; is that right?

25     A.   It's my understanding, yes.

1    Q.   They didn't start out by getting lump-sum

2  amounts for a period of time, did they?

3    A.   That's not the package they put together.

4  They put together a running royalty package open to all

5  commerce, same terms.

6    Q.   And, in fact, those 3C license terms, those

7  are publicly available on the license amounts, aren't

8  they?

9    A.   On the royalty rate, on the terms, yes, as I

10  understand it.

11    Q.   Now, you also rely on license terms for six

12  electronics companies licensing through Toshiba from

13  1997, nine years before 2006; is that right?

14    A.   Yes.

15    Q.   And that's the 6C Group.

16    A.   Yes.  And likewise, it's still an active

17  program.

18    Q.   So is it just Plaintiff's licenses where you

19  apply this three-year rule?

20    A.   I don't understand how you are dealing with

21  the three-year rule.  I don't have a three-year rule

22  with respect to these, expect as one element of my

23  judgment, why they don't provide an established royalty.

24  There are other elements, which we haven't gotten into

25  yet.

1       Q.   Now, you're aware, aren't you, that

2  Mr. Kamatani wrote to Defendants in 2002 to offer -- to

3  grant a nonexclusive license under the '981 patent on

4  reasonable terms?

5       A.   Yes.

6       Q.   You're also aware, aren't you, that

7  Mr. Kamatani's lawyers engaged in actual negotiations

8  with Defendants in 2002 and 2003; is that right?

9       A.   Discussions at least.

10       Q.   Are you aware that Mr. Kamatani's lawyer

11  offered a license to QSI?

12       A.   Yes.

13       Q.   Do you know what the amount of that proposed

14  license was?

15       A.   I do not recall.

16       Q.   So you couldn't have taken that into account

17  in conducting your analysis then.

18       A.   Well, it wasn't finalized; therefore, it

19  was -- you know, what do you call it -- executory.

20  Nothing had happened.

21       Q.   Oh, you didn't take it into account, because

22  you didn't know it?

23       A.   Excuse me.  I took it into account that Quanta

24  refused to take a license.  That lodged in my mind.

25       Q.   Now, sir, your date of hypothetical

1  negotiation in 2006 is actually three to four years

2  after these discussions that you acknowledge; is that

3  right?

4       A.   Yes.  If I recall, you said the discussions

5  were in 2002.

6       Q.   Right.

7       A.   And that will be four years.

8       Q.   Now, you're aware that Plaintiff has collected

9  only about $2 million in licensing revenue from its 16

10 licenses from some of the biggest companies in the

11 world; is that right?

12      A.   Well, I never added it up, but I'll take your

13 word for it, if that's what it adds up to.

14      Q.   Now, let's say that applying your 2 percent

15 and 6 percent royalty rates result in estimated damages

16 of $50 million.

17           Do you think that's reasonable?

18      A.   That's how I characterize it.

19      Q.   So you believe that it's reasonable for

20 Plaintiff to collect more than 25 times its total

21 licensing revenues for all 16 licenses than it has ever

22 collected in its history?

23      A.   Sure, because it now perceives the value of

24 its patent, and it didn't before, just as if it's corn

25 field suddenly sprouted oil.

1    Q.   In fact, now that you're involved in this

2 case, you would -- you would claim that it is reasonable

3 if Plaintiff collects more than 200 times, the highest

4 royalty that a defendant has ever negotiated, in these

5 16 agreements?

6    A.   Well, I -- I don't follow your math exactly,

7 but I certainly believe they're entitled to a great deal

8 more than they got back before it was clear how valuable

9 their patent was.

10    Q.   Well, sir, let's talk about your 6 percent

11 rate on an optical drive.

12         You came up with this rate by looking at

13 agreements that do not include the '981 patent; is that

14 right?

15    A.   Well, I came up with it based on, in part, the

16 Licensing Executive Society's study, which provided --

17 which stated -- the respondents to the study stated that

18 for a major improvement, which everybody would agree, I

19 think, is the '981 patent, of 4 to 8 percent.  That's

20 the going rate, according to the survey.

21    Q.   And that survey didn't address the '981

22 patent, did it?

23    A.   I don't think so.

24    Q.   You also rely on agreements that QSI entered

25 into that don't relate to the '981 patent; is that

1  right?

2      A.    Well, QSI hadn't licensed the '981 patent.

3  QSI did enter into numerous agreements on DVD

4  technology, and I think we all agree that the '981

5  patent involves DVD technology, among others.

6      Q.    Now, those other agreements -- I just want to

7  get this right.  You favored those agreements that don't

8  have to do with the '981 patent over agreements that do

9  have to do with the '981 patent.

10     A.    Well, the Georgia-Pacific analysis calls for

11  that sort of comparison.  You look for what are called

12  comparables.

13          In my opinion, those agreements up on the

14  screen are not comparable, whereas the agreements

15  entered into by Quanta, which all occurred closer to the

16  time of the hypothetical when the value of DVD, the

17  success of DVD was known, are more comparable.  That's

18  my job.

19  ████   ████  ████  ████  ████  ████  ████  ████  ████

20  █ ██    **REDACTED BY ORDER OF THE COURT**

21                                                ██

22  ████  ████

23          ████   ████

24       ██   ████

25     ████   ████   ████   ████   ████   ████   ████



**REDACTED BY ORDER OF THE COURT**

21          ████████ was a semicolon.

22          I'm not sure it was the same agreement.  I

23 just didn't follow it well enough to know it was the

24 same agreement or not.

25          Q.   Now, why don't we take a look at one of your

1  charts that you put up earlier today.

2  ████ ████ ███ ████ ████ ████ ████ ████

3  ████ ████   **REDACTED BY ORDER OF THE COURT**   ████

4  ██ ██

5  ███ ███ ███ ██████ ████ ████ ████

6      Q.   Right.

7      A.   No.

8  ███ ████ ██████ ████ ████ ████ ████

9  █████ ███ ████ ████ ███ ███ ██████

10  ███ █████ ████ █ ███ █████ ████ ████ ██

11  ████ ███ ███████ ████ ███ ██ ████ ███ ██ ██

12  ████

13  ████ ████ █ ████ ███ ███ ███ █████

14  █████ ████ ███ ███ ██ ███ █ ███ █████

15      Q.   And just so we're clear, my question is, you

16  didn't include that agreement in this statement.

17      A.   I have the agreement information in front of

18  me.  I looked at the agreement, and I felt that it

19  wasn't relevant.

20  ███ ████ ██ ███ ████ ████ ████ █████ ███

21  ████ ████ ███ ████ ████ ████ ████ █████ ██

22  ██ ███

23      A.   Well, I will agree there's no agreement listed

24  here for Panasonic.  Let's see why it wasn't put in.  I

25  presume that's what you want to get at.

1    Q.   Well, I think your counsel will have an

2  opportunity to --

3              THE COURT:  His only question,

4  Mr. Murtha, is, it's not on this chart?

5              THE WITNESS:  Yes.  It's not on that

6  chart.

7              Thank you, Your Honor.

8    Q.   ■                                          ■

**REDACTED BY ORDER OF THE COURT**

9  ■■■  ■■■

10   A.   No.

11   Q.   Do you know what the average price is of an

12  optical disk drive?

13   A.   Yes.  It's in the 20s.  I looked at it for

14  2006, and my recollection -- recollection -- I'm

15  sorry -- is it was $28 and change for a -- for a Quanta

16  drive.

17   Q.   Okay.  Now, for a computer, what's the average

18  price of a computer?

19   A.   So we're talking about apples and apples at

20  the same period.  The selling price -- average selling

21  price for Quanta Computer was 860, I believe.

22   Q.   Now, if you apply your 2 percent royalty to

23  the 860-dollar price for a laptop, what's the number

24  that you come up with?

25   A.   $16 and change, I believe.

1    ██    ▍      **REDACTED BY ORDER OF THE COURT**

2 █ ██ █

3       A.   Well, that was a royalty for a standalone ODD,

4 not a personal computer with an embedded ODD.  Two

5 different animals.

6       ██  ███  ██ ██ ███ ███ ███ ██ ██ ██ ██

7 ███ ███ ███ ███ ██ ███ ██ ██ ██ ███ ███

8 █ ███ ████

9       A.   Yes.

10       Q.   In fact, if the drive costs about $28, there's

11 going to be an extra $16 on top of that under your

12 analysis; is that right?

13       A.   I don't understand your arithmetic.  We're

14 applying the 2 percent to the PC, not to the drive.

15       Q.   Well, if you look at it in the context of the

16 value of the drive, we're looking at something like a 50

17 or 60 percent markup.

18       A.   Well, we are looking at it in the context of

19 the value that the drive brings to the PC when it's

20 installed in it.  That's the reason for the 2 percent

21 rate.

22       Q.   Well, let's -- let's look at some of these

23 agreements that you have listed here.

24            Now, we talked a little bit about --

25       A.   Those agreements there?

1    Q.   Yes.

2    A.   Okay.

3    ■■          **REDACTED BY ORDER OF THE COURT**          ■■■■■

4                                                        ■■  ■■

5    ■■■■■■

6    A.   Okay.

7    Q.   And I think we talked a little bit about this

8    earlier.  Most companies would know what those rates

9    were, correct?  For the 3C licensing.

10   A.   Most companies would know?

11   Q.   Right.

12   A.   Yes, I think so.

13   Q.   Okay.  Now, you heard yesterday when Mr. Cheng

14   testified that QSI doesn't pay royalties to Sony when it

15   makes products for Sony or Philips.

16        Did you hear that?

17   A.   Well, nobody pays royalties to a licensor for

18   whom they make products.

19   Q.   Right.

20        MR. PLATT:  So why don't we take that one

21   off.

22   ■■  ■■  ■■  ■■■  ■■  ■■  ■■  ■■  ■■

23   ■■■  ■■■■■

24        ■■  ■■  ■■  ■■  ■■■  ■■  ■■  ■■

25   ■■■  ■■  ■■  ■■  ■■  ■■■  ■■  ■■  ■■  ■

1      ████   ████      **REDACTED BY ORDER OF THE COURT**

2              Did you hear that?

3      A.   I -- I can't say I heard it.  I will accept

4   from you that he said it, but I would state for people

5   who don't realize this, that those royalties would apply

6   if they were making products for somebody else.

7      Q.   Okay.

8              MR. PLATT:  So let's take those off.

9   ████  ████  ████  ████  ████  ████  ████  ████  ██

10  ████  ████  ████  ████  ████  ████  ████  ████

11  ████████  ████  ████  ████  ████ █ ████  ████  ████ ██

12  ████  ████  ████  ████  ████  ████ █ ████

13     A.   I don't remember that, but I'll accept it, if

14  you say it.

