```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3  LASERDYNAMICS                *    Civil Docket No.
                                 *    2:06-CV-348
 4  VS.                          *    Marshall, Texas
                                 *
 5                               *    July 2, 2009
    QUANTA, ET AL                *    8:15 A.M.
 6
                 TRANSCRIPT OF TRIAL PROCEEDINGS
 7          BEFORE THE HONORABLE T. JOHN WARD
               UNITED STATES DISTRICT JUDGE
 8                    AND A JURY

 9  APPEARANCES:

10  FOR THE PLAINTIFFS:    MR. THOMAS SANKEY
                           MR. GREGORY LUCK
11                         Duane Morris
                           3200 Southwest Freeway
12                         Suite 3150
                           Houston, TX   77027
13
                           MR. TIMOTHY TROP
14                         Trop Pruner & Hu
                           1616 South Voss Road
15                         Suite 750
                           Houston, TX   77057
16
                           MR. JEFFREY RAMBIN
17                         Capshaw DeRieux
                           1127 Judson Road
18                         Suite 220
                           Longview, TX   75601
19
    APPEARANCES CONTINUED ON NEXT PAGE:
20

21  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                           MS. JUDY WERLINGER, CRS
22                         MS. SHELLY HOLMES
                           Official Court Reporters
23                         100 East Houston, Suite 125
                           Marshall, TX   75670
24                         903/935-3868

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

<u>APPEARANCES CONTINUED</u>:

FOR THE DEFENDANTS:          MR. MELVIN WILCOX
                             Yarbrough & Wilcox
                             100 East Ferguson
                             Suite 1015
                             Tyler, TX    75702

                             MR. JOHN PARKER
                             Paul-Hastings
                             600 Peachtree St., NE
                             Suite 2400
                             Atlanta, GA    30308

                             MR. CHRISTIAN PLATT
                             MS. ERICKA SCHULZ
                             Paul-Hastings
                             4747 Executive Drive
                             12th Floor
                             San Diego, CA    92121

                             MS. KATHERINE MURRAY
                             MR. JAY CHIU
                             Paul-Hastings
                             515 South Flower Street
                             25th Floor
                             Los Angeles, CA    90071

               *      *      *      *      *      *

                   <u>P R O C E E D I N G S</u>

          (Jury out.)

          COURT SECURITY OFFICER:  All rise.

          THE COURT:  Please be seated.

          All right.  We have a number of matters I

understand you want to bring up this morning.

          What's the Plaintiff got?

          MR. RAMBIN:  Yes, Your Honor.

1    The first thing we have is some

2  objections to the demonstratives.  Specifically, there

3  are some demonstratives that they try to insert, a 2001

4  hypothetical date, into the case.  The date is 2006.

5    Secondly, there are also some

6  demonstratives in Mr. Reed's report, or in conjunction

7  with the testimony, they get into breaking down the

8  litigation licenses.  That wasn't in his report for

9  obvious reasons.  Those didn't come into the case until

10 yesterday.  But, nonetheless, those are outside of his

11 report.

12    And finally, they also -- there is a

13 demonstrative that was a tab from Mr. Reed's report that

14 lays out all the entities and all the licenses.  And

15 given the Court's order, we don't see the relevance of

16 that.

17    In addition, there is a motion to strike

18 the testimony and deal with the issue of this buy/sell

19 situation.

20    Yesterday, we had a hearing downstairs in

21 front of Judge Everingham, and -- over some

22 demonstratives that introduced the buy/sell arrangement.

23 And the representation from the Quanta Defendants was

24 that they were going to say that this is something that

25 happens in general and that was as far as they were

1   going to go.

2               And based on that, Judge Everingham

3   entered an order allowing them to show that

4   demonstrative.  But then yesterday at trial, what they

5   did is they went beyond that order.  They've not only

6   said it happens in general, but they said it happens the

7   vast majority of times.

8               And that was our specific objection at

9   the hearing in front of Judge Everingham, because they

10  didn't produce documents to demonstrate that nor did

11  they give us deposition testimony on -- going to the

12  issue of whether the buy/sell issue applies to the

13  drives accused in this case.

14              THE COURT:  Well now, like Judge

15  Everingham, it's my understanding that there was

16  deposition testimony about the buy/sell, and my

17  understanding is that he said that it was represented to

18  him that it was going to be done in general.

19              What do you say about that, Mr. Parker?

20              MS. MURRAY:  Your Honor, when they were

21  objecting to that exhibit, when I explained to Judge

22  Everingham --

23              THE COURT:  I know what Judge Everingham

24  said.  I just talked to him.

25              MS. MURRAY:  Okay.  Yes, that -- that

1 demonstrative was to show one way that Quanta does

2 business.

3                THE COURT:  Well, that's right.  It was

4 to show one way, but then the testimony that you

5 elicited was that that was the predominant way.  So

6 those are two inconsistent positions.

7                I'll instruct the jury that the previous

8 position of the Defendant, prior to yesterday, had been

9 that that was only one of the ways, and they are to take

10 that into account in evaluating the credibility of this

11 witness, who is coming in here now testifying that it is

12 the predominant way.  It's a change in position.  I'll

13 give them that instruction.

14                I'll overrule the motion to strike.

15                So now then, let's take up these other

16 issues.

17                How do you say that the 2006 is the only

18 possible date of the first negotiations?

19                You've elicited testimony through your

20 own witnesses from the Plaintiff that a letter, either

21 in 2001 or 2002, was made threatening -- wanting to

22 offer this -- this -- a license on this -- was offering

23 a license under reasonable terms, I believe is what the

24 testimony is.

25                MR. RAMBIN:  Yes, Your Honor.

1                    The letter was to QSI in 2002.  There was

2    no such discussion with QCI.

3                    And further, this is something that was

4    taken up in front of Judge Everingham.  The hypothetical

5    date was basically set by court order, because there was

6    an interrogatory outstanding to the Quanta Defendants to

7    identify for us what they contended the hypothetical

8    date was.

9                    And they did not answer that

10   interrogatory, until after expert reports had been done,

11   and, accordingly, Judge Everingham ruled that they could

12   not contest the 2006 hypothetical date.

13                   THE COURT:  What --

14                   MR. RAMBIN:  And in their case-in-chief

15   and in rebuttal, they can come back in.

16                   MR. PARKER:  I believe that's not an

17   appropriate characterization of Judge Everingham's

18   order.  I believe what the order was, was that we could

19   not use the facts set forth in that interrogatory to

20   support our position on the hypothetical negotiation

21   date.

22                   But there were plenty of facts already in

23   the record, and there is a stipulated fact in this case

24   right now that we originally sold into this country in

25   '01 -- in '01 and '02 and also that this --

```
 1                    THE COURT:  We or what --
 2                    MR. PARKER:  QSI.
 3                    THE COURT:  QSI.  Now then, you're
 4  contending that QCI is the one that sells.  That's the
 5  problem, Mr. Parker.  You're changing your position on
 6  me.
 7                    MR. PARKER:  I think that their evidence
 8  in their damage evidence includes both QSI and QCI
 9  selling into this country.
10                    THE COURT:  Does anybody happen to have a
11  copy of the Judge's rulings so I can see what we've got?
12                    The motion and the ruling?
13                    Was it a motion in limine, or what was
14  it?
15                    MR. SANKEY:  Judge, if I could add to
16  that, I believe, based on the Court's summary judgment
17  ruling that came out Monday, the 52 million, Judge, that
18  Mr. Davis testified yesterday, are drives that are in
19  QCI computers coming into the United States directly or
20  indirectly, not anything being shipped directly by QSI.
21                    Those are out of the case, based on the
22  summary judgment order.
23                    THE COURT:  Well, your damage model was
24  limited to QCI yesterday.
25                    MR. SANKEY:  Correct.  And they were not
```

1  notified of anything of infringement or licensing until

2  August of 2006 when the lawsuit was filed.

3                    THE COURT:  Well, it's been the

4  Defendants' position consistently, Mr. Parker,

5  throughout today -- or not today -- this week in front

6  of this trial that QSI and QCI are totally separate

7  entities.

8                    MR. PARKER:  It is our position and has

9  been our position as it has between their --

10                   THE COURT:  Then the infringement as to

11 QSI has nothing to do with the damage model as to QCI,

12 sir.

13                   MR. PARKER:  But it's been their position

14 and they're going to argue to the jury, I suspect, that

15 we're one and the same, and, in fact, they put up board

16 charts and --

17                   THE COURT:  Well, their only damage

18 testimony is to QCI.

19                   MR. PARKER:  Yes, sir.

20                   THE COURT:  Well, how am I going to

21 submit a question on damages to anybody other than QCI,

22 then, since that's all the testimony I've heard?

23                   MR. PARKER:  I don't know that you can.

24                   THE COURT:  I don't think I can either.

25                   MR. PARKER:  Yes, sir.

1                    THE COURT:  It looks like to me 2006 is

2    the date.  There's no testimony about QSI -- about QCI

3    prior to 2006, is there?

4                    MR. PARKER:  Not that I am aware of.

5                    THE COURT:  Okay.  I mean, your position

6    has been consistently, QSI and QCI are totally separate,

7    then this letter that happened in 2001 or 2002,

8    addressed to QSI, can't be to establish -- you can't

9    have it both ways.

10                    You can't say to me on the one hand,

11    they're totally separate, and then try to use a demand

12    letter to QSI to say that that establishes the date of

13    infringement, the date of the hypothetical negotiation

14    to QCI.

15                    You're telling me they are totally

16    separate.

17                    MR. PARKER:  Yes, sir.  And they're

18    taking just the opposite position, that we're one and

19    the same.

20                    THE COURT:  Well, there are not going to

21    be any -- he cross-examined the witnesses about that,

22    but it's going to be the damage question -- or the

23    damage testimony was presented solely to QCI, so I

24    cannot possibly -- I don't see how I can submit it on

25    anybody else, or the infringement question on anyone

1  else.

2              MR. PARKER:  And, of course, the damage

3  model is limited to QCI computers with QSI drives, so...

4              THE COURT:  It's still limited to QCI and

5  it's limited to 2006 and forward, the testimony has

6  been.

7              MR. PARKER:  The damage period, yes, sir.

8              THE COURT:  Okay.  Well then, that's the

9  hypothetical negotiation.  I'm going to grant the motion

10  on that.

11              MR. PARKER:  Yes, sir.

12              THE COURT:  I mean, we're going to cut it

13  back.

14              Now, here's where the position that you

15  put me in on whether or not they're going to get into

16  all these license agreements.  You wait until the very

17  end of their testimony, which they are not prepared to

18  go forward with, obviously, based on the Court's ruling,

19  that these litigation settlements can't come out and

20  create a false impression in front of the jury.

21              And now then, you're trying to capitalize

22  on that by changing your damage model and then inserting

23  now new information that the Plaintiff did not have a

24  chance to put into theirs.

25              MR. PARKER:  I don't -- I would not

1 characterize it as an effort on our part to capitalize

2 on it.  I would just characterize it as effort on our

3 part to respond to the fact that it is now in the case.

4 It actually increases our expert's damage calculation,

5 but we think he ought to be able to address it since

6 they addressed it.

7 　　　　　　　THE COURT:  They didn't get to fully

8 address it, sir.

9 　　　　　　　MR. PARKER:  No, I understand that, Your

10 Honor.

11 　　　　　　　THE COURT:  They only addressed it to the

12 extent they had to to try to create at least something

13 of a truthful explanation of what the true picture of

14 this case was in terms of the total royalties received.

15 And you took it as far as you would need to take it.

16 I'm not going to allow your expert to mention it.

17 　　　　　　　That's sustained.

18 　　　　　　　MR. PARKER:  Yes, sir.

19 　　　　　　　THE COURT:  Now then, the third thing is

20 about this use of the S-curve technique here.  What are

21 we talking about here?

22 　　　　　　　MR. RAMBIN:  Your Honor, if I may,

23 there's one other thing on the license issue.

24 　　　　　　　It's not going to the litigation issue,

25 but there is a demonstrative that's a tab from Reed's

1  report, and it lays out all the prior licensed entities,

2  and it just talks about who had a license and who didn't

3  and when they got their licenses.

4              And I believe this goes back to the

5  colloquy we had at the bench yesterday at the close of

6  the day.  I'm guessing they're going there.  I don't

7  speak for them, but I don't see the relevance for that

8  at this point, given the Court's order and given the

9  Court's summary judgment -- summary judgment order and

10 given the conversation we had yesterday at the bench.

11             THE COURT:  What -- what are you speaking

12 about now specifically, Mr. Rambin?

13             MR. RAMBIN:  I'm speaking about the list

14 of -- it's Tab B6.

15             THE COURT:  Okay.  I've got it here.  Now

16 what is it that you say is new here that wasn't before?

17             MR. RAMBIN:  There's nothing there that's

18 new.  We're saying that it's irrelevant in light of the

19 Court's order clarifying -- there's nothing -- there's

20 no question anymore about the license issue, so the

21 license issues aren't really in the case.

22             So I don't see the relevance for this to

23 go through line-by-line who got a license and when,

24 given what I anticipate is going to be happening at

25 some -- they're going to followup and try to open the

1 door they tried to open yesterday.

2         MR. SANKEY:  If I could add to that, Your

3 Honor.

4         At the time he did that exhibit in his

5 report, those drives were in the case, and they were

6 going to say, well, we've got a license from LVS, and we

7 buy drives from LVS; therefore, it's a licensed drive.

8         The only drives in the case now were

9 manufactured by QSI, so those are no longer relevant to

10 any issue.

11         THE COURT:  How are they relevant,

12 Mr. Parker?

13         MR. PARKER:  Well, they are relevant,

14 Your Honor, because it shows what other participants in

15 the industry, what kind of arrangements they have with

16 respect to royalties, and supports his expert opinion.

17         MR. RAMBIN:  Your Honor, the concern we

18 have is that one of the subjects that Mr. Reed discussed

19 in his report, and we anticipate they'll offer testimony

20 on, is the non-infringing alternatives available to QCI.

21 And to the extent that he tries to get into who was

22 licensed and when and whether that was a non-infringing

23 alternative or not, I believe that was already covered

24 yesterday afternoon.

25         THE COURT:  No.  What was covered

1  yesterday afternoon was the witness beginning to offer

2  what-if testimony, basically opinion testimony, about

3  what if we would have known whatever we had known.

4  This is totally different.  This involves a license

5  between parties unrelated to this lawsuit, does it not?

6                    MR. PARKER:  In some cases, it does, Your

7  Honor, but it supports his testimony as to what --

8                    THE COURT:  Well, in what cases it

9  doesn't, then, on this list under Tab 6?

10                    MR. PARKER:  It may be all of them, Your

11  Honor.  But what it does is support his opinion as to

12  what willing participants in the marketplace were

13  willing to do with respect to licensing and the

14  standards of licensing and cost at that point in time,

15  and it --

16                    THE COURT:  That point in time being

17  2006?

18                    MR. PARKER:  That point in time being the

19  time period of this lawsuit, yes, sir, or the time of

20  those licenses -- those licenses are relevant to, we

21  believe, the support of his opinion.

22                    THE COURT:  I'm going to allow to use

23  2000 -- use it for that purpose only.

24                    MR. PARKER:  Yes, sir.

25                    THE COURT:  Does that take care of it or

1   not?

2                    Now, we've still need to talk about this

3   S-curve technique.  I guess you've got -- what's the

4   objection exactly here?

5                    I'm talking about this right here

6   (indicating).

7                    MS. SANGALLI:  Those are demonstratives

8   that the Defendants provided us last night.  There are

9   two signals that are shown on that page there; one is

10  the S-curve signal, which is the only theory that they

11  have been presenting with respect to non-infringement.

12                   The other signal, the one that looks just

13  like a couple of humps is an SBAD signal.

14                   Their expert has never discussed the SBAD

15  signal in their expert report.  In fact, during his

16  deposition, when he was asked whether he knew what an

17  SBAD signal was and what the difference between SBAD and

18  S-curve was, he said that he did not know and did not

19  know what an SBAD signal is.

20                   And now it's showing up in their

21  demonstratives, so, obviously, they're planning on

22  having their expert testify about something that has not

23  appeared before in his report.

24                   THE COURT:  Was it in the expert's report

25  or not?

 1          MR. PLATT:  Yes, Your Honor.

 2          He points out in Page 17 through 186 his

 3   report that Dr. Howe talks about the elapsed time that

 4   occurs between these peaks and the resulting SBAD signal

 5   that correspond to the transparent substrate surface of

 6   the disk and the disk data surface, comparing the last

 7   time with the threshold comparison value.

 8          Then he goes on to say these rely on

 9   S-curve measurements and is well-known and so describes

10   in the above citation from Howe.  The S-curve

11   measurements originate from focusing effort effects

12   through the disk surveys.

13          Now, during his deposition, I just

14   learned --

15          THE COURT:  That's all about S-curves.

16   That's over on the -- my far left, right?

17          MR. PLATT:  Right.  He does talk about

18   the fact that what they're looking at -- and this is

19   what Dr. Howe points out and Dr. Howe talks about

20   measuring the elapsed time that occurs between those

21   peaks and the resulting SBAD signal.

22          And then he goes on to say these rely on

23   S-curve measurements, because there are sort of two

24   sides on the same point.

25          THE COURT:  Well, that half on the left,

1    you are permitted to take it off, then, on the right.

2                    MS. SANGALLI:  Thank you, Your Honor.

3                    THE COURT:  All right.  What else?

4                    MS. SANGALLI:  There is also -- we have a

5    datasheet that we've submitted as an exhibit, or what we

6    would actually like to use as a demonstrative.  It's a

7    datasheet that had been -- that our expert had relied on

8    in his expert report.

9                    He attached the datasheet in support of

10   what he was saying in his expert report.  The datasheet

11   that was attached was the wrong version.  We have asked

12   if he could put the correct version into -- use the

13   correct version as part of his testimony.

14                   THE COURT:  I'm not clear.  You want to

15   substitute an exhibit?

16                   MS. SANGALLI:  That's correct, Your

17   Honor.

18                   THE COURT:  Any objection to that?

19                   MR. PLATT:  Yes, Your Honor.

20                   This -- the cites of this document

21   relating to a chipset called CXA1372, they originally

22   tried to put it in a datasheet for a model called

23   1372BQ/BS that's undated.  It hasn't been authenticated.

24   Judge Everingham looked at this, and he ruled that it

25   was an undated datasheet; that without further evidence,

1  the significance of the B designation on that, if any,

2  the report just doesn't define -- the Exhibit 130

3  references the same model number as the '540 patent.

4        The new datasheet they're proposing has

5  the same problems as the datasheet that Judge Everingham

6  didn't allow previously.

7        MR. SANKEY:  Judge, if I could.

8        In his expert report, he cites the

9  correct datasheet, the 1372.  He inadvertently attached

10  a different one, and when we sent it in to date it, they

11  pointed out that it had this BQ at the end of the

12  number.

13        We now have a copy of the 1372 that he

14  referred to in his report, and we can also -- the

15  witness can date it, and we have a textbook that dates

16  it also.

17        THE COURT:  Is he going to be available

18  for rebuttal?

19        MR. SANKEY:  Yes.

20        THE COURT:  Well --

21        MR. PLATT:  Your Honor --

22        THE COURT:  I will allow you to reopen

23  your case-in-chief during the rebuttal just for that

24  limited purpose.  If he can lay a proper foundation, I

25  will give him the opportunity.

