```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3   LASERDYNAMICS               *    Civil Docket No.
                                 *    2:06-CV-348
 4   VS.                         *    Marshall, Texas
                                 *
 5                               *    July 2, 2009
     QUANTA, ET AL               *    1:10 P.M.
 6
                      TRANSCRIPT OF TRIAL PROCEEDINGS
 7               BEFORE THE HONORABLE T. JOHN WARD
                    UNITED STATES DISTRICT JUDGE
 8                          AND A JURY

 9   APPEARANCES:

10   FOR THE PLAINTIFFS:    MR. THOMAS SANKEY
                            MR. GREGORY LUCK
11                          Duane Morris
                            3200 Southwest Freeway
12                          Suite 3150
                            Houston, TX   77027
13
                            MR. TIMOTHY TROP
14                          Trop Pruner & Hu
                            1616 South Voss Road
15                          Suite 750
                            Houston, TX   77057
16
                            MR. JEFFREY RAMBIN
17                          Capshaw DeRieux
                            1127 Judson Road
18                          Suite 220
                            Longview, TX   75601
19
     APPEARANCES CONTINUED ON NEXT PAGE:
20

21   COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                            MS. JUDY WERLINGER, CRS
22                          MS. SHELLY HOLMES
                            Official Court Reporters
23                          100 East Houston, Suite 125
                            Marshall, TX   75670
24                          903/935-3868

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

```
 1
    APPEARANCES CONTINUED:
 2

 3  FOR THE DEFENDANTS:        MR. MELVIN WILCOX
                               Yarbrough & Wilcox
 4                             100 East Ferguson
                               Suite 1015
 5                             Tyler, TX    75702

 6                             MR. JOHN PARKER
                               Paul-Hastings
 7                             600 Peachtree St., NE
                               Suite 2400
 8                             Atlanta, GA    30308

 9                             MR. CHRISTIAN PLATT
                               MS. ERICKA SCHULZ
10                             Paul-Hastings
                               4747 Executive Drive
11                             12th Floor
                               San Diego, CA    92121
12
                               MS. KATHERINE MURRAY
13                             MR. JAY CHIU
                               Paul-Hastings
14                             515 South Flower Street
                               25th Floor
15                             Los Angeles, CA    90071

16              *      *      *      *      *      *

17
                       P R O C E E D I N G S
18

19              (Jury out.)

20              COURT SECURITY OFFICER:  All rise.

21              THE COURT:  Please be seated.

22              Okay.  What is it that we want now?

23              MR. GARNETT:  Good afternoon, Your Honor.

24  Again, my name is Terry Garnett.

25              THE COURT:  Why don't you step to the
```

1  podium so the court reporter can hear you and perhaps I

2  can better, too.

3            MR. GARNETT:  Your Honor, I just wanted

4  to clarify that it's okay for me to question my damage

5  expert on the 16 non-settlement license agreements and

6  that QSI or -- excuse me -- QCI could have purchased

7  licensed drives from those manufacturers as an

8  alternative to buying from QSI.

9            THE COURT:  You got any objection to that

10 line of questioning, Counselor?

11            MR. LUCK:  We do not, Your Honor, but

12 there is another slide that is at issue that we have an

13 issue with.

14            MR. GARNETT:  Okay.  And then the second

15 issue I wanted to raise, Your Honor, is I wanted to make

16 an offer of proof.  I believe there was some

17 representations to the Court this morning, and I'm not

18 clear on what exactly those were, but I just want to

19 make the record clear that in Trial Exhibit QDX414 and

20 Trial Exhibit QDX416, which had been preadmitted, there

21 is evidence of sales from QSI to QCI in the United

22 States of accused drives.

23            And obviously, that would impact the

24 hypothetical negotiation date, but I understand the

25 Court's ruling this morning that the hypothetical

1  negotiation date is 2006.  We were prepared to proceed

2  that way, but I did want to make that offer of proof at

3  the Court's convenience.

4              MR. LUCK:  Your Honor, if I could add to

5  that, the particular issue is a new -- a demonstrative

6  slide is at issue --

7              THE COURT:  Wait a minute.  What do you

8  say about this?

9              My ruling this morning with respect to

10  the -- I wasn't aware of the sale that -- if y'all have

11  brought this sale between the two entities up, I wasn't

12  aware of it.

13              Mr. Parker, has that been brought up?

14              MR. PARKER:  I didn't bring it up, Your

15  Honor, because I just did not remember the exhibit.  So

16  it is entirely my fault.

17              THE COURT:  No, I'm not saying fault.

18  I'm just saying that my ruling this morning, since I

19  wasn't aware of those exhibits --

20              MR. PARKER:  Yes, sir.

21              THE COURT:  -- certainly wasn't intended

22  to cover those exhibits.

23              MR. PARKER:  Yes, sir.

24              MR. GARNETT:  Yes, sir.

25              THE COURT:  What do you say about those

1  exhibits -- I'm going to get this -- I'm going to try to

2  get these compartmentalized.

3                 What do you say about those exhibits --

4  exhibit of sale of -- between QSI to QCI in the United

5  States?

6                 MR. LUCK:  Irrespective of the sale, Your

7  Honor, the date of the hypothetical is the first date of

8  infringement, and that requires, for our claims in this

9  case against QCI, notice of the patent.

10                 QCI has told us from the beginning of

11  this case they had no notice until sued in this case,

12  and I believe we heard that in the testimony in the

13  trial here.

14                 So they could not have induced or

15  contributorially infringed, until they knew of the

16  patent in August 2006, irrespective of these sales.

17                 We've not had an opportunity to analyze

18  all the documents right now.  Obviously, I got these --

19                 THE COURT:  Well, these are in evidence.

20  You've had an opportunity to see them, because they're

21  preadmitted is what counsel just told him.

22                 MR. GARNETT:  Yes, sir.  May I address

23  the comments by Mr. Luck?

24                 THE COURT:  Pardon?

25                 MR. GARNETT:  May I address Mr. Luck's --

 1                THE COURT:  Are you through?

 2                MR. LUCK:  I would also answer, in the

 3 interrogatory response that we received that was late

 4 after the date of expert reports, I don't recall seeing

 5 this argument as to the 2003 date at that time.

 6                THE COURT:  I thought he said it was

 7 2001.

 8                When did you say the sale was?

 9                MR. GARNETT:  It was actually 2003, Your

10 Honor, and, originally, our expert's report was written

11 as if QSI was being accused of infringement, and they

12 were until about a week ago, maybe a week and a half.

13                And then they dropped all their damage

14 claims against QSI.  So we have to revise our report

15 accordingly.  And that's what we're attempting to do.

16                And I wanted to also clear up the record

17 that there are preadmitted exhibits that show sales in

18 2003, and that would be direct infringement, because

19 they're from QSI, Your Honor, to QCI into the United

20 States.

21                Notice is an issue for the damage period.

22 Notice is not an issue as to when there would be a sale

23 for first infringement as to the hypothetical

24 negotiation date.

25                THE COURT:  Well, their theory of

1   infringement requires intentional conduct, doesn't it?

2             MR. GARNETT:  Your Honor, for certain

3   drives, there's -- it's not a contributory infringement

4   theory.  In my understanding, it would be direct

5   infringement because the sales were made directly into

6   the United States, and that's the sale that I'm

7   discussing in 2003.  And so notice would be irrelevant.

8             THE COURT:  Sales made directly in the

9   United States by QCI?

10            MR. GARNETT:  QSI to QCI, so QCI, once

11  they accepted that drive, would be an infringer, a

12  direct infringer, actually, in the United States.

13            MR. LUCK:  Your Honor, unless there's

14  evidence that QCI used the drives, this process claim --

15  I've not seen any evidence that QCI used the drives.

16            THE COURT:  I'm going to exclude it.  You

17  can offer those two exhibits on -- on your bill.

18            MR. GARNETT:  Thank you, Your Honor.

19  Appreciate that.

20            THE COURT:  Well, you just proffer them.

21  They'll be a proffer of proof -- exhibits -- what are

22  the numbers?

23            MR. GARNETT:  I can do it now.  It's

24  Trial Exhibit QDX414 and Trial Exhibit QDX416.

25            THE COURT:  They're part of the record.

1    You're restricted based upon my rulings from questioning

2    the expert about that.  They're already a part of the

3    record.

4                    MR. GARNETT:  Yes, Your Honor.  I realize

5    that.  And so --

6                    THE COURT:  Okay.  Now, what -- okay.

7    That takes care of your problem, correct?

8                    MR. GARNETT:  And I just want to clarify.

9    We're proceeding on 2006 as the --

10                   THE COURT:  Correct.

11                   MR. GARNETT:  Thank you, Your Honor.

12                   THE COURT:  Did you have something -- you

13   said there was some exhibit you wanted to talk about.

14                   MR. LUCK:  It's the same document, Your

15   Honor.  It was a demonstrative slide that included all

16   this information and the theory of that date, and I

17   believe that's --

18                   THE COURT:  All right.  So that takes

19   care of that?

20                   MR. GARNETT:  It does.

21                   THE COURT:  All right.

22                   MR. GARNETT:  We won't present that

23   demonstrative.

24                   THE COURT:  Okay.  What did we tell the

25   jury, 1:10?

```
 1                    MR. PARKER:  Yes, Your Honor.
 2                    THE COURT:  We'll see y'all back at 1:10.
 3                    COURT SECURITY OFFICER:   All rise.
 4                    (Recess.)
 5                    (Jury in.)
 6                    COURT SECURITY OFFICER:  All rise.
 7                    THE COURT:  Please be seated.  Where is
 8  my witness?
 9                    THE WITNESS:  Sorry, sir.
10                    THE COURT:  All right.  Mr. MacFarlane.
11  Mr. Trop.
12    DUNCAN MACFARLANE, Ph.D., DEFENDANTS' WITNESS, SWORN
13                       CROSS-EXAMINATION
14  BY MR. TROP:
15      Q.   Good afternoon, Dr. MacFarlane.
16      A.   Good afternoon.
17      Q.   You told me you've never worked in the optical
18  disk drive industry; is that correct?
19      A.   That's correct.
20      Q.   You've never been involved in the design of an
21  optical disk drive in your life.
22      A.   That's correct.
23      Q.   You claim you're an expert in this case, but
24  only with the proviso that you've never designed an
25  optical disk drive; is that correct?
```

1       A.    That's correct.

2       Q.    Now, let's talk about your design experience

3  in total of any type.

4             Am I correct in understanding in the exhibit

5  that you put up that the total amount of design

6  experience you've had in your life is less than three

7  years?

8       A.    I don't know how you're calculating that, sir.

9       Q.    Okay.  You had -- what were the three

10 companies that were listed up there?  Do you recall

11 them?

12      A.    Oh, well, I worked -- I worked at Texas

13 Instruments; I worked at Celion Networks; I worked at

14 JDS Uniphase; and I also worked Schafer Associates

15 outside of Boston for a year after I got my master's.

16      Q.    You left the Schafer off of that slide.

17      A.    I believe that was off that slide, yes.

18      Q.    Okay.  So if you add all that up -- was

19 Schafer Design experience, too, that you left off?

20      A.    Yes, I would say so.

21      Q.    And how long were you there?

22      A.    A year.

23      Q.    Okay.  So would you -- do you think you had

24 more than three years total design experience of any

25 type?

 1     A.   Especially, if you include my research

 2 activities in the laboratory, absolutely.

 3     Q.   Okay.  Well, I'm talking about design.  Have

 4 you ever designed a product, other than at those three

 5 or four companies?

 6     A.   Those are the most noteworthy events, yes.

 7     Q.   Now, you formed your opinions in this case

 8 without ever talking to anyone at Quanta, except

 9 Quanta's lawyers; is that correct?

10     A.   That's correct, yes.

11     Q.   Did you talk to anyone outside of Quanta,

12 other than Quanta's lawyers, to assist you in forming

13 your opinions?

14     A.   No, I did not.

15     Q.   Did you review any of the depositions that

16 were taken in this case?

17     A.   Yes, but I can't give you a complete list of

18 what I did -- what I -- what I reviewed and what I

19 didn't.

20     Q.   Okay.

21          MR. TROP:  Would you put up Plaintiff's

22 Exhibit 140?

23          And could you turn to Page 4?

24     Q.   (By Mr. Trop) Can you see that okay,

25 Dr. MacFarlane?  It's a little hazy to me.

1        A.   Not at all.

2        Q.   Okay.

3        A.   Okay.

4        Q.   So do you see any depositions listed so far?

5   This is the section of your report where you listed the

6   materials you considered, correct?

7        A.   That's correct.

8        Q.   And can you --

9             MR. TROP:  Would you scan through it so

10  Dr. MacFarlane can take a look and see if there are

11  any --

12       A.   There shouldn't be any depositions there,

13  because I didn't -- at that point in time that I wrote

14  this, I had not looked at any depositions.

15       Q.   (By Mr. Trop) Oh, I didn't understand that.

16  So you looked at the depositions after you'd already

17  formed your opinions and had put them in your report; is

18  that correct?

19       A.   Well, for example, I read my deposition, yes.

20       Q.   Okay.  Did you review any other deposition,

21  other than that, after you'd already formed your

22  opinions and written your report?

23       A.   Not that I recall.

24       Q.   And before you wrote your report and formed

25  your opinions, you didn't look at a single deposition in

1   this case, did you?

2       A.   I -- if I did, I did not rely on it for my

3   opinion.

4       Q.   Did you or did you not?

5       A.   I don't recall.

6       Q.   Did you analyze one physical drive of Quanta

7   at the time you formed -- you wrote your report?

8       A.   No, I did not.

9       Q.   Did you do one test?

10      A.   No, I did not.

11      Q.   Did you do one experiment?

12      A.   No, I did not.

13      Q.   Now, you told me that you do not know how

14  Quanta figures out what kind of disk is in their drives;

15  is that correct?

16      A.   That's a fair statement, yes.  I did not do

17  the source -- I did not do a full source code analysis

18  to determine that.

19      Q.   You deliberately did not figure out how this

20  was done; is that correct?

21      A.   It was not part of what I was asked to do, no.

22      Q.   So you deliberately did not figure out how the

23  Quanta drives work; is that correct?

24      A.   It was not -- it was not part of what I was

25  asked to do; that's correct.

