```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3   LASERDYNAMICS              *    Civil Docket No.
                               *    2:06-CV-348
 4   VS.                        *    Marshall, Texas
                               *
 5                              *    July 6, 2009
     QUANTA, ET AL             *    8:30 A.M.
 6
              TRANSCRIPT OF TRIAL PROCEEDINGS
 7          BEFORE THE HONORABLE T. JOHN WARD
              UNITED STATES DISTRICT JUDGE
 8                    AND A JURY

 9   APPEARANCES:

10   FOR THE PLAINTIFFS:    MR. THOMAS SANKEY
                            MR. GREGORY LUCK
11                          Duane Morris
                            3200 Southwest Freeway
12                          Suite 3150
                            Houston, TX   77027
13
                            MR. TIMOTHY TROP
14                          Trop Pruner & Hu
                            1616 South Voss Road
15                          Suite 750
                            Houston, TX   77057
16
                            MR. JEFFREY RAMBIN
17                          Capshaw DeRieux
                            1127 Judson Road
18                          Suite 220
                            Longview, TX   75601
19
     APPEARANCES CONTINUED ON NEXT PAGE:
20

21   COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                            MS. JUDY WERLINGER, CRS
22                          MS. SHELLY HOLMES
                            Official Court Reporters
23                          100 East Houston, Suite 125
                            Marshall, TX   75670
24                          903/935-3868

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

```
 1
    APPEARANCES CONTINUED:
 2

 3  FOR THE DEFENDANTS:        MR. MELVIN WILCOX
                               Yarbrough & Wilcox
 4                             100 East Ferguson
                               Suite 1015
 5                             Tyler, TX    75702

 6                             MR. JOHN PARKER
                               Paul-Hastings
 7                             600 Peachtree St., NE
                               Suite 2400
 8                             Atlanta, GA    30308

 9                             MR. CHRISTIAN PLATT
                               MS. ERICKA SCHULZ
10                             Paul-Hastings
                               4747 Executive Drive
11                             12th Floor
                               San Diego, CA    92121
12
                               MS. KATHERINE MURRAY
13                             MR. JAY CHIU
                               Paul-Hastings
14                             515 South Flower Street
                               25th Floor
15                             Los Angeles, CA    90071

16              *      *      *      *      *      *

17
                      P R O C E E D I N G S
18

19              COURT SECURITY OFFICER:  All rise.

20              (Jury in.)

21              THE COURT:  Please be seated.

22              Good morning, Ladies and Gentlemen.

23  Thank you very much for being here.  I'm glad you

24  brought the rain.  At least we had a good rain at our

25  house this morning.
```

```
 1                   Morning, Counsel.

 2                   All right.  Ladies and Gentlemen, what

 3  we're going to do now we're going to hear final

 4  arguments from the parties, after which time I will give

 5  you the final instructions, and you will retire and

 6  deliberate your verdict.

 7                   And we will first hear this morning from

 8  the Plaintiff.  Who's going to argue it?

 9                   MR. SANKEY:  Your Honor, I will.

10                   THE COURT:  Mr. Sankey.

11                   MR. SANKEY:  Thank you, Judge Ward.

12                   THE COURT:  And I'll give you the

13  requested warnings.

14                   MR. SANKEY:  Thank you.

15                   May it please the Court, counsel.

16                   Ladies and Gentlemen of the Jury, good

17  morning.

18                   As I said in opening, this is an

19  important case for Mr. Kamatani, and it's an important

20  case for the patent system.  The patent laws lay out

21  what happens to infringers, but it's only jurors like

22  yourself that can enforce the law.