15     Q.   Okay.

16              MR. PLATT:  Why don't we take those off.

17     Q.   (By Mr. Platt) Now, in your expert report in

18  this case, you didn't take into account that QSI doesn't

19  pay royalties to Sony, Philips, or HP when it makes

20  drives for Sony or Philips.

21     A.   It's a funny question.  No.

22  ████  ████  ████  ████  ████  ████  ████  ████  ████

23  LaserDynamics' 16 licensees paid that amount?

24     A.   None yet.

25     Q.   Now, let's talk about your 2 percent royalty

1  on the sale of a computer.

2          Now, you came up with that royalty, because

3  you claim that the Plaintiff's patent is so significant

4  that it's worth no less than one-third of the total

5  value of a computer; is that right?

6      A.   In a nutshell, yes.  I feel the importance of

7  the invention to the personal computer, in my opinion,

8  based on my experiences, as well as all the other

9  factors that go into that, particularly the verification

10 by our experts about the inner operability,

11 functionality, and importance to a customer's buying

12 decisions, supports that.

13          In summary, 2 percent is not unreasonable, any

14 more than it was in the IBM laser eye surgery patent.

15     Q.   Well, you think LaserDynamics' patent is so

16 significant, it's worth no less than one-third of the

17 total value of the computer?

18     A.   No.  It's worth no less than 2 percent of

19 one-third of the total value of the computer.

20     Q.   Mr. Murtha, you -- you provided an expert

21 report in this case; is that right?

22     A.   Yes, Mr. Platt, I did.

23     Q.   Okay.  Would agree with me that you said:  As

24 it is my opinion, based upon the findings of Bell and

25 Costello, that the economic and engineering contribution

1 of an integrated optical drive with disk format

2 discrimination is so significant, it is worth no less

3 than one-third of the total value of the computer?

4      A.   It represents one-third of the total value.

5      Q.   Okay.  Now, we talked a little bit about 3C

6 and 6C licenses, and that involves hundreds, if not

7 thousands, of patents; is that right?

8      A.   It involves many patents in each case, yes.

9      Q.   And those patents are essential to

10 manufacturing DVD or CD drives; is that right?

11      A.   The owners of the patents have declared them

12 to be essential.

13      Q.   Well, if LaserDynamics' patents are worth

14 one-third of the value of a computer, what are the 3C

15 and 6C patents worth, in terms of the value of the

16 computer?

17      A.   Well, you're assuming that they set those

18 royalties based solely on a perception of value, but I

19 can tell you, because I deal in this sort of thing all

20 the time, that those companies wanted their technologies

21 to be accepted as a standard, and, therefore, regardless

22 of the value, perhaps put up an attractive price.  That

23 happens all the time.

24      Q.   Did you allocate any of that one-third value

25 of the computer to the 3C or 6C patents?

1        A.    No.

2        Q.    Not even a percentage?

3        A.    Well, Mr. Platt, it could overlap.  There's --
4   there's no exclusion just because one patent applies
5   with regard to another.  They can overlap.

6             So the royalty can be 2 percent for me; 4
7   percent for you; 6 percent for him.  That's how it
8   works.

9        Q.    Now, let's take a look at Georgia-Pacific
10  Factor No. 15.

11       A.    15?

12       Q.    15.

13       A.    Uh-huh.

14       Q.    Well, while we get this worked out, I'll just
15  go ahead and ask you the question.

16            You would agree with me that one of the things
17  that Georgia-Pacific Factor No. 15 looks at is the
18  amount which a prudent licensee who desired, as a
19  business proposition, to obtain a license to manufacture
20  and sell a particular article embodying the patented
21  invention would have been willing to pay as a royalty
22  and yet be able to make a reasonable profit?

23       A.    Are you asking if I agree that that's what it
24  says?

25       Q.    That that's part of the analysis that you

1  looked at.

2      A.   You read -- you read it correctly.

3      Q.   Now, during your deposition, you could not

4  recall a case where you claimed a royalty rate should be

5  as great or greater than the profit on a product; is

6  that right?

7      A.   You said should be or was?

8      Q.   I'm sorry.  I'm going to have to -- I'll

9  repeat my question for you.

10      A.   Please.

11      Q.   Now, in your deposition, you cannot recall a

12  case where you claimed a royalty rate should be as great

13  or greater than the profit on a product; is that right?

14      A.   Where it should be, not was, because I can

15  recall plenty of situations where the royalty rate --

16  where the royalty is greater than the profit.

17              THE COURT:   He just asked you if that's

18  what you said in your deposition.

19      A.   I can't remember if that's what I said.  If

20  you can show it to me, then I'll refresh my memory.  I

21  can't remember that deposition.  It was long.

22      Q.   (By Mr. Platt) Sure.  Why don't we take a look

23  at Page 86, Lines 10 through 14.

24              Okay.  And the question was:  And to be clear,

25  can you recall any specific instance in which you

1 provided testimony that a reasonable royalty should be

2 at least as great as or greater than the profit on the

3 sale of the accused device?

4          ANSWER:  No.

5          Did I read that correctly?

6     A.   Yes, but in your earlier question, you didn't

7 mention that it was involving previous testimony.

8     Q.   Sir, do you know what the average percentage

9 of Quanta Computer's operating profit was for the last

10 three years, 2003 (sic) to 2008?

11     A.   The company as a whole?

12     Q.   Yes.

13     A.   The average for the three years, no.

14     Q.   Well, why don't we take a look at Table B11

15 from LaserDynamics' other expert, Mr. Davis.

16          Are you aware that Quanta Computer's operating

17 margin is 2 percent from 2006 to 2008?

18     A.   I saw that for one year, but I said to you

19 previously, I didn't know what the story was for three

20 years.

21          That's the company as a whole, correct?

22     Q.   Now, if Quanta Computer's operating margin was

23 2 percent from 2006 to 2008, you believe that they

24 should pay 2 percent of that -- or 2 percent -- that 2

25 percent to LaserDynamics?

1    A.    I said I thought 2 percent was a fair

2 reasonable royalty on Quanta Computers which contained

3 the patented device.

4    Q.    And if Quanta Computers is making a 2 percent

5 margin on a laptop, you would transfer that to

6 LaserDynamics.

7    A.    Wait a minute.  You said their overall gross

8 profit, I guess, was 2 percent.  Now, that's not per

9 machine, and I haven't seen anything that gives their

10 profit on computers, nothing verifiable.  All we've ever

11 seen is their financial statements.

12    Q.    Okay.

13    A.    Composite --

14    Q.    So --

15    A.    I'm sorry.  Composite financial statements.

16    Q.    So you wouldn't have taken that into account

17 in your analysis?

18    A.    Their corporate gross profit?

19    Q.    Right.  Well, their profit on a laptop.

20    A.    I'm sorry.  They're two different things.

21          Their corporate gross profit is their

22 company-wide profit, just like General Motors.  And

23 we're not talking about a specific automobile; we're

24 talking about the corporate-wide profit.  There's a

25 difference.

1       Q.    Do you know what the profit is on Quanta

2   Computer's laptops?

3       A.    They have not provided that information that I

4   know of.

5       Q.    So you didn't take that into account.

6       A.    I didn't have that information available, so I

7   couldn't, no.

8       Q.    Now, as part of your analysis, you assume that

9   one of the things Defendants could do is pass on any

10  LaserDynamics' royalty to its customers; is that right?

11      A.    I'm sorry.  I didn't hear the first part of

12  your question.  Please repeat that.

13      Q.    Sure.  As part of your analysis, you assumed

14  that the Defendants could pass on any LaserDynamics'

15  royalty to its customers; is that right?

16      A.    I assumed that?

17      Q.    Is that right?

18      A.    I don't believe I stated that.

19      Q.    Now, at your deposition, would you agree that

20  you testified that it is not right to assume that once a

21  rate is levied, that the Defendants can do nothing about

22  their profitability after that; they could, of course,

23  raise their prices?

24      A.    And I said more than that, or was that the --

25  was there a period at the end of that?

1      Q.    There is.

2      A.    Yes.

3      Q.    Now, rather than give up all its profit, don't

4  you think it would make good business sense for Quanta

5  Computer to simply get a drive from another vendor that

6  would have a license?

7      A.    If an acceptable one were available, yes,

8  that's a possibility.

9      Q.    Now, Mr. Murtha, how much time have you spent

10 preparing for trial today?

11     A.    Preparing for trial?  Broadly speaking, the

12 last couple of weeks at least.

13     Q.    Would you agree with me that you spent about

14 the same amount of time since your deposition that you

15 spent before your deposition?

16     A.    No.  I -- before the deposition, I spent the

17 time doing the research it took to make my report and to

18 prepare for the deposition and to do the deposition and

19 correct the deposition.

20          So I think it's more like two-thirds or

21 one-third.  I'm just guessing.

22     Q.    Okay.  Now, Plaintiff's pay you $600 an hour

23 for your work; is that right?

24     A.    Yes.

25     Q.    Now, at the time that we took your deposition

1   two months ago, Plaintiff had paid you more than

2   $133,000; is that right?

3       A.   I don't remember, but if that's what I said,

4   that's what it was.

5       Q.   And, in fact, 133,000 is over one-third your

6   salary, your yearly salary; is that right?

7       A.   Well, to put a fine point on it, they paid the

8   company the 133.  They didn't pay me.

9       Q.   Okay.

10      A.   I don't get it all.

11      Q.   Now, sir, assuming the two-third/one-third

12  ratio, if you're being paid about $200,000, it wouldn't

13  make a lot of sense for Plaintiff to hire you and pay

14  you that for you to come in and say that the royalty in

15  this case should be less than $260,000, would it?

16      A.   Are you questioning my integrity?

17      Q.   No, I'm not.  I'm asking -- sorry -- whether

18  that would make sense for the Plaintiff to do that.

19      A.   Repeat the question, please.

20      Q.   Yeah.  Would it make sense for the Plaintiff

21  to pay you more than $200,000 to have you come in here

22  and offer a royalty amount that was less than $260,000?

23      A.   My contract says I can give my opinion no

24  matter what.

25      Q.   Okay.

```
 1              MR. PLATT:  Pass the witness.

 2              MR. LUCK:  We're probably going to be

 3  done by the break.

 4              THE COURT:  Okay.

 5                    REDIRECT EXAMINATION

 6  BY MR. LUCK:

 7     Q.   You were asked, if Quanta wanted to avoid

 8  paying LaserDynamics, they could get drives from another

 9  vendor; is that correct?

10     A.   Yes.  Yes.  Yes.

11     Q.   Have you seen any evidence, since they were

12  sued in this case in 2006, that they have adopted that

13  option?

14     A.   No.

15              MR. LUCK:  If I could have Schedule B11.

16  Oh, thank you.

17     Q.   (By Mr. Luck) Let me ask you to look at

18  Schedule B11.  I noticed that Mr. Platt was focusing in

19  on the operating margin down here, the 2.3 percent; is

20  that correct?

21     A.   I'm sorry.  Show me.

22     Q.   I'm sorry.  Up here (indicating).

23     A.   Yes.  Yes.  Yes.  I see it, yes.

24     Q.   Is it not your experience from IBM that a

25  royalty --
```

1                    THE COURT:  Mr. Luck, you're going to

2  have to get to the microphone around there, so we can

3  all hear you.