```
 1                    MR. SANKEY:  Thank you.

 2                    MS. SANGALLI:  Thank you, Your Honor.

 3                    THE COURT:  Anything else?

 4                    MR. SANKEY:  Nothing further.

 5                    THE COURT:  Bring them in.

 6                    (Jury in.)

 7                    THE COURT:  Everyone please be seated.

 8                    Thank you, Ladies and Gentlemen.  Thank

 9      you for being here on time.

10                    Counsel and I have already had some

11      discussions this morning about legal matters.  I needed

12      to -- when we originally picked this jury, I had a

13      matter scheduled for the morning of July -- next Monday

14      morning.

15                    That matter is now resolved; however, I,

16      know that when you were selected as jurors, I told you

17      for planning purposes that we wouldn't be in trial on

18      Monday, July the 6th.

19                    And my inquiry now is, since that time is

20      now available, I would like to go ahead and reconvene on

21      Monday morning, the 6th, rather than -- but if someone

22      has made plans, relying on what I told you is going to

23      happen, I need to know about it.

24                    Is there anybody that's made plans that

25      would be difficult to change and could not be here on
```

1  Monday, the 6th?

2                     Everyone can then?

3                     Okay.  I am hopeful that these lawyers

4  are going to actually finish the evidence today, and

5  that way you will be -- what you would be hearing on

6  Monday, first thing early, was opening arguments and my

7  charge, and you would be deliberating on the case

8  perhaps be through on Monday or possibly come back

9  Tuesday.

10                     But I'm not representing to you that --

11 based upon just the hearings we've already had this

12 morning that we're going to be moving quite as quickly

13 as I had hoped, but we'll see how hard I can press on

14 the accelerator as the day goes on with these lawyers.

15 I have a heavy foot some days.  Mine's getting heavier

16 in this case.  So we'll see if I can move them along as

17 fast as I can.

18                     All right.  Who will be the next witness?

19                     MS. MURRAY:  Your Honor, we have a few

20 more questions of Tracy Li.

21                     THE COURT:  All right.  Come around,

22 Ms. Li.

23                     Proceed.

24     TRACY LI, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

25                 DIRECT EXAMINATION (CONTINUED)

1  BY MS. MURRAY:

2      Q.   Good morning, Ms. Li.

3          Do you recall when Plaintiff filed this

4  lawsuit against Quanta Computer?

5      A.   Yes.

6      Q.   And when was that?

7      A.   Quanta Computer, September 2007.

8      Q.   And after Quanta Computer was sued, has Quanta

9  Computer examined whether the drives that it purchases

10 from third parties work in the same way as the '981

11 patent?

12     A.   We are not able to do it, because at Quanta,

13 we are assembly company, and we don't make the drive,

14 that kind of component.  So, you know, we are not able

15 to understand the technology of the drive itself.  Don't

16 have the abilities to do it.

17     Q.   Okay.  I would like to talk a little bit about

18 a document that Mr. Sankey had shown you on Tuesday.

19              MS. MURRAY:  If we can bring up

20 Exhibit 219, please.

21     Q.   (By Ms. Murray) Do you recall Mr. Sankey

22 showing you this agreement between Quanta Computer and

23 Hewlett-Packard?

24     A.   Yes, I remember.

25     Q.   Were you involved in negotiating this



1  agreement, Ms. Li?

2      A.    Yes.

3

4

5

6

7

8      Q.    Okay.  So let's take a look.

9            MS. MURRAY:   If we can go to Page 6,

10  please, of this agreement.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**REDACTED BY ORDER OF THE COURT**



REDACTED BY ORDER OF THE COURT

Q.   Thank you, Ms. Li.

MS. MURRAY:  I pass the witness.

THE WITNESS:  Thank you.

CROSS-EXAMINATION

1   BY MR. SANKEY:

2       Q.   Good morning, Ms. Li.

3       A.   Good morning.

4       Q.   As I understand your testimony this morning,

5   your company does not know how the optical disk drives

6   operate, correct?

7       A.   Correct.

8       Q.   And so you can't tell the jury one way or the

9   other whether or not your company is infringing, can

10  you?

11      A.   We don't know the technology; that's correct.

12      Q.   Now, you sent a letter over to QSI demanding

13  that they indemnify for you any damages that this jury

14  may find, and you also asked them to assure you that

15  you're not infringing, correct?

16      A.   Correct.  We sent an indemnification to QSI.

17      Q.   And you sent that in January of 2008?

18      A.   Yes, I believe so.

19      Q.   And your testimony Tuesday was no one has ever

20  gotten back to you on those letters, correct?

21      A.   Correct.

22      ███   ███ ███ ███ ███ ███ ███ ███ ███   ███

23  ███ ███        **REDACTED BY ORDER OF THE COURT**        ███ ███ ███

24  ███ ███                                        ███████

25  ███



REDACTED BY ORDER OF THE COURT

11    Q.   You don't have a license from LaserDynamics

12  that covers ODDs, do you?

13    A.   No, we don't.  That's why we are here, I

14  think.

15    Q.   Your testimony yesterday afternoon was that

16  your company doesn't pay royalties on any components

17  because you don't make the component, right?

18    A.   Right.

19    Q.   Do you understand that the patent laws are

20  broader than just prohibiting you from making the

21  product; they also prohibit you from selling or shipping

22  the product into the United States?

23         Do you understand that?

24    A.   I understand the patent law.

25    Q.   Do you understand that a component that goes

1    in a computer can also infringe?

2         A.   Can also -- yeah, your statement is correct.

3         Q.   Now, you talked briefly about how QCI obtains

4    different ways you obtain drives, and there were -- I

5    think you buy them or you get them by consignment or you

6    do a buy/sell agreement.

7              Regardless of how it's papered, the bottom

8    line is the drive goes directly from QSI in China to the

9    shop or the manufacturing shop to QCI where they put it

10   in the computer, correct?

11        A.   In some cases, yes.  It's just, you know, it's

12   shorter delivery time.  I think that's the concern.

13             MR. SANKEY:  Your Honor, is this an

14   appropriate time for our instruction?

15             THE COURT:  I'm working on that.  You got

16   a few more questions?

17             MR. SANKEY:  No more questions, Your

18   Honor.

19             THE COURT:  Ladies and Gentlemen,

20   yesterday afternoon testimony was elicited from this

21   witness about this, quote, buy/sell arrangement, wherein

22   the testimony was that Quanta Computer purchased the

23   components from the customer as directed by the

24   customer, then Quanta Computer then assembled the

25   computer for the customer, and then Quanta Computer sold

1    the assembled computer back to the same customer.

2                    Prior to yesterday, the position of

3    Quanta Computers was that this buy/sell arrangement

4    generally was one of the ways in which they accomplished

5    their -- or the way they did their business.

6                    Yesterday, the testimony was, for the

7    first time, that that was the predominant method of

8    doing business.

9                    You are instructed that this constitutes

10   a significant change in the testimony, and no documents

11   have been produced that support that, and that you may

12   take this instruction into account in judging the

13   credibility of all of this witness' testimony and all

14   other Quanta Computer's positions in this case.

15                   MR. SANKEY:  Thank you, Your Honor.

16                   THE COURT:  Who will be your next

17   witness?

18                   You may step down.

19                   THE WITNESS:  Thank you.

20                   MS. MURRAY:  William Wang, Your Honor,

21   W-A-N-G.

22                   COURTROOM DEPUTY:  Raise your right hand,

23   please.

24                   (Witness sworn.)

25           WILLIAM WANG, DEFENDANTS' WITNESS, SWORN

<u>DIRECT EXAMINATION</u>

<u>BY MS. MURRAY:</u>

    Q.    Good morning.

    A.    Good morning.

    Q.    Can you please state your name?

    A.    William Wang.

    Q.    Mr. Wang, do you speak English?

    A.    I speak some English, but I feel more

comfortable answering questions in Mandarin --

correction -- in Chinese.

    Q.    What company do you currently work for?

    A.    Quanta Storage, Inc.

    Q.    And what is your position at Quanta Storage,

Inc.?

    A.    I'm the Chief of the Finance Department.

    Q.    Is that what we would call the Chief Financial

Officer, or the CFO, here in the United States?

    A.    Yes.

    Q.    Can you please explain a little bit about your

educational background?

    A.    I graduated from National Taiwan University.

I got my accounting degree, and that was in 1992.

    Q.    And what did you do after college?

    A.    After college, I served in the military.

    Q.    What did you do after that?

1      A.    And after that, I joined the Deloitte & Touche

2  as an auditor.

3      Q.    What did you do after that?

4      A.    And after that, I joined D-Link Corporation as

5  an assistant manager in the Accounting Department.

6      Q.    What is D-Link Corporation?

7      A.    It is a company that makes networking

8  products, including switches and wireless cards, et

9  cetera.

10      Q.    And where did you go after D-Link Corporation?

11      A.    Then I joined Quanta Storage, Inc.

12      Q.    And when was that?

13      A.    That was in 2001.

14      Q.    Can you tell us a little bit about your past

15  work experience?

16      A.    In the past, my job involves accounting

17  responsibility, finance, and then auditing.

18      Q.    Okay.  You say in the past.

19            What do you mean by that?

20      A.    You asked me about my work experience.  That's

21  my work experience in the past till now.

22      Q.    Okay.  I see.  Thank you.

23            As a Director of Finance at Quanta Storage,

24  what are your job responsibilities?

25      A.    My job responsibilities include managing the

1  personnel in the Finance and Accounting Department and

2  finish the work in the two departments.

3         I also represent the company to manage the

4  relationship with the shareholders and investors.

5  I would also represent a company to have discussions and

6  communicate with our supervisory authority which is

7  Gre-Tai Securities Market regarding some business and

8  compliance issues.

9     Q.   Can you tell us a little bit about QSI?  What

10 does QSI do?

11    A.   We are a company specialize in the assembly

12 and manufacturing and service of slim drive.

13        What I meant to say was, we are a subcontract

14 manufacturing company, an OEM-type company, specializing

15 in slim optical disk drive.

16    Q.   What is a slim drive?

17    A.   A slim drive is a small -- a smaller disk

18 drive that can be installed in a laptop computer.

19    Q.   When was QSI established?

20    A.   In 1999.

21    Q.   And is QSI a public company?

22    A.   It is.  It is a public-traded company, and our

23 stocks are traded in Taiwan's Gre-Tai Securities Market.

24 It's a security market just like the New York Stock

25 Exchange in the United States.

1      Q.    When did QSI become a public company?

2      A.    In 2002.

3      Q.    Do you know who the shareholders are of QSI?

4      A.    Most of the shares are owned by the investing

5   public, and other shareholders also include Quanta

6   Computer, Inc., and also Chunghwa Post Co., Inc., and

7   also some mutual funds.

8      Q.    How much stock does Quanta Computer, Inc.,

9   hold in QSI?

10      A.    About 29 percent.

11      Q.    And can you explain QSI's relationship with

12   Quanta Computer?

13      A.    I think we're two independent publicly traded

14   companies.

15      Q.    Who is Quanta Storage America?

16      A.    It is a 100-percent-owned subsidiary of ours.

17      Q.    What does Quanta Storage America do?

18      A.    This company doesn't do much business.

19   The purpose for us to set up this company is because the

20   Taiwanese government would give the operation

21   headquarters some incentives if we have such a company.

22      Q.    Did the company sell any products?

23      A.    Not at all.

24      Q.    Can you tell us who QSI's competitors are?

25      A.    Okay.  Companies such as Panasonic or Toshiba,

1  Samsung Storage Technology, which is called TSST.  It is

2  a joint venture company between Toshiba and Samsung.

3  And also a company like Hitachi LG Data Storage.  The

4  company HLGS, it is also a joint venture company between

5  Hitachi and LG.  And others would be Lite-On, and

6  another one is TEAC.

7          These companies are also major manufacturing

8  companies of the slim disk drive.

9      Q.  Can I go on Amazon.com and buy a QSI brand

10 drive?

11     A.  No.

12     Q.  Why not?

13     A.  Because we only manufacture for our customers,

14 and they sell their brand-name products.  We do not have

15 products of our own brand name.

16     Q.  So over the past couple of years, which

17 brand-name companies has QSI made drives for?

18          THE INTERPRETER:  Interpreter was asked

19 to repeat the rendition.

20     A.  Sony Optiarc.

21     Q.  (By Ms. Murray)  Any others?

22     A.  And also Philips.

23     Q.  Can you explain a little bit about how that

24 works when QSI is making drives for these companies?

25     A.  Basically, customers would come to us and tell

1   us what their product spec -- specifications are and

2   they would also let us know their demands and give us a

3   projection of their quantity they would need.

4          And we would plan production based on their

5   specifications and the quantity.  And then -- then we

6   would attach their label on the products.  And then we