```
 1                    THE COURT:  Well --
 2        A.    That's correct.
 3                    THE COURT:  He just asked you a question.
 4   You could either answer yes or no, letting you know what
 5   you did or didn't do deliberately, I think, can't you?
 6                    THE WITNESS:  Yes, sir.  Yes, sir.  Yes,
 7   that's correct.
 8                    THE COURT:  All right.
 9        Q.    (By Mr. Trop) You did not study the operation
10   of the drives extensively; is that correct?
11        A.    That's correct.
12        Q.    You did not do any oscilloscope traces of the
13   type that Dr. Howe did, did you?
14        A.    That's correct.
15        Q.    You did not review any of the drives like
16   Dr. Howe did, did you?
17        A.    That's correct.
18        Q.    You didn't do a full source code analysis for
19   any drive; is that correct?
20        A.    That's correct.
21        Q.    You've never done a full source code of an
22   optical disk drive in your life; is that correct?
23        A.    That's true.
24        Q.    Now, with respect to your -- your opinions on
25   non-infringing alternatives, did I understand you
```

1  correctly to indicate -- well, strike that.

2         Did you tell me you did not analyze in your

3  report the cost of any of those non-infringing

4  alternatives that you pointed out?

5      A.   I would say that's true.

6      Q.   And you told me in your report you did not

7  look at the commercial availability of any of those

8  alternatives; is that correct?

9      A.   That's correct.

10      Q.   And am I correct that you also did not tell

11  me -- or strike that.

12         Did you also tell me that you did not look at

13  the ability of any of those alternatives to distinguish

14  between CDs and DVDs?

15      A.   Not -- not in any precise detail, no.

16      Q.   Okay.  And is it correct that you told me that

17  you do not know how Quanta designed its parts?

18      A.   That's -- that's correct.

19      Q.   And were you aware that Quanta contends that

20  it does not know how its drives with Philips controllers

21  work?

22      A.   Could you repeat that again, please?

23      Q.   Were you -- are you aware that Quanta contends

24  that it does not know how the drives that it sells that

25  have the Philips controllers, it does not know how they

1    work?

2         A.    That -- that's probably -- I -- I might have

3    run across that statement in -- in some of the material

4    I reviewed.  With that -- with that, I'll say yes.

5         Q.    Now, wouldn't that -- you also testified in

6    direct that Quanta could have modified its drives.

7              Is that -- did I understand you correctly?

8         A.    They could have.  Absolutely.

9         Q.    Wouldn't it be a problem to modify the drive

10   if you don't even know how the drive you already has --

11   you already have works?

12        A.    There are -- that's a fair statement, yes.

13        Q.    Okay.  And you mentioned some experience you

14   had with source code.  You knew how those products work,

15   didn't you?

16        A.    Yes, I did.

17        Q.    And are you surprised that Quanta would

18   contend that it doesn't know how its own products

19   operate with respect to disk discrimination?

20        A.    I really don't feel comfortable saying what

21   Quanta knows or doesn't know.  That's -- that's -- I

22   guess that's -- I guess that's where I'm hesitating.

23        Q.    Are you -- were you surprised to learn that

24   Quanta contends that it does not know how its drives

25   with Philips controllers operate?

1      A.   I guess I really don't know enough about the

2  business model of Quanta to -- to say yes or no.

3      Q.   Okay.  I'm asking for your own personal

4  reaction, when you learned that Quanta contends that it

5  doesn't even know how its own drives operate.

6      A.   If they are -- if they are just a contract

7  manufacturing house, it's quite possible that that's --

8  that's the case.  I don't -- I just don't know enough

9  about their business model to -- to talk about -- about

10  the details of Quanta.

11      Q.   But, Dr. MacFarlane, if they're just a

12  contract manufacturing house, how could you have opined

13  that they could have easily modified their drives?

14      A.   Because modifying source code is easy.

15      Q.   Well, if it's so easy to modify the source

16  code, then shouldn't -- wouldn't you need to understand

17  how the source code operates to modify it?

18      A.   Again, I really don't -- I really don't have

19  any firsthand knowledge of -- of Quanta's business

20  knowledge or what they know or not -- don't know.

21           THE COURT:  Well, but you're -- you know

22  whether or not you need to know about the source code,

23  if you're going to modify it.

24           THE WITNESS:  Oh, yes, yes.  That's

25  absolutely true, Judge.

1      A.    You should -- before you modify the source

2   code, you should know what you're doing with this

3   product.

4      Q.    (By Mr. Trop) Okay.   Thank you.

5            Now, you don't know what level of skill or

6   experience the engineers at Quanta have, because you

7   never talked to any of them; isn't that correct?

8      A.    That's correct.

9      Q.    And you never read any of their depositions

10  either, did you?

11     A.    That's my recollection, yes.

12     Q.    Now, with respect to the level of skill, you

13  opined about the level of skill even though you yourself

14  have no experience whatsoever in the design of optical

15  disk drives; is that correct?

16     A.    That's correct.

17               MR. TROP:  Let me check real quick here.

18               No further questions.

19               MR. PLATT:  Nothing further.

20               THE COURT:  All right.  You may step

21  down, Dr. MacFarlane.

22               Who will be your next witness?

23               MR. PARKER:  Brett Reed will be our next

24  witness, Your Honor, and Mr. Garnett will inquire.

25               THE COURT:  Okay.

```
 1                    (Witness sworn.)

 2           BRETT REED, DEFENDANTS' WITNESS, SWORN

 3                    DIRECT EXAMINATION

 4   BY MR. GARNETT:

 5      Q.   Good afternoon.

 6           Would you please introduce yourself to the

 7   Court and to the jury.

 8      A.   Yes.  My name is Brett Reed.  I'm from Los

 9   Angeles, California.

10      Q.   And what is your area of expertise?

11      A.   I'm an economist, and I specialize in patent

12   infringement damage and other types of damages in cases

13   such as this.

14      Q.   And would you please describe your educational

15   background?

16      A.   Sure.  I do have a slide -- there it is -- of

17   some of my background.  But I have a Master's degree in

18   economics from the University of California-Los Angeles,

19   or UCLA, and I did my undergraduate education at

20   University of California-Irvine.

21      Q.   And before this case, did you have any

22   experience with the optical disk drive or ODD industry?