23                   As Judge Ward told you, your service as a

24  juror is a high duty, second only to the men and women

25  serving in our military.  I agree with Judge Ward's
```

1  statement.

2              And on behalf of Mr. Kamatani and myself,

3  we want to thank you for the honor and privilege of

4  coming before you to seek justice.

5              At the end of this case, you're going to

6  be asked four questions, and I want to tell you what

7  those questions are one by one and walk you through the

8  evidence that supports them.

9              The first question is going to be

10  infringement and whether or not the Defendants infringe.

11  We are the only side that presented evidence to you, and

12  that was from Dr. Howe, that said that the Defendants'

13  drives infringe, and he has no doubt that they do.

14              Dr. Howe has 40 years of experience

15  designing optical disk drives.  Dr. Howe did an

16  infringement analysis on the MediaTek controller and the

17  Philips controller.  Those two controllers met every

18  element of Claim 3 of the '981 patent.

19              The evidence is undisputed that the

20  Defendants' drives at issue in this case have either a

21  MediaTek or a Philips controller.  That's one of the few

22  things that the Defendants have been honest about in

23  this case to you.

24              The scales on this issue -- the scales of

25  justice are heavily weighted in favor of infringement.

1  When the Defendants put on their case, the scales never

2  move.  They don't put on any evidence, not a single

3  piece of evidence, that suggests that they do not

4  infringe.

5              Not one engineer from the company came

6  and gave you any testimony.  Don't you think if they

7  could find someone to analyze their products and say

8  they don't infringe that they would have called them as

9  a witness, be it an expert or one of their inside

10 engineers?

11             Of course, they would have.  They didn't

12 call that person because they don't exist.

13             Dr. MacFarlane, the one expert that they

14 did call, the gentleman from Dallas, said that he never

15 analyzed any of their drives and was specifically asked

16 not to.  All that they could do, the best defense they

17 could put on was to try to pick on Dr. Howe, the

18 gentleman from Arizona -- University of Arizona that has

19 40 years designing drives.

20             I suspect when they give their closing

21 that they're going to try to pick on some of Dr. Howe's

22 testimony and take it out of context or pick on his

23 methodology.  His conclusion that they infringe was rock

24 solid.  No one ever told you anything different.

25             Dr. Howe told you the source code doesn't

1   have to be exact line by line.  The product names or the

2   part names for the products don't have to be called the

3   same thing between different products.  They just have

4   to operate the same, and they do.

5            They infringe, and as he put it:  I have

6   no doubt.

7            On whether the Defendants induce or

8   contribute to infringement, again, the evidence was

9   overwhelming on the scales.  First, they know about the

10  patent no later than August 2006 when the lawsuit is

11  filed.  They never change the design or buy drives that

12  operate differently.

13           They have a U.S. subsidiary with hundreds

14  of employees to assist their customers when the drives

15  stop working.  They have an employee stationed with

16  Gateway.  They have an employee stationed with Dell.

17  They have hubs in the United States that store the

18  constant influx of more products.

19           They meet at least quarterly with all

20  their customers in the United States.  They participate

21  in design review meetings, and they share product design

22  documents.  They present PowerPoints on how the drives

23  are designed.

24           On contributory infringement, they put

25  the drive into the computer, which is then shipped into

1 the United States for use by the end-user.  It is that

2 use by the end-user that constitutes direct

3 infringement.

4            When a disk is put into a drive, direct

5 infringement occurs.  I guess that's a second thing that

6 they don't dispute, that the end-user actually uses the

7 drive.

8            I'm sure if they could have figured out a

9 way to try to convince you that the drives are never

10 used, they would have tried.  Common sense tells us

11 that's the reason the drive is in the computer, for the

12 end-user to use it.

13            Question No. 1 will list the drives for

14 you and ask whether or not they infringe.  The answer is

15 yes as to all of the accused drives in this case.

16 Again, the scales are overwhelming; no evidence on the

17 other side.

18            Question No. 2 that you will be asked is

19 whether or not the Defendants presented clear and

20 convincing evidence that the '981 patent is invalid.

21            Remember, that is the very high burden,

22 clear and convincing.  The Defendants actually presented

23 no evidence.  Dr. MacFarlane gave his opinion, but then

24 he gave no facts to support it.  All he said was that

25 someone with as little experience as he had would find

1  it difficult to practice the patent.

2              Dr. Howe said:  I've got 40 years of

3  experience.  It would be very easy for me to practice

4  the patent.

5              When you hear the instruction from Judge

6  Ward on enablement, you will see that it talks about one

7  skilled in the art not having to use undue

8  experimentation to practice the patent.

9              There's no evidence in the record about

10  one having to use undue experimentation.  This was their

11  one defense to try to get out of the trap.

12              Remember, the United States government

13  has now twice said Claim 3 is valid.  1996, 2008.

14  The answer to Question No. 2 on whether or not they

15  presented clear and convincing evidence that the patent

16  is invalid is no.

17              The third question you're going to be

18  asked is whether or not the Defendants' conduct was

19  willful.  The answer is yes.  I don't know how it could

20  have been any more willful.

21              Let's look at some of the facts.  They

22  knew about the patent.

23              They never get an opinion from an

24  attorney as to whether or not they are infringing.  They

25  raise a defense of invalidity; then they never get an

1 opinion from an attorney as to whether the patent is

2 invalid.  It never was a serious defense, one they threw

3 on the wall to see if it would stick.

4                    They never use any alternative

5 technologies, although Dr. MacFarlane says he believes

6 some exist.  The letters from Ms. Li to their customers

7 requesting indemnification, extremely important.

8                    They requested indemnification from

9 Philips, Sony, NEC, Sony NEC Optiarc.  And they also

10 requested indemnification from QSI, a company that they

11 own part of and the documents say they control.

12                    Why are you requesting indemnification,

13 unless you know what you're doing is wrong?

14                    Once the lawsuit is filed, what happens

15 to their U.S. sales?

16                    They increase.  They acted with reckless

17 disregard.  That's one of the tests and one of the

18 instructions that Judge Ward will give you, when you're

19 looking at willfulness, is whether they acted with

20 reckless disregard.

21                    And what was their excuse for acting with

22 reckless disregard?

23                    Mr. Cheng said:  Philips told us to keep

24 doing what we're doing; keep selling; they'll take care

25 of it.  Maybe Philips or Sony or one of these companies

1   will reimburse them for the damages in this case, but

2   we're here to assess damages against these Defendants

3   for their infringement.

4               Another element of willfulness is whether

5   they tried to cover up their infringement.  They spent

6   the entire week last week trying to tell you that QSI

7   and QCI are separate companies that have no

8   relationship.

9               Mr. Parker said they were like General

10  Motors and General Dynamics or General Tire.  Their

11  documents say otherwise.  Their documents -- and they

12  tell their bank in their financial statements:  We

13  control that other entity.  They're trying to cover up

14  their infringement.

15              How many times did the Defendants lie to

16  you in this case or try to tell you something that they

17  didn't have any single document to support?

18              There is clear and convincing evidence

19  that their conduct was willful.  And when you're asked

20  that question on No. 3, again, the scales are lopsided.

21  They have no evidence that their conduct was not

22  willful, and the answer to Question No. 3 is yes.

23              The last question you will be answered --

24  that you will answer in this case will be damages.  I

25  told you in the beginning that the timeline would be

1  critical, and it is.

2          I also told you that the Defendants will

3  spend the entire trial talking about the 1997/2001

4  timeframe, and they did.

5          Let's put the timeline back up.

6          The problem is, you heard the dramatic

7  changes that the optical disk drive market went through

8  after 2001.  Their own expert, Mr. Reed, agreed that the

9  changes in the market were dramatic.  The timeline in

10 you making your decision is critical, because the

11 instructions that Judge Ward is going to give you, after

12 closing argument, will tell you to determine what a

13 reasonable royalty is as of August 31, 2006, the red

14 line.

15         Any date before that, what's going on in

16 1997/1998 time period is not relevant to you making that

17 decision.  All these agreements in the '98/'99 timeframe

18 mean nothing when you're considering what was going on

19 in the market in 2006.

20         Why do the Defendants talk about them

21 every chance they got?

22         And I bet they're going to talk about

23 those same agreements over here in their closing

24 argument.  I told you why they were going to do that in

25 opening statement.  It's an effort to get you to let

1  them off cheap for their infringement.  Don't buy into

2  that.

3            QCI is the largest laptop manufacturer in

4  the world, 2.6 billion dollars' worth of sales into the

5  United States since this lawsuit started.  The damages

6  testified to by Mr. Murtha and Mr. Davis is 2 percent of

7  what they sold into the United States since this lawsuit

8  started.

9            Were the Defendants even honest with you

10  in talking about damages?

11            Of course, they weren't.  They said we

12  ██████  ████   **REDACTED BY ORDER OF THE COURT**   ███  █  ██████

13  have a single document to verify that.  Come on.  This

14  is a publicly traded company in Taiwan.

15            Then they said the Plaintiff wants a

16  50-percent royalty, because $14 over $28, the cost of

17  the drive, is 50 percent.  I guess they forgot that they

18  sell the computer with the drive in it for $875.

19            The royalty rate is 2 percent of what

20  they've sold since this lawsuit has been filed in the

21  United States.

22            Now, let's focus on the timeline during

23  the relevant time period that you will be asked by Judge

24  ████ ██ ███ ███ ███ ███ ██ ████ ███

25  ███████ ██ ██ ██ ████ ██ ██ ██ ██ █

**REDACTED BY ORDER OF THE COURT**

9   amount of money that they could make selling this

10   product into the United States, substantially higher

11   than the amount they were willing to pay.

12          Mr. Reed, who told you that his client

13   should only have to pay 500,000 in damages, admitted

14   that he focused on this time period here (indicates).

15   Maybe they could have gotten a license in 2000 or 2001,

16   but they chose not to.

17          They chose voluntarily to infringe.  They

18   chose to take the chance that an individual, like Mr.

19   Kamatani, would not have the wherewithal to sue them,

20   would not drag them kicking and screaming to a federal

21   court in the Eastern District of Texas, and ask 10

22   citizens of the United States to enforce the patent laws

23   and to award damages for their conduct.

24          The numbers they are facing are a direct

25   result of their own wrongful conduct.  Mr. Davis, who

1  had the damage model for you, says that 2 percent of

2  their sales, since this lawsuit has been filed, is

3  $52,070,154.  It is the only number you have evidence

4  of, of what was relevant during the 2006 time period

5  that you will be asked to award damages on.

6            Their own expert, Mr. Reed, said:  I

7  think Mr. Davis did a fine job in calculating his

8  numbers.  He was correct as to the royalty base, and he

9  applied Mr. Murtha's royalty rate to come up with the

10 damage number.

11           Focus on, as you were told at the

12 beginning of this case by Judge Ward, the credibility of

13 the witnesses, because it's very important in a lawsuit.

14 The witnesses take an oath to tell the truth.

15           You heard testimony from the Defendants

16 that was exactly opposite of what their documents said.

17 You saw inaccurate spreadsheets that they gave us during

18 discovery that lied about who was manufacturing the

19 drives.  And then you saw them take a position that they

20 had taken throughout this lawsuit and change that

21 position about how they obtained the drives.

22           The last question you will be asked is

23 what sum of money would fairly and reasonably compensate

24 LaserDynamics for the infringement that you have found.

25           Remember, when they changed their

1 position in trial about how they obtained their drives,

2 they received -- you received an instruction from Judge

3 Ward as follows:

4　　　　　　　Prior to yesterday, the position of

5 Quanta Computer was that this buy/sell arrangement

6 generally was one of the ways in which they accomplished

7 their -- or the way they did their business.  Yesterday,

8 the testimony was, for the first time, that that was the

9 predominant method of doing business.

10　　　　　　You are instructed that this constitutes

11 a significant change in the testimony, and no documents

12 have been produced that support that and that you may

13 take this instruction into account in judging the

14 credibility of all of this witness' testimony and all

15 other Quanta Computer's positions in this case.

16　　　　　　THE COURT:  You've used 18 minutes.

17　　　　　　MR. SANKEY:  Thank you, Judge.

18　　　　　　The Defendants were not honest to you

19 from the beginning of this case to the end of this case.

20 And you have to ask yourself why.  What are they hiding?

21 What are they trying to get out of?

22　　　　　　I'm going to sit down now, and let

23 Mr. Parker give you his closing, and then I'll get to

24 come back up and talk to you for a few more minutes

25 before you start your deliberations.

1           Maybe Mr. Parker can explain to you why

2  his clients chose not to tell the truth throughout this

3  trial.

4           Thank you.

5           MR. PARKER:  May it please the Court.

6           THE COURT:  Mr. Parker.

7           MR. PARKER:  Counsel.

8           Ladies and Gentlemen of the Jury, good

9  morning.

10           First of all, it's definitely my position

11  that my clients and the people that testified on behalf

12  of my clients did not, in fact, mislead anyone, and that

13  we have been honest throughout this matter.

14           I want to talk, first of all, a little

15  bit about the patent.  You learned it is what is known

16  as a method or a process patent.  Mr. Kamatani did not

17  build anything, not even a prototype.  And the film you

18  saw -- and I don't know -- think back; I know you saw it

19  a long time ago.

20           But one of the examples they showed in

21  that film was Thomas Edison and the lightbulb.  Guess

22  what?  Thomas Edison built a lightbulb.  And they showed

23  you the telephone, and Alexander Graham Bell built the

24  telephone.

25           And even with the process, something as

1  complex as a computer operating system, we all know the

2  story about Bill Gates in his garage writing source

3  code, actually practicing the process, putting it into

4  effect.

5           Mr. Kamatani -- Mr. Kamatani did nothing

6  like that.  He did not even try to explain to you what

7  his patent does.  He left that up to his expert, who I

8  am going to tell you later didn't do a very good job.

9  He can't even say whether or not it implicates the

10 S-curve.  In fact, he says:  I don't even know what an

11 S-curve is.  I didn't know then, and I don't know now.

12 And that's going to be important, too.

13          He's never written one line of source

14 code to implement his patent, not one.  And now any

15 claim of infringement in this matter that relies solely

16 on source code analysis, it is incumbent -- and this is

17 so important -- it is incumbent that the Plaintiff,

18 LaserDynamics, or its expert identify on an

19 element-by-element basis for the asserted claim what

20 source code of each accused instrumentality satisfies

21 the software limitations for that element exactly.

22          You can't do it by comparing it to

23 something else.  You have to look at the accused

24 product.

25          Now, why do I say exactly?

1                    I am using Dr. Howe's own words.  You

2    will recall, I said:  So what you're saying is that in