4                    MR. LUCK:  I'm sorry.

5       Q.   (By Mr. Luck) Is it your experience from IBM

6  that a royalty would be paid from the gross margin and

7  not the operating margin?

8       A.   Correct.  The royalty is based on sales.

9       Q.   And so the gross margin, albeit, this is a

10 slide for Q -- for QCI as a whole, is 5.5 percent; is

11 that correct?

12      A.   That's what it says for the most recent year

13 on the left, yes.

14      Q.   And so even if we were applying 2 percent

15 against QCI as a whole, they would still have a residual

16 of 3.2 percent for the last year; is that right?

17      A.   Yes.  Assuming all they ever sold was

18 computers, that would be correct.

19      Q.   But we don't know what QCI -- what profit they

20 made for computers; is that correct?

21      A.   We have no idea, based on this.

22      Q.   You were asked if you have an example when a

23 rate on a product is greater than the rate on a

24 component, or a high rate anyway.

25                    Do you have an example from IBM or otherwise

1  where that is the case?  And I don't mean higher -- I

2  mean, higher than the rate on the component itself.

3      A.   Put the question together again for me,

4  please.

5      Q.   Okay.  That was unclear.  I'll reask it.

6  While at IBM, did you have occasion to negotiate

7  agreements for patents earlier entered into at a lower

8  rate, where as time progressed, they were executed at a

9  higher rate?

10      A.   Yes, I understand your question now.

11  Twice during my time in the Licensing Department at IBM,

12  we raised our royalty rates so that in April of 1988, a

13  license under IBM's patents cost as much as five times

14  what it cost in April of 1987.

15      Q.   And how could IBM convince people to execute

16  an agreement for a higher rate that people could get for

17  a lower rate earlier in time?

18      A.   Well, if they wanted a license, that was the

19  cost of the license.  It's no different than a price

20  going up in other areas.

21           MR. LUCK:  If I could have Slide M18,

22  please.  Is that M18?  I think I misspoke.  That's all

23  right.

24      Q.   (By Mr. Luck) I believe Mr. Platt asked you if

25  you were aware of negotiations between QSI and

1   LaserDynamics in 2002.

2       A.   He did.

3       Q.   Yes, I believe he did.

4       A.   He did.

5       Q.   Are you aware of any negotiations between QCI

6   and LaserDynamics at any time -- at any time?

7       A.   No.

8       Q.   No negotiations?

9       A.   I'm not aware of any.

10      Q.   No overtures for a license?

11      A.   Can't recall.

12      Q.   Finally, I believe you were asked about these

13  agreements, and you were asked if you remembered Mr.

14  Cheng indicating that notwithstanding all these

15  agreements on this slide, none of these were for a

16  royalty; is that right?

17      A.   I -- I -- I think so, at least I think -- I

18  think so.  But I can't really say I understood what he

19  was saying.

20      Q.   Other than his testimony on that point in

21  trial, do you have any evidence that these agreements,

22  which recited these rates, were not, in fact, for a

23  royalty?

24      A.   No.  I read them, and they are royalty-bearing

25  agreements.

1              MR. LUCK:  Pass the witness.

2              MR. PLATT:  We don't have any other

3    questions, Your Honor.

4              THE COURT:  All right.  Ladies and

5    Gentlemen, we'll go ahead and take our break right now.

6              Come back -- be ready to come back at

7    3:25.

8              Remember our instruction about not

9    discussing the case.

10             You may leave the courtroom.

11             (Jury out.)

12             THE COURT:  Why don't you go ahead and

13   step down, Mr. Murtha.

14             THE WITNESS:  Thank you, sir.

15             THE COURT:  Everyone be seated.

16             Mr. Platt, you asked this witness two

17   questions, which you know that you were eliciting -- you

18   asked him in such a fashion -- because this Court

19   entered a limine order saying that they couldn't discuss

20   litigation revenues or litigation agreements.

21             But then you couched your question saying

22   all licensing revenues rather than -- rather than

23   conditioning them on saying all negotiated,

24   nonlitigation license agreements.

25             You know that what you're doing is

1  creating a false impression to the jury, and you're

2  doing it knowingly after this Court has adopted your

3  position that these litigation agreements are not coming

4  into evidence.  That ruling is -- because of your

5  conduct in doing that, that ruling is now out.

6                    COURT SECURITY OFFICER:  All rise.

7                    (Recess.)

8                    COURT SECURITY OFFICER:  All rise.

9                    (Jury in.)

10                   THE COURT:  Please be seated.

11                   All right.  Who will be your next

12 witness?

13                   MR. LUCK:  Your Honor, LaserDynamics

14 would call Mr. James Davis.

15                   THE COURT:  Okay.

16                   (Witness sworn.)

17        JAMES DAVIS, PLAINTIFF'S WITNESS, SWORN

18                    DIRECT EXAMINATION

19 BY MR. LUCK:

20     Q.   Good afternoon.

21     A.   Good afternoon.

22     Q.   You're -- you've been retained by Plaintiff as

23 an expert in this case?

24     A.   I have.

25     Q.   Before we begin with your opinion, if I could

1   ask you to state by whom you're employed.

2       A.   I'm employed by Davis Griffin, LLP, A

3   certified public accounting firm in Longview, Texas.

4       Q.   Are you from this area?

5       A.   Born and raised in Gilmer, and my office is,

6   as I said, in Longview.  And I live over in Jefferson on

7   my farm.

8       Q.   Have you previously been qualified as an

9   expert in other litigation regarding patent damages?

10      A.   Yes.

11      Q.   What was your assignment in this case,

12  Mr. Davis?

13      A.   My assignment was to review certain documents

14  and formulate a base to which a rate would be applied to

15  compute a reasonable royalty representing damages in

16  this case.

17      Q.   Did you prepare an expert report in this

18  matter?

19      A.   I did.

20      Q.   What information did you review in computing

21  your expert reports?

22      A.   Information furnished from the Defendants,

23  third-party information, public research that was

24  available, and the deposition testimonies.

25      Q.   From a review of your information, were you

1  able to ascertain information regarding quantities of

2  sales by QCI?

3        A.    Yes.

4        Q.    Does QCI sell computers?

5        A.    They do.

6        Q.    Do they also sell a small amount of standalone

7  drives?

8        A.    Yes, very small.

9        Q.    Do you understand they sell computers and

10  drives throughout the world?

11       A.    Yes.

12       Q.    Do you understand QSI sells computers and

13  drives in the United States?

14       A.    Yes.

15       Q.    Did you identify in your report those drives

16  accused in this case?

17       A.    Yes.

18       Q.    Are at least some of the optical disk drives

19  or ODDs sold by QSI accused in this case?

20       A.    Yes.

21       Q.    Do at least some of the computers sold by QCI

22  contain ODDs accused in this case?

23       A.    Yes.

24       Q.    How do you know this?

25       A.    Information provided indicates that some of

1   the serial numbers that are inclusive in the accused

2   ODDs were installed and made a part of computers sold by

3   QCI.

4        Q.   Does this exhibit illustrate accused ODDs?

5        A.   Yes.  There's 20 of them.

6        Q.   Is this A5 out of your expert report?

7        A.   Yes.

8        Q.   Did all computers sold by QCI include accused

9   ODDs?

10        A.   No.

11        Q.   How did you ascertain the total amount of

12   computers sold by QCI?  How did you determine the amount

13   that included the accused ODDs?

14        A.   An estimation was presented that --

15   essentially, a menu of potential ODDs were put into the

16   various computers.  We knew the serial numbers and the

17   prefix of those numbers.

18             Approximately, one out of five could go and

19   did go into the computers, and we formulated a base

20   based upon those numbers, one out of five.

21        Q.   From your review of the documents, did you

22   obtain an understanding of how QCI sells computers, and

23   I mean by that, directly and indirectly?

24        A.   Yes.  Both methods, but mostly direct.

25        Q.   Did you obtain an understanding that QCI

1  purchases at least some of the ODDs in its computers

2  from QCI?

3       A.   Yes.   They're transferred, if not purchased.

4            MR. LUCK:   If I could have D3, please.

5       Q.   (By Mr. Luck) Does this slide accurately

6  illustrate your understanding from a review of the

7  documents the way that QCI receives optical disk drives

8  installed in computers?

9       A.   Yes.   Both the direct means and the indirect

10  means.

11       Q.   What is your understanding of the difference

12  in direct and indirect sales?

13       A.   Direct sales are essentially shipments that

14  are direct into the United States.   Indirect sales are

15  through third parties or other avenues that are --

16  finally arrive in the United States that are not

17  directly shipped.

18       Q.   Did you review any documents which revealed

19  purchases of ODDs by QCI; in other words, this way here?

20       A.   There were no hard copy invoices for those

21  purchases.

22       Q.   For '06 and '07, did QCI spreadsheets identify

23  drives that are integrated in QCI computers?

24       A.   They did.

25       Q.   Did you have an opportunity to review among

1  the documents any backup information which corroborated

2  spreadsheets which showed the drives in computers?

3      A.   There was no underlying data that supported

4  the made-for litigation worksheets that I used for 2006

5  and 2007.

6      Q.   How about '08?

7      A.   There were none from '08 at all.

8      Q.   Did you have occasion to review inventory

9  documents from QCI?

10     A.   There were none.

11     Q.   Are the -- is inventory documentation and

12 purchase documents the kind of thing you believe ought

13 to exist in the ordinary course?

14     A.   Oh, yes.

15     Q.   In the time period August 31st, '06 to the

16 first quarter of '09, did you calculate QCI revenues for

17 direct U.S. sales of computers into the United States?

18     A.   Yes, a mathematical computation.

19          MR. LUCK:  If I could have D5, please.

20     Q.   (By Mr. Luck) How did you calculate these

21 direct sales?

22     A.   Direct sales came off of the litigation

23 spreadsheets that were provided, and they essentially

24 represent the bulk of the infringed products and

25 resulting revenue.

1          For 2006 and 2007, we had those documents for

2    those periods.  We prorated 2006, because the damage

3    period began after August 31st, 2006.

4          Q.    Is this slide actually incorrect; it actually

5    ought to indicate August 31, '06 to the first quarter of

6    '09?

7          A.    Yes, it should.  But the numbers are right.

8    The notation should be the first quarter of 2009.

9          Q.    Did you also have occasion to calculate

10    indirect sales by QCI into the United States?