7   would ship the products to the destinations specified by

8   them.

9      Q.   I think we have a graphic kind of to help us

10  walk through this process.

11          MS. MURRAY:  Can you bring that up?

12     Q.   (By Ms. Murray) Okay.  So Mr. -- I didn't want

13  to interrupt.  I'm sorry.

14          Mr. Wang, can you tell us, where does QSI fit

15  in this picture here?

16     A.   We would be at the bottom, in the middle,

17  drive OEM, that's our position.

18     Q.   Okay.  Right here (indicates)?

19     A.   Correct.

20     Q.   Okay.  So these other companies that are here,

21  are those competitors of Quanta Storage, Inc.?

22     A.   They are.

23     Q.   All right.  And who does QSI make drives for?

24     A.   Sony Optiarc.

25     Q.   And where is Sony Optiarc in this?

1              MS. MURRAY:  You can go back one.

2      A.   A little above the drive vendors; that's the

3  location.

4      Q.   (By Ms. Murray) So up here (indicates)?

5      A.   Correct.

6      Q.   Now, does QSI make drives for all those

7  companies that are in that circle?

8      A.   No.

9      Q.   So which ones does it make drives for?

10     A.   Sony Optiarc.

11     Q.   All right.  If you can take us through -- I

12  know you started to talk about this -- the process by

13  which QSI makes drives for Sony Optiarc.

14     A.   Basically, Sony Optiarc would issue a purchase

15  order to us and let us know the quantities that they

16  need and also the destinations they want us to ship the

17  products.

18     Q.   Okay.  And what happens after Optiarc issues a

19  purchase order?

20              THE INTERPRETER:  Okay.  Interpreter

21  needs clarification.

22     A.   Then based on their delivery instructions, we

23  would ship the products to the OEMs.

24     Q.   (By Ms. Murray) Okay.  And when you say OEMs,

25  what are you referring to?

1    A.    I'm referring to the companies in the circle

2  above there where it says notebook OEMs.

3    Q.    So these four companies (indicates)?

4    A.    Well, these four companies are the four

5  largest companies.  Of course, there are smaller

6  companies, such as CoPark (phonetic spelling), FIC, or

7  Twinhead, et cetera.

8    Q.    And would QSI ship products to those companies

9  you just mentioned as well?

10    A.    Yes.

11    Q.    Okay.  And after QSI ships products to these

12  notebook OEMs, what happens next?

13    A.    Then we would notify Sony Optiarc that the

14  products have been delivered.

15    Q.    And what happens after that?

16    A.    Basically, you know, when the time comes, they

17  would pay us for the products.

18    Q.    And who is paying you for the products?

19    A.    Sony Optiarc.

20    Q.    And why doesn't QSI just make the drives and

21  sell them itself to these notebook OEMs?

22    A.    Because our specialty is in manufacturing

23  issues, so it's better for us to concentrate on our

24  specialty and conduct our business in the OEM model.

25    Q.    Does QSI still make slim drives for Philips?

1       A.    No.

2       Q.    When did that stop?

3       A.    Around 2007.

4       Q.    Do you know why that stopped you?

5       A.    Because Philips formed a JV, joint venture

6  company with Lite-On.  That's the company we see above

7  there under drive vendors, is PLDS.  So for the

8  manufacturing business for PLDS, they would get it from

9  Lite-On.

10      Q.    Okay.

11      A.    Oh, they would give the business to Lite-On.

12      Q.    Okay.  And what does QSI ship products to?

13      A.    Basically, we would ship our products to the

14 destinations designated by our customers based on our

15 customers' instructions and requests.

16            For example, if Sony Optiarc asked us to ship

17 the products to a certain address, then we would do so.

18      Q.    Do you ever ship drives directly to Sony?

19      A.    Yes, but not very often.

20      Q.    Why not very often?

21      A.    Because, basically, the slim-type optical disk

22 drives are to be used in the notebook computers, who I

23 meant to say they would be assembled into the notebook

24 computers.

25            So the larger quantities -- the great portion

1  of the quantities would go to these notebook OEMs.

2       Q.    Okay.  Do you know what a hub is, Mr. Wang?

3       A.    My understanding is that a hub is a warehouse.

4  And normally, it's a warehouse managed by a professional

5  storage company.  And normally, the customers would ask

6  the suppliers to supply some JIT, just in time,

7  inventories.

8             And -- and normally, the customer would ask us

9  to ship our products to these warehouses, and then we

10  would do so.  And they can come to pick up their

11  products at any time they want.

12      Q.    So QSI ships products to hubs?

13      A.    Yes.

14      Q.    And you mentioned in your response JIT or just

15  in time.  What did you mean by that?

16      A.    I would explain this way:  Because the

17  customers do not want to carry the load of finished

18  products in their inventory, so they would ask the

19  suppliers to put the products in designated warehouses

20  or -- or their own warehouses so that whenever they need

21  to pick up the products, they are able to do that.

22      Q.    And when QSI is shipping products to a hub,

23  who's paying for these products?

24      A.    Well, when the products are delivered to the

25  hub, I think no payments have been made.  Because when

1   the products are shipped to the hub, basically, the

2   products are still -- still belong to the suppliers.

3       Q.   So when the products are shipped to the hub

4   and they're at the hub, who has title to those products?

5       A.   In the case of our relationship with Sony

6   Optiarc, the title would still be ours.

7       Q.   And does the title ever pass to -- out of

8   QSI's hands?

9       A.   When the customer come to pick up the products

10  or when we ship the products out of the hub, then the

11  title would be transferred to Sony Optiarc.

12      Q.   And you said when the product is being shipped

13  to the hub, no payment is being made.  So when does QSI

14  get paid?

15      A.   After our customers pick up the products from

16  the hub.  Of course, there's a payment term -- a period

17  of time before they would pay.

18      Q.   And so what if, let's say, HP comes and picks

19  up drives at a hub?  Do they have title to the drive

20  when they pick up the drives?

21      A.   I don't know.

22      Q.   Why don't you know?

23      A.   My knowledge is only limited to our

24  relationship with Sony Optiarc, according to the

25  agreement.

1          As for the title ownership in the later

2   stages, that would depend on the agreements between Sony

3   Optiarc and HP.

4       Q.   And when these drives get shipped to the hub,

5   is Sony Optiarc in physical possession of these drives?

6       A.   No.  But they have the right to pick up the

7   products from the hub at any time, and nobody would stop

8   them.  Nobody would -- okay.  Right.

9       Q.   Mr. Wang, do you know what an average optical

10  disk drive sells for these days?

11      A.   Around $25 U.S. dollars.

12      Q.   Has this always been the price for ODDs?

13      A.   No.

14      Q.   When did QSI start selling optical disk

15  drives?

16      A.   In 2001.

17      Q.   And in 2001, did it start selling drives into

18  the United States?

19      A.   In 2001, I think small quantities.

20      Q.   And at the time in 2001, do you know how much

21  an ODD was selling for?

22      A.   About $80 per unit.

23      Q.   Okay.  How about in 2004?  Do you know what

24  the price of an ODD was?

25      A.   About $50 U.S. dollars.

1    Q.    And in 2006, do you know what the average

2    price was for an ODD?

3    A.    Maybe around, U.S.D., $40.

4    Q.    What is U.S.D.?

5    A.    U.S. dollars.  That's in Chinese.

6    Q.    Okay.  Thank you.

7         In 2008, what was QSI's net profit margin on a

8    typical ODD?

9    **REDACTED BY ORDER OF THE COURT**

10

11    Q.    And how did you determine that amount?

12    A.    You can find the information in our financial

13    information.

14    Q.    Okay.  I'd like to take a look at a graphic of

15    the accused devices in this case.

16         Mr. Wang, do you understand that this is a

17    list of the drives that are being accused of

18    infringement in this case?

19    A.    Yes.

20    Q.    Do you know if all of these 20 drives go into

21    computers that are assembled by Quanta Computer, Inc.?

22    A.    For most of them, I'm not sure, but I'm sure

23    some of them are not assembled in the computer.

24    Q.    Okay.  Are there specific ones that you know

25    are not assembled in the computer?

1    A.   For example, the EBW242 (sic) and also this

2  EBW -- oh, EDW085 and also EDW041, the lower left-hand

3  corner.

4    Q.   Okay.

5    A.   And also the one on the side, EDW042.

6    Q.   Got it.

7    A.   These are external optical disk drives.  They

8  have no way to assemble these into notebook computers.

9    Q.   What is an external optical disk drive?

10    A.   Basically, it's an independent optical disk

11  drive that can operate by itself, but maybe you just

12  need a USB connection to connect the drive to either a

13  notebook computer or a desktop computer.

14    Q.   Okay.

15          MS. MURRAY:   If we can bring up

16  Exhibit 370, please.

17    Q.   (By Ms. Murray) Mr. Wang, do you know what

18  this document is?

19    A.   This is a product specification.

20    Q.   Is this a product specification for a

21  particular model drive?

22    A.   It is.  It is for EDW085.

23    Q.   Okay.  And what does this product spec show?

24    A.   As I mentioned earlier, we can see that it is

25  an EDW085 external drive.

1    Q.    Thank you, Mr. Wang.

2          MS. MURRAY:  Pass the witness.

3                    CROSS-EXAMINATION

4  BY MR. SANKEY:

5    Q.    Good morning, Mr. Wang.

6    A.    Good morning.

7    Q.    Your company produced documents in this case,

8  correct?

9    A.    Yes.

10   Q.    And, in fact, I think you were in charge of

11 putting together a number of the spreadsheets?

12   A.    Yes.

13   Q.    Can our experts in this case rely upon those

14 spreadsheets that your company produced as being

15 accurate?

16   A.    Yes.

17   Q.    So with respect to what the sheets say on

18 which drives are shipped to the United States and how

19 many drives are shipped to the United States, they can

20 rely on those documents as being accurate, correct?

21   A.    Yes.

22   Q.    Okay.  Now, when we looked at this sheet by

23 your counsel, it does show that, again, you do what your

24 customers ask you to do or tell you to do.  QSI ships

25 optical disk drives directly to Quanta Computer,

1  correct?

2      A.   Yes.

3      Q.   And then you said, once that drive is put into

4  a Quanta Computer notebook, they then ship it based on a

5  designation by their customer, correct?

6      A.   I didn't -- I didn't say that.

7      Q.   You understand that Quanta Computer, once that

8  drive is in it, then ships the products out, correct?

9      A.   After they have finished the assembly, of

10  course, they're going to ship the products out.

11      Q.   Okay.  And I'm not much of an artist, but

12  where those products are going to then is the United

13  States, correct?

14      A.   Can I confirm?  Did you say all of them would

15  be shipped to the United States?

16      Q.   No, sir.  I'm saying, do you know that there

17  are laptop computers with QSI's drives in them that

18  Quanta Computer ships to the United States?

19      A.   I'm not sure.  I don't know.

20      Q.   Okay.  Well, as the Chief Financial Officer of

21  your company, you're in charge of writing checks,

22  correct?

23      A.   No.

24      Q.   Do you oversee that process?

25      A.   I would say it is within my job responsibility

1  to oversee that function.

2      Q.   Do you understand that your company has hubs

3  or warehouses in the United States?

4      A.   Yes.

5      Q.   And your company writes checks to pay those

6  leases for the warehouses where those products are

7  stored, correct?

8      A.   We normally would pay through electronic

9  remittance.

10      Q.   You testified that someone could not go on

11  amazon.com and buy a QSI drive, correct?

12      A.   Correct.

13      Q.   But I can go to Dell in Austin, Texas, and buy

14  a laptop with a QSI drive in it, can't I?

15      A.   I don't know whose drive is installed in their

16  particular computer.

17      Q.   Do you know whether or not any QSI drives are

18  in any Dell computers?

19      A.   Yes.

20      Q.   And do you know that your company has

21  Mr. Chung in Austin, Texas, to help work on these laptop

22  computers with the drives in them?

23      A.   I think that's arranged based on our

24  customer's request.

25      Q.   Now, you said, when your company is making

1  products for Philips and Sony Optiarc, that they receive

2  the product specifications from those companies,

3  correct?

4       A.   Correct.

5       Q.   And, therefore, your company doesn't know how

6  its products operate, correct?

7                 THE INTERPRETER:  Interpreter needs to

8  clarify with the witness.

9       A.   I don't think that's the case.  I think we do

10 know how it operates.

11      Q.   (By Mr. Sankey) You said that you -- your

12 company has an American subsidiary, QSA, that doesn't do

13 much business, but you have it because it gives you some

14 incentive.  What's the incentive?

15      A.   Basically, it's a tax incentive.  The

16 Taiwanese government encourage the companies to plan

17 their future operation to be international and that the

18 tax incentives would be given to the companies in that

19 way.

20      Q.   Does the company do -- conduct any business,

21 or is it a virtual company?

22      A.   It doesn't have any specific business.

23 Basically, it doesn't have any business.

24      Q.   Now, you have testified that you participated

25 in doing the contract between QSI and Philips, correct?