23      A.   Yes, I did, and, more generally, in the

24   computer industry.  Again, the slide indicates some of

25   the companies with which I've worked or matters in which
```

1   I've worked with the companies, including in the ODD or

2   DVD industry, work I did with Panasonic, and a matter

3   involving Ricoh, another company that manufactures ODD

4   drives.

5        Q.   And did that experience include the

6   calculation of a reasonable royalty?

7        A.   Yes.  The items I picked for the lower part of

8   that chart are all matters on which I was working on a

9   matter -- working on a case involving the calculation of

10  a reasonable royalty involving patent damages.

11       Q.   Mr. Reed, is your background different than

12  Mr. Murtha's, LaserDynamics' expert?

13       A.   Yes, quite a bit.  I'm an economist.  I

14  research markets, competition, industries.  I analyze

15  license agreements from a different standpoint.  I look

16  at the underlying documents, including negotiation

17  documents that are produced by parties in litigation

18  such as this.

19            And I analyze it more from a standpoint of an

20  economist, looking at competitive aspects, being

21  concerned about the consequences of royalties to a

22  company in the industry.  And in that sense, I -- I

23  don't negotiate license agreements like Mr. Murtha.  I

24  sometimes consult with attorneys who are negotiating in

25  what I'm calling in a room next door or maybe on the end

1  of the phone, consulting with the attorneys who

2  typically negotiate the license agreements.

3        But I myself don't sit at a table negotiating

4  license agreements.

5     Q.   Does your work give you access to license

6  agreements?

7     A.   Yes.   That's what I hinted to a moment ago.

8  The interesting thing for me about my job is I get

9  access to documents produced by both sides of a case.

10  So if I'm involved in a case between MediaTek and

11  Panasonic, for example, I get access to the license

12  agreements of both sides, including all the underlying

13  negotiating documents to the extent those are produced

14  in cases, and I can look and see what the issues are

15  that were being considered by the parties, and,

16  ultimately, how they came to the conclusions about the

17  royalty rates that they agreed to.

18     Q.   Mr. Reed, what were you asked to do in this

19  case?

20     A.   In this case, I was really asked to do two

21  things.   One is to critique the analysis of Mr. Murtha

22  and his conclusion on a reasonable royalty rate.

23        And then second, also, to do my own analysis

24  of the Georgia-Pacific Factors and come up with a

25  conclusion on a reasonable royalty for Quanta to pay to

1  LaserDynamics in the event that the jury finds that the

2  patents are valid and infringed by Quanta.

3      Q.   Sir, if the jury determines that

4  LaserDynamics' patent is not infringed by Quanta, would

5  your opinion apply in this case?

6      A.   No.  My work would be -- would not be relevant

7  at all.

8      Q.   And would you please describe the materials

9  that you considered in the course of your work?

10     A.   Yes.  I considered a wide range of materials,

11 including depositions from this case; license agreements

12 produced in this case, of course; sales documents

13 produced by Quanta entities, QSI and Quanta Computer;

14 also market data; market research; information on market

15 shares; and public information and license agreements.

16     Q.   And what type of license agreements did you

17 review in the course of your work?

18     A.   There are really four categories.  License

19 agreements that were entered into by Quanta Computer;

20 license agreements that were entered into by

21 LaserDynamics, which you've heard some about already;

22 license agreements that were entered into by QSI, Quanta

23 Storage; and then as I mentioned a moment ago, the

24 public documents that give rise to information about

25 licensing generally in the ODD industry, more generally

1 relating to things like chipsets, and also the computer

2 industry.

3    Q.   Would you explain what kind of publicly

4 available agreements you reviewed?

5    A.   Sure.  There are a wide range of very large,

6 important companies that have been engaged in the ODD

7 industry or the DVD industry, and have been so for about

8 10 years or more.

9         And in many cases, information relating to the

10 licensing programs of those very significant companies

11 are made public.  And one can go to the website, for

12 example, of Philips and see the license agreements that

13 are offered both -- both for the Philips patents

14 individually and also as Philips administers the 3C

15 group, which you've heard of, I think, earlier in this

16 trial.

17         The 3C is a group of companies that entered

18 together into a pool, sometimes called a patent pool,

19 and they license hundreds of patents together in one

20 place.

21         And I've analyzed the information about

22 companies like that from their websites, looking at

23 royalty rates, for example, but also other public

24 information that is often reported about dealing with

25 the royalty situation in the ODD industry.

1      Q.    So you mentioned that you worked in the

2  computer and ODD industries.

3            Would you give the jury some background on

4  those companies in that industry?

5      A.    Sure.   I prepared a chart that kind of gives a

6  background about the ODD industry and the DVD industry.

7  And the top part of that chart shows the founders of the

8  DVD forum.   These are considered, really, the companies

9  that promoted DVD, that introduced the -- the

10 technology.   Much of it was patented that made DVD

11 possible.

12           And they include names we've heard and names

13 that are probably familiar to everybody here:   Toshiba,

14 Panasonic, JVC.   Time-Warner was involved in the

15 development of DVD, Mitsubishi, another company that

16 ultimately also purchased patents in the DVD space from

17 IBM.

18           And the color there is Philips.   And Sony, of

19 course, we've heard a lot about them.   Tomson is another

20 company that was involved.

21           And the lower part of the chart shows that

22 ultimately these companies that started working with DVD

23 introduced a lot of technology, received a lot of

24 important patents.   They formed into these patent pools

25 to license their technology, their patent technology.

1          And they -- they focused on licensing the

2    patents that were viewed as essential to manufacturing

3    the DVDs.  Sometimes the companies would have more

4    patents, but only the essential patents would be part of

5    these pools.

6          And you can see the 6C pool started out with

7    six companies.  That's the 6C, and was headed by

8    Toshiba, included Panasonic, Hitachi, other companies as

9    well.  Ultimately, Toshiba bought the IBM DVD-related

10   patents, or at least certain of them, and Sharp, Sanyo,

11   and Samsung also joined.

12         So now, 6C represents the patents of ten

13   companies, and it's quite a large set of important

14   patents.

15         3C is a similar situation administered by

16   Philips.  Sony and Pioneer were initially in it.  Later,

17   additional companies like LG Electronics.  And for

18   certain types of drives, like recorders, HP patents were

19   included.

20         And I think in some areas, there's also Ricoh

21   was involved, but, generally, it's the Philips, Sony,

22   and Pioneer group.

23     Q.   Before this --

24     A.   I'll just finish with one last thing.

25     Q.   Certainly.

1      A.   At the bottom, Tomson is one of the original

2   DVD forum companies that didn't join one of those pools,

3   but it separately licensed its patents and is

4   well-known, a lot of public information about Tomson's

5   efforts.

6           And there's another company that was active in

7   licensing relating to DVD called Nissim.  And there's

8   also a lot of public information about Nissim, its

9   efforts to license, the number of companies that it has

10  licensed.  And that's other public information that's

11  available.

12     Q.   Before this case, had you heard of

13  LaserDynamics?

14     A.   No, I hadn't.

15     Q.   And before we get into the details of your

16  opinion, would you please summarize for the jury what

17  you believe would be a reasonable royalty in this case?

18     A.   Yes.  And I believe I have a chart that shows

19  the high-level summary, but it's quite simple.

20          In my opinion, a reasonable royalty

21  negotiation that gave rise to a decision of the amount

22  that Quanta would pay to LaserDynamics for what I view

23  to be a three-year term, from August of 2006 through

24  approximately today, because that's the appropriate time

25  period for -- for the evaluation of damages as I

1 understand it.

2        The reasonable royalty would be $500,000.

3    Q.    Now, your 500,000-dollar number is quite

4 different than Mr. Murtha's 52-million-dollar number.

5        Would you provide the jury with a preview of

6 your critique of Mr. Murtha's number?

7    A.    Yes.  And I'll get into more detail, but I

8 prepared a chart that I think shows at a high level what

9 the difference of opinion is.  And, again, I'll get into

10 more detail later.

11        But this chart shows the activity of licensing

12 of these major companies in the DVD and ODD space.  And

13 if we look at the chart, I put check marks for where --

14 what the activities are -- of the companies or the

15 groups, whether they license their patents as a

16 percentage royalty applied to an ODD, whether they do a

17 per-unit royalty that applies to an ODD unit.

18        And also, I put on there whether companies

19 with ODD patents ever license their patents based on a

20 percentage royalty applied to a personal computer or a

21 notebook computer.

22        And you can see, none of the companies have

23 licensed their ODD patents where the percentage royalty

24 would apply to a personal computer.  Even the most

25 powerful groups of patent holders, like 3C and 6C and

1   Sony and Philips and Panasonic, they license as a

2   percentage royalty applied to the drive, the cost of

3   that drive or the price of that drive.

4              And, in fact, LaserDynamics is -- is somewhat

5   unusual, in that they were licensing in the same time

6   period that these other groups and companies were, but

7   they didn't license on a per-unit basis or a percentage

8   royalty basis.  They used a lump sum approach.

9              And now, Mr. Murtha is asking the jury to

10  conclude that instead of lump sum, it should be a

11  percentage royalty, not on an ODD drive but on the

12  entire computer.  And that's the basis of the large

13  difference in his 52-million-dollar number and what I

14  think is a reasonable royalty.

15      Q.   Sir, are some of these ODD companies also

16  involved in the computer industry?

17      A.   They are.  And that kind of highlights my

18  previous point.  These four highlighted line entries

19  here represent companies that manufacture personal

20  computers or notebook computers.  Toshiba, the head of

21  the 6C group, Hewlett-Packard, Sony, and Panasonic all

22  manufacture personal computers.

23              And yet, when they were licensing the patents

24  related to ODD technology or DVD technology, they

25  licensed based on the price of that drive, not on a

1    personal computer.

2        Q.   Mr. Murtha is also opined that a 6-percent

3    royalty should be applied to the price of the ODD.

4             Do you agree with that?

5        A.   I also disagree with that.  I think it's much

6    too large of a royalty to apply to an ODD price.

7             And, again, later I'll get into more details

8    as to why I believe that.

9        Q.   How did you reach your conclusion that the

10   reasonable royalty in this case should be $500,000?

11       A.   Well, like Mr. Murtha and like my analysis in

12   every other project I've worked on, I did a

13   Georgia-Pacific analysis.  I considered the same 15

14   factors which -- which relate to licensing issues,

15   economic issues, financial issues.

16            And I -- and I evaluated those factors to come

17   up with what would be a reasonable royalty.

18       Q.   Are there any assumptions you make as part of

19   your Georgia-Pacific analysis?

20       A.   Yes, there are.

21            First of all, I assume that the jury has

22   already determined the patent is valid and infringed, or

23   that the parties understand that at the time of this

24   hypothetical negotiation.

25            So there's no question between the parties

1  about whether the patent, in fact, would be infringed if

2  the company manufactured the products that were accused.

3       And then the second part would be this whole

4  concept of the hypothetical negotiation, that the two

5  parties would sit down before the infringement began,

6  and negotiate what a reasonable royalty would be, taking

7  into account these economic, financial, and licensing

8  issues.

9  Q.   And Mr. Murtha discussed the Georgia-Pacific

10 Factors.  Did you also consider the Georgia-Pacific

11 Factors in your analysis?

12 A.   Yes.  As I just mentioned, I considered all 15

13 factors.

14      In many cases, the difference in my views and

15 Mr. Murtha's views for particular factors are not that

16 significant.  But in particular areas, there are very

17 significant difference.

18 Q.   So to avoid repeating to the jury all the 15

19 Georgia-Pacific Factors, let's focus on those factors

20 which you found most important to your analysis.

21 A.    Okay.  I would start with -- with

22 Georgia-Pacific Factor 1, which is the licensing

23 activity and the royalty rates associated with the

24 patent owner -- in this case, LaserDynamics -- looking

25 for information that's pertinent to what it actually

received, when it licensed its patent in this case, not
only the '981 patent but other LaserDynamics' patents.

Q.   And did you summarize the LaserDynamics'
non-settlement license agreements?

A.   I did.  It was a chart from my original expert
report that was, I believe, also used yesterday by Mr.
Murtha in his testimony.

I have a slide.  Yeah, that's my -- that's my
exhibit from my expert report.

That shows, essentially, a timeline of
these -- these non-settlement license agreements that
were entered into by LaserDynamics and with some of the
largest companies in the ODD space.

We can see again these DVD forum companies,
like Toshiba, Pioneer, Hitachi, Sony.  And it spans
approximately four years from -- from Toshiba at the
beginning up to NEC at a later time period.

Q.   Well, is there any correlation between the
license rates and time?

A.   I don't believe so.  I think this chart shows
there is not.  One of the things I was interested in
looking at is whether there was a change in the
licensing approach, or after -- I analyzed what happened
after LaserDynamics received the initial $1 million in
the early period, whether that might have changed the

1  way they approached things.

2       But you can see NEC, which is a very large

3  company that manufactured ODD drives, and Toshiba at the

4  beginning, that four years' span between them,

5  approximately four years, and very similar amounts were

6  being received by LaserDynamics.

7       Q.   And does this chart reveal any information

8  about LaserDynamics' licensing policies?

9       A.   Well, I think it does.  I think it reveals

10  that LaserDynamics, as it was licensing a very large

11  portion of the industry, always was -- was willing to

12  accept a lump sum royalty.  And those lump sum royalties

13  fell within the range of 50,000 to about $250,000.

14       Q.   So far you've only discussed LaserDynamics'

15  license agreements.

16       What about the other license agreements that

17  you looked at in the course of your work?

18       A.   Well, for example -- and I mentioned them.  I

19  have a slide that summarizes -- summarizes this with

20  quite a bit of information, so please bear with me.

21       Q.   Well, why don't we -- why don't we start on

22  the left side first, then.

23       A.   Okay.  If you can highlight that top part.

24  That's great.

25       So this relates to Georgia-Pacific Factor 2,

1  which are the royalty rates paid by -- by the potential

2  hypothetical licensee; in this case, the Quanta

3  entities.

4          And -- and these show the royalty rates that

5  were paid by or agreed to be paid by license agreements

6  by Quanta Storage, QSI.

7  ███████████████████████████████████████████

8  █████

**REDACTED BY ORDER OF THE COURT**

9  █████

10  ████████████████████████████████████████████████

11  ██████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████

15  ████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  █████

19  ████████████████████████████████████

20  ████████████████████████████████████████████████

21  ██████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████

25          So here, we're getting down to a smaller group

1   of patents rather than the very large sets.  And what

2   kind of royalties do we see when we're looking at a

3   small set of important patents.

4               **REDACTED BY ORDER OF THE COURT**  ▮ ▮

5   ▮

6    Let's go back to the full chart, and if you would

7   explain the right column in this chart.

8                    THE WITNESS:  Could you highlight the

9   first two would be -- that's great.  Thank you.

10      A.   So public information about royalty rates, I

11  believe, are associated with Georgia-Pacific Factors 12

12  and 13.  And those factors really ask about, how is

13  patented technology compared to other technology,

14  typically licensed in the industry or in related

15  industries.

16               And one of the places I started was looking at

17  the 3C and 6C patent licensing experiences.  And as I

18  mentioned before, 3C and 6C involve very large numbers

19  of companies with important backgrounds in the ODD

20  industry.  They license very large numbers of patents.

21               6C publicly states that they have over 100

22  patent families, and a patent family can include many

23  U.S. patents and many overseas patents as well.  And the

24  3C patent pool is also a very large number of patents.

25               And their licensing program has been and has

1  always been 3.5 percent of the ODD price, in the case of

2  the 3C patent pool.  There also are royalty minimums or

3  maximums that apply.  In fact, over time, the maximum

4  has actually been reduced, because as prices fell, these

5  licensors recognized that they had to drop their maximum

6  royalty amount.

7          The 6C patent pool is licensed at 4 percent of

8  the ODD price royalty, again, for 10 companies.  And not

9  only the issued patents but other potential future

10 patents that are essential that are issued to the

11 companies that belong to that group.

12          MR. GARNETT:  And the bottom part of the

13 right column?

14     Q.   (By Mr. Garnett) Could you explain that,

15 please?

16     A.   Yes.  So this is continuing with additional

17 public information.  As part of my ongoing research in

18 the ODD industry and more generally in the computer

19 industry, I track and follow information about rates.

20          And as I mentioned earlier, Nissim is a

21 company that's involved and has patents in the area of

22 parental control and DVD and other areas as well.  And

23 Nissim has been actively involved in licensing very

24 publicly identifying when it licensed a company and what

25 the company pays.

1           They licensed Microsoft not too long ago, and

2   their royalty structure was initially 25 cents.  And

3   then they were issued a couple of additional patents,

4   and they -- they raised their rate going forward to --

5   to -- by an additional 12 cents.  So for those

6   additional patents, it's kind of a similar point to what

7   I was talking about with Hewlett-Packard.

8           For the additional patents, a relatively small

9   group, they charge an additional 12 cents.

10          MR. GARNETT:  Can we have the full slide

11  again?

12      A.   Well, I should move to the middle part below

13  that.

14      Q.   (By Mr. Garnett) I'm sorry.  I didn't mean to

15  interrupt you.

16      A.   That's okay.  I'm moving too slow perhaps.

17      Q.   No, not at all.

18      A.   The -- the next group is public information

19  that I've researched over many years, relating to

20  royalties for chipsets.  If you remember my first slide,

21  I worked on many matters involving companies that make

22  chipsets.

23          They're semiconductors.  They're used as

24  really the brains of devices, so like a DSL chipset,

25  which is in the case of Texas Instruments.  They

1  invented the key technology that's used for most of the

2  DSLs that we probably all have in our home.

3        And they've licensed that to most of the

4  companies that manufacture these chipsets that are used

5  in DSL modems.  And public information made it available

6  for me to -- to -- to use this information.  Texas

7  Instruments was charging about 2 percent, according to a

8  Texas Instruments employee who testified in court about

9  what they actually did.

10        And Rambus is another company that has been

11  very active in licensing technology both related to

12  DRAM, which is memory for a PC, and also DRAM -- the

13  technology that's used for DRAM controllers that are

14  controllers in personal computers that interact with

15  memory.

16        And Rambus has publicly stated that they've

17  licensed their patents for a range of .75 percent to 3.5

18  percent.  And importantly, this applies to the chipset

19  price, not the price of a DSL modem, not the price of an

20  ODD drive, but to the chipset that is part of the brains

21  of that product.

22        We've heard Dr. Howe discussing in this case

23  where he was analyzing the chipset and the source code

24  for that chipset.  And -- and in this case, the --

25  there's information about the chipset value, and one can

1  look at these types of royalty rates to -- to get

2  another benchmark.

3          And then the last entry is information that

4  was available between a term sheet between Sony and Asus

5  that was produced in this case where Sony said, we have

6  our essential patents; these are the patents related to

7  3C; we'll license you those essential patents for

8  2 percent, but we have additional useful patents.  If

9  you would like to take a license to that, we'll charge

10 you 2.1 percent.

11         So an additional .1 percent for these

12 additional useful patents.  It's another important

13 observation about what happens when a smaller set of

14 patent technology is licensed in the industry.

15     Q.   Mr. Reed --

16             MR. GARNETT:  Could we have the full

17 slide?

18     Q.   (By Mr. Garnett) That was a lot of

19 information.  Could you remind the jury which of these

20 license agreements you think would not be a good

21 benchmark for your work in this case?

22     A.   Well, in a nutshell, it would be the

23 agreements that involve very large number of patents,

24 like the 3C, the 6C, the Sony, the Panasonic.

25             And I have a slide that comes from my report

1    that shows the number of patents associated with Sony

2    and -- and Philips.  So this came from my first expert

3    report, and it lists -- this is from the public website

4    of Sony and then also from Philips that show -- and I

5    actually had to go through and count them, because they

6    don't give you these summaries, but they list the

7    patents, and they list it by category.

8               So, for example, under Philips, the first

9    entry is for DVD plus RW plus R, recorder technology.

10              And so for a company that would be

11   manufacturing that type of drive, there would be 40 U.S.

12   patents and 278 non-U.S. patents that Philips by itself

13   owned and were viewed essential to that particular type

14   of DVD device.

15              And you can see the listing for all these

16   different categories.  There's a large number of

17   patents.  I have to say that there's some overlap across

18   these, but it's a very large number of patents.

19              For Sony, also at the top, you can see there

20   are two categories with 50 U.S. patents and 300 non-U.S.

21   patents.

22              MR. GARNETT:  Could we go back to the

23   previous slide?

24       Q.   (By Mr. Garnett) And, sir, would you remind

25   the jury which of these license agreements you think

1    would be a better benchmark for your work in this case?

2        A.    I think the important benchmark is looking at

3    a smaller group of patents and -- and I mentioned three

4    specific and then also the chipsets.

5              But the specifics would be the additional

6    dual-layer Hewlett-Packard technology that had the

7    25-cent per-unit royalty; the information from Nissim

8    for the additional patents, 12 cents per unit; the Sony

9    experience with 21 percent for the additional useful

10   Sony patents; and then also the chipset patent licensing

11   where those chipset patent -- patented technologies were

12   licensed very broadly to a large number of firms that --

13   that were using that technology.

14       Q.    Okay.  Let's move on to another

15   Georgia-Pacific Factor.

16             What is Georgia-Pacific Factor 5?

17       A.    Georgia-Pacific Factor 5 is the commercial

18   relationship between the parties.  And Mr. Murtha and I

19   both agreed that -- that the relationship is not a

20   competitive one.

21             LaserDynamics is interested in licensing its

22   technology, but the difference between Mr. Murtha and my

23   analysis is that I recognize that because LaserDynamics

24   has licensed most of the industry, LaserDynamics would

25   not receive royalties from -- from other companies, if

1  Quanta Computer was to use the drives manufactured by

2  those companies.

3         So LaserDynamics, in order to get additional

4  royalty income from Quanta Computer, would want to be

5  realistic and reasonable so that otherwise Quanta isn't

6  forced essentially, as Mr. Davis said, to -- to buy from

7  other drive manufacturers where Quanta or its customers

8  would not be subject to a -- to a large per-unit

9  royalty.

10     Q.   What companies could Quanta Computer buy

11  licensed drives from?

12     A.   Well, there's, again, from my first expert

13  report, a slide I had prepared that -- that showed --

14              THE WITNESS:  If we can do the top part

15  of this, please.

16              If you can move that -- okay.  That's

17  fine.

18     A.   This shows the -- the different ODD

19  manufacturers that were actually selling drives to

20  Quanta Computer, the top part does.

21         The bottom part shows additional drive

22  manufacturers where the Quanta Computer records did not

23  show that they were purchasing the drives.  But there

24  are a large number of drive manufacturers, and these are

25  major companies like -- like NEC, which we talked about

1 before.

2       Gold Star is part of -- like -- Gold Star was

3 the old Lucky Gold Star, which is now LG Electronics;

4 Sony, of course, Pioneer, Philips, Toshiba, and TEAC.

5 So Quanta Computer is already buying drives from these

6 

7 **REDACTED BY ORDER OF THE COURT**

8 

9       So if Quanta was presented with -- with a

10 demand for a per-unit royalty, even if the royalty

11 wasn't that large, Quanta is constantly working to try

12 to save pennies so that it can drop the price of its

13 products for companies like Dell, to make it more

14 affordable for us.

15       And if Quanta was told, we want you to pay --

16 by LaserDynamics, we would like you to pay us 12 cents,

17 15 cents per unit, let alone 6 percent of an ODD price,

18 or 2 percent of the computer price, Quanta would turn to

19 these other companies, like Toshiba, and say, please

20 sell me more units.  I can't afford to buy from Sony.

21 And at the same time, Sony would want to react to that

22 by finding a way to get units to Quanta Computer.  So

23 that's a very important fact that I don't believe Mr.

24 Murtha has considered appropriately.

25     Q.  So would Quanta Computer buy a drive that was

1   above market price due to a high royalty?

2       A.   I don't believe so at all.  We saw numbers

3   like $28 as the average price of a drive.  And then we

4   also saw or heard about royalties that were being

5   suggested of $16.

6            So Quanta would -- Quanta Computer would have

7   the choice of buying a 28-dollar drive from Toshiba, a

8   large company that can produce a very large quantity, or

9   if they bought through Sony Optiarc or QSI, they'd have

10  to pay $28, the cost of the drive, plus a royalty of 14

11  or $16.  It wouldn't happen.

12           And this is a factor that would be part of the

13  negotiation between Quanta Computer and LaserDynamics.

14           Quanta would say, look, LaserDynamics, if you

15  want it, get some additional money here, you should be

16  reasonable, because otherwise you're going to force me

17  to buy from these others, and you won't get anything.

18      Q.   And based on your analysis of these

19  Georgia-Pacific Factors, what did you ultimately

20  conclude would be a reasonable royalty for Quanta to pay

21  LaserDynamics in this case?

22      A.   Well, ultimately, I concluded that the number

23  I already spoke to, 500,000.  But I do have a chart that

24  summarizes the information, this high-level information

25  I considered.

1          And -- and on the LaserDynamics' side, I've

2    listed here 16 LaserDynamics non-settlement license

3    agreements, all ranging between 50,000 and $250,000, all

4    lump sums.

5          Also, the point that LaserDynamics would not

6    get additional royalty income if it didn't come to

7    reasonable terms with Quanta Computer.

8          And on the QSI/Quanta side, there's a number

9    of options that were available, but foremost among those