3    order for a QSI drive to infringe Claim 3 of the '981

4    patent, each -- each optical disk must satisfy each

5    element of the claim exactly, correct?

6                    Correct, yeah.

7                    And I say it's his word, even though I'm

8    the one that spoke it, because it came out of something

9    he had prepared for this case.

10                    They have not come close to carrying

11    their burden, and they are the one with the burden.

12                    Dr. Howe admits, albeit reluctantly, that

13    he did not do the very analysis he says is necessary,

14    including preparing the accompanying flow chart for even

15    one -- one accused drive.  Not even one.

16                    Now, when Mr. Kamatani and his company

17    had a claim against the company called Asus, they had

18    the same expert, Dr. Howe.  And he did the analysis, the

19    very analysis that he says is what you have to do.  He

20    looked at the Asus drive, not somebody else's drive, and

21    he went element by element, and he did it exactly.  He

22    told you that.

23                    And when they made a claim against a

24    company called BenQ, Dr. Howe was their expert.  And

25    what did he do?

1           Exactly what he says here he was supposed

2    to do.  But not in this case.  And even he admits it,

3    again reluctantly, that that would have been the better

4    approach.

5           I suggest it's the only approach.  It's

6    the only approach he's ever used in any other claim.

7    Why not here?

8           Now, let's look at the accused drives.

9    We started out with 20 of them, but now the E drives

10   that you heard, or external drives, are no longer being

11   accused, so they're out of the case.  You don't need to

12   worry about those.

13          Let's look at the drives that Dr. Howe

14   did a limited analysis on.  Let's see the three limited

15   analysis drives.

16          Did analysis -- he did the limited

17   analysis he described on three, but even there, he

18   didn't look at all the code, and he didn't do a flow

19   chart for any of them.

20          Now, let's look at the one that he did

21   the most analysis on.  This is the top drive in terms of

22   Dr. Howe doing anything to it, and that's the 087 drive.

23          Now, LaserDynamics asserts you should

24   find infringement of the QSI drives because Dr. Howe

25   said so.

1          But in the end, you need to look at the

2    evidence that they have presented to see if Dr. Howe's

3    conclusion can be justified or corroborated.  Even if

4    you were to take their best shot, and that's the limited

5    analysis of the 087 drive, you'll find that

6    LaserDynamics has failed to present enough evidence to

7    show infringement for each and every element of the

8    claim.

9          You have nothing to take back to the jury

10   room to review and determine infringement for each

11   drive.  No flow charts, no analysis of any QSI product.

12   Dr. Howe didn't do it, and, therefore, neither can you.

13   He admitted that he did not do a complete software or

14   firmware comparison analysis for even the three drives,

15   and that includes the 087.

16          Now, for the 087, Dr. Howe initially even

17   had the wrong number for the chipset in his expert

18   report, and he described -- he caught it, and on the

19   witness stand, he said:  Oh, that's a typo.  That's just

20   a typo.

21          Now, he agrees that the 087 uses a

22   different chipset model number than the Asus drives.

23   And how does he get around that?

24          He says:  Oh, those extra letters on the

25   087 drive, I think they have to do with how it's

1  packaged.

2              And what did I ask him?  I said:  Well --

3  remember, those are the ones that are made by MediaTek.

4  I said:  Dr. Howe, did you call anybody at MediaTek to

5  determine that, to make sure your assumption that this

6  different model number was meaningless?

7              No.

8              One phone call, one phone call to verify

9  what he was saying.  When Dr. Howe isn't interested in

10 finding out whether his theories are right or wrong, he

11 doesn't test them.  Didn't test our products, didn't

12 make one phone call, one phone call to MediaTek to make

13 sure that he was right about that, because he didn't

14 want to know the answer.

15             There's no other conclusion you can

16 reach.  He cannot say with respect to the 087 drive --

17 and he admitted it -- that the source code is identical.

18 And he can't explain the differences to you either.  He

19 admitted there's no flow chart for it.  He chose a

20 function -- remember, he said:  Oh, look at my chart

21 from my report; look at my chart.

22             He chose a function from the SDW087.  He

23 said they're similar, but he can't say they're exactly

24 the same.  Howe can say he thinks it's similar until

25 he's blue in the face, but if you look at his own chart,

1 the call BDiskIDMeaData, paren/paren, doesn't sound the

2 same to me, and it shouldn't sound the same to you, as

3 BScan_FE_SBAD, paren/paren.

4              I mean, they aren't the same.  They

5 aren't the same letters; they're not in the same order.

6 They don't have the same spacing.  And he can't

7 definitely say they're exactly the same without having

8 completely analyzed the source code in a source code

9 editor, which he didn't do for his report.

10              Then they identify in that same one --

11 remember, the 087 is the best one they've got.  In the

12 087, they identify the function, bServoOn, paren/paren,

13 to satisfy the quote:  Settling the modulation of the

14 servo mechanism element.

15              But when you go over to the side of the

16 chart for the SDW087, they don't identify any function

17 that's even claimed by him to be similar.  So the

18 element is completely missing.

19              Now, if you try to locate evidence for

20 any other drive, you can't find anything, not even what

21 he had for the 087.  No comparison for the 243 or the

22 085, both of which he said he did a limited analysis on.

23 Thus, you won't even be able to find something that he

24 claims is similar functions in those drives.

25              Next, let's go to the drives with the

1 Philips chipsets.  Howe says that there are four

2 functions.  This is his testimony; this is his report.

3 There are four functions that absolutely must be

4 analyzed to compare these devices with the accused

5 devices.

6           And then he says he only looked at one of

7 them.  He only looked at one of the four, because he

8 didn't have the other three, but that didn't stop him

9 from giving an opinion.  He wants us to take it on faith

10 that his speculation is enough to carry the day.

11           No way.  There is no way for you to find

12 infringement of those drives, because he himself has not

13 done what he admits is critical to do at a minimum.  At

14 a minimum.

15           And finally, you go to the other MediaTek

16 controller drives, and of those, he had shown you

17 absolutely nothing, and he didn't even do a limited

18 analysis.  There's no way you can determine

19 infringement.

20           And, remember, the burden is theirs.

21           He admits he did nothing.  There's no

22 evidence to show these drives infringe, because Howe

23 didn't analyze them in any way, and he presented not

24 even a bare chart like what he did with the 087, which

25 was totally inadequate there.  But he didn't even have

1   an inadequate chart for the rest of them.

2              But what he did say about the stuff he

3   looked at is, he forms his opinion on the base -- on the

4   basis that they're similar.  That's his word.  Remember?

5   Good enough.  Is that good enough?

6              It's not.  Remember, I asked him:  Is

7   that the sort of analysis that you would use to support

8   an academic paper that you submitted to a peer-reviewed

9   journal?

10             And, of course, the honest answer to that

11  is absolutely not, because I know it would be rejected

12  out of hand, is what Dr. MacFarlane, who is an editor of

13  those journals, said.

14             The honest answer would be to admit no.

15             But what did he say?

16             He said:  Well, if you let me define

17  similar -- those are his words -- well, you know, folks,

18  I'll bet you if we had let Mr. Madoff define fraud, he

19  wouldn't be in jail.  But he doesn't get to do it, and

20  neither does Dr. Howe.

21             It's simple, people.  Similar means

22  somewhat alike but not exactly the same.  And to

23  infringe, it must be, in Dr. Howe's words, exactly the

24  same.

25             It's Plaintiff's job to do the analysis,

1  and for whatever reason, for purposes of his report in

2  this case, Dr. Howe did not do it, even though he's

3  always done it before.  We can only speculate why.

4  But it really doesn't matter, because it doesn't change

5  the fact that he didn't do it.  Plaintiff has not

6  carried the burden.  And while I think it takes more

7  than a feather, they don't even have that.

8            And I think Mr. Sankey shared that

9  feather analogy with you at the beginning of the case,

10 because he knew he didn't have much to show, based on

11 what he knew Dr. Howe's testimony was going to be and

12 based more on what he knew Dr. Howe had not done.

13           They need a feather for every element,

14 every element exactly, for every accused drive.  They

15 don't need a feather.  They need a whole chicken.  And

16 they haven't shown it to you.

17           And I suggest that once you determine

18 that, that's as far as you need to go in your

19 deliberations.

20           Now, even though Dr. Howe did not do a

21 detailed analysis of the QSI drives, he bases his

22 infringement theory on the signal that results from the

23 laser focus error.  He testified about that and showed

24 you a chart, which can be called the S-curve or the

25 SBAD, which are kind of like two sides of the same coin.

1  However, even the S-curve doesn't infringe, as Professor

2  MacFarlane explained.  CDs and DVDs are different in two

3  distinct ways.

4            First, CDs and DVDs have different pit

5  sizes and different configurations.

6            Secondly, CDs and DVDs have different

7  locations for the data layer.  The '981 patent -- you'll

8  have it with it.  Read Claim 3.  It relates to pits and

9  pit configuration standards.

10            The S-curve technique, which Mr. Kamatani

11  admits his patent doesn't teach, on the other hand, just

12  relates to the depth of the data layer.  Even if Dr.

13  Howe were correct on the S-curve, it simply does not

14  infringe.  And that's what he showed and described as

15  the activity of our drives.  That's his opinion.

16            And remember, I asked him, I said:  Well,

17  why do you have to go any further and deal with any

18  pits, because once you've determined the depth of the

19  drive, you know whether it's a CD or a DVD?

20            And he danced around that.  But you saw

21  it.  And the bottom line is, that's right, and that's

22  all you need to do.  And that does not implicate the

23  patent.

24            Now, what about the operation of the

25  patent?

1          Dr. MacFarlane pointed out a flaw that

2    raises a question of enablement.  In other words, could

3    someone skilled in the art put the patent into practice

4    without going to undue lengths to figure it out?

5          This has to be -- this has to do with

6    that loop in the middle of the patent diagram.  And the

7    fact that it could, in fact, be never ending.  Dr. Howe

8    admits there's no explanation in the patent itself to

9    avoid this problem, no time limit, no counter limit,

10   indeed no limit or instruction at all to avoid that

11   problem.  That's something Dr. Howe and Dr. MacFarlane

12   agreed on.

13          Dr. Howe says:  Oh, hey, it would be easy

14   to figure out by one skilled in the art, which he says

15   he is, and I think he is.

16          Why not show us?

17          He did a diagram or a movie or some kind

18   of depiction for everything else.  If it's so easy, show

19   us.  He did describe someone skilled in the art as

20   having certain educational credentials and certain

21   experience.  And you see it there, neither of which, by

22   the way, Mr. Kamatani has or had at the time he

23   submitted his patent.

24          So how was he supposed to teach one

25   skilled in the art?

1          Think about it.  Another leap of faith by

2   Dr. Howe, but not enough to get over Dr. MacFarlane's

3   opinion, I suggest.

4          Damages.  I don't think you should get

5   there, but I have to talk to you about them.  Now, I

6   think Mr. Sankey was implying don't worry about it,

7   because somebody else is going to step up and pay.

8          That's not true.

9          Why in the world would Philips or Sony or

10  NEC, the big companies that those demand letters were

11  sent to, indemnity letters were sent to, which are

12  always sent out in cases like this -- why in the world

13  would they step up and pay?

14         They've got a license.

15         Now, on the damages issue, it's where the

16  Plaintiff's case really leaves the realm of reality,

17  logic, and good sense.  I am going to talk about those

18  16 negotiated licenses, because that's all we have.

19  Those are all the licenses in the world that anybody

20  ever entered into in a business-like negotiation with --

21  with LaserDynamics.  It hadn't happened since then.

22         Why?

23         Think about it.  Because the market

24  doesn't value the patent.  Not one single running

25  royalty, not one.  Even through today, not one single

1  running royalty in any circumstance.

2              And even when you add it in, as they did

3  with the testimony of their damage calculation person,

4  Mr. Davis -- even when you add in settlements that

5  they've gotten out of other claims they've made, their

6  average -- their average they received is $388,000.

7  They say don't look at the old licenses.  What else can

8  we look at?

9              And then they say:  Well, wait a minute.

10 Those early ones, those were lump sum, because the

11 technology was in its infancy.

12             Think about that.  If you were really

13 buying technology that was in its infancy and you didn't

14 think it might develop, wouldn't you rather do a running

15 rate?  Because that way, if it doesn't happen, you don't

16 pay.

17             I mean, that explanation is nonsense.

18 The explanation is, they had a way of proceeding.

19 LaserDynamics had a way of proceeding, and it was

20 selling licenses.  One time, one payment world-wide, you

21 can use it.

22             They had a game plan.  Big companies they

23 go $200,000; smaller companies, they go somewhat less

24 than that.  And you saw that from the chart.  That's the

25 way, in fact, that it worked out over time.

1              And they did sell licenses to Philips,

2    Sony, and Mitsubishi, companies that dwarf Quanta, all

3    for fixed fees and all for $250,000 or less.

4              And those companies, I suggest, pay minor

5    tribute to make LaserDynamics go away.  Quanta said no.

6    Quanta said:  We looked at it.  We don't infringe, and

7    we're not going to pay because we don't need it.

8              As for Quanta Computer, they assemble

9    from parts made by others.  And as Ms. Li said, they

10   rely on the supplier to deal with license issues.  And

11   that's certainly reasonable, because if they had to pay

12   a royalty on every piece they put in the computer,

13   pretty soon there's no reason to make one.

14             You can't do it.  You expect the people

15   that supply you the finished parts to go into the

16   assembled computer to deal with it.  And that's

17   reasonable.

18             Mr. Murtha's royalty opinion is so

19   grossly inflated that it approaches a make-believe

20   world.  I think we're in a Star Trek episode.  He

21   suggests a royalty for the single patent, this one

22   patent.  And remember, all those licenses included all

23   of Mr. Kamatani's patents.  And when they want to build

24   Mr. Kamatani up, they talk about he's got 15 patents.

25   But when we point out that those licenses include all

1  the patents, they say:  Oh, the rest of them don't mean

2  anything.

3              Which way is it?  Which way is it?

4              He suggests a royalty that's -- Mr.

5  Murtha suggests a royalty on a par with the royalty that

6  Quanta paid to the so-called 3C.  Remember, those are

7  companies -- those are Philips, Sony, and Pioneer.

8  And to the 6C, and that actually is nine companies,

9  instead of six, but they have members like Hitachi,

10 Toshiba, Sharp, and Warner Brothers.  They are giants.

11 And those two patent portfolios each contain thousands

12 of world-wide patents.  And to suggest that you would

13 pay a royalty for this one patent, the '981 patent

14 that's a patent for a small part of the software related

15 to a DVD drive, for which you've heard there are

16 alternatives -- to suggest that you would pay for that

17 on a par with what you pay for these huge patent

18 portfolios is -- is insane.

19              And you must realize that.  You have to

20 see that.

21              And in terms of alternatives, you saw

22 Rosen and Maeda up on the board, and you heard about the

23 table of contents and the trial-and-error method from

24 Dr. MacFarlane.

25              I mean, why in the world for this one