11          A.    Yes.  Again, that was a mathematical

12    computation.

13          Q.    Are the numbers on this slide calculated to be

14    the revenues and sales for the time period August 31st

15    of '06 through Quarter 1 of '09?

16          A.    Yes.  The notations at the top of the yellow,

17    indirect, and the gray, direct, are the cumulative

18    result of the analysis through and into the first

19    quarter '09, beginning August the 31st of '06.

20          Q.    When you add direct and indirect, what is the

21    number you get for -- from August 31st of '06 to the

22    first quarter of '09?

23    ██  ████  ████  ████  ████  ████  ████  ████  ████

24    ██  ██  **REDACTED BY ORDER OF THE COURT**

25    ██████  ███  ██  ████  ██████  ████  ████  ████  █████

1    ████  ████████     **REDACTED BY ORDER OF THE COURT**

2        Q.    If I wanted to get all sales, would I add

3    direct and indirect together?

4        A.    Yes.

5        Q.    If I performed that calculation, what are the

6    numbers?

7        ████    ████████████████

8        Q.    Oh, that is the number for everything

9    together?

10       A.    Right.

11       Q.    Okay.  I understand.

12             You heard Mr. Murtha earlier today provide an

13   opinion on a rate; is that correct?

14       A.    I did.

15       Q.    If you take a 2-percent rate by the total you

16   have here, what is the number?

17   ████  ████  ████  ████  ████  ████  ████  ██  ████████

18   ████  ████  ████  ████  ████  ████  ████    ████  ██  █

19   ████████  ████  ████  ██  ████████  ████  ████  ████████

20   ████    ████████

21        ████  ██████  ████  ████████  ████  ████  ████

22   ████  ████  ████████  ████  ████  ████  ████  ████  ██████

23             MR. LUCK:  Let me have that slide,

24   please.  Thank you.

25       Q.    (By Mr. Luck) Are these the numbers?

**REDACTED BY ORDER OF THE COURT**

Q.    And that is for the small amount of the standalone drives?

A.    Yes.

Q.    You heard Mr. Platt earlier ask, what were the total revenues LaserDynamics received as a result of its licenses.  And I believe the number he identified was in the ballpark of $2 million.

A.    Yes.  On the 16 licenses that were presented on the slide, yes.

Q.    Is that actually the total of the number?

A.    No, it's not.

Q.    Could you explain, please?

A.    There -- there were licenses represented in the 16 that were on the screen.  Then in addition to that, there were licenses that were obtained through threatened, pending, and settled litigation.

        The total of all those is about 10 and a half million dollars, not $2 million.

Q.    Thank you, sir.

            MR. LUCK:  Pass the witness.

                    CROSS-EXAMINATION

BY MR. PARKER:

Q.    Afternoon, Mr. Davis.

 1        A.    Good afternoon, sir.

 2        Q.    My name is John Parker, and we got a chance to

 3   meet briefly just before you got on the witness stand,

 4   did we not?

 5        A.    We did.

 6        Q.    Okay.  Let me pick up with the last thing you

 7   testified about there when you were talking about adding

 8   the negotiated licenses to the litigation license and

 9   getting your 10-million-dollar figure.

10              If you -- if you divide that by all the

11   licenses, whether they were negotiated or litigation,

12   what you get is an average license fee that has been

13   paid to LaserDynamics for all the licenses, regardless

14   of how they're categorized, from the beginning of the

15   company through today.

16        A.    I don't really know the number of -- of

17   litigation cases.

18        Q.    You don't have that available?

19        A.    No, sir.  I just have the number.  I'm sorry.

20        Q.    Let me ask you to assume that the total

21   number -- including the negotiated ones that we've seen

22   throughout this trial, the total number is 27.

23        A.    27?  Okay.

24        Q.    Okay.  Can you do the math for me?

25        A.    You bet.  388,889.

1      Q.   So no matter what you include, the average

2  license -- throughout the life of this patent, the

3  average license fee is under $400,000, correct?

4      A.   As a raw average, that would be the math, yes.

5      Q.   Right.  Okay.

6           Now, for preparing your report, you assumed

7  that Mr. Murtha's analysis was correct in terms of his

8  6-percent and 2-percent royalty rates, right?

9      A.   Yes.

10     Q.   Okay.  Now, did you even attempt to do a

11  practicality check; that is, to say run, for instance,

12  the 2-percent number against the average selling price

13  of a laptop computer and compare that to the selling

14  price for these optical disk drives?

15     A.   I didn't call it a practicality check.  I knew

16  generally what the numbers were.

17     Q.   So you knew that if you applied his 2-percent

18  royalty at the computer sales stage, that meant that the

19  amount paid for each optical disk drive was over $16 a

20  drive, right?

21     A.   That's certainly the math.  I'm not sure that

22  was the testimony.

23     Q.   But that's what the math would show?

24     A.   Yes, the raw math is $16.

25     Q.   And you were also aware that the average

1  selling price for the most recent full year where

2  information is available is about 28 bucks a drive,

3  right?

4       A.   That's what I heard today, yes.

5       Q.   So the royalty would be more than half the

6  selling price of the optical disk drive?

7       A.   Based on the computer at 2 percent, yes.

8       Q.   Okay.  And you also used some information that

9  had been provided by a company called CapAnalysis out of

10  California?

11      A.   Yes, sir.

12      Q.   And you assumed that their information was

13  correct?

14      A.   Yes.

15      Q.   All right.  And we haven't -- to your

16  knowledge, they haven't been here or appeared in this

17  case, have they?

18      A.   Personally, I haven't seen them.

19      Q.   Okay.  Now, for the percent of market share

20  that you talked about when you were doing the direct and

21  indirect sales, you relied on some reports from a

22  company called Techno Systems Research?

23      A.   Partially, yes, sir.

24      Q.   You did?

25           Is that a company whose research you've used

1  in the past?

2       A.   Yes.

3       Q.   Are -- do you understand them to have some

4  particular credibility in the marketplace?

5       A.   They're just a source of information that's

6  relied on in the normal course of business for reports

7  like the one I've done.

8       Q.   Have you done anything, for instance, to

9  verify the accuracy of their report?

10      A.   Certainly.

11      Q.   Do you know, for instance, that the report

12 that they did on -- that had information on it about the

13 Quanta entities even had the wrong entity name on it?

14      A.   I was not aware of that.

15      Q.   You didn't notice that?

16      A.   This is the -- if you're referring to this

17 report, this is a 2006 report.

18      Q.   That's not one you used?

19      A.   No, sir.

20      Q.   Just forget it; we'll take that down.

21           Assume for me for a minute that the Techno

22 Systems report that you used just had the wrong Quanta

23 entity name on it; you didn't realize that?

24      A.   No, I did not know that.

25      Q.   If you saw things like -- careless things like

1  that, would that cause you to question the overall

2  accuracy of the information?

3       A.   If that was a standalone position or a

4  standalone resource, yes, but I had other resources that

5  confirmed that.

6       Q.   Okay.  Now, previously, in the testimony

7  you've given in this case, you had some concern about

8  so-called double-counting; is that right?

9       A.   As the case was at that status, yes.

10       Q.   I understand that.  And you -- you believe --

11  you have made an effort to eliminate that

12  double-counting; is that correct?

13       A.   Well, I think the course of the case has

14  eliminated the issue of double-counting.

15       Q.   So it's your belief in your final spreadsheet,

16  you've eliminated the double-counting?

17       A.   Yes.

18       Q.   And the primary way that that happened is you

19  applied the 2-percent royalty at the sale of the

20  computer stage for 99-plus percent of your damage

21  calculation as opposed to the 6-percent royalty at the

22  stage where the optical disk drive is sold to the

23  computer manufacturer?

24       A.   Well, that didn't have anything to do with the

25  double-counting application, if that was the question.

1      Q.   Do you understand that if you apply the

2  6-percent royalty at the point in time when the optical

3  disk drive is sold to the computer manufacturer that you

4  don't get to do it again at the resale of the computer?

5      A.   Right.

6      Q.   You only get to do it once?

7      A.   At a different rate, yes.

8      Q.   Right.  But if you do it at the 2-percent rate

9  of the sale of the computer, that vastly increases the

10 damage calculation, does it not?

11     A.   The ratio is smaller.  The base is higher, so

12 yes.

13     Q.   The total dollars go up by 20 or 30 times,

14 don't they?

15     A.   Well, it would be the difference between the

16 cost or the revenue for the computer versus the revenue

17 for the drive.

18     Q.   Right.

19     A.   At the applied rate, the difference in the

20 applied rate.

21     Q.   And you were not hired to do and you did not

22 do any independent analysis of the so-called Georgia

23 Pacific Factors; is that right?

24     A.   No.  That was not a part of what I was hired

25 to do.

1      Q.   And so if Mr. Murtha's analysis, based on

2  those factors is wrong, then your calculation is

3  similarly wrong?

4      A.   Well, I guess only to the extent that it's

5  wrong.

6      Q.   All right.  So if this 2 percent should be .01

7  percent, then that would change your calculation

8  dramatically?

9      A.   If you change any of the moving parts, it will

10  change the result.

11      Q.   Okay.  And you have not analyzed any of the

12  individual license agreements, either the LaserDynamics

13  license agreements or the QSI license agreements, to

14  help you in formulating your opinion.

15          Is that a fair statement?

16      A.   They had nothing to do with my opinions.

17  Right.

18      Q.   Now, let me look at your Exhibit A2.  I think

19  it's QDX693.

20          Is this from -- is this from your report, sir?

21      A.   It is.

22      Q.   And do you see that the operating margin

23  for -- let's take it -- let's take gross margin for

24  2007/2008 for various optical disk drive models.

25      A.   Yes.



REDACTED BY ORDER OF THE COURT

13    A.    Okay.   If it applied to the entire revenue of

14  the company, it certainly would.

15    Q.    Okay.

16    A.    But that's not what we did.

17    Q.    Now, you understand this has to do with a

18  particular optical disk drive model?

19    A.    Yes.

20    Q.    The SBW model, and this reflects gross margin

21  on a sale of that model.

22    A.    Yes.

23    Q.    And that's one of the models that you would

24  apply or that Mr. Murtha -- not you, but Mr. Murtha

25  would apply a 6-percent royalty to?

1       A.   As a standalone disk, yes.

2       ▉

3       ▉    ▉    **REDACTED BY ORDER OF THE COURT**

4       A.   No, sir.  I don't think so.

5       Q.   You don't?

6       A.   No.

7       Q.   How would it not?

8       A.   Because you only apply the rate against the

9  accused product, not the entire product.  In other

10 words, the -- the entire revenue creates the gross

11 margin.  So the royalty base is not the entire portfolio

12 of sales.  It's just the accused product.

13      Q.   So that's -- that's a -- that's a good point,

14 and I accept your correction.