```
 1        A.    Yes.  I have a small part of involvement.
 2
 3
 4              REDACTED BY ORDER OF THE COURT
 5
 6
 7
 8
 9
10
11
12
13
14
15                   MR. SANKEY:  Nothing further.
16                   MS. MURRAY:  Nothing further, Your Honor.
17                   THE COURT:  You may step down.
18                   Who will be your next witness?
19                   MS. MURRAY:  Call Kevin Cheng, Your
20   Honor.
21        KEVIN CHENG, DEFENDANTS' WITNESS, SWORN
22                   DIRECT EXAMINATION
23   BY MS. MURRAY:
24        Q.    Good morning.
25        A.    Good morning.
```

1      Q.    Mr. Cheng, you've testified before.  Can you
2 just tell us again which company you work for?
3      A.    Currently, I'm working in Quanta Storage, Inc.
4      Q.    And what is your position with Quanta Storage,
5 Inc.?
6      A.    I am the manager of the company's legal
7 department.
8      Q.    Can you give us a little bit about your
9 educational background, please.
10      A.    I graduated from National Chong-Shin
11 University from its legal department.  I graduated from
12 National Chong-Shin University, and I got my law degree.
13      Q.    Okay.  And what did you do after college?
14      A.    After college, I served in the Air Force for
15 about two years.
16      Q.    And can you tell us a little bit about your
17 past work experience?
18      A.    After my military service, I joined a law firm
19 and worked there for five years, and after the law firm,
20 I joined a company, Lite-On, and I worked in its legal
21 department for about three and a half years.  And after
22 Lite-On, I joined Quanta Storage.
23      Q.    What is -- what does Lite-On do?
24      A.    Lite-On is a company that manufactures
25 electronic products, including computer monitors and

1   also some optical disk drives.

2       Q.   And how long have you worked at QSI?

3       A.   Up to now, I've been there for about six and a

4   half years.

5       Q.   And how long have you worked in the optical

6   disk drive industry?

7       A.   Almost ten years.

8       Q.   As the manager of the legal department at QSI,

9   what are some of your job responsibilities?

10      A.   My job responsibilities, including legal

11  advice and consultation and also drafting and verifying

12  some legal contracts and also handles disputes,

13  including -- also handles some legal disputes and, of

14  course, including the licensing negotiation matters.

15      Q.   And after you joined QSI, when was the first

16  time that you had heard of LaserDynamics?

17      A.   As soon as I joined, I sought -- as soon as I

18  joined QSI, I heard about this matter regarding to

19  LaserDynamics.  It's a licensing issue.

20      Q.   And what --

21              THE INTERPRETER:  Oh, I'm sorry.

22              MS. MURRAY:  I'm sorry.

23              MR. PARKER:  Interpreter omitted

24  something.

25      A.   It was around the year 2002.

1       Q.   (By Ms. Murray) And when you say you heard

2  about a licensing issue, what are you referring to?

3       A.   As soon as I joined Quanta Storage, I heard

4  that.

5            MR. SANKEY:  Your Honor, I'm going to

6  object to the answer revealing hearsay.

7            THE COURT:  Sustained.

8            MS. MURRAY:  Your Honor --

9            THE COURT:  Sustained.  Maybe you can

10 rephrase your question.

11      Q.   (By Ms. Murray) Mr. Cheng, I'd like to show

12 you a copy of an exhibit.

13            MS. MURRAY:  If we can pull up

14 Exhibit 41, please.

15      A.   Yes, I see that.

16      Q.   (By Ms. Murray) During your investigation,

17 when you joined QSI about the LaserDynamics

18 negotiations, did you come to learn about this document?

19      A.   So are you asking me if I have seen such a

20 document?

21      Q.   Well, I'm asking you, when -- when you joined

22 QSI and you mentioned that you had heard of

23 LaserDynamics, were you aware of this document?

24            THE COURT:  Counsel approach, please.

25            (Bench conference.)

1    THE COURT:  You know, I just sustained an

2  objection to a question about what he heard, and then

3  you told him -- you turned right around and said what he

4  heard to the jury.  You repeated what I had sustained an

5  objection to.

6    MS. MURRAY:  Your Honor, I believe he had

7  said that he had heard --

8    THE COURT:  I sustained -- he objected,

9  and I sustained the hearsay objection, and then you turn

10  right around and told it again, ma'am.  Do you not

11  understand what you did?

12    MS. MURRAY:  I didn't realize that's what

13  I was doing, Your Honor.

14    THE COURT:  Well, when I sustain an

15  objection, that means that the jury disregards it.  You

16  turned right around and put it right in front of the

17  jury again, contrary to my instructions.

18    You don't understand that?

19    MS. MURRAY:  I'm sorry, Your Honor.  I

20  didn't --

21    THE COURT:  Well, now, I'm serious.  You

22  don't understand what you did?

23    MS. MURRAY:  Your Honor, what I wanted --

24  what he -- what I understood you were sustaining the

25  objection to is what he had heard from speaking with

1    people at the company.

2              THE COURT:  Then you said what you heard.

3    You repeated --

4              MS. MURRAY:  I asked him, did he hear

5    about -- what I asked him was, did you hear about --

6              THE COURT:  If you're going to argue with

7    me --

8              MS. MURRAY:  No, I don't want to argue

9    with you, Your Honor.

10             MR. PARKER:  Don't, don't, don't.  Just

11   ask him if he's seen the letter and if he had any

12   discussions with people representing LaserDynamics.

13             MR. SANKEY:  Judge, I was getting ready

14   to ask for a bench conference.  I want to object to this

15   entire line, because I'll tell you where they're going

16   with it.

17             It's not an issue in the case.  There

18   will not be a damage question as to QSI.  They want this

19   witness to say that he participated in the dispute with

20   QSI in 2002 and 2003 and that they met and that they

21   were offered a license for between a hundred and

22   $200,000.

23             THE COURT:  Well, that still goes to

24   reasonableness of the license agreement in 2006.  I'm

25   going to allow it for that purpose.  I'll overrule that

1  objection.

2              (Bench conference concluded.)

3              MS. MURRAY:  If we can put that back up,

4  please.

5      Q.   (By Ms. Murray) Mr. Cheng, have you seen this

6  letter before?

7      A.   Yes, I have.

8      Q.   And have you had any dealings with

9  LaserDynamics relating to this -- the contents of this

10 letter?

11     A.   Yes.  Subsequently, we had some exchange of

12 opinions regarding technical issues, and we also briefly

13 mentioned --

14             THE INTERPRETER:  Interpreter correction.

15     A.   And also the issue of licensing was briefly

16 mentioned.

17     Q.   (By Ms. Murray) Can you tell us what was

18 discussed?

19     A.   After the matter was handed over to me, the

20 discussion with them was mainly -- was mainly regarding

21 whether we have used their technology in the patent.

22             In the very end -- I think it was around

23 sometime in 2003 -- the attorney, on behalf of

24 LaserDynamics, proposed a -- some simple licensing

25 conditions for us to consider.

1    Q.    And can you elaborate on what those licensing

2 conditions were?

3    A.    The condition was mainly regarding the

4 licensing fee.  The attorney on behalf of LaserDynamics

5 explained -- or said at that time that based on the

6 Quanta Storage business -- based on Quanta Storage's

7 business scale at that time, LaserDynamics -- Laser

8 (sic) is willing -- or was willing to negotiate a

9 licensing fee of between 100,000 U.S. dollars and

10 200,000 U.S. dollars.

11    Q.    And did QSI evaluate this proposal?

12    A.    Basically, in these discussions, we explained

13 our position to them, that we could not use the

14 technology in their patent.

15          As for the issue of licensing, their attorney

16 did not make any further contact with us; therefore, we

17 did not have the opportunity to engage in any in-depth

18 negotiation with them.

19    Q.    Did they provide any written response back --

20 I'm sorry.

21          Did QSI provide any written response back to

22 LaserDynamics?

23    A.    Yes.  I do remember, you know, we had some

24 e-mail exchanges with them, and we explained our

25 position.  From a technology perspective, our company

1  did not use the claims in the patents.

2       Q.   Okay.

3            MS. MURRAY:   If we can bring up

4  Exhibit 434, please.

5       Q.   (By Ms. Murray) Is this a copy of the e-mail

6  that you're referring to?

7       A.   Yes, this is the e-mail.

8       Q.   Okay.  After you had those discussions with

9  LaserDynamics, did LaserDynamics ever contact you in the

10 second half of 2003?

11      A.   To my recollection, I think the last meeting

12 happened at sometime around March or April 2003, and

13 after that time, no further discussion or contacts ever

14 happened.

15      Q.   And when is the next time that you ever heard

16 from LaserDynamics?

17      A.   After 2003, I think in August of 2006, we

18 learned that we were involved in this litigation.

19      Q.   How did you learn that?

20      A.   At the beginning, the lawsuit -- in the

21 lawsuit, they sued our subsidiary in the United States,

22 Quanta Storage American, Inc.  Then I learned about this

23 lawsuit.

24      Q.   And at the time that this lawsuit was filed in

25 August 2006, who was QSI's major customer?

```
 1      A.   I think, at that time, the major customer was

 2  Philips.

 3      Q.   Did you alert Philips after this lawsuit was

 4  filed?

 5      A.   Yes.  We did notify Philips of this lawsuit.

 6      Q.   Why did you notify Philips?

 7      A.   Because based on our agreement, based on our

 8  subcontract manufacturing agreement with Philips,

 9  Philips had the responsibility to handle such licensing

10  issues.

11      Q.   And what happened with Philips after you

12  alerted Philips?

13      A.   Philips told us that they hoped --

14               MR. SANKEY:  Objection, hearsay.

15               THE COURT:  Sustained.

16      Q.   (By Ms. Murray) Mr. Cheng, can you tell us who

17  currently is QSI's largest customer?

18      A.   Currently, it is Sony.

19      Q.   And does QSI manufacture products for Sony

20  pursuant to an agreement?

21      A.   Correct.  We supply the optical disk drives to

22  Sony based on a subcontract manufacturing agreement with

23  them.