10   are what I just talked about, that Quanta -- Quanta

11   Computer would look to these other drive manufacturers,

12   if the royalty was too large.

13         And QSI would also consider options, and one

14   of the options that I focused on was they could buy

15   chipsets from a licensed chipset supplier.  And so in

16   consideration of that and also looking at the three-year

17   timeframe, I thought $500,000 is a good measure of a

18   reasonable royalty.

19      Q.   Mr. Reed, did you do a check on the

20   reasonableness of your conclusion?

21      A.   Yes, I did.  I prepared a chart again that

22   summarizes -- summarizes this information.

23         And the top part, I've addressed already that

24   I certainly made a reasonableness check to say, let's

25   look at what actually happened, the license agreements

1   that were entered into with royalties between 50,000 and

2   250,000 that covered the life of the patent.  So it's

3   not a three-year term.

4           It's however long the patent and the patent

5   families might -- might be -- be active.  And that could

6   be 20 years or longer, depending on when certain patents

7   that are included in the license get issued, because

8   they might not all be issued already.

9           And then another important difference is, this

10  is a license for -- this hypothetical license is a

11  license for just the '981 patent, not Japanese patents,

12  not other patents that are owned by LaserDynamics.

13  So comparing the $500,000 to the 50,000 to 250,000

14  range, considering the difference in the term, the

15  number of patents, the coverage of the patents, I

16  believe 500,000 is reasonable.

17          And then the lower part goes back to those

18  benchmarks I was talking about.  What happens when we

19  take the royalty base associated with LaserDynamics'

20  calculations of how many units are at issue in the

21  damage period here.

22  ██████████████████████████████████████████████

23  ███     **REDACTED BY ORDER OF THE COURT**

24  ███

25  ███████████████████████████████████████████████

1 ████████████████████████████████████████

2 ██████

**REDACTED BY ORDER OF THE COURT**

3

4         The next entry, Nissim, an additional 12

5 cents, which is a fairly large royalty rate.  A lot of

6 ████████████████████████████████████████

7 ████████████████████████████████

8         And then finally, if we look at the chipset

9 value and we apply a 1- to 2-percent range, which I got

10 from evaluating the Rambus and the -- and the Texas

11 Instruments' royalty rates for chipsets, and then apply

12 it to the -- to the chipset value of the ODD, which I

13 based on a 3-dollar value as the chipset part of that

14 ████████████████████████████████████████

15 ████████████████

16     Q.    Let me ask you one last question about your

17 approach.

18         Have you ever applied a lump sum royalty

19 payment in other patent cases?

20     A.    Yes, I have.  In some cases, it's appropriate.

21 In other cases, it's not.

22         When the evidence is that's the way the

23 company that's licensing its patents does it suggests

24 that, that lump sum makes sense.  That's an important

25 factor.

1          If the industry more generally did it that

2    way, that's an important factor.

3          If the evidence of what is the cost of the

4    alternatives suggests that it should be a lump sum

5    because the alternatives are quite viable, then all

6    those reasons give rise to what I think appropriately

7    would be a lump sum royalty.

8      Q.   Let's turn back to your critique of

9    Mr. Murtha.

10          What would be the effective royalty rate, if

11   you applied Mr. Murtha's or LaserDynamics' damage

12   demand?

13     A.   I'm not sure I understand, but you might be

14   asking about a calculation I did summarizing

15   Mr. Murtha's analysis.

16     Q.   Yes.

17     A.   And that's a slide that I prepared.

18          So this summarizes Mr. Murtha's conclusions

19   applied to Mr. Davis' calculations, and I don't have --

20   I should say I only have very minor issues with

21   Mr. Davis' calculations.  By and large, he did a fine

22   job putting together the information.

23          So I'm focusing on, really, the issue from the

24   ██████                                              █

25   ██████    **REDACTED BY ORDER OF THE COURT**    ████

1  of the damage amount is associated with the

2  approximately 14-dollar-per-unit royalty, because it's

3  2 percent of the computer price.

4         And only 0. -- .0367 percent is associated

5  with the 6-percent royalty.

6         And then finally, if you look at the bottom,

7  if you take that 14-dollar amount and compare it to the

8  price of an ODD drive, it's a 50-percent royalty rate.

9  It's unheard of.

10    Q.   Is Mr. Murtha's 6-percent royalty rate on the

11 price of the ODD reasonable, in your opinion?

12    A.   No, I don't believe so.  And, again,

13 comparison to the actual benchmark rate suggests --

14 indicates why it's not reasonable.  6 percent is very

15 large compared to -- to the licensing history in the ODD

16 industry.

17         And, again, I have a chart that compares

18 these.  So this shows on the one side the LaserDynamics

19 royalty demand, 6 percent of the ODD revenue.  As I just

20 showed, though, this reflects only a very small part of

21 the total damages.  But even this -- this rate is too

22 large.

23         So if we compare it to the rates of Sony,

24 TEAC, Panasonic, the 3C patent pool, the 6C patent pool,

25 this royalty rate of 6 percent for one patent is larger

1  than the rates for the entire patent portfolios and

2  patent pools of these other groups.

3          If we compare it to the rates for the chipsets

4  and we take into account the chipset value, about $3

5  compared to a 28-dollar value of an ODD drive, we'd have

6  to adjust the royalty rate to make them comparable.

7  But then we're comparing 6 percent of the ODD versus for

8  these chipset companies a royalty of 0.1 percent or 0.4

9  percent.  So Mr. Murtha's royalty is at least 20 times

10 too large compared to that benchmark.

11         And then finally down below, again, you can

12 see the royalty that -- it was shown at opening, as I

13 believe it was stated, the royalty that was -- that

14 LaserDynamics was asking the jury to award, $1.69.

15         Of course, that doesn't relate to many

16 products actually being claimed in this case, 0.03

17 percent, but if it was, this chart, I think, shows even

18 that $1.69 is unreasonable compared to the 25-cent

19 Nissim rate, the additional 12 cents for the additional

20 Nissim patents, the dollar and the additional 25 cents

21 per dual-layer patents charged by Hewlett-Packard.

22         So I believe this shows that the 6 percent of

23 the ODD price is not a reasonable royalty.

24     Q.   What would happen to Quanta Computer's

25 profitability if it had to pay 2 percent of the computer

1    price to LaserDynamics?

2        A.    Well, first of all, I don't believe that could

3    happen.  If that was the result of the hypothetical

4    negotiation, Quanta Computer would have to buy drives

5    from -- from another supplier or have its customers buy

6    drives from another supplier to avoid the royalty.

7             They would turn to Toshiba; they would turn to

8    Pioneer.  But if for whatever reason Quanta Computer did

9    have to pay the 2 percent, it would take away their

10   operating profit on every drive that was subject to --

11   on every drive and computer that was subject to that

12   ████████ ███████ █████ ████ ███████ ██████ ███████ ████

13   ██                                                    ███

14   ████       **REDACTED BY ORDER OF THE COURT**

15              ██████ █████ ██████ ████████ █████ ██████ ███████

16   ████ █████ █████████ ██████ █████ █████ ███████ █████████

17   █████████ ██████ ██████ ████████ █████████ █████ ████████

18   █████ ██████ ████████ ███████ ██████ ██████ ████████ ██

19   an opportunity to raise prices.  It's a very competitive

20   industry.  They would have to look to other drives.

21       Q.    So would you summarize for the jury your major

22   critique of Mr. Murtha's opinion in this case?

23       A.    Yes.  First, the use of the 2 percent of

24   the -- of a notebook computer price, there's no

25   precedent for it.  It results in a 14-dollar royalty

1    that's effectively a 50-percent royalty rate on the

2    drive.

3           It doesn't make any common sense, given the

4    realities of the industry and the competition in the

5    industry.  And I prepared a chart that would -- just

6    summarizes the overall results.

7           So this shows -- the first blue bar is the

8    royalties that LaserDynamics actually received in its

9    nonsettlement agreements ranging from 50,000 to

10   $250,000.

11          The second bar or arrow, if you will, shows,

12   with a scaling adjustment, because it had to be scale

13   adjusted, $52 million is what they're claiming for the

14   three-year time period.

15          And then finally, if you can add the next bar,

16   what I believe is a -- a reasonable royalty, $500,000,

17   for Quanta Computer to pay to LaserDynamics in the event

18   that the patents are found to be valid and infringed.

19      Q.   So, in your opinion, is LaserDynamics damage

20   demand off the charts, Mr. Reed?

21      A.   Well, yes, that's a way of putting it.  I

22   believe that there's no basis for this 52-million-dollar

23   number.

24      Q.   And would you remind the jury what you would

25   consider to be a reasonable royalty in this case?

1        A.   Given the time period at issue here and the

2   facts at issue in this case, 500,000, in my opinion, is

3   a reasonable royalty.

4        Q.   Thank you.

5             MR. GARNETT:  I pass the witness.

6                  CROSS-EXAMINATION

7   BY MR. LUCK:

8        Q.   Hello, Mr. Reed.

9        A.   Hello, Mr. Luck.  How are you?

10       Q.   Remember, I took your -- the deposition in

11  Los Angeles in March or April of this year?

12       A.   April, yes.

13       Q.   Is it my understanding of your opinion in this

14  case that in light of QCI's sale in the United States of

15  ██████ ██   **REDACTED BY ORDER OF THE COURT**      ██████ ██

16  is your opinion that your client would only pay

17  $500,000?  Is that correct?

18       A.   Yes.

19       Q.   Now, you say you have some experience in ODD

20  technology; is that correct?

21       A.   Well, you say ODD technology.  I think I

22  described it as the ODD industry, looking at the

23  economic licensing and financial issues in that

24  industry.

25       Q.   I stand corrected.

1          Is that due in part to the fact that you have

2  been an expert for these Defendants on three prior

3  occasions?

4      A.   Well, I believe only in one prior occasion was

5  I working with QSI.   Other cases involved computer

6  industry technology, but also because I've worked on

7  several matters with Panasonic as well.

8      Q.   I understand that you said that you have very

9  little issue with the -- the royalty base; is that

10  correct?   I believe you said Mr. Davis did a good job in

11  that; is that right?

12      A.   I believe Mr. Davis did a fine job.   The only

13  disagreement I had with him was dealing with the

14  indirect units, which were a relatively small part of

15  the ultimate damage number.

16      Q.   Am I correct in understanding the entirety of

17  your report in this case -- I'm sorry -- the entirety of

18  your opinion in this case are in your two expert

19  reports?

20      A.   I would say yes, but also there was some

21  additional exhibits that were prepared reflecting

22  changes that took place in LaserDynamics' analysis.

23      Q.   They were not in your report?

24      A.   Well, the information is in my report, but,

25  ██  ████      **REDACTED BY ORDER OF THE COURT**      ████

1  number that I testified to, that was a new number that

2  came from LaserDynamics, and I don't believe that number

3  was in my report.

4      Q.   Well, let's track your analysis.

5          I believe you indicated that you did perform a

6  GP analysis; is that correct?

7      A.   That's correct, yes.

8      Q.   And you understand that that kind of analysis,

9  there is a hypothetical negotiation performed?

10     A.   There is -- the 15th factor deals with the

11 hypothetical negotiation between the two parties, yes.

12     Q.   And in that hypothetical negotiation, the

13 patent is assumed to be valid and infringed; is that

14 correct?

15     A.   Absolutely.

16     Q.   You admit, under Factor 1, that the --

17 LaserDynamics' prior agreements do not result in

18 established royalty; is that correct?

19     A.   Yes, I agree with Mr. Murtha on that.

20     Q.   But you, nevertheless, contend that if you

21 analyze the highs and the lows of those agreements --

22         MR. LUCK:  And if I could have Tab 11,

23 please.  That is -- that's actually R2.

24     Q.   (By Mr. Luck) Nevertheless, you claim that if

25 you analyze the highs and the lows from this and account

1    for the duration, you're still in the ballpark of the

2    numbers here (indicating) in these --

3                    THE COURT:  Mr. Luck, remember that when

4    you turn your back, unless you move that microphone, the

5    jury can't hear you.

6                    MR. LUCK:  I'm sorry.

7        Q.    (By Mr. Luck) You -- nevertheless, it's your

8    opinion that though you're not claiming an established

9    royalty is created as a result of these prior

10   agreements, your opinion in this case doesn't deviate a

11   great amount from the range of these; is that correct?

12       A.    I think it depends on what you mean by deviate

13   by a great amount.  If I believed this was an

14   established royalty, I would look at the average, or I'd

15   look at some of the figures, maybe compare Quanta

16   Storage compared to companies here, and I would use that

17   as the value.

18              Five hundred thousand is quite a bit larger

19   than the amounts we see on this -- this tab.

20       Q.    You said, with respect to Tab 11, that you

21   analyzed a timeline; isn't that correct?

22              Isn't Tab 11 supposed to be the timeline at

23   issue?  Is that correct?

24       A.    Yes.  Yes.

25                    MR. LUCK:  If I could have R8, please.

1    Q.    (By Mr. Luck) Mr. Reed, isn't this actually

2  the timeline involved here where we have the -- the

3  timing of the LaserDynamics' agreements against the date

4  of the hypothetical negotiation?  Isn't this actually a

5  true timeline here?

6    A.    Well, this would be a timeline for a broader

7  picture of what was going on, but I was focusing on the

8  timeline of those particular agreements.

9    Q.    You remember you told me that it was

10 commonplace to observe industry reports on forecasts of

11 projected sales; is that correct?

12   A.    I'm not sure I understand the question.  I'm

13 sorry.

14   Q.    I believe we were discussing how parties would

15 arrive at projected sales, and you said it was

16 commonplace in the industry to look at market forecast;

17 is that right?

18   A.    Well, certainly, I think it's common that

19 industry participants will look at third-party forecasts

20 or early forecasts.

21   Q.    In fact, yourself (sic) relied on a TSR

22 report, is that correct, in this case?

23   A.    That's -- that's correct.

24   Q.    And you believe a report of that nature is

25 reliable as an indicator of forecast of sales and trends

1  and the like; is that correct?

2       A.   I think it can be.  You have to be careful

3  sometimes, but they are used.  I know Panasonic used

4  TSR.

5       Q.   How about the TSR report that you relied on in

6  your report?  Do you believe that -- do you believe that

7  to be a reliable indicator?

8       A.   If it's used appropriately, yes.

9       Q.   Did you use it correctly in your report?

10      A.   I think the primary use that I had was

11  correcting one of Mr. Davis' calculations.  And I think

12  with respect to that particular use, yes, I used it

13  correctly.

14      Q.   All right.

15              MR. LUCK:  If I could have the 2006 TSR

16  report, please, the top page.  Thank you.

17      Q.   (By Mr. Luck) Is this not the TSR report that

18  you referred to in your report?

19      A.   I believe it is.

20      Q.   Let me show you what is on Page 3 of that

21  report.

22              In -- isn't it true, in your expert reports in

23  this case, you made no analysis of these trends, as

24  reflected in the TSR report here?

25      A.   I'm not sure what you mean by not making any

1  analysis of the trends.

2  　Q.　Well, this is a analysis of trends in the

3  market for ODDs, isn't it?

4  　A.　Yes.

5  　Q.　Okay.  You notice, in this particular graph,

6  it is styled, Further Expansion of Recordable DVD

7  Market.

8  　　　Do you see that?

9  　A.　It's a little hard to read, but I certainly

10 see an increase in trend.

11 　　　MR. LUCK:  Perhaps we can blow it up.

12 　Q.　(By Mr. Luck) Okay.  Down here (indicating),

13 do you see the timeline?

14 　A.　I see --

15 　Q.　Do you see --

16 　A.　I see a timeline, yes.

17 　Q.　Okay.  Well, where were -- where on this

18 timeline were the agreements which you rely upon under

19 GP Factor 1?  They're over here (indicating), aren't

20 they?

21 　A.　It would be 1999 to -- to 2002.

22 　Q.　In here (indicating); is that correct?

23 　A.　Yes.

24 　Q.　In this time period.

25 　　　The date of the hypothetical negotiation,

1    though, is over here (indicating), isn't it?

2        A.   Yes, but you should be careful with this chart

3    because --

4              THE COURT:  Well, he just asked you if

5    that's where it was, Mr. Reed.

6              THE WITNESS:  All right.  Thank you.

7        Q.   (By Mr. Luck) So in your report, you didn't

8    analyze the trends in recordable DVD-W, and how they

9    were increasing from 1999 through 2006, did you?

10       A.   I don't know -- yes, I considered this,

11   because this is information I'm aware of.

12       Q.   It's not in your report, though, is it?

13       A.   No reason for this to be in my report.

14             MR. LUCK:  If I could ask you to go to

15   Page 9.

16       Q.   (By Mr. Luck) This is another page of the TSR

17   report on which you relied, and if I could ask you to

18   look on the right-hand side to media market trends.

19             Do you have that?  Is that clear enough --

20       A.   Yes, it is.

21       Q.   -- on your screen?

22             Okay.  Now, again, on this chart, where are

23   the agreements you reviewed under Factor 1?

24             They're over here (indicating), aren't they?

25       A.   They would be at the beginning of this chart.

1     Q.   Yes.  And where on this chart would be the

2  date of the hypothetical negotiation?

3     A.   Well --

4     Q.   It would be right in here (indicating); is

5  that right?

6     A.   According to LaserDynamics, yes.

7     Q.   What do you mean by that?

8     A.   That's --

9     Q.   I don't understand your answer.

10    A.   That's what, in this case, LaserDynamics is

11 proposing.  That's the hypothetical negotiation.

12    Q.   Okay.  It's over here (indicating).

13    A.   That would be 2006, correct.

14    Q.   And you'll note from this chart referred to in

15 your report that in '06, the trends of DVDs, which you

16 understand is -- is covered by the '981 patent, is

17 enhancing; isn't that right?

18         It's going up, trending up right there

19 (indicating), right?

20    A.   Well, the question has a premise built into it

21 that I -- I --

22    Q.   I'm sorry?

23    A.   Your question has a premise built into it that

24 I don't think has been decided by the jury yet.

25    Q.   Well, I just asked you if -- from this chart,

1    if the DVD trends are trending up?

2        A.   If that's the question, yes.   The DVD trend is

3    going up.   That's absolutely true.

4        Q.   And you also didn't refer to this chart or

5    this analysis in your report, did you?

6        A.   No, because this is obvious to the industry.

7                 MR. LUCK:   Let me have Factor 23, please.

8    23.   I can do it on the ELMO.

9        Q.   (By Mr. Luck) Let me show you Chart 2.4 from

10   the TSR report, also -- the TSR survey also in your

11   report.

12            Do you have that?

13       A.   I see that, yes.

14       Q.   And you'll notice on this chart, also, the

15   agreements you reviewed under Factor 1 are back here

16   (indicating)?

17       A.   Absolutely, at the very beginning.

18       Q.   And the trend in DVD sales is increasing right

19   here (indicating).   Here's the date of the negotiation;

20   isn't that right?

21       A.   Yes.

22       Q.   Is that '06?

23       A.   That's right.

24       Q.   You didn't include an analysis of that also in

25   your report, did you?

1      A.   I think it's taken into account, but it's an

2 obvious trend.

3      Q.   Let me ask you to review this last slide from

4 this report.

5           Do you have that?

6      A.   Yes.

7      Q.   On this chart, it's hard to see, but the dates

8 are up at the top, I believe.

9      A.   Yes.  I believe 2000 corresponds to where we

10 see the little cloud for PC market.  That's

11 approximately the year 2000.

12     Q.   Here (indicating)?

13          MR. LUCK:  I don't have to do anything

14 special, do I?

15     Q.   (By Mr. Luck) You'll notice from this chart

16 that at the time of the agreements you reviewed under

17 Factor 1 was in this area here (indicating); is that

18 correct?

19     A.   Yes.

20     Q.   And in this era, CD was the predominant media

21 type; is that correct?

22     A.   Absolutely.

23     Q.   And DVD was just beginning to ramp up; is that

24 correct?

25     A.   Absolutely.

1    Q.    However, if you look at 2006, in this area

2    (indicating), DVD now is the predominant media source on

3    ODDs; is that correct?

4    A.    By that point, DVD writable, I believe.  And

5    the market was already anticipating the next generation

6    and the next generation after that.  It's completely

7    expected.

8    Q.    That's a good point.  In fact, even -- even

9    over here, we have now this, and this, I understand, is

10   to be Blu-ray (indicating); is that right?

11   A.    That's most likely.  At that time, it could

12   have also been HD.

13   Q.    You also -- you also don't refer to that chart

14   in your report; is that correct?

15   A.    Not specifically to that chart, no.

16   Q.    Now, in the slides you presented here for the

17   jury, on one of your slides, I believe, you created for

18   us -- remember this one?

19   A.    Yes.

20   Q.    How did you select, to go on this slide, the

21   particular agreements that you have up here?

22   A.    Well, generally, all this information came

23   from my expert report.  In the case of that particular

24   area you're asking about, Mr. Luck, basically, I was

25   picking up a sampling of the -- of the particular

1    entries.

2         For example, I didn't put in Pioneer, in part

3    because Pioneer is covered by the 3C as well.  But I

4    wanted to represent a range of the different portfolios

5    that were licensed at a percentage royalty rate.

6         Q.   Is your answer the same for these over here

7    (indicating), again, out of your report?

8         A.   It's out of my report, and again, I'm aware

9    there are others, like Yamaha, which has a rate that

10   goes from a dollar down to 12 cents, but -- but this is

11   what I highlighted in my report because of the 25-cent

12   additional charge for the layer technology.

13             MR. LUCK:  If I could have R10, please.

14   I'm sorry.  The -- is this R10?  Yes.

15        Q.   (By Mr. Luck) Okay.  Help us understand the

16   difference between your slide and these agreements

17   from -- produced by your client in this case, in fact,

18   executed by your client.

19             Aren't these the type of agreements that

20   should be considered under Factor 2, agreements entered

21   into by the licensee?

22        A.   These are agreements that are entered into by

23   ████ ████ ████ ████ ████ ████ ████ ████ ████

24   ████   **REDACTED BY ORDER OF THE COURT**   ██

25   ████ ███ ████ ████ ████ ████ ████ █████

1   ███ ███ ███    **REDACTED BY ORDER OF THE COURT**

2   misleading.

3       Q.    In fact, not even this chart includes any

4   agreements executed by QCI; is that correct?

5       A.    This chart does not appear to include any

6   agreements executed by QCI, that's right.

7       Q.    Nor does your chart here; is that correct?

8       A.    Correct.  This is -- this is focused on QSI.

9   I did consider, though, the QCI agreements as well.

10      Q.    Okay.  I was just asking you what is on your

11  chart here.

12            And so we don't have any agreements entered

13  into by QCI in this case in Factor 2; is that correct?

14      A.    Well, there is in my expert report.  It is

15  something I considered.

16      Q.    Okay.  I understand that.  I'm referring now

17  specifically to your slide.

18      A.    This chart.

19      Q.    Yes.

20      A.    That's correct.  This chart is focused on

21  public information and QSI's agreements that relate to

22  ODD.

23      Q.    Did you make an analysis under Factor 6?

24      A.    Yes, I did.

25      Q.    What is the focus of Factor 6?

1    A.   Well, Factor 6 relates to convoyed sales.  And

2  what that means is, if by use of a patented technology

3  in a particular product, does it help companies sell

4  another product.

5    Q.   And you contend, I presume, that -- that the

6  ODDs in this case do not promote the sale of computers;

7  is that correct?

8    A.   Well, that's a different point.  I think ODDs

9  do help sell computers.  The question is whether the

10 patented technology at issue in the hypothetical license

11 is required to -- to sell the computers.

12   Q.   Are you aware of any ODDs sold anywhere in the

13 world that do not -- that do not include disk

14 discrimination technology?

15   A.   Well, first of all, that's a technical issue.

16 I would direct you to technical experts.  But I'm not

17 aware of a -- representations that the patented

18 technology is included in every single product.

19   Q.   I just asked you, do you know of any optical

20 disk drives sold anywhere in the world that do not

21 include disk discrimination technology?

22   A.   My understanding is that it does.  They do

23 discriminate upon DVD and CD.

24   Q.   And you've not analyzed anywhere in your

25 expert report any computers sold that do not include

1  ODDs, have you?

2      A.   Not in my report, no.

3      Q.   And so presumably, all computers sold by your

4  clients, including those accused in this case, include

5  disk discrimination technology; is that correct?

6      A.   No, that's not correct, and my report

7  addresses that issue.

8      Q.   I don't believe I understand your answer.

9  If all optical drives include disk discrimination

10 technology in all computers, and you don't have any

11 analysis of computers that don't include ODDs, I don't

12 understand your response.

13     A.   I might have misspoke if that last part of

14 your question is what you asked me before.

15          In my report, I addressed that Quanta Computer

16 sells what's sometimes called barebones computers to

17 Dell, and those do not include ODDs.

18          Dell ultimately either buys ODDs or doesn't

19 buy ODDs, may or may not include them in Dell computers,

20 but Quanta Computer does sell to Dell notebook computers

21 without ODDs.

22          MR. LUCK:  If I could have Exhibit 876,

23 please, Page 5.

24     Q.   (By Mr. Luck) Were you here earlier when we

25 reviewed this part of an application made by QSI?  Do

1  you remember this?

2      A.   Is this yesterday?

3      Q.   Actually, it was two days ago, I believe.

4      A.   Two days ago?

5      Q.   Yes.

6      A.   Yes.

7      Q.   Do you remember this?

8      A.   I believe --

9      Q.   I'm sorry.  Go ahead.

10     A.   I'm sorry.  Yes.

11     Q.   Did you review the significance of ODDs --

12  DVDs to PC sales in your report under Factor 6?

13     A.   I believe this is consistent with my report,

14  that -- that the ability to do disk discrimination would

15  be important.

16     Q.   Especially significant to your client; is that

17  right?

18     A.   I think it would be important to any computer

19  manufacturer.

20     Q.   Now, it is your -- strike that.

21          MR. LUCK:  Let's turn to Factor 8.

22     Q.   (By Mr. Luck) What is the focus of Factor 8,

23  the GP analysis?

24     A.   I believe it deals with profitability, but I'd

25  feel more comfortable if you would show me your chart or

1  pull up a Georgia-Pacific listing.

2      Q.   Sure.  Okay.  Let me pull that up.

3           I believe you're correct when you spoke

4  earlier that the profits saw by QCI were -- I believe

5  ████ ████ ████ ██ █ ████ ████ ████ █████

6

### REDACTED BY ORDER OF THE COURT

7  █████                                          █

8  █████ ██ ███ ████ █████

9      Q.   I understand you're an economist, but, of

10  course, any kind of rate paid on computers would not be

11  applied against the bottom line for QCI, would it?

12      A.   Well, ultimately, it has to be paid somewhere,

13  but if what you're asking is, where do the costs of a

14  royalty get recorded, it would be reflected before you

15  ████ ██ ███ █ █████ █████

16           But that's not addressing the question at hand

17  here, what would happen if you have an additional

18  2 percent royalty.

19      Q.   What -- what is the profit realized by QCI on

20  computers?

21      A.   Well, we had testimony yesterday from Quanta

22  Computer on that -- excuse me -- on this issue, and the

23  ████ ████ ████ ████ ██ ███ █████ ████ ███ ████

24  ████ ██ ████ ███ ██ ████ █████

25           So it would be -- the logic that would follow

1  would be that the profit on the computers would be less

2  ███ ███  **REDACTED BY ORDER OF THE COURT**

3      Q.    Did you also hear Mr. Sankey ask the question,