```
 1  little piece of technology in a part -- they want to
 2  talk about how important the part is, and we've never
 3  disputed that an optical disk drive is an important part
 4  of a laptop computer.
 5              It's getting less important over time,
 6  but it's still important.  It's convenient.  You can
 7  show movies; you can play music.  Eventually, it's going
 8  to be replaced by solid-state things like flash drives.
 9  But today, it has value, and it has utility.  We've
10  never disputed that.
11              But they want to talk about -- like
12  Mr. Kamatani's patent, LaserDynamics patent, is the
13  whole deal like they patented the disk drive.  They
14  patented one tiny piece of software.
15              THE COURT:  Five minutes.
16              MR. PARKER:  One tiny piece of software.
17              Thank you, Your Honor.
18              That didn't pass reasonableness.  And
19  ████████████████████████████████████████████████
20  ██████    REDACTED BY ORDER OF THE COURT      ██
21  ████
22  ████████████████████████████████████████████████
23  ████████████████████████████████████████████████
24              Why in the world are they talking about
25  that?  Or why, if they are going to talk about it, don't
```

1  we talk about it in terms of $7700 a patent.

2              He applies his royalty -- Murtha -- to

3  the finished product, and he doesn't give you one single

4  example.  And Mr. Reed said it doesn't happen in the

5  marketplace.  It just does not happen.

6              Given Mr. Murtha's theory, it's a good

7  thing these drives weren't put in a fleet of 747s.

8  Imagine what the royalty would be.

9              And he does put a 14-dollar royalty on

10 the 28-dollar part.  There's no other way to get around

11 it.  And if that were the case, Quanta Computer would

12 simply buy drives from other manufacturers, and there

13 would be more royalty at all.

14             His theory would eliminate all of

15 Quanta's profit, and they tried to get around that nine

16 ways from Sunday, but they had in evidence Quanta's

17 ███████        **REDACTED BY ORDER OF THE COURT**

18 ███████

19             And Mr. Reed said that they make actually

20 less on the computers than they do on other things like

21 the cell phones and the other electronic products they

22 make.  And that makes sense, because Quanta is the one

23 in the squeeze.

24             They have three large OEM competitors,

25 and they are selling to huge companies like Apple, HP --

1  HP, Toshiba, Lenovo, which is IBM, the IBM computer.

2  That's where the profit is, with the big boys.

3              These guys are in the middle in the

4  squeeze, so, yes, they have to do it on volume.  And,

5  ████  ████   **REDACTED BY ORDER OF THE COURT**   ████  ████████

6  And, yes, if you take Dr. Murtha -- Mr. Murtha's

7  methodology, it would eliminate the profit.

8              And you will learn from the charts that

9  that is important.  That's something to take into

10 consideration.

11             As to willfulness, when this case was

12 first filed, every single drive in every Quanta Computer

13 was named.  Quanta didn't have a choice.  Quanta

14 couldn't change its conduct unless it closed its doors.

15             And you will learn that willfulness is

16 more than just doing what you intend to do, that there

17 are elements to it, that it has to do with recklessness.

18 And there's nothing in the evidence in this case, I

19 submit, that shows they were reckless.

20             Ms. Li testified that as an OEM

21 manufacturer, they depended on their suppliers.  There's

22 nothing reckless about that.

23             Folks, send them packing.  They're here

24 trying to shoot the moon on the off chance they can

25 convince a group of citizens -- you, the jury -- to

1  award a ridiculous sum of money to which there's

2  absolutely no entitlement and for which they absolutely

3  have no history in their own operations.

4           Don't punish Quanta for having the

5  courage to say enough is enough.  We will not give in to

6  ridiculous demands and pay for something that has no

7  value just to avoid being dragged into a lawsuit a long

8  way from home.

9           Now, the Plaintiff has got certain

10  advantages in this case, because they have the burden of

11  proof.  They talk to you first in voir dire.  They talk

12  to you first in the opening statement, and they got a

13  chance -- Mr. Sankey did -- to talk to you first today.

14  And he may bring up things when he gets a chance to get

15  up again that I don't have a chance to respond to.  I

16  ask you to use your common sense.  Help me.  Think about

17  what a logical response would be.

18           And when you use your common sense and

19  you look at all the evidence and, more importantly, the

20  lack of evidence of any analysis of a single QSI accused

21  drive, I believe your result will have to be that they

22  take nothing.

23           And even if you do consider damages, the

24  only reasonable damage calculation that had anything to

25  do with business reality that was shown to you was shown

1    to you by Mr. Reed.

2                    I don't think you should go there, but if

3    you go anywhere, that's the only place I suggest you

4    should or can go, based on the evidence you have.

5                    On behalf of the Quanta team, I thank you

6    for your time and attention and for what I know will be

7    your fair, honest, and just consideration of the

8    evidence in this case and a verdict for Quanta.

9                    Thank you.

10                   THE COURT:  Thank you, Mr. Parker.

11                   Mr. Sankey.

12                   MR. SANKEY:  Mr. Parker says don't make

13   us pay for something that has no value.  I guess he

14   forgot that QSI filed a patent application in 2006

15   trying to get a patent on technology that was almost

16   identical.

17                   In that patent application, he

18   described -- or they described it, his own client, as

19   essential to optical disk drives and essential to being

20   able to sell computers.

21                   Do you think they would have been able to

22   sell $2.6 billion into the United States without that

23   technology?

24                   They pick on Mr. Kamatani and say he's

25   never made anything; he's never written any source code.

1 When Judge Ward reads you the instructions, see if it

2 says anything in there about having to make any products

3 or having to write any source code.

4          The law says the owner of a patent is

5 entitled to damages for infringement.  As I expected,

6 they criticize Dr. Howe in his methodology.

7          Remember, his conclusion was unwavering.

8 He didn't say, I think they infringe; he said, I know

9 they infringe.  I have no doubt.  Not a single expert

10 witness from their side to get on the stand to say, I

11 disagree with Dr. Howe.  I've analyzed these drives.

12 They don't infringe.

13          The scales are overwhelmingly in favor of

14 infringement.  They put on no evidence -- they pick on

15 Dr. Howe and his methodology only.  They cannot pick on

16 his conclusion, because it was unwavering.

17          Remember, that attorney argument from

18 Mr. Parker is not evidence.  If you didn't hear it from

19 the stand, if you don't have an exhibit, it is not

20 evidence to consider.

21          One of the things he said was that he

22 did -- he never looked at Quanta's source code.  Well,

23 remember, he tried that with Dr. Howe, and Dr. Howe

24 said, Now, wait a minute.  Let's put Exhibit N from my

25 report, N as in Nancy, up on there.  See all along the

 1  left side where I did refer to Quanta's source code, and

 2  I did match it up.

 3          And though the source code doesn't have

 4  to be identical, though the part names don't have to be

 5  the same, they operate identically.  They infringe.

 6          An interesting comment -- again, they

 7  want to stick and talk to the '97, '98 license

 8  agreements.  You're going to be asked about damages in

 9  2006, and we told you what changed.

10          This is an exhibit in evidence that

11  you're entitled to look at, if you so choose, in the

12  jury room.  This was the TSR report.

13          Let me see if I can get that to focus a

14  little bit.

15          The TSR report -- and the critical thing

16  here is, you heard Mr. Parker say that the average of

17  Mr. Kamatani's license agreements way back in '97 and

18  '98 were $388,000.

19          If you take a look, they don't even go

20  back -- this is 2000 here -- they don't go back to '97

21  and '98 when he was entering into these agreements for

22  $388,000.

23          In 2002, on this exhibit, they said that

24  there were 400,000 optical disk drives made that year

25  and sold in the United States.  If you look at 2006, the

1 year that you're going to be asked to look at, 53

2 million.  That's 375 times what they were doing in 2000.

3 Take that 388 average that he was doing licenses for and

4 multiply it by 375 and see what you get.  It's

5 substantially more than we're asking for in this case

6 and that the only testimony that you have as what would

7 be reasonable in 2006.

8            You did hear about the E drives coming

9 out of the case, and I'll tell you that there were four,

10 and they are out of the case because the question you're

11 going to be asked is damages against Quanta Computer

12 that have to put drives into their computer before they

13 ship them to the United States.

14            Judge Ward made some rulings pretrial

15 that took those out of the case.  We just took them out

16 over the weekend, realizing that they were in there.

17 But the key here is, Mr. Davis' damage model did not

18 include those drives in it.

19            And if you want to take a look at Quanta

20 Exhibit 1175, it was Davis Exhibit A6 to his report

21 where he shows that those four E drives from 2006

22 forward had zero in sales in the United States.  They

23 weren't part of his damage model.  It does not reduce

24 his opinion.

25            The comment was made that I'm trying to

1   suggest that Philips or Sony is going to pay their

2   damages in this case.  I'm not.  I'm saying they're

3   suggesting it by requesting indemnification.

4           Mr. Wang told you that last year alone,

5   ███    ███    **REDACTED BY ORDER OF THE COURT**    ███   ███  ███

6   afford to pay their own damages in this case.  They

7   don't have to look to some other company.

8           Lawsuits are about responsibility.  When

9   a company won't take responsibility for its actions,

10  jurors just like you have to do it for them.

11          Remember, Mr. Reed, when he talked about

12  some of the royalty agreements he went through, he said

13  that he had analyzed many other royalty agreements, and

14  1 percent was reasonable; 2 percent was reasonable; 3

15  percent was reasonable; 4 percent is reasonable.

16          We're asking for 2 percent.  It fits

17  within what he says was reasonable.  If you believe that

18  the number should be less or if you believe that the

19  number should be more, you, as the jurors, make that

20  decision.  There's no evidence that less than 2 percent

21  is reasonable.

22          When Judge Ward reads you the

23  instructions here in a few minutes, he will state the

24  law on this that says that the owner of a patent is

25  entitled to an award of damages adequate to compensate

1  for the infringement, but in no event less than a

2  reasonable royalty for the use that the defendant made

3  of the invention.

4           Ladies and Gentlemen, the Defendants made

5  use of this invention to the tune of $2.6 billion.  They

6  never mention that number from start to finish in this

7  case, and there's a reason why.  They don't want you to

8  focus on how much money they were making.

9           In 2006, the date that you're going to be

10  looking at with the hypothetical negotiation, if you sat

11  down with these Defendants and said, We're going to give

12  you two choices:  You can sell $2.6 billion worth of

13  products into the United States, but you've got to pay a

14  2 percent royalty, or you're not going to be allowed to

15  sell anything into the United States, because Mr.

16  Kamatani has a patent that covers this technology, which

17  one of those choices do you think they would have taken?

18           Of course, they would have paid 2 percent

19  in order to sell $2.6 billion into the United States.

20           Remember, one of their witnesses said to

21  you that they will not stop infringing until the jury

22  tells them to do so.

23           Ladies and Gentlemen, that is your job

24  today, to enforce the patent laws of the United States.

25  It is an important system, and this case is important to

1  that system.

2              The bottom line is, Mr. Kamatani followed

3  the rules.  The Defendants did not.

4              On behalf of Mr. Kamatani, LaserDynamics,

5  our trial team, we want to thank you for the attention

6  that you gave this case, and we ask that you stay

7  focused and continue to give it your attention until you

8  render a true verdict that does justice.

9              Thank you.

10             THE COURT:  Thank you, Mr. Sankey.

11             All right.  Ladies and Gentlemen, you've

12 heard the evidence that's been presented by the parties

13 to this suit, and you've heard the argument of the

14 respective attorneys in support of their position.

15             It is now my duty, under the law, to give

16 you the charge in this case.  It will be an oral charge

17 and is given in an effort to assist you in your

18 deliberation in deciding the issues which you must

19 decide in order to reach a fair and impartial verdict in

20 this case.

21             Perhaps this function of the Court is the

22 most important one that the Court performs in the trial

23 of any case, so I do ask that you pay close attention to

24 my remarks.

25             You will remember that at the beginning

1 of this trial, I gave you some general instructions and

2 definitions.  Rather than repeat them, I ask you to

3 recall them now in deciding the facts and issues which

4 you are to decide.

5             As I instructed you at the beginning of

6 the trial, you are the exclusive judges of the facts,

7 the credibility of the evidence, and the weight to be

8 given the testimony of the witnesses.

9             The Plaintiff's claims and Defendants'

10 defenses may be proven by both direct and circumstantial

11 evidence.

12             Now, you are to perform your duty without

13 bias or prejudice to any party.  The law does not permit

14 jurors to be governed by sympathy or prejudice.  A

15 corporation and all other persons are equal before the

16 law and must be treated as equals in a court of justice.

17             The Court and the parties expect that you

18 will carefully and impartially consider all of the

19 evidence, follow the law, as I will give it to you, and

20 reach a just verdict.

21             You're instructed that all persons,

22 including the Plaintiff and the Defendant in this case,

23 stand equal before the law and are to be dealt with as

24 equals in this court.  The law is no respecter of

25 persons.