15           So what it would do is, it would eliminate the

16 gross profit on any of those drives that was sold into

17 the United States?

18      A.   Assuming that it was 6 percent throughout the

19 damage period.

20      Q.   All right.  Now, let's get back to this.  If

21 you apply it at the computer stage, you wind up with a

22 royalty that represents about half the sales price of

23 the optical disk drive, okay, to put that into

24 perspective.

25           And let's say that Quanta Computer or Dell

1  came to you and said we need some business advice from

2  you, that we can buy these drives from Sony Optiarc,

3  but -- which costs 28 bucks apiece, but on top of that,

4  we're going to have to pay a royalty of about 50 percent

5  of what they're worth.

6         Would you advise them to do business with Sony

7  NEC Optiarc under those circumstances?

8      A.   I would advise them not to infringe.  If that

9  was the cost, that would be the cost of business.

10     Q.   And if they had -- if they could buy them from

11 TEAC and not pay a royalty, wouldn't you advise them to

12 go to TEAC?

13     A.   Those are actually business decisions that

14 have nothing to do with my report.

15             MR. LUCK:  Your Honor, I believe we're

16 getting way beyond the scope of our direct here.

17             THE COURT:  Overruled.

18     Q.   (By Mr. Parker) If they could buy them from

19 TEAC and pay no royalty instead of buying them from Sony

20 NEC Optiarc and paying a 50-percent royalty on the

21 purchase price, you would advise them to go to TEAC,

22 wouldn't you?

23     A.   As a business decision, yes.

24     Q.   And as a certified public accountant, you are

25 from time to time called on to give people business

1  advice, are you not?

2      A.   Regularly.

3      Q.   Right.  And so under those circumstances,

4  you'd wind up with no sales of Sony NEC Optiarc drives

5  at least to anybody who made a reasonable business

6  decision; is that correct?

7      A.   Under your theory, yes.

8      Q.   And if there are no sales, there are no

9  royalties.

10     A.   If there's no infringement, there's no

11  royalties.

12     Q.   All right.  Thank you.

13     A.   Yes, sir.

14          MR. LUCK:  A little more, Your Honor.

15                   REDIRECT EXAMINATION

16  BY MR. LUCK:

17     Q.   Mr. Davis, I think you were asked to add all

18  the prior payments to LaserDynamics and divide by the

19  number of agreements; is that right?  And you did so?

20     A.   Yes.

21     Q.   Does your calculation have anything to do with

22  the volume of sales by those respective entities under

23  those prior agreements?

24     A.   No.

25     Q.   Does the -- the calculation that he asked you

1  to do have anything to do with anything in this case at

2  all?

3      A.   Not at all.

4              MR. LUCK:  Pass the witness.

5              MR. PARKER:  Nothing further, Your Honor.

6              THE COURT:  All right.  You may step

7  down.

8              THE WITNESS:  Thank you.

9              THE COURT:  All right.  Who will be your

10 next witness?

11             MR. SANKEY:  Your Honor, at this time,

12 Plaintiff LaserDynamics rests its case-in-chief.

13             THE COURT:  All right.  Y'all approach.

14             (Bench conference.)

15             THE COURT:  Does Plaintiff stipulate that

16 they can make their motions for JMOL at a later time?

17 And they will be deemed as timely made at this time.

18 Does Plaintiff stipulate to that?

19             MR. SANKEY:  We do.

20             THE COURT:  Okay.  Call your first

21 witness.

22             MR. PARKER:  Okay.

23             (Bench conference concluded.)

24             THE COURT:  Who will be your first

25 witness?

```
 1              MR. PARKER:  Ms. Murray will inquire,

 2   Your Honor.

 3              THE COURT:  Okay.  Can we give the court

 4   reporter a name?

 5              MS. MURRAY:  His name is Simon Shih,

 6   S-H-I-H.

 7              (Witness sworn.)

 8        SIMON SHIH, DEFENDANTS' WITNESS, SWORN

 9                  DIRECT EXAMINATION

10   BY MS. MURRAY:

11        Q.   Good afternoon.

12        A.   Good afternoon.

13        Q.   Can you please state your name.

14        A.   Ho Cheng Shih (phonetics).

15        Q.   Do you also have an English name?

16        A.   Yes.  Simon.

17        Q.   Mr. Shih, where do you live?

18        A.   Taiwan, ROC.

19        Q.   What does ROC stand for?

20        A.   Republic of China.

21        Q.   So is Taiwan in China?

22        A.   No.

23        Q.   And what language do you speak most of the

24   time?

25        A.   Mandarin.
```

1      Q.    And what language do you feel most comfortable

2   conducting today's examination?

3      A.    Mandarin.

4      Q.    Mr. Shih, can you tell us who you're employed

5   by?

6      A.    Quanta Computer, Inc.

7      Q.    And what kind of company is Quanta Computer,

8   Inc.?

9      A.    Basically, we're an OEM subcontractor for

10  notebook computers and other products.

11     Q.    What does OEM stand for?

12     A.    Original equipment manufacturer.

13     Q.    Does Quanta Computer manufacture products

14  other than notebook products?

15     A.    Yes.  We make other products such as Dell

16  servers, Apple's iPod Touch, TomTom's GPS, and

17  Panasonic's cell phones.

18     Q.    And how long have you worked at Quanta

19  Computer?

20     A.    I joined Quanta Computer in 1995.

21     Q.    What is your position at Quanta Computer?

22     A.    Senior Sales Director NB4.

23     Q.    What does NB4 stand for?

24     A.    Notebook Business Unit 4.

25     Q.    What is a notebook business unit?

1      A.    They are business units specifically in charge

2  of notebook subcontract manufacturing.

3      Q.    Is there more than one notebook business unit

4  at Quanta Computer?

5      A.    That's correct.

6      Q.    Do you know how many notebook business units

7  there are?

8      A.    Seven.

9      Q.    And are these seven notebook business units

10 divided up in any particular way?

11     A.    They are divided based on different brand-name

12 customers.

13     Q.    So you mentioned you were a Senior Sales

14 Director or -- I'm sorry -- you are a Senior Sales

15 Director for NB4.

16         What customer is serviced by NB4?

17     A.    Acer, Gateway.

18     Q.    Have you held any other positions at Quanta

19 Computer?

20     A.    Yes.  Senior Sales Director NB2.

21     Q.    And what does NB -- which customer does NB2

22 service?

23     A.    Before, it served Gateway, and currently, it

24 serves Lenovo and IBM.

25     Q.    Okay.  When was Quanta Computer established?



```
 1      A.   1988.

 2      Q.   And where is the company headquartered?

 3      A.   In Taiwan.

 4      ███   ████ ████ ████ ████ ████ ████

 5    ████        REDACTED BY ORDER OF THE COURT

 6         ██

 7   █████████ ███ ███ ███ ███ ███ ███ ███

 8   █ ████

 9      ███  ████ ███ █ ████ ███ █ ████

10              ███ ████ ███ ███ ███ ███ ████

11   ██████

12      ██  ████ ███ ███ ████ ███ ███

13   ██████████ ███ ███ ███ ████ ███ ████

14   ████ ████ ████ ████ ████

15     ███ ███ ███ ████ ███ ███

16   ████████ ███ ███ ███ ███ ████

17   █████ ███ ███ ████ ████

18     ███ ███ ███ ████ ███ ███ ████

19   ████ ███ ███ ███ ████

20     ███ ███ ███ ███ ████ ██ ███ ███

21   ████ ███ ███ ████ ███ ███ ███

22   ████ █ ████ ███ ███ ████ ███ ███

23   █ █████

24      Q.   Okay.  Does Quanta Computer make or sell

25   computers with its own brand name on them?
```

1       A.    No.

2       Q.    And the customers that you mentioned here, are

3   those customers competitors of one another?

4       A.    Yes.

5       Q.    And with respect to these customers you

6   identified, does Quanta Computer assemble all of the

7   notebook computers for these customers?

8       A.    No.   We're just only one of their OEM

9   subcontractors.

10      Q.    Do you know who the other customers' OEM

11  subcontractors are?

12      A.    Yes.   There are others such as Compal,

13  Wistron, Inventec, et cetera.

14      Q.    And these companies you just listed, are these

15  companies competitors of Quanta Computer?

16      A.    Yes.

17      Q.    And these companies, these other -- these

18  competitors, do you know where they are located?

19      A.    Their headquarters are all in Taiwan.

20      Q.    Okay.   I think we have a graphic we can put

21  this in some context.

22            So the headquarters of the OEMs are in Taiwan.

23  Do you know where the factories of these companies are?

24      A.    The factories are located -- are all located

25  in China.

1      Q.    And does that include Quanta Computer's

2 factories?

3      A.    Correct.  Quanta used to have factories in

4 Taiwan, but currently, they're all in China.

5      Q.    Do you know why the factories moved to China?

6      A.    Because we had to expand our production

7 capacity in order to meet our customers' needs for

8 quantity.

9      Q.    And how about the customers of Quanta Computer

10 we spoke a little bit about earlier, do you know where

11 they are located?

12      A.    These major brand-name customers are located

13 all over the world.  The ones in the United States, HP

14 and Dell, are located in Texas.  Acer and Apple are

15 located in California.

16      Q.    Okay.  You said Acer?

17      A.    Before it was called Gateway; currently, it is

18 Acer.

19      Q.    I see.

20           Mr. Shih, do you know what Quanta Computer's

21 profits are on each computer that it assembles for its

22 brand-name customers?

23      ████  ████████  ████  ████  ████████  ██████    ████████████

24  ████████   **REDACTED BY ORDER OF THE COURT**   ████████

25  ██ ████ ███  █████ ███ ██ ████ ██ ██  ██  ████████

1      Q.    How do you know that?

2      A.    Because we have monthly reviews of the

3   quantities delivered and the profits information.

4      Q.    And have you participated in those reviews?

5      A.    Yes.

6      Q.    And you just mentioned that there's intense

7   competition.

8            What does Quanta do to meet the needs of its

9   customers in view of this competition in the industry?

10                THE INTERPRETER:  By Quanta, you mean

11   Quanta Computer?

12                MS. MURRAY:  Yes.  Thank you.

13      A.    Since early on, we have paid great, great

14   attention to the production yield and products' quality.

15                THE INTERPRETER:  Interpreter needs to

16   clarify with the witness.

17      A.    And also lower our costs.

18      Q.    (By Ms. Murray) And in your position as a

19   sales director, do you have the opportunity to

20   communicate with the customers of Quanta Computer?

21      A.    Yes.

22      Q.    And which customers have you had the

23   opportunity to work with?

24      A.    Currently, it is Acer.  Before, it was

25   Gateway.

1    Q.    And how often would you communicate with Acer?

2    A.    Almost every week.

3    Q.    How about Gateway?  How often would you

4 communicate with them?