24      Q.   Let's take a look at that agreement.

25               MS. MURRAY:  It's Exhibit 392, please.
```

1    Q.   (By Ms. Murray) Does this Exhibit 392 -- is

2  this a copy of the agreement between QSI and Sony for

3  manufacturing the drives?

4    A.   Yes, this is the one.



REDACTED BY ORDER OF THE COURT



**REDACTED BY ORDER OF THE COURT**

21          THE COURT:  All right.  We'll take a

22  morning break here, Ladies and Gentlemen.

23          Be ready to come back in the courtroom at

24  10:30.  Remember my instruction about not discussing the

25  case during the break.

```
 1                     (Jury out.)

 2                     THE COURT:  Court's in recess till 10:30.

 3                     MR. PARKER:  Your Honor, may we

 4   address -- may I address one thing briefly before the

 5   recess?

 6                     THE COURT:  Okay.  Have a seat.

 7                     MR. PARKER:  The --

 8                     THE COURT:  You may step down, Mr. Cheng.

 9                     MR. PARKER:  The inquiry that you started

10   to make about what he was told by Philips and the

11   hearsay objection was made and sustained, I do believe,

12   Your Honor, that there is an exception there in that it

13   would come in to explain course of conduct in the sense

14   that they did not change their operations because they

15   were given assurances by Philips.

16                     I'm not trying to re-inject the license

17   thing in the case, but it would go to willfulness, if

18   they were told by -- if he was told by Philips not to

19   worry about it and go forward because Philips has a

20   license.

21                     I understand it's a problematic issue,

22   but it really is important about willfulness.

23                     THE COURT:  Well, you don't think you got

24   that through without -- you don't think that -- well,

25   first of all, I sustained an objection.  Nobody
```

 1  suggested to me that they're offering this under a

 2  hearsay exception.

 3              And then the question was, well, after

 4  you heard.  That's just what I ruled out, you know.  If

 5  we have an exception, then we need to talk about it.

 6              Now then, you're now wanting to offer

 7  that testimony as an exception?

 8              MR. PARKER:  Yes, sir.  And that was the

 9  second hearsay objection.  I'm not trying to say

10  anything about the first one that we had the bench

11  conference about, but the one where you said -- when you

12  talked to Philips, what did -- you told Philips about

13  the lawsuit.  What did Philips say?

14              Mr. Sankey objected.  You sustained the

15  objection.  And perhaps it would have been appropriate

16  if I had stood at that time to suggest, but I didn't

17  know if we wanted to argue that in front of the jury.

18              THE COURT:  Why wouldn't that be an

19  exception, Mr. Sankey?

20              MR. SANKEY:  Your Honor, if the witness's

21  answer is going to be that Philips told him not to worry

22  about it, I don't have an objection to that response.

23              And I think it would be an exception,

24  what they were told.

25              THE COURT:  Okay.  Why don't we get that

60