4  are there any documents to support that contention, and

5  the answer was no?

6      A.    I heard the -- initially, the answer was, our

7  annual report would provide that information, but then,

8  ultimately, yes, he didn't have any documents with him.

9      Q.    Did you review any of the documents that

10  showed the profits made by QCI for computers?

11      A.    No, only as reflected in the annual report.

12      Q.    So if Mr. Parker was to say in his opening

13  here that the -- the profits QCI sees for computers are

14  razor thin, you don't have any evidence to support that,

15  do you?

16      A.    No.  I do have evidence.  I have the annual

17  report that shows a 2-percent profit, and I have the --

18      Q.    For the company?

19      A.    For the company.  And the knowledge that most

20  of Quanta Computer -- Quanta Computer, historically, was

21  a company making notebook computers for Dell and others.

22  It's a large part of their business.

23          So it's -- it doesn't make sense that there

24  could be a large profit on computers and over -- and an

25  overall profit rate of 2 percent.

1        Q.    How many products does QCI sell?

2        A.    They sell now quite a variety of products,

3   cell phones, DVD players, a variety of different things.

4        Q.    Have you not dealt with industry where you

5   have a portfolio of products sold, some of which are

6   profitable, others don't?

7        A.    That's absolutely possible, Mr. Luck.

8        Q.    And -- and so for all you know right now, QCI

9   makes a handsome profit on computers; other products it

10  sells pull down the net for the company; is that

11  correct?

12       A.    That's not my understanding, no.

13       Q.    Well, you don't -- I don't know either, but

14  neither do you; is that correct?

15       A.    I don't have like -- like the testimony

16  yesterday, I don't have documents that specifically show

17  that, but -- but it's not consistent with my

18  understanding.

19       Q.    I'm going to ask you about your slide here.

20            Now, again, you don't quibble with the base;

21  is that right?  And the base would be this number here

22  (indicating).

23       A.    Correct.  I would add, though, I still

24  disagree with Mr. Davis on the indirect -- his

25  calculation of the indirect units that he added to

1  the -- direct to the United States units of QCI.

2  But by and large, I haven't raised that issue, and I

3  haven't gotten into the detail of that.

4      Q.   By this slide, you're trying to apply the

5  rate -- the 2-percent rate, which Quanta's expert

6  applied to the computer and compare that result, the

7  $14, against the price of the drive; is that right?

8      A.   Yes, because that's the way the computer

9  companies would be looking at it.

10     Q.   Well, does your -- does QCI sell computers?

11 They do, don't they?

12     A.   Absolutely.

13     Q.   Of course they do.

14          And you heard Ms. Li, in her testimony, say

15 that QCI does not apply a royalty against components.

16          Do you remember that?

17     A.   Because QCI expects that its component

18 manufacturers will pay royalties, if applicable.

19     Q.   Do you remember that?

20          We don't assemble computers.  We don't

21 actually pay the royalty on a component.

22          Remember that?

23     A.   That's right.

24     Q.   And you're not suggesting by your slide here

25 that if QCI were to sell a computer, we would just pull

1  out the drive and analyze that all by itself, are you?

2      A.   I'm afraid I don't understand your question.

3      Q.   Well, your -- it looks like here you're

4  applying apples and oranges.

5           We have a 2-percent rate applied to a

6  computer, and you're taking that resultant -- that's

7  that $14 -- and comparing that to the price of a

8  component.

9           And I'm asking you, are you suggesting we pull

10 the component out and analyze that, independent of the

11 application of the rate against the computer as a whole?

12     A.   Absolutely.  That's the way the industry would

13 look at this.  What is the cost of this component?

14               MR. LUCK:  Let me go back to Slide -- if

15 I could go back to Slide R2.  Thank you.

16     Q.   (By Mr. Luck) What was the volume of products

17 sold by, for example, Onkyo?  Do you know that

18 information?

19     A.   In which time period?

20     Q.   In the time period of the execution of this

21 agreement in your Tab 11.

22     A.   I think at that time, I can't -- I'm not sure

23 it's exactly Onkyo.  I think one of the parties, and it

24 might have been Onkyo, wasn't manufacturing it, and some

25 of these companies never did manufacture ODD drives.

1            So -- so it really varies by companies.  Some

2   of these companies became quite large manufacturers;

3   others didn't manufacture at all; some manufactured a

4   smaller amount.

5        Q.   Okay.  I was just asking you --

6        A.   I'm not sure about Onkyo.

7        Q.   Okay.  I was just asking you how many they

8   made.

9        A.   I don't know.

10        Q.   Okay.  Let's talk about your confirmatory

11   numbers here.

12        A.   I'm sorry.  My what number?

13        Q.   Confirmatory numbers.  I believe --

14        A.   Yes, sir.

15        Q.   -- you had a schedule on that?

16        A.   Yes, sir.

17        Q.   You rely upon the Sony/Asus agreement; is that

18   correct?

19        A.   It was a term sheet, not an agreement.

20        Q.   Do you know if the term sheet matured into a

21   license?

22        A.   It did.

23        Q.   Are you relying upon both the term sheet and

24   the license?

25        A.   Well, I considered both, but it was the term

1  sheet that had the specific information about the

2  additional rate for the useful patents.

3           So for that particular piece of analysis, I

4  need the term sheet.

5       Q.   Okay.

6              MR. LUCK:  Ms. Dupree, I'm not getting

7  my --

8              MS. DUPREE:  You need the document cam?

9              MR. LUCK:  Yes.  Yes.

10             MS. DUPREE:  Sorry.  There you go.

11             MR. LUCK:   Thank you.

12      Q.   (By Mr. Luck) Here is the term sheet; is that

13  correct?  Is this the one that you're relying upon?

14      A.   I believe so.

15      Q.   Okay.  Well, I had the note out here.  What

16  are the patents implicated under this agreement?

17      A.   I believe it's the way I addressed it, that

18  the 2-percent rate, it would be the essential patents of

19  Sony, and then for the additional .1 percent, it would

20  be what was called useful patents.

21      Q.   What are essential patents?

22      A.   Well, the essential patents would be patents

23  viewed as necessary to manufacture the products, the DVD

24  products, ODD products, under the standards that have

25  been specified for DVD and ODD.

1      Q.   And which patents in this agreement were

2  deemed to be essential?  Did you analyze those?

3      A.   Yes.  We saw earlier -- I didn't analyze the

4  specific patents.  I looked at the list of patents from

5  the Sony website, and I had showed a slide earlier that

6  had the list.

7           Sony had -- it was about 50 U.S. patents and I

8  believe it was 300 U.S. patents that were part of its

9  licensing program of essential patents that were also

10 licensed through Philips in the 3C.

11     Q.   Was the Sony/Asus agreement entered into under

12 any kind of presumption of validity or infringement?

13     A.   Not in the sense that we're asking to assume

14 here, but when you have that many patents, the reality

15 is you are going to believe that --

16          THE COURT:  Mr. Reed, please listen to

17 the question and answer the question he asks you.  Don't

18 start -- we're going to get a little -- have more

19 involvement by me, which that's not good for any of us.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Just answer the question

22 asked.  We're trying to get through with this.

23          THE WITNESS:  Okay.

24     Q.   (By Mr. Luck) Did you not also tell me that an

25 essential patent is one that is difficult to design

1 around or is presumed it cannot be designed around?  Is

2 that correct?

3        A.   I believe in some cases, that's -- that's

4 true, yes.

5        Q.   Do you believe the patents in the Sony/Asus

6 agreement are essential?

7        A.   I would have to point you to a technical

8 expert.  I believe that Sony believes that.

9        Q.   In your opinion, did you assume they were?

10        A.   No.  My opinion focused on the additional

11 useful patents.

12        Q.   Well, if you don't know what is the goose and

13 the gander, how do you know?  In order to determine

14 the -- the patents under Option B, you have to know

15 those under Option A, don't you?

16        A.   I don't believe so.

17        Q.   Did you analyze the other patents under Option

18 B, the useful patents?  Did you look at their scope?

19        A.   I'm sorry.  You said Asus patents --

20        Q.   The --

21        A.   -- or useful?

22        Q.   The useful patents, yes --

23        A.   I'm sorry.

24        Q.   -- under Option B.

25        A.   No.  I don't know particularly what the useful

1  patents were; just, again, the reference to that by Sony

2  in this term sheet.

3      Q.   You just looked at the rates; you liked the

4  rates; is that right?

5      A.   I looked at the rates.

6      Q.   Did you make any kind of determination whether

7  it would be difficult to design around the patents in

8  this agreement?

9      A.   And you're talking about the useful patents?

10     Q.   Yes.

11     A.   I think the reference of Sony to the useful

12 patents would be -- it's a nice feature that perhaps

13 could be costly to design around, but it's a useful

14 function that might be worth taking a license for.

15     Q.   Now, do you understand the '981 patent is

16 directed to DVDs?  Is that your understanding?  I

17 understand you're not the technical guy, but is that

18 your understanding?

19     A.   That relates to disk discrimination between

20 DVD and CD and other disks as well.

21     Q.   And the '981 patent is also directed to other

22 forms, like Blu-ray; is that correct?

23     A.   Yes, it can be.

24     Q.   Did you note in your review of the Sony

25 agreements that these, in fact, were confined to and

1  excluded Blu-ray?  Did you notice that?

2      A.   I do recall that, yes.

3      Q.   Use the other part of the page.

4           And so this, by definition, excludes Blu-ray

5  technology; is that right?

6      A.   I believe that's correct.

7      Q.   The precise -- precise technology that is

8  ramping up after '06, the date of the hypothetical

9  negotiation; isn't that right?

10     A.   Yes.  Blu-ray has been gaining.

11     Q.   You have seen the reports of Dr. Bell and Dr.

12 Costello?

13     A.   I have, yes.

14     Q.   Is their opinion that the '981 patent helps

15 promote the sales of ODD, which in turn promotes the

16 sales of computers?  Is that correct?

17     A.   I think --

18     Q.   Is that your understanding?

19     A.   I think they focus on disk discrimination.

20     Q.   You don't recall that Costello focused on the

21 impact of the sale of ODDs to sell the computer?

22     A.   Yes.  But, again, disk discrimination in that

23 regard.

24     Q.   The Nissim program, how did you select this

25 particular program instead of focusing in on the QSI

1  agreements?

2      A.   I have followed the Nissim program for quite a

3  while and frequently refer to it.  And I wouldn't say I

4  focused on Nissim.  It was one of the pieces I

5  considered.

6      Q.   Have you analyzed the patent, subject of that

7  program?

8      A.   Not from a technical standpoint, but I am

9  aware of the patents and the number of patents.

10     Q.   Are you aware of -- in your report, is there

11 any kind of analysis of those players in the industry

12 that have executed any patents in this program?

13     A.   I believe so, yes.  I mentioned them in my

14 report.

15     Q.   Have you analyzed in your report whether any

16 of these patents cover products manufactured by QCI?

17          You haven't, have you?

18     A.   I don't believe I have, no.

19     Q.   In your report, have you made any kind of

20 analysis whether QCI requires the technology in this

21 program?

22     A.   I don't know.

23     Q.   And so you haven't made any analysis of

24 whether the accused computers or the drives in those

25 computers fall within the scope of this program, have

1  you?

2      A.   No.

3      Q.   You've not made any kind of analysis whether

4  any patents in this program can be designed around; is

5  that right?

6      A.   No.

7      Q.   Or bought around or sold around; is that

8  right?

9      A.   Well, it could be sold around from the

10  standpoint of buying drives that are licensed.  That's

11  one way.  But I haven't analyzed that.  With respect to

12  Nissim, that should be correct.

13      Q.   Let me ask you, you said that the patents

14  which purport to cover the technology -- here's a quote

15  out of the Nissim agreement -- incorporated in

16  electronics capable of playing DVDs.

17          Have you analyzed if the Nissim -- the Nissim

18  program, as broad as it purports to be, why it does not

19  cover products made by your clients?

20      A.   I don't know if it covers the products.  I

21  haven't analyzed that.

22      Q.   In other words, I'm trying to ask you where

23  programs that don't seem to fit the parts we have in the

24  case right here, you -- you're pulling in all these

25  programs that don't seem to fit where we are today.  You

1  take issue with that, obviously.

2       A.   I do take issue with how you just

3  characterized that.

4       Q.   Now, in your -- I believe you earlier said

5  that your clients always had the option to buy drives

6  from the licensees; is that right?

7       A.   They would have -- have in this hypothetical

8  negotiation, yes.

9       Q.   And that option would have begun when:  The

10  date of the negotiation?

11      A.   In a sense, it would be argued in the

12  negotiation.

13      Q.   Okay.  In the negotiation?

14           So their opportunity to take those options to

15  buy drives elsewhere began in the negotiation; is that

16  right?

17      A.   Because in the hypothetical negotiation, you

18  would have an understanding about what you could do.

19      Q.   And so -- well, to be clear, their option to

20  purchase from the licensees would have begun in August

21  of '06; is that right?

22      A.   Yes.  In the hypothetical, that's correct.

23      Q.   But in the time period since this suit was

24  filed, your clients have not exercised that option, have

25  they?

1      A.   Correct, for the reasons previously addressed.

2      Q.   Now, you also have applied -- one of your

3 slides here -- over here (indicating), you're applying

4 rates against a chipset; is that right?

5      A.   That's right.

6      Q.   Why?

7      A.   Because it's another way to benchmark the

8 potential valuation of patent royalties and patent

9 licenses.

10      Q.   Is it your understanding that a chipset falls

11 within the scope of the '981 patent claim?

12      A.   That's my understanding, and that's what

13 Professor MacFarlane had told me as well.

14      Q.   I don't think we heard that today, did we?

15      A.   I have to say I wasn't here for all of

16 Professor MacFarlane's testimony.

17           MR. LUCK:   Let me have -- let me have

18 Exhibit 2, please.

19      Q.   (By Mr. Luck) Mr. Reed, have you -- have you

20 heard in the testimony in this case any allegations that

21 a chipset infringes the '981 patent?

22      A.   Not specifically.

23      Q.   Well, specifically or generally.

24      A.   Well, I heard Dr. Howe's testimony relating to

25 chipsets and source code.

1      Q.    Okay.

2            MR. LUCK:  If I could ask you to thumb

3    through to the claims, please.  Okay.  There we go.  At

4    the bottom here, Claim 3.

5      Q.    (By Mr. Luck) I understand you're an

6    economist, but even going from the language here, is it

7    your understanding that a chipset falls within the scope

8    of this claim and thus is a good surrogate for your

9    damage evaluation in this case?

10     A.    I can't address the technical issues.

11     Q.    So, now, we have this slide here, but you know

12   if it fits that; is that right?

13     A.    I've been told that it fits.

14     Q.    By Professor MacFarlane?

15     A.    Yes.

16     Q.    Okay.  Finally, I think you said that QCI

17   cannot afford to pay the rates requested by Plaintiff in

18   this case, because they couldn't afford to raise their

19   prices.  The market's very competitive.

20           Do you remember that?

21     A.    I think I probably said they couldn't raise

22   their prices.

23     Q.    Could not.

24     A.    Not for this royalty, that's correct.

25     Q.    Okay.  And you presume from that answer that

1  if they were to increase their price, they would be

2  unable to compete; is that right?

3      A.   I think I said they -- their customers would

4  look to other people to buy ODDs.

5      Q.   How do you know that?  It isn't in your

6  report, right?

7      A.   I believe it is in my report.

8      Q.   You admitted in your deposition that -- that

9  you do not know the rates of products sold by either QSI

10 or QCI's competitors; isn't that right?

11     A.   You mean the prices of the competitors?

12     Q.   You bet, yes.

13     A.   I don't have specific information or numbers

14 on that in this case, that's correct.

15     Q.   So for all we know, QCI is already below

16 market and could easily afford to increase its prices

17 and still stay competitive.

18     A.   I don't believe that's consistent with the

19 economics of the industry.

20     Q.   But you've not analyzed that in your report?

21     A.   I know that's the issue, but not specific

22 numbers from the competitors, as you mentioned.

23              MR. LUCK:  Thank you, sir.

24              THE COURT:  Redirect?

25              MR. GARNETT:  No, Your Honor.  No further

1 questions.

2                    THE COURT:  Okay.  You may step down.

3                    THE WITNESS:  Okay.

4                    THE COURT:  Who will be your next

5 witness?

6                    MR. PARKER:  Your Honor, at this time,

7 the Defendants would rest their case-in-chief.

8                    THE COURT:  All right.  Counsel approach.

9                    (Bench conference.)

10                    THE COURT:  How much rebuttal are you

11 going to have?

12                    MR. SANKEY:  If we could have our break

13 and figure it out.  If we have anyone, it will be one

14 witness and very short.

15                    THE COURT:  Well, I tell you what, we'll

16 go ahead and break until 3:30, but we'll also take up

17 everybody's motions right now.  And yours will be deemed

18 made as at the close of the time they rested.  You might

19 as well go ahead and make whatever motions you want, and

20 then we'll break till 3:30.

21                    Okay.  Thank you step back.

22                    (Bench conference concluded.)

23                    THE COURT:   Ladies and Gentlemen, we

24 have some legal issues that come up at this point.  I'm

25 going to say that we're -- I hate to say this, because

1   every time I make predictions, I'm wrong, but I might as

2   well be consistently wrong, I guess.

3               I still believe we'll get out of here not

4   later than 4:00 o'clock today.  But I'm going to take a

5   little extra long, and I'm going to release you until

6   3:30.  Be back ready to come back in the courtroom at

7   3:30.  See you back in here at 3:30.  Don't discuss the

8   case.

9               (Jury out.)

10              THE COURT:  Please be seated.

11              All right, Mr. Parker.

12              MR. PARKER:  Yes, sir.

13              Your Honor, the Defendants move for

14   judgment as a matter of law.  And as I understand it,

15   based on the instructions that have been given by the

16   Court, this motion is considered to have been made at

17   the end of the Plaintiff's case and is now being renewed

18   at the end of the case-in-chief of both parties.

19   And --

20              THE COURT:  That's correct.

21              That's Plaintiff's counsel understanding,

22   also, right?

23              MR. LUCK:  It is, Your Honor.

24              THE COURT:  Okay.

25              MR. PARKER:  Sir, we believe that we are

1  entitled to judgment as a matter of law because the

2  Plaintiffs have clearly not carried their burden on the

3  issue of proving infringement even by a preponderance of

4  the evidence.

5           And the reason we say that, Your Honor,

6  is -- and I cite specifically to this Court's rules and

7  the orders of this Court amending its rules or

8  supplementing its rules, and specifically, to local

9  patent rule 3-1, paren H, close paren, which states, if

10  a party claiming patent infringement asserts that a

11  claim element is a software limitation, the party need

12  not comply with patent rule 3-1 for those claim elements

13  until 30 days after the source code for each accused

14  instrumentality is produced by the opposing party.

15           Thereafter, the party claiming patent

16  infringement shall identify -- and this is, to me, the

17  crucial language -- on an element-by-element basis for

18  each asserted claim what source code of each accused

19  instrumentality allegedly satisfies the software

20  limitations of the asserted claim elements.

21           Their only evidence to support

22  infringement is the testimony of their expert, Mr. Howe,

23  who admitted, with respect to each one of the 20 accused

24  drives, that he had not done a line-by-line,

25  element-by-element analysis of the source code.

1  He tries to accomplish it through a leap of faith from

2  his line-by-line, element-by-element analysis of the

3  source code associated to two Asus drives, and

4  similarly, his prior line-by-line, element-by-element

5  analysis of the source code related to a BenQ drive.

6               That does not meet -- in my judgment and

7  I submit, it should not meet and should not be held to

8  meet the standard established by this Court or

9  established by the whole line of legal precedent when

10 somebody is accusing someone of infringement of a method

11 patent and it depends on the analysis of source code,

12 which must be done for each accused instrumentality on

13 an element-by-element basis.  It simply has not happened

14 here.

15              THE COURT:  Okay.  Motion denied.

16              Anything from the Plaintiff?

17              MR. SANKEY:  Your Honor, with respect to

18 the defenses raised by the Defendants -- one second,

19 please -- I believe that there are a number of defenses

20 that have been voluntarily dropped because we heard no

21 testimony on them whatsoever.

22              THE COURT:  Well, let me tell you, this

23 Court's practice will not be to grant a JMOL; this

24 Court's practice will be reflected in its charge to the

25 jury, but go ahead for the record.

1          MR. SANKEY:  With the ones that I've

2  looked at with the charge, with respect to obviousness,

3  no testimony on that.

4          With respect to anticipation, no

5  testimony on that.

6          With respect to prior art and invalidity,

7  I think the only thing that the witness said was that

8  he -- he cited the two patents.  He did not do any kind

9  of claim-by-claim analysis of it.

10          THE COURT:  All that will be reflected --

11  the Court prepared you a draft of the charge, based on

12  what had been pled, not what I know the evidence was

13  going to be.

14          So I'm not granting a JMOL, but it will

15  be reflected in the Court's charge.

16          MR. SANKEY:  Thank you, Your Honor.

17          That's all I have.

18          THE COURT:  Well, that didn't take long.

19          We are going to take out the charge, I

20  will tell you, those -- I'm going to put back

21  enablement.  Was that pled?

22          MR. PARKER:  Yes, sir.

23          THE COURT:  There wasn't any objection to

24  the testimony, so enablement will be in.

25          And the others that there were no

1  testimony will not -- they will not be in the Court's

2  charge.  The legal effect of that, I think, is clear.

3  But what I was going to discuss with you, since we had a

4  few extra minutes, was, when we come back in at 3:30,

5  and let's assume that we do get this jury out of here by

6  4:00 o'clock, based on representations, then I would

7  propose that we'll have a charge conference on the

8  Court's charge immediately, as soon as we dismiss the

9  jury.

10          And we'll have an informal charge right

11 thereafter and then probably, before 5:00 o'clock, we'll

12 finalize the -- well, let me say this:  An informal

13 charge, we'll do that in chambers.  And what I really

14 want you to do is get specific as to what it is that

15 gives you the worst case of heartburn, you know what you

16 really want to object to.

17          I'm not talking about objections that

18 you're going to need to make for the record on the

19 sufficiency of the evidence; I'm talking about the

20 charge itself.

21          Then the Court would propose to give you

22 a final draft.  We would come back out before we leave

23 here today and take on the record final objections,

24 formal objections, to the Court's charge and verdict

25 form so that we come back on Monday morning, and we'll

1  roll out of here with arguments at 8:30, 30 minutes a

2  side, followed by the Court's charge.

3                    I do not give them a copy of the charge

4  to take back in the jury room.  You're free to tell them

5  in your argument -- and I say this now just so I don't

6  forget later in the afternoon -- you're free to argue to

7  the jury that this is what the Court will be charging

8  you, you know, about the law.

9                    But they don't -- I just want you to know

10  that it will not be sent back with them.  It will just

11  be the questions.

12                    With that, I'll see you back in here at

13  3:30.

14                    COURT SECURITY OFFICER:  All rise.

15                    (Recess.)

16                    COURT SECURITY OFFICER:  All rise.

17                    (Jury in.)

18                    THE COURT:  Please be seated.

19                    All right, Mr. Sankey.

20                    MR. SANKEY:  Your Honor, Plaintiff

21  LaserDynamics, in its rebuttal case, will briefly call

22  Dr. Howe back to the stand.

23                    THE COURT:  All right.  Dr. Howe, come

24  around.

25                    Dr. Howe, do you understand you're still

1    under oath?

2                    THE WITNESS:  I do.  Thank you.

3                    THE COURT:  All right.  Thank you.

4                    Let's proceed.

5        DENNIS HOWE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

6                        DIRECT EXAMINATION

7    BY MR. TROP:

8        Q.   Dr. Howe, were you present during the

9    testimony of Dr. MacFarlane?

10       A.   Yes, I was.

11       Q.   Did you hear anything from Dr. MacFarlane

12   about the SBAD signals that you relied on in connection

13   with the processing step of Claim 3?

14       A.   I did not.

15                   MR. PARKER:  Your Honor, may we approach?

16                   THE COURT:  Yes.

17                   (Bench conference.)

18                   MR. PARKER:  Your Honor, this is the same

19   kind of situation I got --

20                   THE COURT:  I know what it is.

21                   MR. PARKER:  Yes, sir.

22                   THE COURT:  Get off of that, Mr. --

23                   MR. TROP:  Pardon?

24                   THE COURT:  You're trying to do exactly

25   what they tried to pull that got me so upset.  Now, I

1   don't want to get upset --

2                   MR. TROP:  We're not going to put any

3   more --

4                   THE COURT:  Well, I know you're not.

5                   Now, get back there and stay with

6   what's -- you know, don't get me involved this late in

7   the day.  You don't want it to happen.

8                   MR. TROP:  I understand, Your Honor.

9                   THE COURT:  Let's go.

10                  (Bench conference concluded.)

11      Q.   (By Mr. Trop) Dr. Howe, what is your opinion

12  about whether one skilled in the art would be able to

13  make and use the invention set forth in Claim 3?

14      A.   I think it's -- it's enabled completely.

15      Q.   And -- and what is the level of skill of one

16  in this art in 1995?

17      A.   In my opinion, he would have a bachelor's

18  degree in electrical engineering, coupled with at least

19  four years' experience in the area of optical disk

20  drives systems technology or an advanced degree and two

21  years of experience.

22      Q.   Now, do you recall Dr. MacFarlane's testimony

23  about what he described as an infinite loop in one of

24  the figures in the '981 patent?

25      A.   Yes.

1      Q.   Do you have an opinion about whether this

2  question of an infinite loop would raise an issue for

3  one of ordinary skill in the art?

4      A.   I think it's no issue at all.

5      Q.   Why is that?

6      A.   It would be second nature to not allow an

7  infinite loop to be in one of your software programs.

8      Q.   And how would one skilled in the art avoid an

9  infinite-loop question?

10     A.   A simple counter variable would do.

11     Q.   And is that something that one skilled in the

12 art would be familiar with?

13     A.   Yes.

14     Q.   And would that involve any experimentation?

15     A.   None.

16     Q.   Did you hear anything from Dr. MacFarlane in

17 his testimony to change your opinion in any way?

18     A.   Absolutely not.

19              MR. TROP:  Pass the witness.

20                  CROSS-EXAMINATION

21 BY MR. PARKER:

22     Q.   Dr. Howe, the simple-counter variable that you

23 just spoke of, that is not described in the '981 patent,

24 is it?

25     A.   No, it's not.