```
 1              First thing I'm going to do is briefly
 2   review the contentions of the parties and then give you
 3   some additional instructions and definitions that will
 4   guide you in deciding the facts that you must decide and
 5   resolve in this case.
 6              With respect to the Plaintiff's claims
 7   and the Defendants' defenses, the Plaintiff,
 8   LaserDynamics, Inc., alleges that the Defendant, Quanta
 9   Computer, Inc. (Quanta) induces or contributorily
10   infringes Claim 3 of its United States Patent
11   No. 5,587,981 entitled Multi-Standard Optical Disk
12   Reading Standard Having Distinctive Process.
13              LaserDynamics contends that Defendant
14   infringes by acts of contributing to and inducing the
15   use of the certain optical disk drives within the United
16   States.
17              In addition, LaserDynamics alleges that
18   Defendants' infringement is willful.  LaserDynamics
19   seeks damages in the form of a reasonable royalty to
20   compensate it for the alleged infringement.
21              Quanta denies the Plaintiff's claims.
22              The Defendants contend that they do not
23   contribute to or induce the infringement of the '981
24   patent.
25              The Defendants also contend that Claim 3
```

1  of the '981 patent is invalid for failing to meet the

2  enablement requirements of patentability.

3          Additionally, the Defendants deny that

4  there is any willful infringement in this case.

5          LaserDynamics bears the burden of proof,

6  by a preponderance of the evidence, that the Defendants

7  infringe the asserted claim of the patent-in-suit.

8          LaserDynamics also bears the burden of

9  proof, by clear and convincing evidence, that the

10  Defendants' alleged infringement was willful.

11          Now, the Defendant bears the burden of

12  proof, by clear and convincing evidence, that Claim 3 of

13  the '981 patent is invalid.

14          I will now give you some additional

15  instructions and definitions that will help you in

16  answering the questions that you will take into the jury

17  room.

18          First of all, with respect to claim

19  interpretation, LaserDynamics contends that the

20  Defendants committed patent infringement.

21          To decide the questions of infringement,

22  you must first understand what Claim 3 of the '981

23  patent covers; that is, what it prevents anyone else

24  from doing.  This is called claim interpretation.

25          Now, it is my duty, under the law, to

1  interpret what the words used in the patent claim mean.

2  I have made my determination, and I will instruct you

3  accordingly.  You must apply the meaning I give the

4  patent claim to your decisions on infringement and

5  validity.

6          I will now instruct you how these words

7  are to be construed and understood when deciding the

8  issues of infringement and validity.

9          You've been provided with a copy of the

10 patent-in-suit and a copy of these claim term

11 definitions, and you certainly should refer to them and

12 use them during your deliberations.

13          Optical disk means a disk-shaped storage

14 device that is read by a laser or other form of light.

15          Encoded pit means a depression in the

16 surface of the disk which represents data or

17 information.

18          Processing an optical signal is construed

19 to mean converting or manipulating an optical signal

20 from one format into another.

21          Pit configuration standard of the optical

22 disk is construed to mean a recognized arrangement of

23 depressions formed in an optical disk.

24          The phrase collating the processed

25 optical disk with an optical disk standard data, which

1  is stored in memory, means comparing the processed

2  optical signal with an optical disk standard data stored

3  on a memory.

4           Stored in a memory means placed in data

5  storage.

6           The phrase settling modulation of

7  servomechanism means dependent upon the optical disk

8  standard data which corresponds with the processed

9  optical signal is construed to mean establishing the

10  regulation of the automatic feedback control system for

11  mechanical motion dependent upon the recognized

12  arrangement of depressions for an optical storage medium

13  which corresponds to the processed optical signal.

14           The term servo means the motor part of

15  the servomechanism controlled by the feedback circuit

16  that produces the final mechanical output.

17           Modulate means regulate.

18           The phrase to modulate movement of a

19  pickup means to regulate the position of an assembly

20  that reads data from a disk.

21           Fortunately, you've been provided with a

22  written copy of these definitions, and they're there for

23  your use during your deliberations.

24           Now, with respect to determining

25  infringement, once the patent is issued, the owner of a

1  patent has a right to exclude others from making, using,

2  offering to sell, or selling the patented invention

3  throughout the United States for a term of 20 years.

4            Thus, infringement occurs when a person,

5  without the owner's permission, makes, uses, offers to

6  sell, or sells the patented invention anywhere in the

7  United States or imports the patented invention into the

8  United States while the patent is in force.

9            Now, to determine whether there is an

10 infringement, you must compare the allegedly infringing

11 product with the scope of the patent claims as I have

12 defined them for you.

13           Talk a little more about infringement.

14           LaserDynamics asserts that Defendant

15 indirectly infringes Claim 3 of the '981 patent by

16 contributing to or inducing direct infringement of the

17 patent.

18           Now, in order to prove indirect

19 infringement, LaserDynamics must first prove, by a

20 preponderance of the evidence, direct infringement by a

21 third party's use of the accused optical disk drives

22 within the United States.

23           In order to directly infringe a patent

24 claim, a product or method must include each and every

25 limitation of the claim.

1            In determining whether the Defendant

2    infringes LaserDynamics' asserted claim, you must

3    determine for each accused product or method of use

4    whether that product or its method of use contains each

5    and every limitation recited in the asserted claim.

6            A claim limitation is present if it

7    exists in the accused product or its method of use just

8    as it is described in the claim language either as I

9    have explained that language to you, or if I did not

10   explain it, as it would be understood by one of skill in

11   the art.

12           If such product or their methods of use

13   omit even a single limitation, then you must find that

14   the claim is not infringed.

15           If you find that each and every

16   limitation of a patent claim is found in the accused

17   products or their methods of use, then the claim is

18   infringed, even if the accused products or their methods

19   of use may be more or less efficient or may include

20   additional features or functions not found in the

21   claims.

22           With respect to inducing patent

23   infringement, LaserDynamics asserts that the Defendant

24   has induced infringement of the '981 patent.

25           Now, to show inducement, the Plaintiff

1  must prove, by a preponderance of the evidence, that

2  someone has directly infringed the patent.  If there is

3  no direct infringement by anyone, the Defendant has not

4  induced infringement.

5          If you find that someone has directly

6  infringed the asserted claims of the '981 patent,

7  Defendant has induced infringement if the Plaintiff

8  proves, by a preponderance of the evidence, that the

9  Defendant actively and knowingly aided and abetted that

10 direct infringement.

11         The Plaintiff must show that the

12 Defendant actually intended to cause the acts that

13 constituted direct infringement and that the Defendant

14 knew or should have known that its actions would induce

15 actual infringement.

16         The Defendant also cannot be liable for

17 inducing infringement if they had no reason to be aware

18 of the existence of the patent.

19         If you find that someone has directly

20 infringed the asserted claim of the '981 patent and the

21 Defendant knew or should have known that their actions

22 would induce direct infringement, you may find that the

23 Defendant induced another to infringe the Plaintiff's

24 patent if they provided instructions and directions to

25 perform the infringing act through labels, advertising,

1    or other sales methods.

2              You may also find that the Defendant

3    induced infringement by supplying the components that

4    are used in an infringing apparatus with the knowledge

5    and the intent that their customer would directly

6    infringe by using the components to make, use, or sell

7    the patented invention.

8              With respect to contributory

9    infringement, LaserDynamics also asserts that the

10   Defendant is liable for contributory infringement of the

11   '981 patent.

12             LaserDynamics has the burden to prove

13   contributory infringement by a preponderance of the

14   evidence.  To establish contributory infringement by the

15   Defendant, LaserDynamics must first show that someone

16   directly infringed one of the asserted claims of the

17   '981 patent.

18             However, the Plaintiff does not need to

19   prove that the Defendant itself directly infringed.  If

20   there is no direct infringement by anyone, there can be

21   no contributory infringement.

22             Now, if you find that someone has

23   directly infringed the patent, then contributory

24   infringement exists if the Plaintiff proves that:

25             Number (1) the Defendant sold, supplied

1  in the United States, or imported into the United

2  States;

3  Number (2) a material component of the

4  patented invention that is not a staple article of

5  commerce capable of substantial non-infringing use;

6  And (3) with the knowledge that the

7  component was especially made or adopted for use in

8  an infringe -- in an infringing product.

9  Now, the term a staple article of

10  commerce capable of substantial non-infringing use is

11  something that has uses other than that -- than as a

12  part or component of the patented product and that

13  those other uses are not occasional, farfetched,

14  impractical, experimental, or hypothetical.

15  With respect to willful infringement,

16  LaserDynamics claims that the Defendant infringed its

17  '981 patent willfully.

18  Although you must determine whether the

19  Defendants' infringement was willful, this determination

20  will not affect the amount of damages, if any, that you

21  assess.  The purpose of your determination is to assist

22  the Court in making decisions that it will have to make.

23  Now, LaserDynamics must prove willfulness

24  by clear and convincing evidence.

25  Clear and convincing evidence is a more

1  exacting standard than proof by a preponderance of the

2  evidence, which only requires that the party's claim be

3  more likely true than not true.

4           Nevertheless, the clear and convincing

5  standard is not as high as the burden of proof applied

6  in a criminal case, which is beyond a reasonable doubt.

7           To prove willful infringement,

8  LaserDynamics must prove that it is highly probable that

9  the Defendant acted with reckless disregard of Claim 3

10 of LaserDynamics' '981 patent.

11          Now, to demonstrate reckless disregard,

12 LaserDynamics must satisfy a two-part test.  The first

13 concerns Defendants' conduct.  The second concerns

14 Defendants' state of mind.

15          The first part of the test is objective.

16 LaserDynamics must prove that the Defendant acted

17 despite an objectively high likelihood that its actions

18 constituted infringement of a patent.

19          The state of mind of the Defendant is not

20 relevant to this inquiry.  You should focus on whether a

21 reasonable person in the position of the Defendant,

22 after learning of the patent, could have reasonably

23 believed that it did not infringe or that the patent was

24 invalid.

25          If a reasonable person in the position of

1 the Defendant could not have held such belief, then you

2 need to consider the second part of the test.

3              Now, the second part of the test looks to

4 the Defendants' state of mind.  If you find that the

5 Defendant proceeded in the face of an unjustifiably high

6 risk, then you must determine whether that risk was

7 known or obvious to the Defendant.

8              LaserDynamics must prove that the

9 Defendant actually knew or it was so obvious that the

10 Defendant should have known that its actions constituted

11 infringement of a valid patent.

12              Now, in deciding whether the Defendant

13 satisfied the second part of the test, you should

14 consider all of the facts surrounding the alleged

15 infringement, including but not limited to the

16 following:

17              (1) whether the Defendant, when it

18 learned of the patent, investigated the scope of the

19 patent and formed a good-faith belief that the patent

20 was not infringed before the Defendant started or

21 continued any possible infringing activity;

22              (2) whether the Defendant had a

23 substantial defense to liability and reasonably believed

24 that the defense would be successful, if litigated;

25              (3) whether the Defendant tried to cover

1   up its infringement;

2                   (4) whether the Defendant copied --

3   copied the patented product;

4                   And (5) whether the Defendant acted in a

5   manner consistent with the standards of commerce of its

6   industry.

7                   Now, none of these factors is

8   determinative, and the list of factors is not an

9   exhaustive list of things you should consider.

10                   Your determination of willfulness should

11  incorporate the totality of the circumstances.

12                   Now I want to talk to you about validity.

13                   Quanta claims that LaserDynamics' '981

14  patent is not valid.  A patent issued by the United

15  States Patent Office is presumed to be valid.

16                   In order to rebut this presumption, the

17  Defendant must establish, by clear and convincing

18  evidence, that the Plaintiff's patent or any claim in

19  the patent is not valid.

20                   As I have instructed you earlier, clear

21  and convincing evidence is a more exacting standard of

22  proof than proof by preponderance of the evidence, which

23  only requires that the party's claim be more likely true

24  than not true.

25                   Nevertheless, the clear and convincing

1  standard is not as high as the burden of proof applied

2  in a criminal case, which is beyond a reasonable doubt.

3              The Defendant contends that the asserted

4  claim is invalid because it fails to meet the enablement

5  requirement necessary for patentability.

6              If you find, by clear and convincing

7  evidence, that Claim 3 of the '981 patent is not

8  enabled, then you should find the claim invalid and

9  render a verdict for Quanta.

10             Now I want to give you some -- a little

11  more understanding or law about enablement.

12             Quanta contends that the asserted claim