5    A.    That also, every week -- almost every week.

6    Q.    And were any of these communications with

7 Gateway or Acer in person?

8    A.    Those are included.

9    Q.    And when you meet with Gateway or Acer, what

10 do you discuss with them?

11    A.    I try to get an understanding of the

12 customers' needs and try to figure out how our company

13 can meet the customers' needs.

14    Q.    And what is your understanding of your

15 customers' needs?

16    A.    The customers would want products of higher

17 quality and lower unit price and also the products that

18 can be mass-produced.

19    Q.    And has Quanta Computer been able to meet the

20 needs of its customers?

21    A.    Yes.  We have been striving to meet our

22 customers' needs.

23    Q.    And can you give us some examples of what

24 Quanta Computer has done in an attempt to meet its

25 customers' needs?

1       A.    As I mentioned earlier, we have focused our

2    attention to improve the products yield and quality and

3    also lower the manufacturing costs through large

4    quantity manufacturing.

5       Q.    Okay.  I'd like to talk a little bit about the

6    component parts that go into the assembly of a laptop

7    computer.

8           Where does Quanta Computer obtain the

9    components that go into the notebooks?

10      A.    We would obtain the components from the

11   suppliers.  The customers would give us instructions to

12   purchase from the suppliers.

13      Q.    Okay.  And is that the only way that Quanta

14   Computer obtains components from suppliers?

15      A.    No.

16      Q.    What are some other ways that Quanta Computer

17   obtains the components for the computers' assembly?

18      A.    We can also purchase from our customers, and

19   our customers would provide us with the key components.

20      Q.    Okay.  You say key components.  What do you

21   mean by that?

22      A.    These components are -- the components that --

23   that are used in notebook computers.  For example, LCD,

24   ODD, HDD, memory, and CPU.

25      Q.    And when you say that Quanta Computer obtains

1   these types of key components from its customers, what

2   do you mean by that?

3       A.   The customers ask us to purchase these main

4   components from them.

5       Q.   And does Quanta Computer have a name for this

6   process?

7       A.   Yes.  We call it buy/sell process.

8            MS. MURRAY:  And I believe we have a

9   graphic on that.

10      Q.   (By Ms. Murray) If you can kind of walk us

11  through the buy/sell process.

12      A.   Our customers would issue purchase orders to

13  the suppliers of the key components, for example, the

14  ODD vendors.

15           And the ODD vendors, after they manufacture

16  the components, they would deliver the components to

17  OEM -- OEMs, such as us.  And after we receive these

18  parts, we have to pay our customers.

19      Q.   Okay.  And after Quanta Computer pays its

20  customers for the parts, what happens next?

21      A.   Then we would assemble these components into a

22  computer and deliver to our customer.

23      Q.   And after Quanta Computer delivers the

24  computers, what happens then?

25      A.   Then our customers would pay us for the

1  computers.

2      Q.   Okay.  I'd like to go back and discuss a

3  little bit about the buy/sell arrangement.

4          Why does the customer buy the drive instead of

5  Quanta Computer buying the drive?

6      A.   Because we are not the only OEM subcontractor

7  for our customers.  They have other OEMs manufacture

8  computers for them.  So they can buy these components in

9  bulk and get a much better price.

10         At the beginning, our customers have tried to

11 use a method -- to use consign -- the method of consign

12 to -- to provide us with these components, asking us to

13 assemble for them.  But later on, our customers

14 discovered that that could cause problem.

15         For example, it would be excessively

16 burdensome to their financial situation.  And also if

17 these drives has any problems, for example, if they're

18 missing or if the drive has -- has any quality problems,

19 then --

20             THE INTERPRETER:  Interpreter needs to

21 clarify with the witness.

22     A.   -- that would be very hard for our customers

23 to handle the situation.

24     Q.   (By Ms. Murray) So you mentioned -- I'm sorry.

25 Were you finished with your response?

1          A.    Yes.

2          Q.    Okay.  So you mentioned previously the

3     customers used to use consignment, but now -- so instead

4     of consignment, what is it that the customers do now

5     after Quanta Computer purchases the drives from the

6     customers?

7          A.    They use buy/sell methods.

8          Q.    So when it was consignment, who would purchase

9     the component?

10         A.    Customers, our customers.

11         Q.    And then would Quanta Computer buy the drive

12    from the customer?

13         A.    No.

14         Q.    Okay.  And then now under the buy/sell

15    arrangement, the customer purchases the drive?

16         A.    Correct.

17         Q.    And then Quanta Computer purchases the drive

18    from the customer?

19               THE INTERPRETER:  Oh, interpreter made a

20    mistake and would like to retranslate the previous

21    question.

22               The answer to the previous question was

23    yes, and then the interpreter would translate the

24    current question.  I'm sorry.

25         A.    Yes.

1        Q.    (By Ms. Murray) Okay.  So under the buy/sell

2   arrangement, when Quanta Computer sells the drive back

3   to the customer, what amount is Quanta Computer charging

4   for that drive?

5   ████████████████████████████████████████████████

6   ██  ██   **REDACTED BY ORDER OF THE COURT**        █

7   ████

8        ████   ██████████   ████████████   ██████  ████

9   ███████████████████████████████████████████████████████

10       ██    ████████████

11       ████   ██████   ██████   ████████████████   █████   █

12   ██████████████   ██████████████

13       ████   ████████   ████████████████████   ██████  █  █████

14   ████████   ████   ██████████   ████████

15       Q.    I think you may have mentioned this earlier,

16   but does Quanta Computer ever purchase these key

17   components directly from suppliers instead of its

18   customers?

19       A.    Yes.

20       Q.    And does Quanta Computer purchase drives

21   directly from suppliers often?

22       A.    Not often.  That would only happen when our

23   customer asks us to purchase from the suppliers

24   directly.

25       Q.    So does it happen more often that Quanta

1  Computer uses the buy/sell arrangement to obtain its key

2  components?

3       A.    That's correct.

**REDACTED BY ORDER OF THE COURT**

13      Q.    Can you identify some of the drive suppliers

14  whose drives are used in the computers that Quanta

15  Computer assembles?

16      A.    Normally, each of our customers would have

17  three or four suppliers that they want to use.  So,

18  collectively, we have used all the brand names of the

19  drives in the computers that we assemble, including, for

20  example, Sony, TEAC, Panasonic, Toshiba.

21      Q.    When you say you've used all the brand name

22  drives, do you know how many brand name drive companies

23  there are?

24      A.    I think over ten.

25      Q.    Let's talk a little bit about one of the final

1  portions of shipment.

2        How does Quanta Computer ship out the

3  computers that it assembles?

4     A.   The customers -- our customers would provide

5  us with the ship-to-address information, and we print

6  out the information on the labels and attach the label

7  to -- to the products.

8        And our customers would find their forwarders,

9  and the forwarders would come and pick up the products

10  and ship the products to their customers' address.

11     Q.   Can you tell us what a forwarder is?

12     A.   Forwarders are companies such as DHL, UPS,

13  et cetera.

14     Q.   So Quanta -- I'm sorry.

15        So the customers instruct the forwarders to

16  come pick up product at Quanta Computer?

17     A.   After we finished manufacturing of the

18  products, we would notify the forwarders to pick up the

19  products.  However, these forwarders are designated by

20  our customers.

21     Q.   Who pays the forwarder, the customer or Quanta

22  Computer, for the shipping cost?

23     A.   Our customers.

24     Q.   Does Quanta Computer know where the computers

25  that it assembles are being shipped?

1     A.   The ship-to-address information would appear

2 on our customer's purchase orders to us; however, we

3 only use the information to print out the shipping

4 labels.  We would not have any other special processing

5 of the address.

6     Q.   Can you tell us where computers that are

7 assembled by Quanta Computer are shipped, generally?

8     A.   Well, our customers are well-known, big

9 customers in the world.  So, basically, we ship all over

10 the world, including the Americas, Europe, and Asia.

11     Q.   Thank you, Mr. Shih.

12          MS. MURRAY:  I pass the witness.

13          THE WITNESS:  Thank you.

14          THE COURT:  Mr. Sankey?

15          MR. SANKEY:  Good afternoon, Mr. Shih.

16                CROSS-EXAMINATION

17 BY MR. SANKEY:

18     Q.   Good afternoon, Mr. Shih.

19     A.   Good afternoon.

20     Q.   Your -- your company, QCI, has manufacturing

21 facilities in China, correct?

22     A.   Yes.

23     Q.   And some of those manufacturing facilities are

24 manufacturing laptops for Dell, Gateway, Apple, correct?

25     A.   Yes.

1    Q.   And so if someone suggests that all your

2 company does is assemble and get paid a small fee for

3 that, that's not correct, is it?

4    A.   Well, currently, the OEM subcontract

5 manufacturing competition is very intense, so these OEMs

6 are competing for purchase orders.   That's very -- the

7 competition is very intense.

8    Q.   Well, does your company get paid anything for

9 manufacturing these laptop computers?

10    A.   We are paid the assembly fee for a subcontract

11 manufacturer, the computers.

12    Q.   I'm not sure I understand your answer.

13         Are you paid -- I know you say you're paid for

14 assembling part of these computers.   Are you paid for

15 manufacturing the computers?

16    A.   I think assembly and manufacture are basically

17 the same thing.

18    Q.   Thank you for that clarification.

19         With respect to your buy/sell testimony,

20 that's one of three or four ways your company obtains

21 components, correct?

22    A.   Correct.

23    Q.   At least when this lawsuit started back in

24 August of 2006, another way you obtained components was

25 to buy them directly from the suppliers, correct?

1      A.   The method of direct purchase and buy/sell,

2  they existed at the same time.

3      Q.   Okay.  And one of the suppliers that you

4  bought optical disk drives from was QSI, correct?

5      A.   Yes.

6      Q.   And you also -- a third method was, you got

7  them by consignment, correct?

8      A.   Okay.  Consignment is not purchase.  It is --

9  that means the customer would provide the components.

10     Q.   And that's another method in which you

11 obtained the components.

12     A.   Yes.

13     Q.   And no matter how you obtained the component,

14 it got put into the laptop and shipped to the United

15 States, correct?

16     A.   If the customer's instruction is to ship them

17 to the United States, we would.

18     Q.   And you did.

19     A.   We have customers in the United States, that's

20 correct.

21     Q.   In fact, you visit the United States often to

22 deal with your customer, Gateway or Acer, correct?

23     A.   Yes.

24     Q.   Now, is it your testimony that the way in

25 which you obtain components has changed over recent

1 times within the last year?

2     A.   No.  The way we obtain them have been in

3 existence -- have been in existence for a long time --

4 or for many years.

5     Q.   The spreadsheets that your company produced in

6 this case show the percentage of those that go through

7 this buy/sell agreement.

8        Can we rely upon those percentages as to the

9 amounts that go through that process for obtaining that

10 component?