```
 1  out since he's going to be back on the stand.
 2              MR. PARKER:  Thank you, Your Honor.
 3              COURT SECURITY OFFICER:  All rise.
 4              (Recess.)
 5              COURT SECURITY OFFICER:  All rise.
 6              (Jury in.)
 7              THE COURT:  Please be seated.
 8              Let's continue.
 9      Q.   (By Ms. Murray) Mr. Cheng, before the break,
10  we were taking a look at QSI's manufacturing agreement
11  with Sony.
12              MS. MURRAY:  If we can put that back up,
13  please.  Thank you.
14      A.   Okay.
```

**REDACTED BY ORDER OF THE COURT**



**REDACTED BY ORDER OF THE COURT**

Before Sony, did QSI have a manufacturing agreement with another company?

A.   Yes.   Before Sony, we subcontract manufacture for Philips.   We manufactured optical disk drives for them.

1          MS. MURRAY:   Let's take a look at Exhibit

2   265, please.

3      Q.   (By Ms. Murray) Mr. Cheng, have you seen this

4   document before?

5      A.   Yes, I have.

6      Q.   And what is this document?

7      A.   Basically, it is the same as Sony.  This is a

8   subcontract manufacturer contract.

9   

10  

11                  **REDACTED BY ORDER OF THE COURT**

12  

13  

14  

15  

16  

17  

18      Q.   Okay.  Let's take a look at the second page of

19  this agreement.

20      A.   Okay.

21      Q.   Mr. Cheng, do you recall discussing this

22  agreement with Mr. Sankey a couple of days ago?

23      A.   Yes.

24      Q.   And on the second page of this agreement,

25  there's a chart in the middle.

1          Do you see that?

2      A.   Yes, I see that.

3      Q.   And do you recall what -- you were explaining

4  with Mr. Sankey what this chart represents?



**REDACTED BY ORDER OF THE COURT**

24      Q.   Let's take a look at another agreement that

25  Mr. Sankey showed you on Tuesday.

1        MS. MURRAY:  If you can bring up 249,

2 please.

3     A.   Yes, I see that.

4     Q.   (By Ms. Murray) What is this agreement?



REDACTED BY ORDER OF THE COURT

**REDACTED BY ORDER OF THE COURT**

Q.   Mr. Cheng, I would like to take you back a little bit, going back to our discussion a little earlier, after the lawsuit was filed and you contacted Philips about the lawsuit.

What did Philips say to you?

A.   In their response, the -- their main opinion was we did not have to worry about this case; they hope that QSI would continue to supply optical disk drives and continue manufacturing for Philips.

Q.   Mr. Cheng, after QSI was sued in this case, did it believe that the '981 patent was valid?

THE INTERPRETER:  Interpreter needs to clarify with the witness.

A.   We did not -- we did not believe so, because we believe that the validity of the patent is in doubt. And my knowledge is the U.S. Patent & Trademarks Office has also had a substantial question of the validity of the patent.

1    Q.   Thank you, Mr. Cheng.

2              MS. MURRAY:   Pass the witness.

3              THE WITNESS:   Thank you.

4                   CROSS-EXAMINATION

5    BY MR. SANKEY:

6    Q.   Mr. Cheng, from 2002 through today, has your

7    company obtained any type of an opinion from an attorney

8    on the issue of validity?

9    A.   We do not have such an official document.

10    Q.   Do you understand that in 1996, the U.S. --

11    the United States government said that this is a valid

12    patent?

13    A.   Yes, I know.

14    Q.   Do you understand that after your company

15    asked the Patent Office in 2008 to take another look at

16    this patent, they sent a letter saying they're going to

17    confirm its validity?

18    A.   That is not a correct statement.   The

19    reexamination was not initiated by QSI.   We just learned

20    of such a matter.

21    Q.   Who was it initiated by?

22    A.   I don't have the knowledge.   I don't know who.

23    Q.   The second half of my statement you agree

24    with, that the United States government said they're

25    going to reaffirm the validity of it?

1    A.   As for how the U.S. government will further

2  examine the issue, I do not have the knowledge.  I only

3  know that the U.S. government has raised a substantial

4  question regarding the validity -- validity of the

5  patent.

6    Q.   So is your answer you don't know that they did

7  that last year?

8    A.   According to my current knowledge, I don't

9  have any relevant information.

10    Q.   Is your company's allegation on validity just

11  an effort to get out of the trap?

12    A.   Of course, after the lawsuit was filed, the

13  position of our company was to --

14             THE INTERPRETER:  Interpreter needs to

15  clarify with the witness.

16    A.   After the lawsuit was filed, our position was

17  that the validity of the patent was questionable.  And

18  this is one of our defense, and our attorney would have

19  such an opinion.

20             As -- as for getting out of the trap in your

21  question, I do not know what you really mean.  But we

22  just want to resolve the issue through the validity.

23             THE INTERPRETER:  That was not a correct

24  translation.

25    A.   What I meant to say was, we want to have a

1  solution regarding the validity, regarding the whole

2  case.

3            THE INTERPRETER:  Okay.  Interpreter

4  needs to clarify with the witness.

5      A.   We want to have an effective resolution of

6  this case.  I did not say the validity solution.

7      Q.   (By Mr. Sankey) And that's why we have the

8  jury here this week, to give us a final resolution of

9  this dispute, correct?

10     A.   Yes.

11

12

13            **REDACTED BY ORDER OF THE COURT**

14

15

16

17

18

19

20

21

22

23

24     A.   Yes, I see that.

25     Q.   The Sony agreement that you talked about, you

1  negotiated that about three months after this lawsuit

2  was filed, correct?

3      THE INTERPRETER:  Interpreter was asked

4  to repeat the rendition.

5    A.   I think we started the negotiation with Sony

6  in 2006, and the signing of the agreement has nothing to

7  do with this lawsuit.

8    Q.   (By Mr. Sankey) You signed the agreement in

9  November of 2006.

10    A.   If I remember correctly, that's right.

11    Q.   Neither you nor Sony mentioned Mr. Kamatani,

12  LaserDynamics, or the '981 patent in this contract, did

13  you?

14    A.   That's correct.  This is simply a subcontract

15  manufacturing agreement.  It would not have any

16  relationship with this case.

17    Q.   You mentioned that when there were meetings

18  with QSI and LaserDynamics in 2002/2003, that there was

19  an offer for a license, a money offer, correct?

20    A.   Basically, in 2003, their attorney proposed to

21  QSI that they would consider a lump sum payment and

22  propose this licensing agreement with us.

23    Q.   Do you have a single document to show this

24  jury to verify that that ever occurred?

25    A.   No, because the discussions were oral

1  discussions.  We did not have any documents to document

2  that.

3      Q.   Because -- I guess Philips and Sony have been

4  your two main clients since about 2004, correct?

5      A.   Correct.  Since the year 2004; that's correct.

6      Q.   And your testimony is that we do what our

7  customers ask us or tell us to do, or we try to?

8      A.   Correct.  That is stipulated in the agreement,

9  and we have to abide by the agreement.

10     Q.   And those customers have told you to keep on

11  making and keep on selling optical disk drives?

12     A.   Correct, because that's the right they have to

13  make such request to QSI --

14     Q.   And that's why --

15     A.   -- according to the agreement.  I'm sorry.

16     Q.   And that's why your company has sought

17  indemnification from Philips and Sony to reimburse you

18  for any damages incurred in this case, correct?

19     A.   I think basically we asked Philips and Sony to

20  stand out and resolve the litigation and so-called

21  license dispute.  I think we did not mention any

22  specific amount or compensation to them.

23             MR. SANKEY:  Nothing further.

24             THE COURT:  Ms. Murray?

25             MS. MURRAY:  Nothing further.

1           THE COURT:  You may step down.

2           Who's your next witness?

3           MR. PARKER:  May we approach, Your Honor?

4           THE COURT:  Sure.

5           (Bench conference.)

6           MR. PARKER:  I would propose to read

7    about one minute of deposition testimony at this point

8    in that I understand we had an agreement on.

9           Now, the agreement was -- it's actually

10   testimony Mr. Trop gave as a corporate representative of

11   LaserDynamics.  We've agreed not to mention Mr. Trop's

12   name, but -- and we agreed not to use it and read it in,

13   if Mr. Kamatani, when I asked him, did you have a policy

14   of proposing lump sum agreements for small, medium, and

15   large companies, and when I put that question to him on

16   the witness stand -- and I had understood he was going

17   to be coached to agree with that or to essentially give

18   the same testimony that Mr. Trop gave.

19           He basically said we didn't have any

20   policy.  So I think, under the terms of our

21   understanding, I now have the right to read this without

22   using Mr. Trop's name but just identifying the person

23   testifying as someone under oath as a representative of

24   LaserDynamics.

25           MR. SANKEY:  One, this is a deposition of

1   Mr. Trop as a 30(b)(6) witness in the BenQ case prior to

2   this one.

3                    He was asked, what are the policies for

4   big, small, medium for 200,000 or less.  The question

5   was asked of Mr. Kamatani.  He never denied that he

6   didn't have a policy for big companies for 200,000 or

7   less.  He wasn't asked the same question.  They want to

8   use this to try to impeach --

9                    THE COURT:  Y'all have got a daily

10  transcript.  Y'all want to show me the question?

11                   MR. PARKER:  We can and I'm not trying to

12  use it for impeachment, Your Honor.  I just want to put

13  into evidence that they, in fact, had a policy.  And in

14  this, they take the position that they, in fact, had a

15  policy.

16                   THE COURT:  Okay.  You're using a

17  deposition from a prior proceeding.  What exception does

18  it have?  Are you saying it's not an inconsistent

19  statement?

20                   MR. PARKER:  I don't have any exception,

21  Your Honor, except that we had an agreement that we

22  could use it.  And I think they --

23                   MR. SANKEY:  For purposes if Mr. Kamatani

24  said the opposite.

25                   MR. PARKER:  If Mr. Kamatani didn't

1  testify from the stand that they had that policy, then

2  we were able to read this in, not for purposes of

3  impeaching Mr. Kamatani, but to establish they had the

4  policy.

5            I thought he was going to say they had a

6  policy, but he fenced with me about that.

7            THE COURT:  Well, I don't think -- I'm

8  sorry.  I don't remember what -- you know, you're trying

9  to get me to enforce an agreement that hasn't been

10  reduced to writing.  He's saying one thing and you're

11  saying another.

12            He's saying it was solely for

13  impeachment; you're saying something different.

14            MR. PARKER:  I'm saying -- I'm saying it

15  was to establish the existence of this policy, which I

16  thought their witness was going to agree to.

17            THE COURT:  Well, do you think -- you're

18  telling me -- you don't agree with me that you don't --

19  you're telling me two different things.

20            MR. PARKER:  That we're taking two

21  different positions?

22            I think we're taking two different

23  positions now, but the position that Mr. Sankey is

24  taking now is inconsistent with what I understood our

25  agreement to be.

1          THE COURT:  You want me -- I'm not going

2   to recess this trial.

3          MR. PARKER:  I'm not asking you, sir.

4          THE COURT:  Y'all need to find out what

5   the agreement is, okay?  So then I'm trying to see, is

6   there a legal position under which this can come in.

7          I don't have an agreement that I can

8   enforce.

9          MR. PARKER:  Yes, sir, I understand.

10          THE COURT:  I'm not going to recess the

11   trial for purpose of conducting an evidentiary hearing

12   and trying to decide if there was an agreement.

13          So now then, have you got an exception or

14   not?

15          MR. PARKER:  Well, we have sworn

16   testimony.  It's not in this proceeding, but it's in

17   another proceeding of a person who identified themself

18   as a representative of LaserDynamics and when they

19   stated, under oath, unequivocally that there was a

20   policy --

21          THE COURT:  Not identifying Trop as the

22   witness, but identifying this as a deposition taken of a

23   30(b)(6) witness.

24          MR. SANKEY:  And is the part in there

25   about the timeframe that he's talking about, the '98/'99

1    timeframe?  That's not in the question I saw.

2                    MR. PARKER:  If that is the timeframe,

3    I'll be happy to say that.  If there's a question that

4    establishes that, I'll be happy to read it.

5                    MR. SANKEY:  You would say the question

6    was asked of the corporate -- corporate's policy?

7                    MR. PARKER:  At the time they entered

8    into these various license agreements, yes.

9                    THE COURT:  Okay.

10                   (Bench conference concluded.)

11                   MR. PARKER:  May it please the Court.

12                   Your Honor, at this time, we're going to

13   read into evidence a small amount of deposition

14   testimony, so it's not going to be like what they had to

15   listen to the other day.

16                   And to put it into context, this is

17   deposition testimony that was offered by someone who was

18   designated as a corporate representative of

19   LaserDynamics.

20                   It was given under oath in another case,

21   but the person was sworn in and was representing

22   LaserDynamics, and they were being questioned about the

23   policy of LaserDynamics during the time period when we

24   saw that various agreements were entered into, the 16

25   agreements that you saw on the board, which I believe

1   were dated in 1998 through 2000.

2                    And I will now read it.

3                    QUESTION:  Did LaserDynamics or

4   Mr. Kamatani do any sort of analysis with respect to

5   companies that they were offering to license the '981

6   patent in determining what LaserDynamics was willing to

7   accept in return for licensing that patent to these

8   companies?

9                    ANSWER:  Yes.

10                   QUESTION:  What analysis did

11  LaserDynamics or Mr. Kamatani do?

12                   ANSWER:  It was some type of subjective

13  effort to organize -- to categorize them as big, medium,

14  or small.

15                   QUESTION:  And which companies were

16  considered to be in the category of big, or what

17  category was used to determine whether a company was

18  big, medium, or small?

19                   ANSWER:  Mostly some type of subjective

20  determination of how large they were and how much they

21  might be interested in DVDs in the future.

22                   And how did the --

23                   QUESTION:  And how did the categorization

24  of companies as big, medium, or small affect the amount

25  that LaserDynamics was willing to license the '981

1 patent for to these companies?

2              ANSWER:  At least early on, the companies

3 in the big category were offered $200,000, and everybody

4 else was offered something less.

5              That ends the testimony.

6              THE COURT:  Who will be your next

7 witness?

8              MR. PLATT:  Defendants would call

9 Professor Duncan MacFarlane.

10              COURTROOM DEPUTY:  Raise your right hand,

11 please.

12              (Witness sworn.)

13   <u>DUNCAN MACFARLANE, Ph.D., DEFENDANTS' WITNESS, SWORN</u>

14                   <u>DIRECT EXAMINATION</u>

15 <u>BY MR. PLATT:</u>

16    Q.   Professor MacFarlane, could you introduce

17 yourself to the jury.

18    A.   Yes.  My name is Duncan MacFarlane.  I'm a

19 professor of electrical engineering at the University of

20 Texas at Dallas.

21    Q.   And did you prepare some slides today?

22    A.   Yes, I -- I have, and some of them are up now.

23    Q.   Okay.  Can you first describe your educational

24 background.

25    A.   Absolutely.  I received a Master's and a

1   Bachelor's in electrical engineering from Brown

2   University in Providence, Rhode Island.  Those were in

3   the mid-'80s.

4           Following that, I worked for a year at a

5   high-tech company outside of Boston, and I went back to

6   graduate school this time in Portland, Oregon, and I

7   graduated from Portland State University with a Ph.D. in

8   electrical engineering in 1989.

9       Q.   Now, did you specialize in any aspect of

10  electrical engineering in your studies?

11      A.   Yes.  From my Bachelor's and certainly from my

12  Master's, I emphasized lasers and modern objects.

13              MR. PLATT:  If you could move to the next

14  slide.

15      Q.   (By Mr. Platt) What is your current position

16  right now?

17      A.   I'm a professor of electrical engineering at

18  the University of Texas in Dallas.

19      Q.   And I notice that you've gone from associate

20  professor up to professor.  Is there a difference there?

21      A.   Well, yes.  Actually, in 1989, right after I

22  graduated with my Ph.D., I moved down to Dallas.  The

23  university was just getting started.

24              And I joined the faculty as an assistant

25  professor, which is an untenured professorship.  You

1  have about five years to prove yourself to -- in

2  teaching and in research to be promoted to associate

3  professor with tenure.

4          I -- I achieved that in -- in 1994, and then I

5  served as an associate professor for a number of years,

6  again, working hard in my laboratory.  I did take a

7  couple of years off in there to -- to work at JDS

8  Uniphase and Celion Networks, a little bit of Texas

9  Instruments as well.

10          But along about 2001, I was promoted to full

11  professor of electrical engineering.

12     Q.    Can you tell us about some of your job

13  responsibilities as a professor?

14     A.    Sure.  You know, professors, especially full

15  professors, have three components to their job.

16          Teaching is by far one of the most important

17  ones, and that's fundamentally classroom teaching at the

18  graduate and undergraduate level.  That's really our

19  biggest and most important product, as a -- human

20  resources, that your public universities turn out.

21  In addition, at a research university like UT Dallas,

22  advancing the art of your -- of your expertise,

23  advancing the knowledge base in your area is also very

24  important.

25          And so the second -- the second part of the

1   job is -- is to perform original research, and you team

2   with postdocs and graduate students and undergraduate

3   students to really advance the field of knowledge.

4           Finally, the third -- the third -- the third

5   piece of this, and this is not to be underestimated,

6   it's service.  And that's service to both the community

7   and -- and the university.

8           Most recently, my activities in service to the

9   university have been to help start new degree programs

10  and new -- and new -- and new departments within the

11  Jonsson School of Engineering and Computer Science.

12      Q.   Now, you mentioned research.  Is there a

13  specific area of your research?

14      A.   Yes.  I've always focused on -- on lasers and

15  optics.  Sometimes we call it photonics these days.

16      Q.   Now, is there a relationship between photonics