```
 1                    MR. PARKER:  Could we put up Figure 2,
 2  please?
 3                    Do I need to press the button?
 4                    THE COURT:  No.  Don't touch the --
 5                    MS. DUPREE:  It's already done.
 6                    THE COURT:  Ms. Dupree has got you there,
 7  Mr. Parker.  You and I have the same technical skills.
 8                    MR. PARKER:  Yes, sir.
 9                    Okay.  Figure 2, please.  And could you
10  just highlight the portion that includes the loop that
11  Dr. MacFarlane talked about?
12      Q.   (By Mr. Parker) Now, if we go back to Figure 2
13  and look at the -- what I'll refer to as the second
14  loop -- now, if it comes through that second loop and
15  still has not identified the disk, it would conduct a
16  third loop; is that right?
17      A.   That's correct.
18      Q.   And this particular drawing, Figure 2,
19  directly from the patent has no exit from that loop; is
20  that correct?
21      A.   That drawing has no exit, that's correct.
22      Q.   So there would be, in that case, a third loop.
23      A.   I'm sorry.  You're saying after the second
24  loop, it would go around again?
25      Q.   Yes, sir.
```

1      A.   If the disk has not been identified, according

2  to that schematic, it would, yes.

3      Q.   Okay.  And there is no counting parameter, for

4  instance, taught in the '981 patent.

5      A.   A counting parameter is not mentioned.

6      Q.   And a counting parameter would be stopping it

7  at a certain number of loops, correct?

8      A.   Correct.

9      Q.   Okay.  And the '981 patent does not describe

10 how the second loop or any additional loop -- loops

11 differ from the first loop.

12     A.   Well, it goes around a loop in the instance in

13 which a disk has not been identified.

14          So, presumably, if the disk is identified in

15 the first loop, it does not take the note path on the

16 left and go around the loop again.

17     Q.   In your expert report, you do not discuss a

18 third loop or a fourth loop or a counting parameter.

19     A.   I believe I may have mentioned one type of

20 identified disk as being a no disk, and that's what you

21 would do when you time out in your loop.  You would

22 report back with no disk.

23     Q.   But that's not described in the '981 patent.

24     A.   That's not described in the '981 patent.

25          MR. PARKER:  Thank you.