13  is not enabled.  The written description set forth in a

14  patent must disclose sufficient information to enable

15  one skilled in the field of the invention to make and

16  use the claimed invention.

17             The full scope of the claimed invention

18  must be enabled employ.  This requirement is known as

19  the enablement requirement.  If a patent claim is not

20  enabled, it is invalid.

21             In considering whether the written

22  description of a patent satisfies the enablement

23  requirement, you must keep in mind that patents are

24  written for persons of skill in the field of the

25  invention.

1              Thus, a patent need not expressly state

2    information that skilled persons would be likely to know

3    or could obtain.

4              The Defendant bears the burden of

5    establishing lack of enablement by clear and convincing

6    evidence.

7              A written description is enabling so long

8    as undue experimentation is not needed to make or use

9    the invention.  The fact that some experimentation may

10   be required for a skilled person to make or use the

11   claimed invention does not mean that a patent's written

12   description fails to meet the enablement requirement.

13             Factors that you may consider in

14   determining whether the written description would

15   require undue experimentation include:

16             (1) the quantity of experimentation

17   necessary;

18             (2) the amount of direction or guidance

19   disclosed in the patent;

20             (3) the presence or absence of working

21   experts in the patent;

22             (4) the nature of the invention;

23             (5) the state of the prior art;

24             (6) the relative skill of those in the

25   art;

1     (7) the predictability of the art;

2     And (8) the breadth of the claims.

3     If you find that the Defendant has

4 proved, by the clear and convincing standard, that the

5 asserted patent claim is not enabled, then you must find

6 the claim invalid and render a verdict for the

7 Defendant.

8     With respect to damages and a reasonable

9 royalty, I'm now going to talk to you and instruct you

10 as to the calculation of the damages should you find

11 that the Plaintiff has met its burden of proof on

12 infringement and Defendant has failed to meet its burden

13 to show that the asserted claim is invalid.

14     If you find that Claim 3 is infringed and

15 not invalid, then you should consider the amount of

16 money LaserDynamics should receive as damages.

17     LaserDynamics has the burden of proving

18 by a preponderance of the evidence the amount of damage

19 caused by the Defendants' conduct.

20     The owner of a patent is entitled an

21 award of damages adequate to compensate for the

22 infringement, but in no event less than a reasonable

23 royalty for the use the Defendant made of the invention.

24     LaserDynamics is asking for damages in

25 the amount of a reasonable royalty.  Now, generally, a

1   reasonable royalty is defined by the patent laws as a

2   reasonable amount that someone wanting to use the

3   patented invention should expect to pay to the patent

4   owner and the owner should expect to receive.

5               A royalty is the amount of money a

6   licensee pays to a patent owner for each article the

7   licensee makes or uses, sells, or offers to sell under

8   the patent or for the right to use the claimed method.

9               A reasonable royalty is the amount of

10  money that a willing patent owner and a willing

11  prospective licensee would have agreed upon at the time

12  of the infringement for a license to make, use, sell, or

13  offer to sell the invention.

14              In making your determination of the

15  amount of a reasonable royalty, it is important that you

16  focus on the time period when the infringer first

17  infringed the patent and the facts that existed at that

18  time.

19              Your determination does not depend on the

20  actual willful -- willingness of the parties of this

21  lawsuit to engage in such negotiation.  Your focus

22  should be on what the parties' expectations would have

23  been had they entered negotiations for royalties at the

24  time of the infringing activity.

25              It is the royalty that would have

1 resulted from an arm's-length negotiation between a

2 willing licensor and a willing licensee, assuming that

3 both parties believe the patent -- patent claim in

4 question to be valid and infringed.

5              Now, in determining the reasonable

6 royalty, you should consider all the facts known and

7 available to the parties on August 31st, 2006, the date

8 of the hypothetical negotiation.

9              Now, some of the kinds of factors that

10 you may consider in making your determination are:

11              (1) whether the patent holder had an

12 established royalty for the invention; in the absence of

13 such a licensing history, any royalty arrangements that

14 were generally used and recognized in the particular

15 industry at that time;

16              (2) the nature of the commercial

17 relationship between the patent owner and the licensee,

18 such as whether they were competitors or whether the

19 relationship was that of an inventor and a promotor;

20              (3) the established profitability of the

21 patented product, its commercial success, and its

22 popularity at the time;

23              (4) whether the patent owner had an

24 established policy of granting licenses or retaining the

25 patented invention as its exclusive right or whether the

1   patent holder had a policy of granting licenses under

2   special conditions designed to preserve his monopoly;

3               (5) the size of the anticipated market

4   for the invention at the time the infringement began;

5               (6) the duration of the patent and of the

6   license, as well as the term and scope of the license,

7   such as whether it is exclusive or nonexclusive or

8   subject to territorial restrictions;

9               (7) the rates paid by the licensee for

10  the use of the other patents comparable to

11  LaserDynamics' patent;

12              (8) whether the licensee's sales of the

13  patented invention promote sales of its other products

14  and whether the invention generates sales to the

15  inventor or his -- on his -- of his nonpatented items;

16              (9) the utility and advantages of the

17  patent property over the old modes or devices, if any,

18  that had been used for working out similar results;

19              (10) the extent to which the infringer

20  used the invention and any evidence probative of the

21  value of such use;

22              (11) the portion of the profits in the

23  particular business that are customarily attributable to

24  the use of the invention or analogous inventions;

25              (12) the portion of the profits that

should be credited to the invention as distinguished
from nonpatented elements, the manufacturing process,
business risks, or significant features or improvements
added by the infringer;

(13) the opinion and testimony of
qualified experts and of the patent holder;

(14) any other factors which, in your
mind, would have increased or decreased the royalty the
infringer would have been willing to pay and the patent
owner would have been willing to accept, acting as
normally prudent business people; that is, the amount
which a prudent licensee, who desired, as a business
proposition, to obtain a license to manufacture and sell
a particular article embodying the patented invention,
would have been willing to pay as a royalty and yet be
able to make a reasonable profit and which would have
been acceptable by a prudent patentee who was willing to
grant a license.

You must not award LaserDynamics more
damages than are adequate to compensate for the
infringement nor shall you include any additional amount
for the purpose of punishing the Defendant or setting an
example.

You may not include damages that are
speculative, damages that are only possible, or damages

1    that are based on guesswork.

2              Now, nothing that I have -- may have said

3    or done during the course of this trial is intended to

4    indicate any view of mine as to which party should or

5    should not win this case.

6              As I have instructed you previously, the

7    jury is the sole judge of the credibility of the

8    testimony and the weight to be given the evidence.

9              Now, these instructions are given to you

10   as a whole.  You are not to single out one instruction

11   alone as stating the law, but you must consider the

12   instructions as a whole.

13             You have heard all the evidence in the

14   case.  You have heard the argument of counsel.  The

15   Court has given you the charge on the law in this case.

16             In just a few moments, you will retire to

17   the jury room, select one of your members to act as

18   foreperson, and begin performing the function for which

19   you have been chosen, for which you have been empaneled,

20   in accordance with the oath that you took as jurors.

21             You will remember that at the beginning

22   of the trial and throughout this trial, the Court has

23   admonished you not to discuss the case with each other

24   until it was submitted to you.

25             Well, now is the time to begin your

1  discussion, and you certainly may express any opinion

2  from the evidence that you have heard and use any

3  reasonable means to persuade other members of the jury

4  to your conviction and to your honest opinion.

5           You are to reach a verdict that speaks

6  the truth and which does justice to all parties without

7  favor, bias, or prejudice in any particular way, either

8  for or against any party to this lawsuit.

9           In the course of your deliberations, do

10  not hesitate to re-examine your own views and change

11  your opinion, if convinced it is erroneous, but do not

12  surrender your honest conviction as to the weight or

13  effect of the evidence solely because of the opinion of

14  your fellow jurors or for the mere purpose of reaching a

15  verdict.

16           The verdict must represent the considered

17  judgment of each juror.  In order to return a verdict,

18  it is necessary that each juror agree thereto.  Your

19  verdict must be unanimous.

20           As soon as you have reached a verdict,

21  you will let this fact be known to the officer who will

22  be assist -- waiting upon you, and he will report to the

23  Court.

24           Mr. McAteer, are you staying with us?

25           COURT SECURITY OFFICER:  Yes, sir.

1              THE COURT:  All right.  Mr. Pete McAteer.

2   Your verdict will be in the form of questions which you

3   are to answer.  You will take these questions to the

4   jury room.  When you have decided and reached a

5   unanimous verdict as to -- or unanimous agreement as to

6   your verdict, you will have your foreperson fill in and

7   sign and date the form and then advise the -- Mr.

8   McAteer, your security officer, that you have reached a

9   verdict.

10             Now, during your deliberations, you may

11  have any exhibits which have been offered into evidence,

12  and the Court will send them to you upon written

13  request.  If you desire further instructions, your

14  foreperson may make this known in writing, and the Court

15  will try to comply with your wishes.

16             All communications with the Court must be

17  in writing, but at no time should you indicate to the

18  Court or to anyone else how the jury is divided in

19  answering any particular question.

20             Now, any notes that you have taken during

21  this trial are only aids to your memory.  If your memory

22  should differ from your notes, then you should rely on

23  your memory and not on the notes.  The notes are not

24  evidence.

25             A juror who is not taking notes should

1  rely on his or her independent recollection of the

2  evidence and should not be unduly influenced by the

3  notes of other jurors.  Notes are not entitled to any

4  greater weight than the recollection or impression of

5  each juror concerning the testimony.

6                 Mr. McAteer, if you'll come forward.

7                 One other thing, Ladies and Gentlemen.

8  You are now in charge of your breaks.  You take --

9  whenever you want to take a break, whenever you want to

10 go to lunch.

11                I think you've figured out I go to lunch

12 usually around 12:00 o'clock.  So if you want to

13 communicate with me, I probably won't be here between

14 12:00 and about 12:45.

15                At this time, you may follow Mr. McAteer

16 into the jury room.

17                (Jury out.)

18                THE COURT:  Please be seated.

19                Anything from the Plaintiff?

20                MR. SANKEY:  Nothing from the Plaintiff,

21 Your Honor.

22                THE COURT:  Anything from the Defendant?

23                MR. PARKER:  Nothing, Your Honor.

24                THE COURT:  Okay.  All right.  Now, one

25 thing, I've got -- started some other hearing, and I

1    don't know what -- there is a scheduling conference this

2    afternoon after 1:00 o'clock -- or around 1:00, but I

3    would recommend to you that you keep available any of

4    your -- on the computer and stay hooked up to show any

5    demonstrative exhibits.

6            So you'll know, this Court's practice is,

7    and it's been the practice -- I can -- personal

8    experience, since 1970, since it's the first time it

9    happened to me, was, the jury asked for a demonstrative

10   exhibit.  I don't send it back.

11           However, I will allow them to come into

12   the courtroom, sit in the jury box, and view it until

13   such time as they're ready -- they indicate they're --

14   that happens a lot in these types of cases, so I just --

15   for your -- I just wanted you to know that.

16           If there's nothing further, we'll be in

17   recess pending the receipt of the verdict.

18           Thank you.

19           (Recess.)

20           (Jury out.)

21           COURT SECURITY OFFICER:   All rise.

22           THE COURT:  Please be seated.

23           All right.  We've got a note that -- need

24   QCI financial statements shown, need Exhibit No. 1175,

25   need units of -- no -- number of units, parenthetical,

1   computer sold by QCI, 2006, 2008.  Need easel board.

2   Need calculator.

3           Now, the Court can provide a calculator,

4   and we'll get the easel.  We may have to get a clean

5   pad, Mr. McAteer.  We'll use that easel, I guess, or is

6   that one of the parties' easels?

7           We just need -- we'll get that in there.

8           Now, do the financial -- y'all know what

9   exhibit that was?

10           MR. SANKEY:  We will locate that.

11           THE COURT:  See if y'all can agree on

12   that.  1175, they don't say whether it's Plaintiff's or

13   Defendants'.

14           MR. SANKEY:  I believe that that was the

15   one referenced in my closing.

16           THE COURT:  That's what I thought.

17           MR. SANKEY:  Defendants'.

18           MR. LUCK:  Judge, I believe the last

19   thing they're asking for is actually a demonstrative.

20           THE COURT:  Well, that's what -- that's

21   my recollection, and -- but I was trying to get

22   everything down to what we could agree upon, and then

23   we'll...

24           And this is signed by the Foreperson of

25   the Jury, Julio Ramos, Juror No. 4.