11     A.   The information produced by our company should

12 be correct.

13     Q.   Okay.  Your company has a subsidiary here in

14 the United States called QCH; is that correct?

15     A.   Yes.

16     Q.   And do you recall telling me that that stood

17 for Quanta Computer Hub?

18     A.   Yes.

19     Q.   Do you recall telling me that the product that

20 you shipped to that hub in the United States is owned by

21 QCI while shipped?

22     A.   Yes, I do recall.

23

24         **REDACTED BY ORDER OF THE COURT**

25

1 ▬

2 ▬▬▬        **REDACTED BY ORDER OF THE COURT**

3        Q.    And QCH is located in Nashville?

4        A.    Well, QCH, the title, name of our virtual

5 company, I think the actual address -- the actual

6 address is not in Nashville.

7        Q.    And you just used an interesting term.  You

8 said virtual company.  Does this company have any

9 employees?

10        A.    I think so.

11 ▬▬ ▬▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬▬

12 ▬▬ ▬▬ ▬▬▬ ▬▬ ▬▬▬▬

13 ▬▬ ▬▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬ ▬

14 ▬▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬ ▬

15 ▬▬▬ ▬▬ ▬▬

16 ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬▬

17 ▬▬▬ ▬▬ ▬ ▬▬▬ ▬▬▬

18 ▬ ▬▬

19        Q.    These warehouses where the products are stored

20 in the United States, you're the individual that

21 actually signs those agreements to lease the warehouse,

22 correct?

23        A.    For the location in Nashville, for Gateway,

24 that's the case.

25        Q.    Is there any kind of an agreement between QCI



1  and QCH where this sale occurs?

**REDACTED BY ORDER OF THE COURT**

12      Q.   QCI in China that's manufacturing these

13  laptops have QSI drives at that manufacturing facility,

14  don't they?

15          THE INTERPRETER:  Interpreter was asked

16  to repeat a rendition.

17      A.   If that is the request of our customer to --

18  to do that, we would put the QSI drive in the computer.

19      Q.   (By Mr. Sankey) In fact, QSI's manufacturing

20  facility in China and QCI's manufacturing facility in

21  China are both located in what you refer to as the QSMC

22  zone, correct?

23      A.   Yes.

24      Q.   And you told me that from NB4, you visit the

25  United States quarterly to deal with Gateway, and you

1  have for ten years, correct?

2      A.    More or less, because we have been having this

3  business relationship with Gateway for ten years.

4      Q.    And is that to assist Gateway with whatever

5  needs they have in purchasing and ordering laptop

6  computers with ODDs in them?

7      A.    Of course, we will try -- we would try to meet

8  our customer's needs, if they have such requests.

9      Q.    And you're not the only salesperson from QCI

10  that comes to the United States to help their customers,

11  correct?

12      A.    Correct.

13      Q.    Are all of the NB units that sell to U.S.

14  customers, do all of those units have sales people that

15  travel quarterly to the United States to assist their

16  customers with this product?

17      A.    Basically, yes.

18      Q.    And do you recall telling me that QCI has

19  people stationed at Gateway in the United States?

20      A.    Yes.

21  ██    ▬▬▬ ▬▬▬ ▬▬▬ ▬▬▬ ▬▬▬ ▬▬▬ ▬▬▬

22  ████  **REDACTED BY ORDER OF THE COURT**

23  ███ ▪ ▬ ▬▬ ▬▬ ▬▬ ▪ ▬▬▬

24  ██ ▬▬ ▬▬ ▬ ▬ ▬▬▬

25  ██ ▬▬ ▬▬▬▬▬ ▬ ▬ ▬▬▬ ▪ ▬▬



**REDACTED BY ORDER OF THE COURT**

12    A.   I do not have a document to show you.

13              MR. SANKEY:  Nothing further.

14              THE COURT:  Anything further?

15              MS. MURRAY:  Nothing further, Your Honor.

16              THE COURT:  All right.  You can step

17 down.

18              Who will be your next witness?

19              MS. MURRAY:  Tracy Li, Your Honor.

20              THE COURT:  Has she been sworn?

21              MS. DUPREE:  Yes, she has.

22              THE COURT:  She was sworn yesterday.

23              MS. DUPREE:  Yes, sir.

24              THE COURT:  Ms. Li, you understand you're

25 still under oath?

```
 1                    THE WITNESS:  Yes.

 2        TRACY LI, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

 3                      DIRECT EXAMINATION

 4  BY MS. MURRAY:

 5        Q.   Good afternoon, Ms. Li.

 6        A.   Good afternoon.

 7        Q.   Ms. Li, as we heard yesterday, you'll be

 8  testifying in English, but in the event that you need

 9  assistance with the interpreter, just let us know.

10        A.   Okay.  Thank you.

11        Q.   And I believe we heard about your position at

12  Quanta, but if you could just remind the jury what your

13  position is at Quanta Computer.

14        A.   Yes.  I'm the head of -- the division head of

15  the legal team of Quanta Computer, Inc.

16        Q.   And how long have you been the division head

17  of the legal team?

18        A.   Seven years already.

19        Q.   And prior to serving as a division head of the

20  legal team, did you hold any other position at Quanta

21  Computer?

22        A.   Yes.

23        Q.   And what position was that?

24        A.   I was senior specialist of IP team of Quanta

25  Computer, Inc.
```

1      Q.    How long did you hold that position?

2      A.    Two years.

3      Q.    Have you had any other positions with Quanta

4   Computer?

5      A.    No.

6      Q.    What are your job responsibilities as a

7   division head of the legal department?

8      A.    Over the legal affairs, something like -- like

9   litigation overseas or in Taiwan, and the contract

10  negotiation is kind of a legal affairs.

11     Q.    Who does Quanta Computer negotiate contracts

12  with?

13     A.    Most of them is customers.

14     Q.    And what kind of contracts is Quanta Computer

15  negotiating with its customers?

16     A.    Customers is always OEM agreements, OEM

17  manufacture agreements.

18     Q.    And have you personally negotiated those

19  contracts with Quanta Computer customers on behalf of

20  Quanta Computer?

21     A.    Yes.

22     Q.    Can you tell us which customers you've

23  negotiated contracts with?

24           ███        **REDACTED BY ORDER OF THE COURT**        ███

25  ███████    |                                                  ▌ █████

**REDACTED BY ORDER OF THE COURT**

6  Q.   And in its agreements with its customers, has

7  Quanta Computer agreed to pay a royalty on the disk

8  drives that are assembled into these notebook computers?

9  A.   No.

10  Q.   Does Quanta Computer pay royalties on the disk

11  drives that it assembles into the computer?

12  A.   No.

13  Q.   Why not?

14  A.   That's -- you are talking about the

15  components, and we don't make the components.  We

16  don't -- we just assemble the computer, and so we

17  actually don't pay royalty to any component, no.

18  Q.   Okay.  Let's talk a little bit about QSI,

19  Quanta Storage.

20      Do you know who Quanta Storage makes drives

21  for?

22  A.   I know right now it's Sony Optiarc.

23  Q.   And you say right now.  Did they make drives

24  for someone else before?

25  A.   Before, I remember is Philips.

1       Q.   And how do you know this?

2       A.   Philips actually is our supplier, and in this

3  industry, actually, people knows the -- you know, the

4  alliance situation, that kind of stuff.

5       Q.   So does Quanta Computer use drives made by

6  Quanta Storage, QSI, in the computers that it's

7  assembling for its customers?

8       A.   Yes.  If our customer asks us to do it, we

9  will --

10      Q.   And do --

11      A.   -- put it into our --

12      Q.   I'm sorry.

13      A.   -- computers.

14      Q.   And do these drives have a QSI brand name on

15  them?

16      A.   No.  No.

17      Q.   And how does Quanta Computer obtain the drives

18  that are made by QSI?

19      A.   How?

20      Q.   How does Quanta Computer obtain the drives

21  that are made by QSI?

22      A.   Made by QSI?

23      Q.   Or how does it receive the drives?

24      A.   We receive the drives actually from our --

25  from our -- from a supplier, so -- that's what you

1  wanted to ask, yes?

2      Q.   So is QSI a supplier for Quanta Computer?

3      A.   Used to.  They used to be a supplier of Quanta

4  Computer, Inc., before.

5      Q.   And when you say before, what do you mean by

6  that?

7      A.   Because before they were -- they were -- they

8  have their -- they -- they have their own skill, have

9  their own plant, and then that's -- that's what I mean.

10     Q.   So, currently, is QSI a drive supplier for

11 Quanta Computer?

12     A.   No.

13     Q.   So the drives that QSI makes, for example, for

14 Philips, where does Quanta Computer get those drives?

15     A.   We -- we actually buy from -- sometimes we buy

16 from our customers, and sometimes our customers ask us

17 to buy from -- directly from the vendor.  And the vendor

18 will have -- and they'll maybe have their manufacturer

19 or OEM contractor to ship to Quanta Computer directly

20 sometime.  That's sometimes the case.

21     Q.   Okay.  So if Quanta Computer is buying a drive

22 directly from the vendor, like, say, Philips --

23     A.   Uh-huh.

24     Q.   -- and QSI made the drive for Philips, who

25 does Quanta Computer pay for that drive?

1       A.    We pay -- we pay Philips.

2       Q.    Is there any other relationship between QSI

3  and Quanta Computer other than QSI serving as a drive

4  manufacturer?

5       A.    Yes.

6       Q.    What is that relationship?

7       A.    Quanta Computer is one of QSI's shareholder.

8       Q.    Do you know how many shares in QSI Quanta

9  Computer holds?

10       A.    I believe that it's about 25 to 30 percent.

11       Q.    Does Quanta Computer own a majority of Quanta

12  Storage shares?

13       A.    No, not a majority.

14       Q.    Is Quanta Computer a publicly traded company?

15       A.    Yes.  We're a publicly traded company.

16       Q.    Does Quanta Computer control QSI?

17       A.    No, we don't control them.

18       Q.    Does Quanta Computer provide any direction to

19  QSI on who QSI should sell or make drives for?

20       A.    No, we don't.

21       Q.    Has Quanta Computer ever sold any drives that

22  it had to QSI?

23       A.    To QSI, no, we don't.  I think we're wrong,

24  because they're the component suppliers.  So they sell

25  the product to us, and then we assemble it, the

1    computer, and they ship to our customers.

2         Q.    Okay.  So the drives that Quanta Computer

3    receives, whether they were made by QSI, whether we

4    receive them for Philips or elsewhere, what does Quanta

5    Computer do with those drives?

6         A.    Like I say, we will assembly -- assemble all

7    those components into the computer.  Then ship to our

8    customers under our customers' instruction.