17  and the optical disk technology?

18      A.   Yes.  I would characterize an optical disk

19  drive as an example of an optical system, example of a

20  photonic system.  It has the lasers.  It has the precise

21  optics.  It has the photodetectors.

22          Even -- even the disks in play are -- are --

23  are carefully designed optical entities.

24              MR. PLATT:  If we could go back to the

25  first slide.

 1      Q.    (By Mr. Platt) How many publications have you

 2  offered?

 3      A.    I have over 60 peer-reviewed journal

 4  publications.

 5      Q.    When you say peer-reviewed, what does that

 6  mean?

 7      A.    Well, there's a -- there's a checks and

 8  balances in the -- in the scientific literature, and

 9  really, the way I look at it is, if you perform original

10  research, and certainly, if you're funded by the

11  government to do so, you have an obligation to -- to

12  carefully and precisely get that information out to the

13  public.  And you do that through these peer-reviewed

14  journals.

15          And so you take your results; you write them

16  up into manuscripts; you submit them to the appropriate

17  journals, the subject matter journal that you think it

18  most matches.

19          It goes to an editor, but then it goes out to

20  other colleagues.  And typically, these are active

21  researchers or experts in industry or academia, and they

22  review that manuscript.

23          And it's a blind review.  And they will --

24  they will put a very high bar on whether or not these --

25  these publications become part of the scientific

1  literature.

2      Q.   Now, do you have any responsibility -- any

3  editorial responsibilities for journals?

4      A.   Yes.  Last year, I was named associate editor

5  for Applied Optics, which is a -- which is a

6  peer-reviewed journal in the area of applied -- in the

7  area of modern optics, applied opticals.

8      Q.   Are you a named inventor on any patents?

9      A.   Yes.  I have over ten -- I'm the named

10 inventor in over ten patents, probably a dozen by now.

11     Q.   Have you been asked to review and consider the

12 '981 patent in this case?

13     A.   Yeah.  Yes, I have.

14     Q.   Have you formulated an opinion with regards to

15 the issue of infringement --

16     A.   Yes.  I do not --

17     Q.   -- of Claim -- I'm sorry.

18     A.   I'm sorry.  Go on.

19     Q.   -- of Claim 3 of the '981 patent?

20     A.   Yes.  I reviewed Claim 3 of the '981 patent,

21 and my opinion is that the S-curve techniques that we've

22 been talking about over the last few days do not

23 infringe -- are not infringed by the patent.

24     Q.   Do you have any other opinions with respect to

25 infringement?

 1       A.   (No response.)

 2       Q.   Okay.

 3       A.   Yes, I do.  The particular products in -- at

 4  question in this case do not -- are not infringed by the

 5  patent as well.

 6       Q.   Why do you disagree with Dr. Howe's opinion

 7  that the Quanta -- with the Quanta products that he says

 8  he analyzed?

 9       A.   So I reviewed Dr. Howe's opinion and listened

10  to his testimony, and I disagree with him on two counts.

11           One is that I don't believe the S-curve

12  characteristics, techniques -- the S-curve techniques

13  are covered by the '981 patent.

14           And I also -- I also object to some of the

15  methodology that was used by Dr. Howe, particularly the

16  interpretation of source code from non-QIS (sic)

17  products and the extrapolation of those -- of that

18  analysis to the accused products.

19       Q.   Now, you mentioned S-curve.  Why do you

20  disagree with Dr. Howe on the S-curve?

21       A.   So fundamentally -- and I think we learned a

22  little bit about S-curves the other day, and we're going

23  to talk a little bit about that in a little bit, but,

24  fundamentality, the S-curves measure the locations of

25  the interface of the optical disk, particularly the data

1  layers, and they -- and they -- and they measure where

2  those -- where those interfaces are, where the data

3  layers are and -- and how many there are.

4       That's not covered by the claim -- by Claim 3

5  in the patent.

6     Q.   Now, you mentioned something about Dr. Howe's

7  methodology.  Why do you disagree with his methodology?

8     A.   Well, Dr. Howe -- Dr. Howe reviewed source

9  code for products that were not part of -- not part of

10  the QSI product line.  He looked at the source code, and

11  he formulated an opinion on those products.

12       And then he did a -- I think his phrase was a

13  limited review of the -- of two QSI products, just a

14  couple of -- two or three or four, just a handful of QSI

15  products, and tried to extrapolate that -- those results

16  on to those products, recognizing, of course, the fact

17  that there are 20 products that -- that are accused.

18     Q.   Could you explain to the jury how an optical

19  disk drive works?

20     A.   Yes, I can.  And if you'll allow me, I have a

21  short -- a cartoon movie that we can -- that we can

22  watch.

23                    (Video playing.)

24     A.   So we're going to go through the basics of the

25  construction of a typical CD.

1          We'll start with the substrate.  That's the

2   plastic polycarbonate layer, and we'll put a -- there's

3   an aluminum data layer that's put down onto that, a

4   lacquer data layer follows mainly to protect that, and

5   then the label comes on.  And that's what you've been

6   seeing in your hands and probably using.

7          Now we're flipping it over and talking about

8   what's on the other surface.  And this is the -- these

9   are the pits and the lands that store the data on the --

10  on the drive.  The pits are these depressions in the

11  surface, and the lands are high reflectivity areas that

12  are not.

13         This is the same, viewing a cross-section.

14  The lacquer layer, the label, the data layer, the

15  plastic layer.

16         And now what we'll do is, we'll bring in the

17  optical head on its sled.  It comes in.  There's the

18  laser on the bottom, the collimating lens, the view

19  splitter, the focusing onto the -- to the surface.

20         This assumes that all the tracking is done

21  right, and you're reading zeros -- you're reading the

22  pits and the lands to get you the ones and the zeros.

23         You're seeing the light reflected off of the

24  land.  That is captured by the collimating -- by the

25  collection optics and routed to the detector.

1          There's also light that hits the -- the pits.

2     The pits are designed not to reflect the light.  There

3     is probably a little bit of light that does get back

4     into the collection optics from those and fall onto

5     the -- onto the detector.

6          In the movie that we saw, everything was

7     tracking, and so the output of the detector layer -- the

8     output of the photodetector would be translated into the

9     music and the videos that we enjoy on -- that are stored

10    on these -- on these CDs and DVDs.

11    Q.   (By Mr. Platt) Okay.  What are the main

12    differences between a CD and a DVD?

13    A.   Well, I -- simply put, the DVD is an advanced

14    version of the -- of a CD.  The -- the pits and the

15    features on the DVD are -- are much higher density, and

16    so you can store much more information on it.

17         In addition, on some of the -- on some of the

18    DVDs, you have multiple layers; you have dual layers.

19    And that -- again, you can store more information on

20    them.

21    Q.   Okay.  And you reviewed the '981 patent; is

22    that correct?

23    A.   Yes, I have.

24              MR. PLATT:  If you could pull that up.

25    Q.   (By Mr. Platt) And would you like a laser

1    pointer as we go through this?

2        A.   Yes, I would love one.

3            MR. PLATT:  Your Honor, if I may real

4    quick?

5            THE COURT:  Yes.

6        A.   I'm always forgetting these.  I apologize.

7    Thank you.

8        Q.   (By Mr. Plat) Okay.  Why don't we turn to

9    Figure 1 of the --

10       A.   Sure.

11       Q.   -- '981 patent.

12       A.   So we were just looking at the cover page of

13   the '981 patent that you've looked at in this case

14   already.  The figures are -- there are two figures that

15   I'll briefly go through with you on this figure are

16   important in patents.

17           But this is the -- this is the -- a block

18   diagram of the guts of an optical disk drive.  You have

19   the motor that spins the disk.  You've got the -- the

20   optical head.  Schematically, you're showing the -- the

21   focusing of the -- of the -- of the byte.

22           Here's the track servos that we -- that's

23   talked about -- we've been talking about as well.  And

24   the rest of the electronics to support that operation

25   and to take that data, to take the data and play it,

 1  either music or -- or videos or what-have-you.

 2              MR. PLATT:  Why don't we turn to

 3  Figure 2.

 4      A.   Remember that the '981 patent is a -- is a

 5  method patent, and methods are often illustrated with

 6  flow charts.  And again, that's consistent with some of

 7  the things we've talked about already.

 8          The -- this is the -- this is the main -- this

 9  is the main figure of a flow chart in the -- in the '981

10  patent.  It's the second of two figures, and it's the

11  flow chart for the -- for the method.

12      Q.   (By Mr. Platt) Could you start at the top and

13  walk us through this?

14      A.   Absolutely.

15          This -- the -- the -- I'll -- I'll -- I'll

16  talk -- look at the start and look at the end.

17          The start is when you put an unknown disk into

18  the -- into the disk drive.

19          The end is when everything is happening, and

20  you're playing the data from the disk.

21          And what those -- what goes between there is a

22  -- is a -- is trying to understand what that disc is.

23  And -- and the first -- the first step of that is to ask

24  the question, is there -- is there -- do you have access

25  to the TOC data.  That's the table of contents data.

1    And if that table of contents data is there, then the

2    method teaches you to try to read that data, to collate

3    the TOC data with the stored data in memory.

4              If the type of -- if that identifies the type

5    of disk, then you settle the servomotors, and you go

6    ahead and you play your -- your -- your data or your

7    video or your CD.

8              If you don't or if there is no TOC data, then

9    you find yourself in this -- in this loop here, and it

10   starts by asking -- asking the -- the -- the disk drive

11   to read any data on the disk and then to do some data

12   processing on that disk and then -- and then to do

13   another collation -- a collating step here.

14             Incidentally, it's interesting that this --

15   the phrase in here is exactly the same as the phrasing

16   on that block as well.

17             And then -- and if that -- if that works,

18   reading the data -- any data on the disk and identifying

19   it.  Then, again, you can -- you understand what disk

20   you have.  You can settle the servo modulation, and you

21   can play the -- play the data.

22             But if you don't, then you have to try again.

23   You have to try again to read any data on the disk, and

24   you have to walk yourself through that -- that same

25   block again.

1          Now, what's interesting about -- about this

2   chart and also this -- the -- the verbiage is, if --

3   there's no real -- there's no guidance on telling you

4   what to do differently through the next step.

5          And -- and even if it was, you can imagine

6   that there would be -- that there's a situation where

7   you'll just loop back and forth and back and forth in

8   what you -- in what's sometimes called an infinite loop

9   in this -- in this -- in this -- in this block diagram.

10          MR. PLATT:  Okay.  Why don't we turn to

11   the next slide?

12      A.   The next slide is the -- is the -- is the text

13   of the patent, and it's -- it's illustrated in Column 1,

14   Column 2, Column 3, and just about to there in Column 4.

15   And -- and it includes a background of the invention

16   that's typically the -- the motivation, includes a

17   summary of -- of -- of the invention.  There's a list of

18   drawings.  I mentioned the drawings are -- are -- are

19   important communication tools in engineering.

20          And then -- and then also a detailed

21   description of the preferred embodiment, which starts

22   about there and ends about there.  And then at the end

23   here are three numbered sentences, and these are --

24   these are the claims of the patent.

25      Q.   (By Mr. Platt) And which claim is at issue?

1      A.    My -- Claim No. 3, which is the last one

2  sitting right over there.

3            MR. PLATT:  Now, if you could turn to --

4  go ahead and go to the next slide.

5      Q.    (By Mr. Platt) Could you just go through

6  briefly this claim?

7      A.    Yes, absolutely.  This is a method claim.  You

8  can -- you can see that from the preamble, an optical

9  disk reading method.

10           And there are -- there are -- there are three

11  steps of this claim.  There's a step that begins with

12  the word processing, a step that begins with the word

13  collating, and a step that begins with the word

14  settling.

15           So these three steps are -- comprise --

16  comprise the method.  And then at the end, there's a --

17  there's a -- another -- a claim element which talks

18  about the servomechanism.

19      Q.    Now, why don't we go ahead and focus in on the

20  first claim element.

21      A.    So -- so I'll take this one by one.

22           The preamble is an optical disk reading method

23  comprising the steps of.  And this -- this first claim

24  element is -- reads:  Processing an optical signal

25  reflected from encoded pits on an optical disk until

1 | total number of data layers and pit configuration
2 | standard of the optical disk is identified.
3 |       And there's a -- and there's some important
4 | words in there that have been considered by the Court
5 | and have been construed.
6 |       Processing an optical signal, for example,
7 | means converting or manipulating an optical signal from
8 | one format into another.
9 |       The phrase encoded pits means depressions in
10 | the surface of the disk, which represents data or
11 | information.
12 |    Q.   Okay.
13 |       MR. PLATT:  Why don't we go ahead and go
14 | to the next slide.
15 |    A.   Okay.  We'll now go to the next step, the
16 | collating step.
17 |       The claim reads -- the claim element reads:
18 | Collating the processed optical signal with an optical
19 | disk standard data, which is stored in a memory.
20 |       And then -- and then that -- and then that
21 | phrase has also been construed.  Collating the processed
22 | optical signal with an optical disk standard data stored
23 | on a memory means -- memory means comparing the
24 | processed optical signal with an optical disk standard
25 | data stored on a memory.

1                  MR. PLATT:  Could you go to the next

2    slide?

3         A.    And the last step of this -- of this -- of

4    this method is the settling step.

5                  And the claim element reads:  Settling

6    modulation of servomechanism means dependent upon the

7    optical disk standard data, which corresponds with the

8    processed optical signal.

9                  And, again, there's a -- there's some

10   important phrasing here that's been construed.  Optical

11   disk, this -- this -- this whole phrase has been -- has

12   been construed to be establishing the regulation of an

13   automatic feedback control system for mechanical motion

14   dependent upon the recognized arrangement of depressions

15   of an optical -- for an optical storage medium which

16   corresponds to the processed optical signal.

17                  So in particular, we learn here what the

18   optical disk standard data is in --

19                  MR. TROP:  Your Honor, could we approach?

20                  THE COURT:  Yes.

21                  (Bench conference.)

22                  MR. TROP:  What's being done now is to

23   partially write the Court's claim construction.  The

24   Court gave a claim construction as a whole, and now

25   they're trying to parse pieces out of it and construe

1  other terms, and that is, they're trying to parse that

2  piece out and construe that as a constructural opt --

3  data storage.

4          And the Court never gave any such

5  instruction.  It construed it as a whole.  It didn't

6  construe it in pieces.

7          THE COURT:  Well, what do you say to

8  that, Counsel?

9          MR. PLATT:  Your Honor, he's talking

10  about the whole construction.  He highlighted part of it

11  to just distinguish those pieces.

12          THE COURT:  Now, what are you say -- what

13  are you referring to particularly?

14          MR. TROP:  The construction -- the

15  Court's claim construction, what they're doing is

16  highlighting four words in the claim and trying to match

17  them up with what they believe you meant within your

18  claim construction.

19          But you didn't do that.  You construed it

20  as a unitary entity, and now they're trying to reparse

21  it out.

22          THE COURT:  Sustained.  Get that off of

23  there, Counsel.

24          MR. PLATT:  Okay.

25          THE COURT:  That is a direct violation --

1    now, wait just a minute.

2                    MR. PLATT:  Yes, sir.

3                    THE COURT:  Don't you walk off from me

4    when I'm talking to you.

5                    MR. PLATT:  I'm sorry.

6                    THE COURT:  You get it off of there, and

7    you comply with the Court's order.  The Court's claim

8    construction order said do not do exactly what you're

9    doing.

10                   MR. PLATT:  I'll take it off.

11                   THE COURT:  And when I'm telling you to

12   do something, you don't start turning around and walking

13   off.

14                   MR. PLATT:  Yes, sir.

15                   THE COURT:  It's going to be a real bad

16   day for your client if you don't get yourself together.

17                   MR. PLATT:  Yes, sir.

18                   (Bench conference concluded.)

19                   MR. PLATT:  May I have a moment, Your

20   Honor?

21                   THE COURT:  Pardon me?

22                   MR. PLATT:  May I have a moment?

23                   THE COURT:  Sure.

24                   (Pause in proceedings.)

25        Q.    (By Mr. Platt) For the three QSI drives that

1  Dr. Howe looked at, what's your understanding of

2  Dr. Howe's basis for why those three drives infringe?

3       A.   My understanding is that Dr. Howe asserts that

4  this -- these operate -- that these operate using

5  S-curve techniques -- techniques.

6       Q.   Can you explain to the jury what the S-curve

7  technique is?

8       A.   Yes, I can.  And I think we have some -- some

9  more animation to show.

10                 (Video playing.)

11      A.   This is -- this is a blank CD-ROM, and it

12  shows the S-curve method.  Again, just reorienting

13  ourselves of what the -- what the parts of that CD-ROM

14  is, the data layer is there, the plastic layer, the

15  light is there -- in there.

16            It's far enough away from the interface that

17  there -- any reflection off the surface would not be

18  very much.  It would not be captured by the -- by the

19  lens.  But as you get close, more signal comes into

20  the -- into the photodetector.

21            The process goes above a threshold and then

22  comes back down, and then that's -- that's a -- that's

23  the characteristic S-curve that comes from the interface