```
 1                    THE COURT:  Anything further?
 2                    MR. TROP:  Nothing further, Your Honor.
 3                    THE COURT:  All right.  You may step
 4   down.
 5                    MR. SANKEY:  Your Honor, at this time,
 6   Plaintiff LaserDynamics rests its rebuttal case.
 7                    THE COURT:  Close then?
 8                    MR. SANKEY:  Close.
 9                    THE COURT:  Close?
10                    MR. PARKER:  Close.
11                    THE COURT:  Why don't you stay there for
12   a minute.
13                    All right.  Go ahead, Dr. Howe, and step
14   down.
15                    THE WITNESS:  Sorry.
16                    THE COURT:  No.  That's fine.  That's all
17   right.
18                    THE WITNESS:  Sorry.
19                    THE COURT:  I've got this train on track.
20                    That's all right.  I'll pull my foot off
21   the accelerator.
22                    All right, Ladies and Gentlemen.  You've
23   heard all of the evidence in this case, and I'm going to
24   dismiss you until Monday morning at 8:30.
25                    Now, this is a critical part of the case.
```

1   You have heard all the evidence.  You have not yet heard

2   the argument of counsel and nor have you heard the

3   Court's instructions as to the law and explaining to you

4   the different burdens of proof and how they apply and

5   the questions that you're going to be asked.

6               So it's real critical that you not make

7   up your mind in this case or start making up your mind

8   until you've got all of that information before you,

9   which you will have before noon on Monday morning.  My

10  best prediction is somewhere between 10:00 and 10:15,

11  you'll probably have the case in your hands in

12  deliberations.

13              And so do not, at this point -- I just

14  reemphasize my instructions about not doing any research

15  on the internet or allowing anyone to discuss it with

16  you.  I'm talking about your family or your friends or

17  anybody, and just avoid those discussions.

18              And travel safely over the weekend, and

19  have a happy Fourth of July, and I'll see you back here

20  Monday morning, okay?

21              Y'all are excused.

22              (Jury out.)

23              THE COURT:  All right.  Please be seated.

24              Do you think the Plaintiff can be ready

25  if we come in at 10 until 4:00?  Does that give you

1  sufficient time to look at the charge or not?

2             MR. SANKEY:  It will, yes, Your Honor.

3             MR. PARKER:  Yes, sir.

4             THE COURT:  Okay.  Why don't we get back

5  in the chambers at 10 till 4:00.

6             The only other thing I want to write down

7  this afternoon before I forget is, when I meet with you

8  in there, I told you I want to give you 30 minutes a

9  side.  The Plaintiff has to use at least half their time

10 in opening or they will not have an equal amount of time

11 in closing.

12            One of the things I'll be asking you, and

13 you might want to think about is, what kind of warnings

14 you want?  I don't have a set pattern.  I'll give you

15 any kind of warning you want just about.

16            So if you have a preference, I'll take

17 that up with you, and I'll see you in there in just a

18 few minutes, 10 till.

19            COURT SECURITY OFFICER:  All rise.

20            (Recess.)

21            COURT SECURITY OFFICER:  All rise.

22            (Jury out.)

23            THE COURT:  Please be seated.

24            In making your final objections, on

25 Question No. 1, it will end with a question mark after

1 the word patent for making an objection.  That last

2 phrase is off there, but the projects will be

3 individually listed as the Defendant requested.

4            All right.  I'll take objections at this

5 time from the Plaintiff.

6            MR. SANKEY:  Your Honor, on behalf of the

7 Plaintiff, LaserDynamics, we would object to the

8 inclusion of the instruction of validity, the

9 instruction of enablement, and Question No. 2, based on

10 the lack of evidence of the level of skill in the art,

11 and specifically undue experimentation, which we believe

12 leads to non-enablement not being able to be established

13 as a matter of law.

14            And our second objection would be to

15 Question No. 1.  In breaking it down into the 20

16 individual drives, we would specifically request that

17 we -- that the question read:  Do you find from a

18 preponderance of the evidence that Quanta Computer,

19 Inc., contributed to or induced infringement of the

20 Claim 3 of the '981 patent?  Answer yes or no.

21            That concludes our formal objections.

22            THE COURT:  Those are overruled.

23            Let me hear from the Defendant.

24            MR. PLATT:  On behalf of the Quanta

25 Defendants, we would object to the current wording of

1  the enablement instruction in light of the fact that

2  there's no disclosure under which one of the processes

3  in the claim can be carried out, as admitted by their

4  expert.

5            We believe that the instruction should be

6  in accordance with Genentech versus Novo Nordisk case,

7  108 F 3d 1361 at 1366 Fed Cir 1997.

8            And we also object to the inclusion of

9  August 31st as the date of the hypothetical negotiation.

10 We think the charge should read that it's the date of

11 the first infringement.

12            That's our only objections.

13            THE COURT:  Okay.  Those are overruled.

14            The Court reviewed, just for the record,

15 the case that you cited.  I believe that's a chemical

16 compound case?

17            MR. PLATT:  Yes, sir.

18            THE COURT:  Earlier this week, we tried a

19 somewhat -- we included some additional instructions on

20 enablement, but I don't think that's what applies to

21 this case.

22            All right.  How much time -- any requests

23 from the Plaintiff -- well, what are your requests for

24 how you want to divide your time?

25            MR. SANKEY:  Your Honor, I'll divide my

1 time 23 minutes for my opening and 7 for the --

2                THE COURT:  All right.  When do you want

3 me to tell you:  That you've used 23 or that you've used

4 22 or --

5                MR. SANKEY:  Actually, if you can tell me

6 when I -- when I have five minutes left on the 23.

7                THE COURT:  All right.  I'm going to

8 tell -- what I'm going to tell you is, you've used 18.

9 I'm going to rely on your math.

10                MR. SANKEY:  Yes, sir.

11                THE COURT:  And then I always, whether

12 you want it or not, give a one-minute warning, because I

13 don't ever like to -- one minute left in your rebuttal,

14 okay?

15                MR. SANKEY:  That's perfect.

16                THE COURT:  Because I don't ever like to

17 interrupt anybody, if I can possibly help it.

18                MR. SANKEY:  That's great.  Thank you.

19                THE COURT:  Mr. Parker?

20                MR. PARKER:  I would like just a

21 five-minute warning, Your Honor.

22                THE COURT:  Five minutes?

23                MR. PARKER:  Yes, sir.

24                THE COURT:  I'm going to tell you the

25 same thing.  If you're in that last minute, I'm going to

1  say one minute, okay?

2             MR. PARKER:  Yes, sir.  I appreciate it.

3             THE COURT:  All right.  Now then,

4  somebody asked the clerk -- I guess somebody from the

5  Defendants said something to Mr. Ahmed about inequitable

6  conduct.

7             What I'd like for you to do is bring your

8  calendars on Monday, and while the jury is out

9  deliberating, we'll be assuming that we're going to need

10 that, and we can go ahead and get a hearing date and --

11 within the Court's schedule.

12            How much time do you think you'll need?

13 Do you have any idea?

14            MR. PARKER:  Half a day -- Christian,

15 half a day?

16            MR. PLATT:  Yes.

17            MR. PARKER:  Half a day.

18            THE COURT:  Okay.  Well, we'll talk about

19 that then, and I assume we'll have plenty of time while

20 the jury is deliberating on Monday.

21            Anything else?

22            MR. SANKEY:  Nothing further from the

23 Plaintiff.

24            MR. PARKER:  Nothing from the Defendants,

25 Your Honor.