```
 1                    Is 1175 a demonstrative?

 2                    MR. SANKEY:  I believe it is a

 3    demonstrative, one of Mr. Davis' exhibits that he did

 4    his report on.

 5                    THE COURT:  Let's see.  Exhibit -- what

 6    is 1175, so I can see it?  It's a demonstrative?

 7                    MR. SANKEY:  Yes, sir.  It's just one

 8    page.  That's the one I mentioned, the top four show the

 9    E-drives and zero sales, and then it shows all the sales

10    for all the drives in 2006/2007.

11                    THE COURT:  Okay.  And wasn't there a

12    demonstrative that showed the number of actual

13    computers -- units?

14                    MR. SANKEY:  Yes, sir.

15                    THE COURT:  Did you get the calculator?

16                    COURT SECURITY OFFICER:  Yes, sir.

17                    THE COURT:  Take it in?

18                    COURT SECURITY OFFICER:  Yes, sir.

19                    THE COURT:  What about the exhibit with

20    the financial statements?

21                    MR. SANKEY:  That's the last one that

22    we're trying to locate.

23                    MR. LUCK:  Your Honor, was that a QSI

24    financial statement?

25                    THE COURT:  QCI financial statements
```

1  shown.  There was a Davis responsive exhibit that showed

2  the number of units.

3              MR. SANKEY:  That -- we have that.

4              THE COURT:  Well, I'm hearing Mr. Parker

5  say that this was one that was before that some things

6  are taken out of the case.  Y'all must have revised it

7  from what was shown in here.

8              MR. RAMBIN:  No, Your Honor.

9              MR. SANKEY:  This one shows both the

10  2 percent for QCI and the 6 percent for QSI, but it does

11  show the units just related to QCI.  They're broken out.

12             THE COURT:  Well, I know, but Davis

13  didn't testify to anything about QSI.

14             MR. SANKEY:  Show -- that was not QSI.

15  Those are direct and indirect sales by QCI.

16             THE COURT:  Is there a dispute about

17  whether this exhibit was shown or not?

18             I'm showing a QCI royalty base.

19             MR. PARKER:  I believe that that was

20  shown, Your Honor.

21             THE COURT:  Well, I heard you saying it

22  had things in it --

23             MR. PARKER:  I thought it still had it.

24  As I looked at it, Your Honor, I thought it still had

25  some of the 6-percent calculations on it, which are out.

```
 1                    MR. RAMBIN:  Your Honor, I believe
 2   Mr. Davis' testimony was there was about $15,000 total
 3   worth of royalty stand-alone or replacement QCI drives
 4   that were sold.  And he and Mr. Murtha both -- Mr. Reed
 5   both just glossed over it, because it was a relatively
 6   trivial figure.
 7                    THE COURT:  Well, you -- there's no
 8   dispute that this exhibit was shown, QCI royalty base?
 9                    MR. PARKER:  It was, yes, sir.
10                    THE COURT:   Okay.  Any dispute about
11   this 275?
12                    MR. PARKER:  No, sir.
13                    THE COURT:  I mean, 1175?  Excuse me.
14                    MR. PARKER:  It was shown.
15                    THE COURT:  All right.  Now, where are we
16   on the --
17                    MR. SANKEY:  This one we have -- we're
18   going to get together everything, but because it appears
19   that they want the financial statement shown, there were
20   basically four.  There were the three that I showed
21   where QCI says we control QSI, and there was one that
22   Mr. Davis had as a demonstrative that showed their --
23   their financial statement summaries.
24                    THE COURT:  Well, I don't --
25                    MR. SANKEY:  That was shown, also.
```