9         Q.    I'd like to talk a little bit about Sony

10   Optiarc.  You've heard of a company named Sony Optiarc?

11        A.    Yes.

12        Q.    And how have you heard of that company?

13        A.    They are one of the ODD supplier.

14        Q.    So has Quanta Computer purchased drives

15   directly from Sony Optiarc?

16        A.    Yes, we did.

17        Q.    Is that the only way that Quanta Computer

18   receives Sony Optiarc drives?

19        A.    No.  We have the buy/sell position, so

20   sometimes it's from our customers.  And if our customers

21   ask us to buy directly from Sony Optiarc, we would do

22   it.

23        Q.    So which one happens more frequently:  That

24   Quanta Computer obtains a drive directly from Sony

25   Optiarc or that it obtains those drives from its

1  customers?

2      A.   As far as I know, actually, from our customer

3  is more frequently.

4      Q.   And does it matter to Quanta Computer whether

5  Sony Optiarc makes its own drives or whether it hires

6  another company to make those drives for them?

7      A.   It doesn't matter to us.

8      Q.   And is there any other relationship between

9  Quanta Computer and Sony Optiarc other than them being a

10 drive supplier?

11     A.   Sony, no.

12     Q.   Does Quanta Computer own any shares in Sony

13 Optiarc?

14     A.   No.

15     Q.   Does Quanta Computer control any aspect of

16 Sony Optiarc?

17     A.   No.

18     Q.   And after Quanta Computer receives the drives

19 made by Sony Optiarc, what does it do with those drives?

20     A.   Same thing.  We will assemble the components

21 and the ODD into our computer; then ship to our

22 customers who own the product.

23     Q.   So Quanta Computer has never sold drives it

24 received from Sony Optiarc to QSI?

25     A.   No, never.

1      Q.    With respect to these drives that Quanta

2  Computer gets from Sony Optiarc, has Sony Corporation

3  ever asked Quanta Computer to pay a royalty on those

4  drives?

5      A.    No.

6      Q.    Has Quanta Computer ever offered to pay a

7  royalty on those drives?

8      A.    No.

9      Q.    Why not?

10     A.    Like I explained earlier, it's components.

11 It's -- it's attached to the components, and we actually

12 don't make the components.  We don't understand, we

13 don't know the technology of the components, so,

14 normally, we would not do that.

15     Q.    Okay.  Let's talk a little bit about Philips.

16          That company's been mentioned the past few

17 days.

18          Have you heard of a company known as Philips?

19     A.    Yes.

20     Q.    And how have you heard of Philips?

21     A.    Philips is also one of the ODD supplier.

22     Q.    So Quanta Computer has assembled computers

23 containing Philips drives in them?

24     A.    Yes.

25     Q.    Where does Quanta Computer obtain the Philips

1  drives?

2      A.   We would obtain from our customers, or if our

3  customer asks us to buy directly from Philips, we will

4  from Philips.

5      Q.   And what happens more frequently:  That Quanta

6  Computer obtains a drive directly from Philips or from a

7  customer?

8      A.   From customers, more frequently.

9      Q.   And does Quanta Computer care whether Philips

10 manufactures its own drives or whether it hires another

11 company to make those drives for it?

12     A.   We don't care just as long as it's Philips

13 brand.  And if it's made by our customers, we don't

14 care.

15     Q.   Is there any other relationship between Quanta

16 Computer and Philips other than Philips serving as a

17 drive supplier?

18

19     **REDACTED BY ORDER OF THE COURT**

20

21

22

23

24

25

1      A.   No.

2      Q.   Does Quanta Computer own any shares in

3 Philips?

4      A.   No.

5      Q.   Does Quanta Computer instruct Philips on who

6 Philips should sell or make drives for?

7      A.   No.

8      Q.   Now, after Quanta Computer receives drives --

9 Philips drives, what does it do with those drives?

10     A.   We -- same thing.  Just assembling the ODD

11 into the computer; then ship to the clients.

12     Q.   I'd like to talk a little bit more present day

13 about the lawsuit.

14          You're aware that the Plaintiff has alleged

15 that Quanta Computer is infringing the '981 patent by

16 selling notebook computers into the United States; is

17 that right?

18     A.   Yes, I am aware.

19     Q.   And what is your understanding as to which of

20 Quanta's computers are being accused of infringement?

21     A.   I'm sorry.  The question?

22     Q.   What is your understanding of -- the notebook

23 computers that Quanta Computer assembles, what is your

24 understanding of how many of those or which of those

25 computers are being accused of infringement in this

1 case?

2     A.   In this case, in the beginning, I think it's

3 all of -- all the computer have -- the ODD is inside and

4 shipped to U.S.

5     Q.   So your --

6     A.   That's my understanding in the beginning.

7     Q.   So your under -- I'm sorry.

8     A.   That's my understanding in the beginning, I

9 think.

10     Q.   Okay.  So your understanding was, in the

11 beginning, all computers that had ODD drives that were

12 shipped to the United States were accused of

13 infringement?

14     A.   Yeah.

15     Q.   And you say in the beginning.  Has that

16 changed?

17     A.   Yeah.  I think recently they limited it to the

18 ODD made by QSI.

19     Q.   Okay.  And when you say recently, they limited

20 it -- so it's limited to computers that have ODD made by

21 QSI?

22     A.   Yeah, that's my understanding.

23     Q.   And what do you mean by recently?

24     A.   I think recently they have, my understanding.

25 And I was aware they -- they have to confirm that the

1    accused computer only limited it to the ODD made by QSI

2    to my lawyer.  That's my understanding.

3        Q.   Okay.  And do -- the majority of computers

4    that Quanta Computer makes or assembles, do they contain

5    drives made by QSI?

6        A.   The what?

7        Q.   The majority.

8        A.   No, I don't think that's the majority, because

9    there's so many ODD manufacturer brand-name companies.

10        Q.   And if Quanta Computer had known from the

11    beginning of the case that the only computers that were

12    being accused of infringement were ones with QSI drives

13    in them, could this have changed the way that Quanta

14    Computer did business for the past two years?

15        A.   It could change.

16        Q.   And how could it change?

17        A.   It can -- if that's -- in the beginning, it's

18    limited to the QSI's drive, then we can discuss or talk

19    to our customers, tell them this may be some issues.

20    Then -- because there is so many alternative in the

21    market, so they might change the component they want to

22    use.

23        Q.   Okay.  So earlier today, you heard Mr. Luck

24    ask Mr. Murtha whether Quanta Computer had the option to

25    use any other non-infringing drives, and Mr. Murtha said

1  he didn't believe Quanta Computer had that option.

2  Do you agree with that?

3      A.   No, because this case -- in the beginning, I

4  don't see we have the option, because all the computers

5  is in the case.

6      Q.   So if the drives have been limited -- I'm

7  sorry.

8          If the accused computers had been limited from

9  the beginning of the case to drives made by QSI, would

10 Quanta Computer have had an option to purchase

11 non-infringing drives?

12          MR. SANKEY:  Your Honor, I'm going to

13 object and ask for a bench conference, please.

14          THE COURT:  Yes.

15          (Bench conference.)

16          MR. RAMBIN:  Your Honor, this is going to

17 open up a whole kettle of fish, because we've tried a

18 clean case on our side without getting into any of the

19 drives that were cut out by your order, and it's going

20 to --

21          MS. MURRAY:  That wasn't the order.

22          THE COURT:  I mean, who's going to talk

23 about this?

24          MR. PARKER:  This doesn't have anything

25 to do with the Court's order.  This is not what she's

1  asking about.

2              When they originally sued QCI, they --

3  they accused all of the computers we brought in,

4  including ones that had TEAC drives and all kinds of

5  other drives.

6              It wasn't until within the last 60 days

7  that they have informed us that they were no longer

8  accusing those.  In fact, they informed us of that

9  before Your Honor entered your order.

10             So I think what we're trying to show is,

11 in the early point of this lawsuit, we were not provided

12 an alternative in the sense that we could have gone to a

13 non-infringing alternative, because at that point in

14 time, they were accusing everything we had.

15             It was only in the last two months that

16 they've said, okay, now we've limited it just to the

17 drives that were --

18             THE COURT:  I understand that, but she

19 has testified that y'all didn't know it.  But now we're

20 getting into this question, if we had known, we would

21 have done something different.

22             Now, what is the relevance of that?

23             MR. PARKER:  Well, I mean, I think, Your

24 Honor, what --

25             THE COURT:  They're not determining

1  willfulness or -- I mean, they're going to determine

2  willfulness as far as infringement.

3              What is the relevance of this line of

4  questioning, is my question.

5              MR. PARKER:  The only thing that I --

6  that we're trying to demonstrate, Your Honor, is that

7  we -- because of the way the case was couched in the

8  early period and, in fact, up until very, very

9  recently -- and the thing's been pending since '06 --

10 until very, very recently, we -- there was no non --

11 legitimate non-infringing alternative available on the

12 basis of the way the case was pled.

13             And that adds -- and they've had -- you

14 know, they've attacked us on our conduct and the fact

15 that we didn't go there, and I think it's legitimate to

16 be able to demonstrate to the jury that based on the way

17 they were accusing us at that time, we didn't have an

18 option to go there.

19             THE COURT:  Well, I think she's got

20 that -- she has got that direct testimony.  What I'm

21 saying is, now she wants to get all these hypotheticals,

22 if this or that, and I'm saying it's over with.

23             MR. PARKER:  We won't go there.

24             MS. MURRAY:  We won't go there, Your

25 Honor.  That was our last question.

```
 1                      (Bench conference concluded.)

 2                      THE COURT:  We'll resume in the morning

 3  at 8:30, Ladies and Gentlemen.  Have a nice evening.

 4                      Remember all my instructions about not

 5  discussing the case or any research or anything of that

 6  nature.

 7                      (Jury out.)

 8                      THE COURT:  Court's in recess till 8:30.

 9                      MR. SANKEY:  Your Honor, if I may just

10  briefly discuss with the Court -- I was talking to

11  Mr. Parker --

12                      THE COURT:  You want this to be an

13  on-the-record discussion or --

14                      MR. SANKEY:  We don't have to do it on

15  the record.

16                      THE COURT:  All right.  I'll see you in

17  chambers in five minutes.

18                      COURT SECURITY OFFICER:  All rise.

19                      (Court adjourned.)

20                   *       *       *       *       *

21

22

23

24

25
```

<u>CERTIFICATION</u>

      I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/_____                    _____
SUSAN SIMMONS, CSR                            Date
Official Court Reporter
State of Texas No.:  267
Expiration Date:  12/31/10


/s/_____                        _____
JUDITH WERLINGER, CSR                         Date
Deputy Official Court Reporter
State of Texas No.:  731
Expiration Date:  12/31/10


/s/_____                       _____
SHELLY HOLMES                                 Date
Deputy Official Court Reporter
State of Texas No.:  7804
Expiration Date:  12/31/10