24  between the air.  That's -- that's often used as a

25  reference.

1          The -- the focus -- the focus continues to

2    move, and when the focus spot gets to the data layer,

3    again, you see that sweeping of the -- of the -- of the

4    high, the zero, and the low again in -- in the

5    characteristic S-curve.

6          It's important to note that this chart

7    shows -- shows two things.  It shows a small S-curve

8    from the surface and a large S-curve from the data layer

9    and a period of time between -- between those two.

10     Q.   (By Mr. Platt) Have you also prepared an

11   animation for a DVD?

12     A.   Yes.  Let's get slightly more complicated and

13   look at a dual-layer DVD.  And remember, on a DVD, the

14   data -- the data layer will be -- will be less -- will

15   be about half the distance to the air interface, and in

16   this case, there will be two of those data layers.

17   So here we have the label, lacquer, the -- and the two

18   data layers, spacer in between, polycarbonate spacer in

19   between, plastic layer, and again, the air interface.

20   The focus is there.  Start moving the lens.

21          As you get close, the collection optic starts

22   to accept a non -- a non-trivial amount of light, nulled

23   out at the center and nulled out right at the interface.

24   Negative gives you your -- your reference S-curve.

25          Very quickly, you hit your first data surface.

1  You get a strong S-curve from that.  Going to zero as

2  you cross, as you hit the second S-curve, you, again,

3  get a -- as you see it, but that second data layer, you

4  get a second S-curve, and again, that's traced out on

5  the -- on the -- in the voltage signal off of the

6  photodetector.

7           And, again, on this one, you have a -- three

8  S-curves; one small one for the reference and two larger

9  ones for the data layers.  And there's a -- there's

10 periods of time between those S-curves that correspond

11 to the physical differences of the DVD.

12    Q.   Do you have a slide comparing the difference

13 between a CD and a DVD?

14    A.   Yeah.  I think the next slide, and it's just a

15 still slide showing the two examples.

16          Again, we have the CD-ROM with the -- with the

17 reference -- the small reference S-curve and a certain

18 time of flight to the -- to the S-curve off the data

19 layer.  And then on the DVD, you've got a small S-curve

20 at the reference level, and then you've got the two

21 larger ones at the two data layers.

22          And so you learn two things from this:  You

23 learn that the DVD has two -- two data layers, and the

24 CD has one, and you learn the relative depths or the

25 relative positions of those -- of those data layers in

 1  the CD-ROM versus the DVD.

 2          Those were taken using physical measurements

 3  of the properties, the interface properties of the -- of

 4  the device -- of the -- of the disk by scanning the

 5  lens.

 6      Q.   Could you briefly describe the methodology you

 7  used to respond to Dr. Howe's analysis?

 8      A.   Yes.  I read through the patent and certainly

 9  the claim construction.

10          I also read the expert report.

11          I also reviewed the materials -- some of the

12  materials that Dr. Howe relied on, in particular, the

13  source code.

14          I reviewed relevant prior art and -- among

15  other things and formulated a -- a review of -- of

16  Dr. Howe's report.

17      Q.   How many QSI products have you looked at in

18  preparing your opinion?

19      A.   I've examined the source code of three QSI

20  products.

21      Q.   Why did you review only those three?

22      A.   Those are the only three that Dr. Howe did.

23      Q.   Are you able to explain to us exactly how

24  those three products work?

25      A.   No, I'm not.

 1      Q.   And why not?

 2      A.   Well, I didn't do a complete investigation of

 3 it.  I didn't do a complete source code analysis.  I

 4 didn't -- I didn't do a flow chart for those particular

 5 three products.

 6      Q.   And why didn't you do that?

 7      A.   Dr. Howe didn't do it, and if he didn't, I

 8 didn't think I should do his work for him.

 9      Q.   Now, do you agree with Dr. Howe's analysis and

10 conclusion -- conclusions regarding infringement by the

11 S-curve method?

12      A.   No.  I disagree with Dr. Howe's opinion on the

13 -- on -- on the -- on -- I'm -- I'm sorry.

14           Could you repeat the question, please?

15      Q.   Sure.  What's your opinion regarding

16 Dr. Howe's analysis of the S-curve method?

17      A.   I disagree with Dr. Howe's analysis on -- on

18 two -- on two points.

19           One is, I don't believe that the S-curve

20 analysis is -- I don't believe that the S-curve

21 technique is -- infringes the -- Claim 3 of the patent,

22 and also, as I pointed out earlier, I disagree with the

23 methodology that Dr. Howe did in terms -- and

24 specifically, extrapolating the source code from

25 other -- other products to -- to the QSI product.

1          And I certainly don't agree with extrapolating

2    from there to the other -- other products that just

3    received -- I think the term was cursory investigation.

4          Q.   Now, without referring to any slides, can you

5    tell us generally what elements of the claim are missing

6    in the S-curve method?

7          A.   Yes, I can.   The claim -- the Claim 3 of the

8    patent was a method -- I'm sorry.

9               The Claim 3 of the patent had three steps in

10   the method.   There was a -- there was a collating

11   step -- I'm sorry.

12              There was a processing step, a collating step,

13   and a settling step.

14         Q.   And what's your opinion with respect to those

15   steps?

16         A.   None of those three are -- are -- are -- none

17   of those three read on -- on an S-curve technique.

18         Q.   And why is that?

19         A.   All of those -- all of those three claim

20   elements require -- and, again, I want to make sure I

21   use the right term.   But all of those -- all of those

22   terms require the -- the -- the patent talks about

23   encoded pits, and the claim constructions talk about a

24   depression in the surface of the disk, which represents

25   data or information and the recognized arrangement of

1  depressions.

2           And -- and so -- and -- and as we've -- as

3  we've looked at these animations, the S-curve doesn't

4  rely on -- on depressions or pits or any features on the

5  surface.  It just requires that there be a surface.

6           In fact, the whole point of the S-curve is

7  to -- is to locate those surfaces and to -- to find out

8  where they are, the depth of them, and how many there

9  are.  That's the -- that's the essence of the -- of the

10  S-curve.  It doesn't require depressions or pits or

11  lands or anything like that.

12      Q.   Did you hear Dr. Howe's testimony regarding

13  the Asus drives yesterday?

14      A.   Yes, I did.

15      Q.   Do you agree with his analysis relating to the

16  Asus drives with respect to the QSI drives?

17      A.   Well, so Dr. Howe provided some very extensive

18  flow charts for the Asus products, and those on the face

19  looked like he did a reasonable analysis of the Asus

20  products, but then he -- then he said, well, gee,

21  all the -- all the -- all the MediaTek chips that are in

22  the queue are going to work the same whether they're

23  coming out of QSI products or Asus products.  And I have

24  a real hard time with that.

25      Q.   And why do you have a hard time with that?

1    A.   Well, you know, even if you have the same

2  chipset, the -- the point -- what -- the point of this

3  firmware, the point of this source code, is that you can

4  very easily adapt it.  You can very easily optimize

5  the -- the -- the product.

6         If you're -- if you're assembling a disk drive

7  at QSI, you may have different -- different mechanical

8  parts.  You may have different motors.  You may have

9  different lasers.  You may have different other chips on

10  -- on -- on -- onboard.

11         And if you do that, then you've absolutely got

12  to go back into the source code and -- and -- and make

13  sure that everything works.

14         I was a product manager for a while, and one

15  of the best things -- one of the nicest things we were

16  able to do was -- was -- was customize a product for a

17  particular customer by changing the source code.

18    Q.   In your opinion, how would one determine

19  whether the method steps of the '981 patent are carried

20  out in a device?

21    A.   Well, I think you would do a full flow chart

22  analysis of the source code, and that would -- that

23  would be a great -- a great first step on that.

24    Q.   Now, you've seen Dr. Howe's analysis.  If one

25  of your graduate students turned in to you what Dr. Howe

1   turned in, what would you say to them?

2       A.   Well, I think I would very -- very firmly and,

3   hopefully, politely tell -- tell that person to go back

4   and do it right.

5       Q.   Now --

6           MR. TROP:  Let's put up the graphic of

7   the 20 drives.

8       Q.   (By Mr. Platt) Now, do you know which of these

9   20 drives are the three that Dr. Howe analyzed?

10      A.   I believe I do.  The -- the numbers are kind

11  of -- a little bit confusing, but I believe that these

12  three here, the SBW243, the SDW085, and the SDW087 were

13  the ones that were addressed in -- in Dr. Howe's report.

14      Q.   Now, why don't we talk about the drives that

15  have Philips chipsets.  Are you able to identify those

16  on this chart?

17      A.   I believe so, mostly because of the

18  organization of the chart.  I believe these along the

19  bottom here are the Philips -- are the Philips drives,

20  the drives that -- I'm sorry -- the drives that have the

21  ███████      **REDACTED BY ORDER OF THE COURT**

22  ███████

23      Q.   What's your opinion with respect to Dr. Howe's

24  analysis of those Philips drives --

25      A.   Okay.  So if I --

1      Q.    -- or chipset drives?

2      A.    For the Philips chipset drives, what I

3  remember on that is that he relied on an analysis that

4  he did four years ago from another -- from yet another

5  company -- I believe it was BenQ -- and extrapolated

6  from that to -- to these QSI products.

7      Q.    And why do you disagree with that analogy?

8      A.    Well, again, for the same ---for the same

9  reasons with -- as lumping all the MediaTek chipsets

10 together.  They are -- they're different products.

11 The beauty of the source code is that you can change it

12 and optimize -- you have to be very careful to make sure

13 that all the -- that what's -- well, all the variables

14 are actually called that are in there and so on.

15          It's not a trivial matter, just to -- just to

16 glance at a variable name and think that that's the same

17 variable as in another -- another code.

18     Q.    Okay.  Why don't we look --

19     A.    Another product.  I'm sorry.

20     Q.    Why don't we look at the other products that

21 are left after -- after we look at the three --

22     A.    That would be this block here, I believe

23 (indicates).

24     Q.    And are those the drives that you understand

25 Dr. Howe to have said were similar?

1      A.    Say that again, please.  I didn't hear you.

2      Q.    Are those the drives that you understood

3  Dr. Howe to say were similar to other drives he looked

4  at?

5      A.    Yes.  He went from the Asus drives to these

6  guys, and then he went from these guys to these drives.

7      Q.    Now, as an editor on a peer-review journal, if

8  someone submitted a paper to you that made a conclusion

9  based on a similar analysis, how would you treat that?

10     A.    I -- I -- I -- I would -- I would not let it

11  be published.

12     Q.    Professor, do you have an opinion about

13  validity of the '981 patent?

14     A.    Yes, I do.  I -- I -- I don't believe it's a

15  valid patent.

16     Q.    And why is that?

17     A.    I don't believe that the patent is enabled.

18     Q.    And the Court's going to instruct the jury, of

19  course, on the proper legal basis for enablement, but

20  what's your general understanding that you used

21  in looking at enablement?

22     A.    So -- so I'm going -- I'm going to speak as an

23  inventor, because that's what I -- and an engineer from

24  what -- what I know.

25            Enablement means that I -- that if you -- if

1 you handed that patent to someone skilled in the art,

2 that that person would be able to reduce it to practice.

3     Q.   What's your opinion of one of ordinary skill

4 in the art?

5     A.   In this case, it would be a degree in

6 electrical engineering and some advanced experience

7 or -- or -- or graduate study in optics.  You can see

8 the heavy elements of source code and electronic

9 hardware, and you can certainly see the precision optics

10 in -- in the disk drives as well.

11     Q.   Now, why do you think the '981 -- I'm sorry.

12 Strike that.

13        Why do you think Claim 3 of the '981 patent is

14 not enabled?

15     A.   Well, so if you -- on the -- one of the claim

16 elements, the processing claim elements tells us to

17 process an optical signal reflected from encoded pits on

18 an optical drive -- disk drive until total number of

19 data layers and pit configuration standard of the

20 optical disk is identified.

21        And if you recall that the -- the flow chart

22 of the -- from the patent, and in particular, what

23 happen -- what you have to do if you don't have TOC

24 data, you have that infinite loop.

25        And so that infinite loop, with no guidance on

1  how to end it, pretty much makes that -- that claim

2  element hard to -- hard to reduce to practice, hard to

3  realize, hard to enable.

4       Q.   Professor, do you have an opinion on

5  non-infringing alternatives?

6       A.   Yes, I do.  I think there's a number of

7  non-infringing alternatives.

8       Q.   Okay.  And what are those alternatives?

9       A.   Well, there's a -- there's a couple of

10  wonderful prior art references on S-curves, one that was

11  done by Rosen, who is an engineer at IBM, and he then

12  filed a patent in '91.  And then there's also one by a

13  Japanese engineer at Matsushita called Maeda.

14       Q.   Could you discuss the Rosen method?

15       A.   Yes.  This is the -- this is the cover sheet

16  of Rosen's patent, and it's entitled, Multiple Data

17  Surface Optical Data Storage System, the inventors, IBM,

18  and when it was filed.  It was issued, actually, I

19  believe, in '93, which was ahead of the '981 patent that

20  we're talking about today.

21            And then -- and then there's this picture that

22  I'd like to go into a little more detail on, if I could.

23  And this is -- this is the optical train, the lensing,

24  the -- the focus scan, and you can see here in schematic

25  multiple layers of this -- of this optical recording

1  medium.

2          And corresponding to this are the

3  characteristic S-curves that we've talked about.  And if

4  you -- if you look carefully at these numbers, you can

5  match these numbers directly off to the layers teaching

6  you that each layer gives you a distinct S-curve.

7      Q.   What's the next alternative?  You said the

8  Maeda reference?

9      A.   Yes.  If we -- I think we have a slide on

10  the -- for the cover sheet of the Maeda reference.  And

11  this was filed just a little bit later, October 30 of

12  '91.

13          And the -- this is an optical recording and

14  reproducing apparatus and recording media -- medium

15  having multilayer recording membranes.  And this was --

16  this was done out of Matsushita at -- in Japan by Maeda

17  and his coworkers.  And you can see here the disk with

18  the multiple layers -- multiple data layers inside of

19  that.

20          I think, if you go to the next slide -- if you

21  go to the next slide, you'll see what happens during --

22  when you move the focus lens through a focus scan.  And,

23  again, you see the characteristic S-curves that

24  correspond to each of those three layers.  And, again,

25  there's numbering associated with those.

1      Q.   Do you have an opinion regarding any other

2  non-infringing alternatives?

3      A.   Sure.  There's a number of design

4  alternatives, all very easy to implement.

5           One of the -- one of the easiest ones is --

6  remember, there's two -- two lasers in these drives --

7  there's a CD laser, and there's a DVD laser.  And

8  there's a feedback loop.

9           And you can -- you can do a trial-and-error

10  technique just by turning one on and then turning the

11  other on and just seeing if the -- if the feedback loops

12  are robust enough to -- to -- to find them.  And they

13  should be.

14           Oh, there's also other -- other non --

15  non-infringing alternatives.  You could just rely on --

16  on the TOC data as well.

17                MR. PLATT:  Pass the witness.

18                THE COURT:  All right.  We'll wait to

19  take cross-examination up.  We'll go ahead and have

20  lunch.  Be back at 10 after -- 10 after 1:00.  Come back

21  at 10 after 1:00, and we'll take up the case then.

22                Remember my instruction about not

23  discussing the case.  Have a nice lunch.

24                (Jury out.)

25                THE COURT:  You may step down, Doctor.

1  Be seated.

2              Anything from the Plaintiff at this time?

3  Anything from the Plaintiff at this time?

4              MR. SANKEY:  No, Your Honor.

5              THE COURT:  Okay.  I just didn't want to

6  get up and start walking out, and then y'all bring up

7  something.

8              Anything from the Defendant?

9              MR. PARKER:  No, sir.  No, sir.

10             MR. GARNETT:  Your Honor, if I may

11 approach.

12             THE COURT:  Will you identify yourself?

13             MR. GARNETT:  Yes.

14             MR. SANKEY:  Mr. Garnett.

15             MR. GARNETT:  My name is Terry Garnett,

16 and I'm going to be examining Mr. Reed, and I want to

17 make sure that I comply with the Court's orders of this

18 morning.

19             And so before we put Mr. Reed on, I want

20 to talk with Your Honor about some of his testimony and

21 some of the new demonstratives.  I sent them to the

22 other side.

23             We can review them after lunch after

24 they've looked at the demonstratives, or we can do that

25 now, but I want to make sure, before I launch into any

1  testimony with Mr. Reed, that I'm clear on the Court's

2  order this morning.

3           MR. LUCK:  I don't think we have the

4  demonstratives.

5           MR. GARNETT:  No.  So if you haven't, I

6  sent them over to you.  We revised his earlier

7  demonstratives.  So you would need to take a look at

8  those.  I mean, we can do that after lunch, if you want

9  to see those.

10           THE COURT:  See you a quarter till 1:00.

11           COURT SECURITY OFFICER:  All rise.

12           (Recess.)

13           *     *     *     *     *

1

2

3

4                              CERTIFICATION

5

6              I HEREBY CERTIFY that the foregoing is a

7   true and correct transcript from the stenographic notes

8   of the proceedings in the above-entitled matter to the

9   best of my ability.

10

11

12

13  /s/_____          _____
    SUSAN SIMMONS, CSR                   Date
14  Official Court Reporter
    State of Texas No.:  267
15  Expiration Date:  12/31/10

16

17

18  /s/_____          _____
    JUDITH WERLINGER, CSR            Date
19  Deputy Official Court Reporter
    State of Texas No.:  731
20  Expiration Date:  12/31/10

21

22  /s/_____          _____
    SHELLY HOLMES                    Date
23  Deputy Official Court Reporter
    State of Texas No.:  7804
24  Expiration Date:  12/31/10

25