```
 1                    THE COURT:  All right.  Now then, the

 2  other thing is, if you're going to use demonstratives

 3  that have not previously been used, I want you to

 4  exchange them by 5:00 o'clock on Sunday.

 5                    MR. PARKER:  Yes, sir.

 6                    THE COURT:  And then as will be my usual

 7  practice, I'll be in here around 8:00 o'clock Monday

 8  morning should we need to take something up.

 9                    MR. PARKER:  Yes, sir.

10                    MR. SANKEY:  Yes, sir.

11                    THE COURT:  All right.  Fine.

12                    Y'all have a nice week.  Happy Fourth to

13  you.

14                    MR. PARKER:  You, too, Your Honor.

15                    COURT SECURITY OFFICER:  All rise.

16                    (Court adjourned.)

17                    *      *      *      *      *

18

19

20

21

22

23

24

25
```

1

2                    <u>CERTIFICATION</u>

3

4         I HEREBY CERTIFY that the foregoing is a

5  true and correct transcript from the stenographic notes

6  of the proceedings in the above-entitled matter to the

7  best of my ability.

8

9

10

11  /s/_____          _____

    SUSAN SIMMONS, CSR                     Date
12  Official Court Reporter
    State of Texas No.:  267
13  Expiration Date:  12/31/10

14

15

16  /s/_____                _____

    JUDITH WERLINGER, CSR                  Date
17  Deputy Official Court Reporter
    State of Texas No.:  731
18  Expiration Date:  12/31/10

19

20  /s/_____                _____

    SHELLY HOLMES                          Date
21  Deputy Official Court Reporter
    State of Texas No.:  7804
22  Expiration Date:  12/31/10

23

24

25