```
 1                    THE COURT:  Shown means to me it was a
 2   demonstrative exhibit.
 3                    Do you disagree with that,
 4                    Mr. Parker?
 5                    MR. PARKER:  Correct.
 6                    THE COURT:  Somebody showed a financial
 7   statement showing what the margins of profit were.  This
 8   was shown to the jury in Mr. Davis' representation,
 9   correct?
10                    MR. SANKEY:  Correct.
11                    MR. LUCK:  Yes, sir, it was.
12                    MR. PARKER:  Yes, sir.
13                    THE COURT:  I believe what they're asking
14   for, then, is all demonstrative exhibits.
15                    MR. SANKEY:  Correct.
16                    THE COURT:  I mean, these three, at
17   least.
18                    MR. SANKEY:  Yes, sir.
19                    THE COURT:  Mr. Parker, you got anything
20   you think is responsive?
21                    MR. PARKER:  No, sir.
22                    THE COURT:  You agree these are three
23   that describe --
24                    MR. PARKER:  I believe that's what
25   they're asking for.
```

 1                    THE COURT:  Okay.  All right.  Let's

 2    bring them in.  Let's have a seat.

 3                    Here, who's going to -- let's see.  Why

 4    don't you, Mr. Smith, put those on the -- turn on the

 5    ELMO.

 6                    Well, let's just -- let's make sure we

 7    got it.  Take them -- Mr. Smith, I don't want to have

 8    anything on when they come in.  I want to talk to them

 9    first, okay?

10                    MR. SMITH:  Okay.

11                    THE COURT:  The first one is financial

12    statements as shown.  That's D9, I believe.  And that

13    one you had -- yeah -- yes, that's the first one.  And

14    then the -- that one you showed is last.  There's three.

15                    MR. SMITH:  Yes, sir.

16                    THE COURT:  Those three.  Okay.

17                    MR. SANKEY:  Your Honor, if I could

18    inquire, would the Court publish those for the jury?

19    Because I can tell you from here, you can't read any of

20    the numbers.

21                    THE COURT:  That's what -- these were

22    shown.  No, I don't ordinarily publish them.

23                    You mean pass them around?

24                    MR. SANKEY:  Yes, sir.

25                    THE COURT:  What's the Defendants'

1  position?

2                    MR. PARKER:  I don't have an objection to

3  that, Your Honor.

4                    THE COURT:  Okay.  Well, do you agree

5  they're not -- can't -- I just -- I'm not going to allow

6  them to go back in the jury room.

7                    MR. PARKER:  No, sir, I would object to

8  that.

9                    THE COURT:  Yeah.  Let's bring them in.

10                    I'll tell them they're so small I can't

11  see them.  We'll pass them around; is that alright?

12                    MR. PARKER:  Yes, sir.

13                    THE COURT:  Is that okay with the

14  Plaintiff?

15                    MR. SANKEY:  Yes, sir.

16                    (Jury in.)

17                    THE COURT:  Everyone please be seated.

18                    Now, Mr. Ramos, I received your note,

19  and, of course, I sent into you an easel and a

20  calculator.

21                    There are three exhibits that we believe

22  that you have requested.  All three were demonstrative

23  exhibits and were not actually introduced into evidence,

24  even though they were placed on the screen.  Therefore,

25  I -- as a matter of law, I don't -- it wasn't actually

1  admitted into evidence, even though you saw the figures.

2            Now then, we have examined those among

3  ourselves and are in agreement the print is so small

4  that you can't see those when we put them up on the

5  screen.  So what we're going to do, there are three --

6  Mr. Smith, my law clerk, is going to hand them to

7  Mr. McAteer.

8            You may take them, look at them, make

9  whatever notes you wish to make, but we can't -- no one

10 is going to be able to talk to you about it, and -- and

11 there shouldn't be any conversation among yourselves

12 here.

13            Just make whatever notes you wish to

14 make, and let me know when you're through.  And then

15 I'll let you return to the jury room without those

16 exhibits.  Take your time -- whatever time you need.

17 With this writing, we might need to get our glasses.

18            (Pause in the proceedings.)

19            THE COURT:  All right.  Ladies and

20 Gentlemen, I'm going to ask you to return and continue

21 deliberations in accordance with all of my instructions.

22            Mr. Ramos, I acknowledge I've received

23 another note.  I'll see if I can comply with your

24 request.

25            If y'all will return to the jury room at

 1  this time.  Continue to deliberate according to all the

 2  instructions.

 3              (Jury out.)

 4              THE COURT:  Be seated, please.

 5              While they were looking at those

 6  demonstrative exhibits, I received another note from the

 7  Foreperson:  Can we see Plaintiff's exhibit showing

 8  number of DVD, slash, CD shown from 2000 to 2008,

 9  parenthetical, Sankey in his closing argument, signed

10  by -- that was the report?

11              MR. SANKEY:  TSR report.

12              THE COURT:  Okay.  You agree with that,

13  Mr. Parker?

14              MR. PARKER:  I do, but, again, that's a

15  demonstrative.

16              THE COURT:  No, that report was

17  introduced into evidence, wasn't it?

18              MR. PARKER:  Was it?

19              THE COURT:  The entire report was.

20              MR. LUCK:   I don't believe it was

21  introduced into evidence.

22              MR. PARKER:  I don't think so.

23              MR. LUCK:  Demonstrative only, Your

24  Honor.

25              THE COURT:  Okay.  I thought it was --

1                    MR. PARKER:  No, sir.

2                    THE COURT:  Well, I'm just wrong.

3                    MR. PARKER:  In fact, it was -- there was

4    a ruling on that by Judge Everingham at pretrial that

5    the expert could rely on it, but it could not come in as

6    primary evidence.

7                    THE COURT:  All right.  Well, we'll bring

8    them back in and see this demonstrative.

9                    Do y'all think this is something they can

10   see on the screen?

11                   MR. SANKEY:  I don't think so.  The 400

12   on the left and 53 million for 2006, and it's hard to

13   read holding it where Your Honor is holding it.

14                   THE COURT:  I'll agree with that.  I'll

15   allow it to be published to the jury.

16                   Any disagreement with that?

17                   MR. PARKER:  No, sir.

18                   THE COURT:  Bring them back in.

19                   (Jury in.)

20                   THE COURT:  Everyone please be seated.

21                   I received your request, Mr. Ramos.

22                   Likewise, the exhibit you requested was a

23   demonstrative exhibit, and because of the size of the

24   print, I'm going to allow this to be published to the

25   jury because it wouldn't do any good to put it on the

```
 1   ELMO.

 2                  Mr. McAteer.

 3                  As previously in our other one, you can

 4   look at it as long as you feel like you need to.

 5                  (Pause in the proceedings.)

 6                  THE COURT:  All right.  Ladies and

 7   Gentlemen, at this time, I'd request you return to the

 8   jury room and continue deliberating in accordance with

 9   all my previous instructions.

10                  (Jury out.)

11                  THE COURT:  Anything from the Plaintiff

12   at this time?

13                  MR. SANKEY:  Nothing from the Plaintiff.

14                  THE COURT:  Defendant?

15                  MR. PARKER:  Nothing, Your Honor.

16                  THE COURT:   I suggest that we -- these

17   copies of the exhibits that have been published to the

18   jury, I'm going to -- Ms. Dupree, I'm going to -- if you

19   need to make another copy for your files, that's fine,

20   but I'm going to ask that they be marked, for the

21   record, just so the record will be complete, as Court's

22   Exhibit 1 through 4 that were shown to the jury in open

23   court during deliberations.

24                  Any objection to that from the Plaintiff?

25                  MR. SANKEY:  No objection.
```

```
 1                    MR. PARKER:  No objection.

 2                    THE COURT:  Okay.  Thank you.  We're in

 3  recess.

 4                    COURT SECURITY OFFICER:  All rise.

 5                    (Recess.)

 6                    (Jury out.)

 7                    COURT SECURITY OFFICER:  All rise.

 8                    THE COURT:  Please be seated.  All right.

 9                    This is Jury Question No. 3, I believe,

10  Jury Note No. 3.

11                    Question:  Are we deciding the dollar for

12  a one-time lump sum or a lump -- one-time lump sum that

13  will set precedent for the future -- for future sales?

14                    Signed by the foreman.

15                    Here's the response the Court proposed.

16  If you have an objection, I want to hear it.

17                    Please answer the question in accordance

18  with all of my prior instructions based upon all of the

19  evidence in the case.  If you desire a repeat of any

20  instructions on the question of damages, you may request

21  that of the Court.

22                    Objection from the plaintiff?

23                    MR. SANKEY:  No objection.

24                    THE COURT:  From the defendant?

25                    MR. PARKER:  No objection.
```

```
 1                    THE COURT:  All right.  We're in recess
 2   pending further communication.
 3                    COURT SECURITY OFFICER:  All rise.
 4                    (Recess.)
 5                    (Jury in.)
 6                    COURT SECURITY OFFICER:  All rise.
 7                    THE COURT:  Please be seated.
 8                    Mr. Ramos, have we reached a verdict?
 9                    JURY FOREPERSON:  Yes.
10                    THE COURT:  All right.  If you'd hand it
11   to Mr. McAteer.
12                    (Complies.)
13                    THE COURT:  All right.  Ladies and
14   Gentlemen, I'm going to read in sort of shorthand
15   fashion the answers to the questions.  Listen carefully
16   because I'll ask, so that we'll have a record here in
17   Court, that you confirmed your verdict as being
18   unanimous.
19                    Question No. 1 is answered yes to all
20   products that were accused.
21                    Question No. 2 was answered no.
22                    Question No. 3 is answered yes.
23                    Question No. 4 is 52 million dollars, and
24   signed by Julio Ramos.
25                    If this represents your verdict, please
```

1  stand at this time.

2              (Jurors comply.)

3              THE COURT:  All right.  Thank you.

4              Please be seated.

5              For the record, show that it was

6  unanimous, that all jurors stood confirming their

7  verdict.

8              Ladies and Gentlemen, at this time, we're

9  going to be releasing you with a sincere thanks of the

10 Court for doing your -- what I consider a very high

11 calling of ordinary citizens to preserve, protect, and

12 defend the constitution, particularly the 7th Amendment.

13             I have told you throughout this trial not

14 to talk to anybody about this.  Now, then, I am

15 reversing that instruction and telling you to talk to

16 anybody you want to, but it's up to you whether you talk

17 to anybody or not.

18             The rules in this district, at least

19 since 1968 when I started practicing here, have been

20 that the lawyers are prohibited from contacting you

21 concerning your verdict or talking to you.  However, let

22 me assure you, if you see one after you leave the

23 courtroom and you have any desire to say anything to one

24 of them, if you indicate, I got something to say, well,

25 they'll be glad to listen to you.  That's what I'm

1  trying to emphasize to you, it's strictly up to you.

2              But -- so with that final instruction, I

3  know it's -- we came back over the weekend.  It was our

4  July 4th weekend celebrating the birth of our country,

5  so y'all sort of worked as ordinary citizens before and

6  after that weekend, and I appreciate your service.  The

7  people that are involved appreciate your service, but

8  I'm going to dismiss you at this time, again, with the

9  sincere thanks of the Court.

10              You may leave the Court.  Thank you.

11              (Jury out.)

12              THE COURT:  Please be seated.

13              Anything from the Plaintiff?

14              MR. SANKEY:  Nothing further from the

15  Plaintiff.

16              THE COURT:  All right.  Anything from the

17  Defendant?

18              MR. PARKER:  Nothing at this time, Your

19  Honor.

20              THE COURT:  All right.  All right.  Court

21  stands in recess.  Thank you very much.

22              COURT SECURITY OFFICER:  All rise.

23              (Court adjourned.)

24              *       *       *       *       *

25

```
 1
 2                        CERTIFICATION
 3
 4           I HEREBY CERTIFY that the foregoing is a
 5  true and correct transcript from the stenographic notes
 6  of the proceedings in the above-entitled matter to the
 7  best of my ability.
 8
 9
10
11  /s/_____          _____
    SUSAN SIMMONS, CSR                  Date
12  Official Court Reporter
    State of Texas No.:  267
13  Expiration Date:  12/31/10
14
15
16  /s/_____              _____
    JUDITH WERLINGER, CSR               Date
17  Deputy Official Court Reporter
    State of Texas No.:  731
18  Expiration Date:  12/31/10
19
20  /s/_____              _____
    SHELLY HOLMES                       Date
21  Deputy Official Court Reporter
    State of Texas No.:  7804
22  Expiration Date:  12/31/10
23
24
25
```